UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| GREGORY A. STEVENSON, as a shareholder of CREDIT SUISSE GROUP AG and on behalf of CREDIT SUISSE GROUP AG shareholders,<br><br>Plaintiff,<br><br>vs.<br><br>RICHARD E. THORNBURGH, BRADLEY W. DOUGAN, JOHN G. POPP, BRIAN CHIN, JAY KIM, ALBERT SOHN, MIRKO BIANCHI, URS ROHNER, JOHN TINER, SEVERIN SCHWAN, IRIS BOHNET, LYDIE HUDSON, KAIKHUSHRU S. NARGOLWALA, SERAINA MACIA, JOAQUIN J. RIBEIRO, MICHAEL KLEIN, NOREEN DOYLE, JAMES L. AMINE, ERIC VARVEL, ROMEO CERUTTI, DAVID L. MILLER, DAVID R. MATHERS, LARA J. WARNER, TIMOTHY P. O'HARA, ROBERT S. SHAFIR, PAMELA A. THOMAS-GRAHAM, SEAN T. BRADY, ROBERT JAIN, PHILIP VASAN, CREDIT SUISSE HOLDINGS (USA) INC., CREDIT SUISSE SECURITIES (USA) LLC, CREDIT SUISSE CAPITAL LLC, CREDIT SUISSE MANAGEMENT LLC, KPMG LLP, KPMG LLC, PAUL KNOPP, WILLIAM THOMAS, LARRY BRADLEY, LAURA M. NEWINSKI, REGINA H. MAYOR, JOHN B. VEIHMEYER, BRIAN J. SWEET, DAVID BRITT, SCOTT MARCELLO, DAVID MIDDENDORF, THOMAS WHITTLE, CYNTHIA HOLDER, and JEFFREY WADA,<br><br>Defendants. | Case No. 23 Civ. _____<br><br>**Class Action Complaint Asserting Direct Claims on Behalf of Credit Suisse Group AG Shareholders Under 18 U.S.C. §§ 1961–1968, New York Business Corporation Law § 720, New York Common Law, and Swiss Code of Obligations §§ 754–755 Seeking Damages and Equitable Relief**<br><br>**Demand for Jury Trial** |

© Copyrighted 2023 by Michelle Ciccarelli Lerach and MCL Law Group APC

## TABLE OF CONTENTS

I.      INTRODUCTION ...................................................................................1

II.     OVERVIEW OF ALLEGATIONS................................................... 3

        A.      The March 2023 Collapse of Credit Suisse .......................................3

        B.      The Complicity of KPMG — Credit Suisse's Statutory
                Auditor ............................................................................................6

        C.      Damage to Credit Suisse's Common Shareholders............................7

        D.      The Destruction of Credit Suisse and Misuse, Waste
                and Loss of Its Assets to Enrich Defendants.................................. 11

        E.      The Mismanagement and Control Failures at Credit
                Suisse and the Resulting Damage and Loss to Credit
                Suisse Common Shareholders............................................................16

        F.      The Applicable New York, Federal and Swiss Statutes.................. 21

III.    SUMMARY OF CREDIT SUISSE'S NEW YORK OPERATIONS'
        "BRAZEN/SYSTEMATIC AND PERVASIVE" MISCONDUCT
        AND "STUNNING SCALE" OF THEIR ILLEGAL AND
        RECKLESS ACTIVITIES ............................................................. 23

        A.      Credit Suisse's New York Operations..............................................23

                1.      The Wealth Management Operations ...................................27

                2.      The Investment Banking Operations ....................................33

        B.      The Unceasing Mismanagement at Credit Suisse and
                the Continuing Course of Misconduct and Conspiracy
                Resulting in Constant Scandals and Damaging Credit
                Suisse Common Shareholders............................................................ 36

                1.      Greensill Scandal................................................................. 36

                2.      Archegos Scandal................................................................. 38

                3.      Tuna Boat/Bond Scandal ...................................................... 40

                4.      Princelings "Pay off" Scandal .............................................. 42

                5.      York Capital Hedge Fund Scandal ....................................... 42

                6.      Money Laundering Scandals................................................. 43

i

|  | 7. | Toxic Securities Scandal — "Bags of Shit" and "Utter and Complete Garbage" | 44 |

|  | 8. | Patrice Lescaudron Scandal | 44 |

|  | 9. | Tax Avoidance Scandal | 45 |

IV.  THE PARTIES AND OTHER IMPORTANT ACTORS ............................. 49

   A.  Plaintiff .................................................................................. 49

   B.  Credit Suisse Entity Defendants ........................................ 49

   C.  Credit Suisse Director and Officer Defendants............................. 52

      1.  Director Defendants .................................................... 53

      2.  Officer Defendants ..................................................... 56

   D.  KPMG Defendants.................................................................. 68

   E.  The Non-Party Important Actor — PriceWaterhouseCoopers .................................................... 77

V.  JURISDICTION AND VENUE ............................................................ 81

   A.  Subject-Matter Jurisdiction ................................................ 81

      1.  Federal-Question Jurisdiction .................................. 81

      2.  Diversity Jurisdiction ................................................ 81

      3.  CAFA Jurisdiction ..................................................... 81

   B.  Personal Jurisdiction........................................................... 82

   C.  Venue/Forum in the Southern District of New York — as the Only Forum Where a U.S.-Based Plaintiff Can Litigate These Claims on a Class Basis Against All Defendants.............................................................................. 83

      1.  Credit Suisse's and KPMG's New York Contacts, Involvement and Misconduct.................................... 87

      2.  Credit Suisse's Consents to New York and United States Jurisdiction and Venue and to the Application of New York and Federal Law ............................... 96

3.    The UBS-Credit Suisse Merger Agreed to After the
Class Period Was Put Together in New York .....................102

4.    Switzerland Does Not Provide an Adequate
Alternative Forum; Any Interest It had in Providing a
Neutral, Fair Forum Is Diminished by Its Involvement
and Potential Liability That Create Interests Adverse
to Plaintiff and the Class ...................................................103

VI.    CLASS ACTION ALLEGATIONS ............................................. 108

A.    The October 22, 2013 — March 17, 2023 Class Period .................108

B.    The Common Shareholder Class ....................................................108

VII.    DUTIES OF THE CREDIT SUISSE DEFENDANTS AND KPMG
DEFENDANTS AND THEIR RESPONSIBILITY FOR THE
DAMAGE TO AND LOSSES OF CREDIT SUISSE'S
COMMON SHAREHOLDERS....................................................111

VIII.    THE PERSISTENT MISMANAGEMENT OF CREDIT SUISSE
OVER THE YEARS ...................................................................126

A.    2008–2011 Events.........................................................................126

1.    Wealth Management/Private Banking 2008–2011............126

2.    Investment Banking 2008–2011.........................................133

B.    2012–2014 Events .........................................................................139

1.    Investment Banking 2012–2014 ........................................139

2.    Wealth Management/Private Banking 2012–2014 ...........142

C.    2015–2017 Events .........................................................................153

1.    Investment Banking 2015–2017 ........................................153

2.    Wealth Management/Private Banking 2015–2017 ........... 161

D.    2018–2021 Events .........................................................................165

1.    Investment Banking 2018–2020 ........................................165

2.    Wealth Management/Private Banking 2018–2020 ...........167

3.    The Tuna Boat/Bond Scandal ............................................169

iii

4.    The 2019–2020 CEO Spying Circus ....................................174

5.    Greensill, Archegos, Money Laundering, York Capital Hedge Fund, Toxic "Bags of Shit," Lescaudron and Tax-Avoidance Activities .....................................................180

6.    Defendants' Specific Failures and Acts of Mismanagement ..................................................................180

7.    Repeated Complaints of Inadequate Controls and Unreasonable Risks Were Turned Aside by Defendants...........................................................................189

IX.    THE CREDIT SUISSE DIRECTORS COVERED UP WRONGDOING, DESTROYED EVIDENCE, CONDUCTED SHAM INVESTIGATIONS, FAILED TO FIRE OR SUE MISCREANT SUBORDINATES PLUNDERED CORPORATE ASSETS FOR THEIR PERSONAL GAIN AND ALLOWED THE ONGOING WRONGDOING TO PERSIST, CAUSING DAMAGE TO COMMON SHAREHOLDERS....................................................194

X.    THE STATUTE OF LIMITATIONS HAS NOT RUN ON ANY CLAIMS........................................................................206

XI.    KPMG'S COMPLICITY IN THE MISCONDUCT AND MISMANAGEMENT AS CREDIT SUISSE'S EXTERNAL AUDITOR AND VIOLATION OF ITS OWN DUTIES OF DUE CARE......................................................211

A.    The Regulation, Oversight and Liability of Accounting Firms like KPMG ............................................................211

B.    KPMG's Involvement and Complicity with Credit Suisse .................................................................................218

C.    KPMG's Long History of Participating in Corporate Accounting Scandals Involving Failed Audits and Destruction of Stock Value ...........................................230

XII.    CAUSES OF ACTION...............................................................238

XIII.    PRAYER FOR RELIEF ...........................................................269

## I.     INTRODUCTION

> [*T*]*he demise of Credit Suisse has been* "*entirely self-inflicted by years of mismanagement and an epic destruction of corporate and shareholder value*."[1]
>
> \*     \*     \*
>
> "For more than a century and a half, Credit Suisse stood as a symbol of Swiss financial power, stability and prestige. *But its fall from grace in recent years has underscored the fragility of its reputation*, *tarnished by a series of self-inflicted scandals*."[2]

1.     Plaintiff, an owner and holder of Credit Suisse Group AG's American Depositary Shares ("ADSs") and/or ordinary shares (together, "common stock"), files this class action complaint asserting direct claims under the laws of the United States, the State of New York, and the Swiss Confederation.  Plaintiff's claims arise from the financial collapse of Credit Suisse Group AG ("Credit Suisse" or the "Bank") and are brought against three groups of defendants for breaches of statutory and common-law duties owed to Credit Suisse shareholders and for violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"):

      (a)     Credit Suisse's four New York-based subsidiaries;[3]

---

[1] Elliot Smith, *Fail or Sale? What Could Be Next For Stricken Credit Suisse*, CNBC, Mar. 18, 2023.  Unless otherwise noted, all emphases in quoted texts are added.

[2] Owen Walker & Stephen Morris, *Credit Suisse: The Rise and Fall of the Bank That Built Modern Switzerland*, FINANCIAL TIMES, Mar. 24, 2013.

[3] Credit Suisse Group AG and Credit Suisse AG are not named as defendants; but they are included in the term "Credit Suisse" as used herein when context so requires.  As stated in Credit Suisse's 2022 Annual Report, the term "Credit Suisse" means "Credit Suisse Group AG and its consolidated subsidiaries."  *Credit Suisse Group AG Annual Report 2022*, at 2.  Credit Suisse Group AG is legally responsible for the liabilities and obligations of its New York-based subsidiaries, and is obligated to indemnify its present and formers directors and officers named as defendants here.  Such liabilities and obligations are expected to be assumed by UBS Group AG ("UBS"), as Credit Suisse's corporate successor.

(b)     29 present and former Officers and Directors of Credit Suisse, including members of Credit Suisse's Board of Directors (the "Board") and of Credit Suisse's Executive Board (the "Management") (together, the "Credit Suisse Individual Defendants" and, collectively with the Credit Suisse entities sued, the "Credit Suisse Defendants"); and

(c)     Credit Suisse's auditors, the New York-headquartered KPMG LLP and KPMG LLC  (together "KPMG"), as well as 13 KPMG U.S.-based partners (including New York residents) who acted as Credit Suisse's statutory external auditors, accountants, consultants, and advisors (together with KPMG, the "KPMG Defendants").[4]

2.     Plaintiff brings this action on behalf of a Class of Credit Suisse common shareholders (defined below), seeking to recover and obtain:

---

[4] In support of these claims, Plaintiff alleges the following upon personal knowledge with respect to those allegations pertaining to themselves, and upon information and belief based upon, among other things, a review of public filings, press releases, articles and reports, and investigations undertaken by counsel, as to all other allegations.  Plaintiff believes that substantial evidentiary support will exist for the allegations set forth below after a reasonable opportunity for discovery.  Credit Suisse is one of the largest and most high-profile banks in the world.  The decline of Credit Suisse and damage to its shareholders have been covered by sophisticated and reputable publications, such as the *Financial Times*, *Reuters*, *The New York Times*, *The Wall Street Journal*, *Bloomberg*, *Forbes*, and *The Guardian*, which have investigated and reported the misconduct of Credit Suisse's Officers and Directors and KPMG.

Because this reporting by reputable journalists and publications is reliable, plaintiff relies on it.  Also, because it was the worldwide coverage of Credit Suisse that has damaged its reputation, these articles are quoted at length.  No Defendant has demanded retraction of what is asserted in these articles as fact, let alone sued any of these publications, authors or the others quoted for libel.

(a)     damages and losses caused them by Defendants' breaches of their statutory duties of care, diligence, and prudence including bad-faith conduct involving the mismanagement of Credit Suisse and misuse, loss and waste of corporate assets;

(b)     an accounting for, and disgorgement of, all compensation, fees, bonuses, benefits, stock sale proceeds and pensions or other things of value obtained, paid or provided to the Credit Suisse Individual Defendants and KPMG, disgorging and/or imposing a constructive trust over such items, to help fund any damages award to the Class members; and

(c)     treble damages and attorneys' fees under RICO.

## II.    OVERVIEW OF ALLEGATIONS

### A.    The March 2023 Collapse of Credit Suisse

3.     Over the past decade, Credit Suisse's repeated scandals, criminal misconduct and the billions in accumulated fines and penalties caused the financial markets, counter parties and depositors to lose trust in Credit Suisse. Beginning in October 2022, deposit outflows surged. The price of Credit Suisse common stock had already fallen from its October 22, 2013 high of $33.84 per share to single digits. In mid-March 2023, already weighed down by years of scandals and criminal pleas resulting in billions of dollars in prior fines, penalties, asset write-downs and losses, Credit Suisse reported a massive $8 billion loss in 2022 alone. Credit Suisse and its new statutory auditor PriceWaterhouseCoopers ("PWC") also admitted that Credit Suisse's internal financial/accounting controls and legal/regulatory/compliance controls were "*materially deficient*," *and that Credit Suisse lacked an* "*effective risk*

***assessment or management process***.”  This confirmation of the longstanding mismanagement of Credit Suisse drove the price of Credit Suisse common stock even lower.  As trust in Credit Suisse waned, deposit outflows could not be stemmed, spiking to over $75 billion.  Its common stock fell to $2.01 per share on March 17, 2023 — the end of the Class Period (defined below).  Credit Suisse's Chair admitted:

> ***The bank could not be saved*** …. [***W***]***e were no longer able to stem the loss of trust that had accumulated over the years***.

4.    The Credit Suisse Defendants and KPMG Defendants permitted and engaged in a common course of misconduct and civil conspiracy, acting as instigators, perpetrators, and accomplices the consequence of which has been that Credit Suisse was buried in ***over $30 billion in losses***, ***write offs***, ***penalties and fines***, ***damaging its shareholders as its stock declined to $2 per share***.  The Chart below presents this collapse.

[The remainder of this page is deliberately left blank.]



**DOW JONES/BIG BANK STOCK INDEX**
**2013 - 2023**
**vs.**
**CREDIT SUISSE GROUP AG BANK COMMON STOCK**



**$30 BILLION IN FINES PENALTIES/PAYMENTS/LOSSES**
**15+ YEARS OF CONTROL, RISK PROCEDURES**
**"MATERIALLY DEFICIENT" VIOLATIONS OF US/NY**
**LAWS DESTROY CREDIT SUISSE**

$8.0 billion - losses/write-offs (2022)
$5.8 billion - losses - DLJ Goodwill/trading losses - 2015/2016
$5+ billion - Archegos Margin losses (2022)
$5.28 billion - USDOJ Payments/Toxic Securities (2017)
$3 + billion - Greensill Capital losses (2022)
$2.8 billion - Toxic securities losses - 2008/09
$2.6 billion - US DOJ - Tax evasion assistance (2014)
$885 million - USFHA - Toxic Securities fraudulent sales (2014)
$715 million - NYAG - Tax evasion assistance (2014)
$547 million - Tuna Boat/Bonds Scandal (2021)
$538 million - US Treasury - Terrorist sanctions transfers (2009)
$450 million - USSEC/DOJ - Toxic Securities - Credit Unions (2017)
$234 million - French Tax evasion (2022)
$200 million - USSEC - Unlicensed brokers in US - tax evasion
$155 million - USSEC/NYDFS - Dark pools (2015-2016)
$150 million - German - Tax evasion (2011)
$135 million - NYDFS - Forex Fine (2015)
$120 million - Italy - Tax evasion/Money Laundering (2015)
$120 million - USSEC - Toxic securities fraudulent sales scheme (2012)
$100 million - USSEC/DOJ - FCPA - Princelings (2017)
$90 million - FINRA - Interest rate fixing (2016)
$70 million - USSEC - Falsified WM assets under management
$70 million - Class action settlement - SDNY (2011-2012)
$16 million - FINRA - Money laundering (2015)
$10 million - NYAG Fraudulent practices misleading customers (2019)
$6.5 million - FINRA Market access (2015-2020)
$4.5 million - FSA Fine - Controls - Toxic Securities (2011)
$2.0 million - FSA Fine - Control failures - toxics (2011)

**MARCH 2023 - LACK OF TRUST - $75 BILLION**
**DEPOSIT OUTFLOWS - $8 BILLION  2022 LOSS**
**COLLAPSE OF CREDIT SUISSE**

**B.      The Complicity of KPMG — Credit Suisse's Statutory Auditor**

5.      In 2020, Credit Suisse was forced to get a new statutory auditor (PWC) because KPMG, Credit Suisse's longtime auditor, was caught in a massive criminal scheme involving Credit Suisse in New York.   KPMG was fined over $50 million for this "stealing the list" scheme.   By bribing Public Company Accounting Oversight Board ("PCAOB") employees with plush KPMG positions, KPMG stole PCAOB's confidential list of KPMG audits to be reviewed by the PCAOB.   Upon learning that the Credit Suisse audits were on the list, KPMG destroyed and altered the workpapers in New York to deceive regulators and to conceal from the PCAOB inspectors audit deficiencies relating to internal controls and risk management procedures.   A substantial factor in causing the damages and losses to the Credit Suisse shareholders was the lack of adequate internal financial/accounting controls and legal/regulatory/compliance controls in Credit Suisse's operations, especially here in New York.   Without adequate internal controls and risk management procedures, Credit Suisse could not be properly managed.   Had such deficiencies been discovered and made public by the PCAOB, the discovery would have disrupted the ongoing conspiracy and ameliorated the damage to be suffered by the Credit Suisse shareholders.   Several KPMG officials were prosecuted and convicted for their involvements in the "steal the list" scheme in the Southern District of New York.

6.      The KPMG Defendants were closely associated with Credit Suisse for decades.   KPMG was the statutory auditor and accountant for some 20 years, up until 2020, when PWC replaced KPMG.   KPMG participated in, and profited from, the "Credit Suisse Enterprise" (defined below).   KPMG was paid nearly a billion dollars by Credit Suisse as its accountant, auditor, consultant and advisor on many matters relating to the

operation and management of Credit Suisse, including its internal controls and risk management procedures and adherence to Credit Suisse's Code of Conduct.

7.      Credit Suisse's internal controls were defective and deficient for over 20 years.  KPMG knew this when certifying Credit Suisse's financial statements as accurate and the controls and risk management processes as adequate and effective in years of Annual Reports to shareholders.  They did this because the New York KPMG operation wanted the huge fees from Credit Suisse, upon which KPMG had become dependent, and which were very important to the individual top partners in New York.  KPMG had a decades-long history of being the external auditor of large and often international financial corporations like Credit Suisse that have blown apart due to a lack of internal controls.  KPMG had been repeatedly criticized, fined, censured and penalized over past years for its professional misconduct and never should have been permitted to be retained and then re-retained each year by the Credit Suisse Board as statutory external auditor.

**C.      Damage to Credit Suisse's Common Shareholders**

8.      Credit Suisse's common stock is listed and traded on the New York Stock Exchange ("NYSE") in the form of ADSs and on foreign exchanges in the form of ordinary shares.  According to Credit Suisse's official filings in the United States, its "registered shares are listed ... in the form of American Depositary Shares on the [NYSE]," trades under the symbol "CS"; and each ADS (as evidenced by American Depositary Receipts) "represents an ordinary share of the Company."  The ADSs are in all respects the legal equivalent of Credit Suisse's ordinary shares.  Each ADS can be converted into ordinary common shares via Bank of New York Mellon ("BNY Mellon") in New York City at a 1-to-1 ratio.  The ADSs are counted as common shares outstanding by Credit Suisse.  The ADSs are treated the same as ordinary shares (which are traded only on foreign exchanges).

There are thousands of Credit Suisse shareholders in New York and the United States who own at least 540 million of its common shares. This action is brought on behalf of all Credit Suisse shareholders who held Credit Suisse common stock, including ordinary shares and ADSs, between October 22, 2013 and March 17, 2023 (the "Class Period"), and suffered loss/damage due to Defendants' actionable conduct by continuing to hold or disposing of their shares.

9.    As a result of Defendants' failure to fulfill their duties of due care, diligence, prudence, and loyalty, as required under the Swiss Code of Obligations, as well as their failure to abide by or enforce the Bank's own Code of Conduct, and internal guidelines and directives, and their failures to act in good faith, Credit Suisse suffered repeated investigations, proceedings and lawsuits, resulting in fines and penalties due to its officials' ***continuing course of misconduct***, which damaged its common shareholders.

10.    The damage and losses to Credit Suisse common shareholders are not due to extraneous events, *i.e.*, economic or financial market factors' disruptions, or the acts of third parties. During the years that Credit Suisse declined and ultimately collapsed, the world enjoyed the longest economic expansion in history and its stock markets enjoyed the strongest "Bull Markets" ever — even post Covid-19. During this period, many large international banks prospered, reported huge and growing profits, strengthened their financial condition, restored and increased their dividends and saw their shareholder value soar. According to the *Financial Times*:

> The past decade has been kind to the biggest United States banks. ***This week's earnings round showed that for all the worries about regulation, low interest rates and technological disruption, the largest universal***

> ***and investment banks have more than doubled their
> collective profits since 2009***.

Rob Armstrong & Laura Noonan, *Largest United States Banks Double Profits in Past Decade*, FINANCIAL TIMES, Jan. 18, 2020.  Just a few weeks after Credit Suisse collapsed, several large international banks reported "[b]lowout," "[b]ig" profits and results.[5]  As reflected in the chart below, that has not been the case with Credit Suisse.

[The remainder of this page is deliberately left blank.]

---

[5] Rob Copeland & Stacy Cowley, *Largest United States Bank Reports Big Profits Despite Turmoil*, NEW YORK TIMES, Apr. 15, 2023; David Benoit, *et al.*, *Big Banks Post Blow Out Quarter*, WALL STREET JOURNAL, April 15, 2023.



## CREDIT SUISSE

### CLASS HOLDING PERIOD
### October 22, 2013 - $33.84 Common Stock
### March 17, 2023 - $2.01 Common Stock

CREDIT SUISSE COMMON STOCK PRICE

BIG BANK STOCK INDEX

DJIA

$33.84
Oct. 22, 2013

March 17, 2023 $2.01

CREDIT SUISSE COMMON STOCK PRICE

Dec. 2009 - DOJ/NY/DAI/SDNY Criminal case/Plea - $536 million payment - largest ever - 20 year scheme - "egregious" evasion of terrorist sanctions - Credit Suisse ordered to implement enhanced global compliance program - wire/mail/bank fraud

July 2011 - Credit Suisse "Target" of US DOJ tax evasion investigation

Feb. 2011 - 4 Credit Suisse bankers indicted - US criminal case - assisting US tax evasion - conspiracy dates back to 1953 - wire/mail/bank fraud

Nov. 2013-2014 - 3 Credit Suisse officials - SDNY criminal indictment guilty plea - toxic securities misconduct - wire/bank fraud/money laundering

Feb. 2014 - criminal/case/plea - Credit Suisse admits its advisors illegally in US - $200 million fine - "Failed to implement internal controls" - Senate report exposes tax evasion - wire/mail/bank fraud/money laundering

May 2014 - $2.6 billion fine criminal case - as "brazen misconduct" - Destroyed evidence - obstructed investigation - wire/mail/bank fraud/money laundering

Feb. 2016 Credit Suisse takes $3.9 billion asset write down plus huge hidden trading losses - "shocking" "unacceptable" - Credit Suisse stock hits 24 year low

Feb. 2016 Credit Suisse "dark pools" violation - $154 million plus censure - largest ever penalty - wire/mail/bank fraud/money laundering

Nov 2017 NNYDFS Fines Credit Suisse $135 million illegal Forex trading - lack of controls - wire/mail/bank fraud

Jan 2017 Credit Suisse $5.28 billion toxic securities settlement with US DOJ - Lack of controls - wire/mail/bank fraud

July 2018 Chinese Princelings criminal case/EDNY plea $100+ million fine - lack of controls - wire/mail/bank fraud

Feb 2018 Lesca-auction Scandal - Credit Suisse censured - lack of controls

Jan 2019 - Credit Suisse bankers indicted Tuna Bloat/Bond scandal criminal case - wire/mail/bank fraud

Credit Suisse $600 million toxic securities payment - lack of controls

Mid-2020-York Capital - in NY - $450 million write off

Dec 2020 Credit Suisse criminally indicted for money laundering - drug smuggling - US Federal Reserve and NNYDFS order Credit Suisse to fix deficient money laundering controls - money laundering

Feb-March 2021 Greensill scandal - $3 billion losses - lack of controls

Feb-March 2021 Archegos Scandal - $5 billion losses - lack of controls

Tuna Bloat/Bond Credit Suisse criminal guilty pleas - $547 million penalties - 3 controls - wire/mail/bank fraud

Credit Suisse $8 billion in 2022 losses - controls and risk management procedures "materially deficient"

Credit Suisse whistle blower says US tax evasion continuing

US Senate report US tax evasion continued

Credit Suisse pays $240 million - French tax evasion

**D.    The Destruction of Credit Suisse and Misuse, Waste and Loss of Its Assets to Enrich Defendants**

11.    Rome was not built in a day and Credit Suisse was not destroyed in one.  Nor was it brought down in one year, or by a single — or even several incidents — or a few or even many bad "rogue" actors.  It took 20 years of ***continuous mismanagement*** by the Credit Suisse Defendants — with the active complicity of KPMG, as external auditor — to destroy this financial giant.  While the shareholders were damaged, the ***Credit Suisse insiders***, ***with the help and acquiescence of the KPMG Defendants***, ***plundered Credit Suisse***, ***and personally profited from their misconduct to the tune of many billions of dollars***, ***including secret illegal bonus pools by which the top insiders*** "***skimmed***" "***sure thing***" ***deals for themselves***.  ***The top Credit Suisse Directors and Officers pocketed over $10 billion in pay/bonuses***, ***options and benefits***, ***and KPMG took in some $1 billion in fees*** — generating large profits for their New York partners — from one of the largest, but one of the ***most corrupt*** clients of the firm.  These payments and benefits constitute a loss, waste, mis-transfer, and/or misuse of corporate assets expended to protect and benefit the Credit Suisse insiders and preserve them in their positions of power, prestige and profit, not for the benefit of Credit Suisse's common shareholders.

12.    The insiders were plundering — looting — Credit Suisse while mismanaging it and damaging its common shareholders.  According to a May 7, 2023 *Reuters* report, Credit Suisse senior staff were paid unreported bonuses:

> ***Senior staff at Credit Suisse received additional bonuses worth hundreds of millions of dollars over many years***, ***most of which were not officially recorded***, ***a Swiss newspaper reported on Sunday***.

The SonntagsZeitung report says the alleged profit-sharing scheme dates back to 2008. It lists two payments of 50 million Swiss francs ($56.12 million) for 2019 alone, citing information from an internal staff meeting. It says the payments went to members of the bank's Asset Management division and that most of them do not feature in the company's annual reports.

According to a March 22, 2023 report by *Finews.com*,

> ... ***Credit Suisse paid out $32 billion in bonuses since 2013 during a timespan when the bank suffered losses of $3.2 billion***.

13. Credit Suisse and its current Board Chair, Axel Lehmann, have ***admitted*** that Credit Suisse's Directors and Officers mismanaged Credit Suisse for over a decade, allowing it to operate with "***materially deficient***" internal financial/accounting controls, legal/regulatory/compliance controls and risk management systems/procedures. Lehmann gave a "***brutal assessment***" of what lay at the heart of Credit Suisse's high-profile scandals, ***admitting to the shareholders in 2022 that***:

> "***It has become clear that the challenges of the past were not solely attributable to isolated poor decisions or to individual decision makers***." ... "***Within the organization as a whole***, ***we have failed too often to anticipate material risks in good time in order to counter them proactively and to prevent them*** ...," [including] over a $5.5bn trading loss the bank suffered on the collapse of family office Archegos Capital last spring, the biggest in its history.
>
> \*\*\*
>
> The Archegos loss came just weeks after Credit Suisse was forced to close a group of funds linked to the specialist finance firm Greensill Capital, trapping $10bn of client money .... ***The twin crises have been the most prominent in a string of scandals that have plagued the bank going back to the global financial crisis of 2008***.
>
> ***A common thread running through the bank's failings has been a risk department that was all too often overruled by commercially minded executives***

> **who were chasing higher returns from riskier deals**, **according to several current and former employees**.
>
> "**We had historically weak compliance combined with high risk-taking businesses**," says a former executive who worked in the bank's risk department. "The structure also made it very difficult to see total global risk — it was like playing hide and seek."
>
> Four months after the Archegos loss, Credit Suisse published a report into its own failings, which it had commissioned from [its New York-based counsel.] ... [*T*]**he report described in excoriating detail a catalogue of individual and organizational errors**.
>
> [Credit Suisse's New York-based counsel] said the losses were the result of a "**fundamental failure of management and controls**" in Credit Suisse's investment bank and a "**lackadaisical attitude towards risk**."

Owen Walker, *Credit Suisse Admits Lax Approach to Scandals: Report admits 'fundamental failure' of bank's mismanagement and a 'lackadaisical attitude' to risk*, FINANCIAL TIMES, May 20, 2022.

14.    A year later, when Credit Suisse failed:

> Mr. Lehmann and Ulrich Korner, the bank's chief executive, struck a funereal tone in their opening remarks. **They pointed out that Credit Suisse had been brought down by a history of scandals and losses that sapped confidence among shareholders and clients**[.]

Michael J. de la Merced, *For Credit Suisse Shareholders, a Wake Followed by Recriminations: Top executives at the bank's final shareholder meeting apologized for the lender's collapse and forced sale to UBS, while investors spoke of betrayal*, THE NEW YORK TIMES, Apr. 4, 2023.

15.    The collapse of Credit Suisse is one of the worst instances of financial and operational misconduct and mismanagement of a large public financial company in history. It is rivaled, if at all, by the infamous Enron and Bank of Credit and Commerce

International ("BCCI," also known as, "Bank of Crooks and Criminals") scandals.

According to the *Financial Times*:

> For more than a century and a half, Credit Suisse stood as a symbol of Swiss financial power, stability and prestige. But its fall from grace in recent years has underscored the fragility of its reputation, tarnished by a series of **self-inflicted scandals**.

> "It is shocking to lose a 167-year-old bank in 72 hours," said Oswald Grübel, a former chief executive of both Credit Suisse and UBS, who added that the **lender's decline began after the financial crisis**, **from where it** "**went down and down and down**."

> John Mack, another former Credit Suisse chief executive who went on to run Morgan Stanley, has a blunter assessment of the reasons for its fall: "**Their performance says it all**."

> ***

> It was not until 1978, when it struck a deal to partner with US investment bank First Boston, that Credit Suisse truly entered the global stage. Through a series of increasingly aggressive acquisitions it built up its presence **in** … **New York**[.]

> ***

> By 1990, Credit Suisse had bought a controlling stake in First Boston after the US business lost millions of dollars on the collapse of the junk bond market. First Boston's high-risk culture pervaded through **Credit Suisse's investment bank for the next three decades**.

> ### *Crisis: Fraud, Scandals and Fallouts*

> While other banks were forced to clean up their act and shrink their balance sheets in the years following the crash, **Credit Suisse put off dealing with legacy problems and was more willing to take risks**. **Its final years as an independent business have been marked by a series of scandals and heavy losses**, **as it lurched from one crisis to the next**.

> The bank's struggles over this period have been pinned on various people. But the two blamed most often are Urs Rohner … who chaired the bank between 2011 and 2021 when its

shares lost 75 per cent of their value — and Romeo Cerutti, the bank's general counsel for 13 years up to 2022.

"There was one person in this organisation through this whole period of rot: chairman Urs Rohner," said David Herro, chief investment officer of Harris Associates, a longtime investor in the bank that sold its entire stake this month. "***But the board was not independent and strong enough to challenge him***."

Owen Walker & Stephen Morris, *Credit Suisse: The Rise and Fall of the Bank That Built Modern Switzerland*, FINANCIAL TIMES, Mar. 24, 2023.

16.    Other sophisticated members of the financial media have detailed this unprecedented banking disaster.  According to *Forbes*:

> ***Credit Suisse has been involved in multiple scandals that have rattled investors in recent years***, ***including the mismanagement of funds***, ***which was uncovered in its 2022 financial report***.  The bank closed the 2022 fiscal year with ***a loss of nearly $8 billion***, its biggest loss since the 2008 global financial crisis. The bank was ***convicted*** in June 2022 of failing to prevent money laundering by a ... cocaine trafficking gang ... [which] washed millions of dollars through the bank and fined Credit Suisse $2.1 million and ordered it to pay the Swiss government $20 million. In March 2022, a ... court ruled the bank owed former Georgian Prime Minister Bidzina Ivanishvili and his family around ***$500 million in damages from Credit Suisse***[] .... The court decided former Credit Suisse adviser, Pascale Lescaudron, committed a long-running fraud against the family ... ***the case will cost around $600 million***. In 2020, Credit Suisse's Chief Executive Tidjane Thiam was forced to resign after it was unveiled the bank hired private detectives ***to spy on its former head of wealth management once he left to join a rival bank***."

Arianna Johnson, *What's Happening With Credit Suisse, Explained; Embattled Bank Rattles Stock Market as Banking Crisis Deepens*; FORBES, Mar. 16, 2023.

17.    According to *Business Briefs*:

Over the last few decades, Credit Suisse has earned itself a rather dubious reputation due to its ***various banking***

> ***deals that helped dictators*, *criminal gangs*, *embargoed states*, *and others*.**
>
> ***Regulators have also pulled it up for tax evasion*, *frauds carried out against its own customers money-laundering*, *kickbacks*, *and several other offences*.**
>
> ***
>
> ***In February 2022, a massive leak (*details of more than 30,000 bank customers and their more than 18,000 accounts*) revealed that Credit Suisse harbored the hidden wealth of clients involved in torture, drug trafficking, money laundering, corruption and other serious crimes. The revelations point to apparently widespread failures of due diligence by the lender, despite repeated pledges to weed out dubious clients and stamp out illicit funds*.**

*The Collapse of Credit Suisse and Attempts by Swiss Government to Salvage Bank with Long and Dubious History*, BUSINESS BRIEFS, Mar. 19, 2023.

18.    And the *Wall Street Journal* put this in ***a broader perspective***:

> ***Stretching back to Nazi gold*, *Credit Suisse had harbored money for suspect clients*.**  In a 2014 settlement with the U.S. Justice Department, the bank paid $2.6 billion and admitted its bankers had hand delivered cash and ***destroyed documents*** to help Americans hide untaxed wealth.

Margot Patrick, *et al.*, *It Wasn't Just Credit Suisse. Switzerland Itself Needed Rescuing*, THE WALL STREET JOURNAL, Mar. 22, 2023.  A recent report of a United States Senate Committee concluded that Credit Suisse ***never stopped this tax evasion assistance here in the United States***, continuing its illegal conduct up until recent times.

## E.    The Mismanagement and Control Failures at Credit Suisse and the Resulting Damage and Loss to Credit Suisse Common Shareholders

19.    Credit Suisse was a global financial institution with very large Investment Banking and Wealth Management operations in New York, doing billions of dollars of

business in the United States each year, much of it based on giving illegal assistance to United States residents seeking to evade federal and New York taxes.  Over the past decade and more, as part of a continuing course of conduct and civil conspiracy, the Credit Suisse Defendants "*ignoring numerous red flags*," "*knowingly and willingly*" spearheaded a "*brazen*," *massive* multi-billion-dollar tax-evasion scheme from its "*giant investment bank*" in New York, which the New York State Department of Financial Services ("NYDFS") has found to be a "*hub for the Bank's private banking business and played a significant role in the Bank's facilitation of tax evasion*."[6]

20.   As detailed herein:

(a)   Credit Suisse has paid billions in fines and penalties to *New York and federal* authorities because of (i) Credit Suisse's core "*business model*" and "*extensive and wide-ranging conspiracy*"; and (ii) its Wealth Management/Private Banking officials, who used Credit Suisse's *New York* office as their "*hub*" to engage in "*intentional misconduct*" and to serve as "*willing accomplices*" in illegal *"systematic"* tax-evasion activities that involved thousands of employees — "*decidedly not the conduct of just a few bad apples*" — over a number of years;

(b)   Credit Suisse entered a *criminal guilty plea* in the United States. The Credit Suisse Defendants "*operated an illegal cross border banking business that knowingly and willfully aided*" tax

---

[6] The quoted material in this Section is specifically sourced to articles and court filings, *etc.*, that are detailed in Sections III.A.–B. and VIII.A.–D.

evasion in the United States, and Credit Suisse today continues to remain under a massive multinational tax-evasion-assistance/money-laundering probe, paying millions of dollars in fines as recently as in 2020.

(b)    Corporate guilty pleas and enhanced penalties were imposed by United States regulators on Credit Suisse because its Directors and Officers permitted the *obstruction of the criminal* [*tax-evasion*] *investigation*, "*shredding documents*" and allowing "*documents to be destroyed*," which "*encumbered the scope and progress*" of the criminal inquiry, while conducting a "*shamefully inadequate internal inquiry*" to try to cover up their own involvement in the illegal conduct. Despite this criminal plea, huge fines and promises to stop their tax-evasion assistance in the United States, as laid out in a new U.S. Senate Report it has been reported, based on documents turned over to the U.S. Department of Justice ("DOJ") by a whistleblower, that the *Credit Suisse Board never put a stop to this illegal conduct here in New York and has continued to illegally help United States citizens hide assets and evade taxes up until current times*, making it appear that the "*bank* [*is*] *a global criminal enterprise*."

(c)    Credit Suisse has also paid massive fines/penalties due to its New York-based Investment Bank officials' criminal misconduct for which they pleaded guilty in the Southern District of New York for mispricing toxic subprime mortgage-backed securities, which Credit

18

Suisse insiders called "***complete crap***," "***sludge***" and "***utter and complete garbage***," ***while selling billions of dollars of this*** "***dogshit***" ***to its clients by making what the New York State Attorney General*** ("***NYAG***") ***said were*** "***false and irresponsible representations***."  Credit Suisse recently had to pay out another $604 million to pay for the still unfolding toxic securities scandal dating back to 2008–2009 — damages — in a lawsuit ***here in New York***.

(d)     Due to the New York-based Investment Bank's thoroughly "***corrupt culture***" and "***unlawful, unsafe and unsound conduct***," that "***failed to implement controls***" and the Credit Suisse Board's "***systematic supervisory failures***" and failure to comply with the Bank's own Code of Conduct, Credit Suisse's Investment Banking officials created "***fictional profits***," pocketing hundreds of millions in huge salaries and bonuses for themselves while causing billions in losses to Credit Suisse and its clients, including "***charities and public pensions***," federal agencies and credit unions.  This "***irresponsible behavior***" was a "***huge breach of trust violating New York law and abusing the customers for many years***."

(e)     The overall continuing course of misconduct and damage suffered by Credit Suisse shareholders never ceased.  Its Investment Bank officials, acting "***within the scope of their employment***," concocted a "***brazen, internal criminal scheme***" ostensibly to

fund a self-sustaining tuna fishing industry in a foreign country. A senior Credit Suisse executive warned top officials to not become involved in this scheme because it involved "***the master of kickbacks***." The scheme has embroiled Credit Suisse in an "***odious and grotesque***" scandal involving "***bribery***, ***money laundering***," to which Credit Suisse Investment Bank officials pleaded guilty in federal court in ***New York***. ***Credit Suisse also pleaded guilty to wire and mail fraud in the Eastern District of New York***, ***suffered $547 million in penalties and the imposition of an independent third party monitor to oversee the banks*** *transactions*, ***risk management and internal control systems***.

(f)     All this misconduct — and the resulting damage to Credit Suisse shareholders, and loss and waste and misuse of corporate assets — are a result of the Credit Suisse Defendants' breaches of their "***nontransferable and inalienable duties***," *i.e.*, "***the overall management of the company***" with "***all due diligence and to safeguard the interests of the company in good faith***" "***in particular with regard to compliance with the law***," as required by the Swiss Code of Obligations; and misconduct, neglect, and a failure to perform duties in the management and disposition of corporate assets as required by New York law. Indeed, one court found "***the bank tolerated acts and practices that it knew were contrary to its own guidelines***." All this misconduct was

participated in, assisted, and furthered by KPMG entities and individuals named as Defendants, as they were violating their own statutory duties of due care, ***pocketing up to $70 million in yearly fees***, while certifying that Credit Suisse's finances were accurately presented, its reported profits were legitimate, and its internal financial/accounting controls and legal/regulatory/compliance controls were sufficient and effective.

## F.  The Applicable New York, Federal and Swiss Statutes

21.  The relevant New York statutes include:

- New York Business Corporation Law § 1317 - Liabilities of directors and officers of foreign corporations:

    ... [T]he directors and officers of a foreign corporation doing business in this state are subject, to the same extent as directors and officers of a domestic corporation, to the provisions of ... Section 720 (Action against directors and officers for misconduct.)

    ... [A]ny liability [under Section 720] may be enforced in, and such relief granted by, the courts in this state, in the same manner as in the case of a domestic corporation.

- New York Business Corporation Law § 720 - Action against directors and officers for misconduct:

    An action may be brought against one or more directors or officers of a corporation to procure a judgment:

    to compel the defendant ***to account for*** his official conduct in the following cases:

    (A) ***The neglect of, or failure to perform, or other violation of his duties in the management and disposition of corporate assets*** ....

(B) ***The acquisition by himself***, ***transfer to others***, ***loss or waste of corporate assets*** due to any neglect of, or failure to perform, or other ***violation of his duties***.[7]

22.    The relevant United States statutes include:

- The RICO statute, 18 U.S.C. §§ 1962–1964, provides:

    [A]ny person who participates in the operation of an enterprise [here Credit Suisse and its external auditor KPMG, which was associated in fact] through a pattern of racketeering activity, committing multiple "predicate" acts including mail, wire, financial institution and visa fraud and money laundering within 10 years, is liable to persons damaged in their property, for treble damages.

23.    The relevant Swiss statutes include:

- The Swiss Code of Obligations:

    **Art. 716a**
    The board of directors has the following non-transferable and inalienable duties:

    ***

    (1)    The overall ***management*** of the company and the issuing of all necessary directives;

    ***

    (2)    The organization of the ***accounting***, ***financial control and financial planning systems as required for management of the company***;

    (3)    The appointment and dismissal of persons entrusted with managing and representing the company;

    (4)    Overall supervision of the persons entrusted with managing the company, ***in particular with regard to compliance with the law***, articles of association, operational regulations and directives;

    **Art. 717 Duty of Care and Loyalty**
    The members of the board of directors and third parties engaged in managing the company's business must perform

---

[7] Under New York law, aiders and abettors and co-conspirators are jointly and severally liable.

their duties with all due diligence and safeguard the interests of the company in good faith.

**Art. 754 Liability of the Directors and Officers**
Section 1.   The members of the board of directors and all persons engaged in the management ... of the corporation are **liable** ... **to each shareholder and to the corporation's obliges for the damage caused by [a] ... negligent violation of their duties**.

**Art. 755 External Auditors' Liability**
All persons engaged in auditing the annual and consolidated accounts ... are liable....to the individual shareholders and creditors for the losses arising from any ... negligent breach of their duties.

**Art. 759 Joint and Several Liability**
If several persons are liable for a damage, any one of them is jointly and severally liable with the others ...

24.     The Swiss Code of Obligations Arts. 41, 50, and 55 provide "any person who unlawfully causes damage to another, whether will-fully or **negligently**, **is obliged to provide compensation**"; "where two or more persons have together caused damage, whether as **instigator**, **perpetrator or accomplice**, **they are jointly and severally liable**"; "an employer is liable for the damage caused by his employees or ancillary staff in the performance of their work unless **he proves that he took all due care** to avoid a damage ... or that the damage would have occurred even if all due care had been taken."

### III.    SUMMARY OF CREDIT SUISSE'S NEW YORK OPERATIONS' "BRAZEN/SYSTEMATIC AND PERVASIVE" MISCONDUCT AND "STUNNING SCALE" OF THEIR ILLEGAL AND RECKLESS ACTIVITIES

## A.    Credit Suisse's New York Operations

25.     By 2000, Credit Suisse operated worldwide with its largest operations here in the United States and New York mostly through the First Boston Corporation's banking operation it had earlier acquired.   In 2000, as part of a major expansion of its operations

in the United States, Credit Suisse acquired Donaldson Lufkin & Jenerette ("DLJ"), a Wall Street firm, for $11 billion, combining DLJ's aggressive trading and securities sales operation with Credit Suisse's existing First Boston banking arm, forming a massive New York City-based operation.

26.    After initial apparent success, Credit Suisse began to come apart in 2007–2008, when its New York-based Investment Banking operation lost almost $3 billion due to criminal misconduct by unsupervised traders who brought about huge trading losses in toxic subprime securities.  Investigations concluded that the losses were the result of a lack of necessary internal compliance controls and inadequate supervision by the Directors, *a situation that had even then long existed inside Credit Suisse*, *was never fixed*, *and continued through March 17*, *2023*.

27.    Suffering from the Credit Suisse Defendants' continuing misconduct, including lack of diligence, due care and prudence and "systematic supervisory failures," a "corrupt culture," and the failure to implement necessary control systems and risk management procedures, Credit Suisse has been embroiled in an endless train of scandals, investigations, lawsuits, prosecutions and regulatory proceedings in New York and elsewhere in the United States.  These events that have resulted in: (a) the imposition on Credit Suisse of some $11 billion in fines, penalties and payments by the NYAG, the NYDFS, the New York County District Attorney (the "Manhattan D.A."), the DOJ, the U.S. Securities and Exchange Commission ("SEC") and other U.S. federal and foreign regulators, on top of over $20 billion in losses and write-offs; (b) repeated criminal convictions, censures, sanctions, consent decrees, cease and desist orders, and non-prosecution agreements for criminal conduct that have badly damaged Credit Suisse's reputation for probity, legal compliance, honesty and fair dealing; and (c) findings and

admissions that Credit Suisse's internal financial/accounting controls and legal/regulatory/compliance controls, as well as its risk management procedures were defective and deficient.

28.    In response to its massive 2007–2008 toxic subprime losses and criminal cases in the Southern District of New York, Credit Suisse's Directors adopted a corporate-wide Code of Conduct requiring due care, diligence, prudence and common sense, to preserve the assets and protect the reputation and trust of a highly regulated, publicly owned financial institution. The Code of Conduct purported to set out a "***clear statement***" by Credit Suisse "***of the ethical values and professional standards***" required of its employees.

29.    The Credit Suisse Code of Conduct provides:

- All members of the Board of Directors and employees must uphold the Code of Conduct — "***There are no exceptions***." "***All members of the Board and employees are expected to comply with applicable laws, regulations and policies***."

- "Only by operating within this framework can we ***maintain and strengthen our reputation for integrity***, ***fair dealing*** and measured risk trading."

- "We strive to maintain an exemplary control and compliance culture … by setting the right tone for ***compliance with applicable laws***, ***regulations and policies***."

- "We act at all times according to the ethical values and professional standards outlined in the Code."

- "***We identify and avoid potential conflicts of interests***."

- "We ***do everything possible to prevent money laundering***, the financing of terrorist activities or corruption."

- "***We maintain the highest standards in our cross-border business activities***" and "***are committed to complying with all relevant tax laws***" and "***do not assist clients in activities intended to breach their tax obligations***."

30.    These proclamations of integrity, good behavior, legal and regulatory compliance, fair and honest dealing were made by faithless fiduciaries ***who were plundering Credit Suisse while mismanaging it***.  The misconduct pleaded in this complaint shows defiance of every principle set forth in this Code of Conduct.  The Credit Suisse Directors and Officers ignored the Code of Conduct yet pocketed billions in unearned and unjustified payments, bonuses and benefits and spent billions more of corporate assets to fend off — and give regulators/prosecutors ***headline-sizing fines and penalties paid with corporate/shareholder funds***.  Those insiders did so to avoid any individual accountability and to hold onto their positions of power, prestige and profit — all a loss, waste, mis-transfer and improper disposition of corporate assets, under their management and control, misused to benefit themselves.

31.    The "rot" at Credit Suisse was not confined to one corner of its operations, or one country — or to a couple of bad apples.  Credit Suisse's New York operations were completely rotten.  Seldom does a large international bank have its two major operations — Investment Banking and Wealth Management — engaging in ongoing criminal conduct at the same time.   The worst, and most extensive, wrongdoing that occurred due to lack oversight and inadequate controls took place in Credit Suisse's New York operations.

32.     This never-ending misconduct and the resulting scandals and losses in Credit Suisse's Investment Banking and Wealth Management operations were due to the absence of, and failure to implement, fix or repair, necessary financial/accounting controls, legal/regulatory/compliance controls and risk management and governance procedures, as well as the inadequate supervision and mismanagement of those operations by the Credit Suisse Defendants and KPMG Defendants.  They failed to enforce compliance with Credit Suisse's Code of Conduct.  They failed to put in place effective legal/regulatory/compliance controls and risk management procedures and create, nurture and, if necessary, impose a corporate culture of respect for an adherence to the law.  Credit Suisse's Directors and Officers and KPMG permitted business-as-usual to continue in the two most important, most corrupt and out-of-control parts of the enterprise — the Wealth Management/Private Banking and Investment Banking operations, ***both of which were centered in and were managed out of New York***.

### 1.     The Wealth Management Operations

33.     As Credit Suisse was attempting to regain its equilibrium after its disastrous 2007–2008 toxic subprime securities losses and criminal cases in the Southern District of New York, a major U.S. crisis began to engulf Credit Suisse involving tax avoidance.  ***In 2008–2009***, the DOJ, the SEC and the Internal Revenue Service ("IRS") began to investigate Swiss banks for helping Americans unlawfully evade United States taxes.

34.     When the illegal tax-evasion activities by UBS, Credit Suisse's then main competitor, came to light in 2008–2009, forcing UBS to pay a $780 million fine and accept a Deferred Prosecution Agreement ("DPA"), it became evident to Credit Suisse's Directors and Officers that Credit Suisse's New York-based Wealth Management division

would likely come under regulatory scrutiny because they were "***knowingly and willfully***" soliciting and assisting thousands of United States residents, including many New Yorkers and foreign citizens, to illegally evade their nation's taxes.

35.    In 2009, the United States imposed a massive fine on UBS for its illegal tax-evasion assistance activities.  But the United States allowed UBS to avoid a criminal conviction and instead permitted it to enter into a DPA because the Swiss government and UBS agreed that the Swiss bank would give up the identities of UBS's tax cheating clients in the United States.  For the first time in history, a Swiss bank had been fined for illegal tax-evasion conduct and was forced to give up the names of its clients.  The impenetrable wall of Swiss bank secrecy had been breached.

36.    Nevertheless, the Credit Suisse Defendants continued to facilitate these illegal tax-avoidance and illicit money-laundering activities because the Bank's clients, ***knowing that they were breaking the law***, ***were willing to pay premium fees for the assistance that Credit Suisse's personnel provided in effecting these transactions***.  These illicit activities were a core part of the business model of Credit Suisse's Wealth Management/Private Banking and Investment Banking operations, enabling the Directors and Officers to enjoy lush pay packages and huge bonuses and to entrench themselves in their positions of power, prestige and profit.  The Credit Suisse Directors' and Officers' continuation of its illegal tax-evasion activities was negligent in the extreme.  It was extraordinarily dangerous to permit criminal activity to continue following worldwide publicity surrounding the $780 million fine paid by UBS accompanied by the unprecedented disclosure of accountholder information.

37.    Tax evasion also requires the illegal money-laundering that necessarily accompanies investing or transferring the fruits of illegal tax evasion — two sides of a

corrupt coin.   However, to pull off this kind of illegal business operation requires deceptive conduct on an industrial strength scale.  And that's exactly what Credit Suisse's Directors and Officers permitted the Wealth Management/Private Banking and Investment Banking operations to do, ***because it was part of the business model of Credit Suisse pursued by the Directors and Officers***.  The tax-evader-aider misconduct in Credit Suisse's Wealth Management and Investment Banking businesses was a massive and sophisticated operation, involving some 2,000 employees, including foreign nationals who ***repeatedly making illegal visits into New York and other cities in the United States to solicit and meet with tax-cheater clients — in violation of the visa and immigration laws in the United States***.

38.    United States Senate hearings in 2014 exposed details of Credit Suisse officials' tax-avoidance/money-laundering misconduct here in the United States.  The hearings revealed that Credit Suisse's Wealth Management/Private Banking operation was a "***willful accomplice***" in tax evasion by New York and other United States citizens with ***thousands*** of secret accounts worth ***billions*** of dollars — "***systematic***" illegal tax-evasion practices involving ***secret trips*** to the United States by unregistered Credit Suisse brokers/advisors, ***secret elevators*** and special meeting rooms at the Zurich airport, ***secret transfers*** of account statements and cash — real "***cloak and dagger tactics***."

39.    When United States regulators and prosecutors began to focus on Credit Suisse's illegal activities, they discovered that there were large numbers of Credit Suisse bankers present in and ***working illegally in the United States — mostly in New York — soliciting clients for and assisting them in illegal tax evasion***.  Credit Suisse was initially fined $200 million because it was "***well aware***" of the legally

required registration steps for broker dealer/financial advisors but, nevertheless, for "*many years*" maintained an illegal United States presence, based in ***New York***.

40.    Officials in the New York Investment Banking and Wealth Management/Private Banking operations also provided Americans corporate-wide tax-evasion and money-laundering assistance.  This misconduct was so egregious that it forced criminal pleas by several Credit Suisse Investment Banking officials for wire and mail frauds in the United States courts and cost Credit Suisse billions of dollars in penalties, fines, and settlements damaging its shareholders when the stock price declined.

41.    In 2014, Credit Suisse was forced to do what no other bank of its size had done in over 20 years — plead guilty to criminal wrongdoing, pay a $2.6 billion fine and admit that its Wealth Management/Private Banking officials "operated an illegal cross-border banking business that knowingly and willfully aided" tax evasion in the United States.  This "brazen" misbehavior was perpetrated by "hundreds of bank employees including managers ... involved in the misconduct over decades."  The corporate guilty plea was insisted upon and the enhanced penalties were imposed by prosecutors because the Bank's Directors and Officers permitted the obstruction of the criminal investigation, allowing "***documents to be destroyed***," which "***encumbered the scope and progress***" of the criminal inquiry, while conducting a "***shamefully inadequate internal inquiry***" in an attempt to cover up their own involvement.   In fact, Credit Suisse and those insiders ***continued to assist tax evaders in the United States***, ***and they continued to do it until current times as exposed in another United States Senate Report***, ***issued in April 2023***.

42.    New York prosecutors and regulators were an active part of the criminal tax-evasion-assistance prosecution.  They found that aiding and facilitating tax evasion was a

"strategy and business model that Credit Suisse engaged in for decades" — "[i]t was decidedly not the result of the conduct of just a few bad apples," as "***it was common knowledge that tax evasion was the strategy***, ***a business model pursued by*** [***Credit Suisse***] ***for a long time***." The conduct of Credit Suisse's Board in allowing this illegal activity to go on "***violates governance and business conduct requirements***," including "***its duty to identify***, ***limit and monitor the risks involved in its United States business***, ***exposing*** … ***the entire financial group to unduly high legal and reputational risks***." ***Such conduct*** "***violates business conduct requirements under the Swiss supervisory law***."

43.    As the United States cracked down on Credit Suisse's Wealth Management/Private Banking tax-evader-aider activities, customers began to withdraw their secret accounts, hurting the Wealth Management/Private Banking division's operating results, while reducing its closely watched assets under management. Because of the damage that the Senate Investigation, and SEC and DOJ proceedings were having on the Wealth Management/Private Banking business, officials there altered "key metrics" that were "reverse engineered" to create "falsified profits" from which the insiders benefited. Credit Suisse was fined $100 million for its officials' misconduct in this regard.

44.    Credit Suisse's money-laundering control deficiencies have existed and persisted in New York and across its entire business, as admitted to with the release of Credit Suisse's 2022 results. However long before that admission, (a) the United States Financial Industry Regulatory Authority ("FINRA") penalized Credit Suisse for its "***significant deficiencies in anti-money laundering programs***" and for "***ignoring red flag***[***s***]"; (b) other authorities fined Credit Suisse for "***breaches of***

*anti-money laundering requirements and lapses in controls*"; and (c) Credit Suisse was sanctioned by its Swiss regulator which found "*failures in anti-money laundering procedures*" due to "*weaknesses*" and "*short comings*" that "*occurred repeatedly over a number of years*." During 2020–2021, *Credit Suisse was again indicted for money laundering on a* "*grand scale*," and was again sanctioned by the United States Fed and the NYDFS for continued *major deficiencies* in money laundering controls. The illegal activities of Credit Suisse's Wealth Management/Private Banking officials harmed Credit Suisse's credibility and reputation for legal compliance and honesty driving the stock price lower — damaging shareholders and contributing to the loss of trust and financial decline leading to the collapse in March 2023.

45.    In March 2023 it was reported that Credit Suisse officials secretly continued those illegal tax-evasion activities here in the United States — out of its New York hub. At the end of March 2023, the United States Senate issued a report — "Credit Suisse's Role in United States Tax Evasion Schemes," following a two-year investigation into Credit Suisse's continuing assistance to United States-based tax evaders out of its New York office. These activities violated and breached the 2014 plea agreement in which Credit Suisse pleaded guilty to helping United States residents evade taxes with secret accounts and other illegal steps.

46.    Credit Suisse remained burdened by and faced a serious financial threat because of the Wealth Management/Investment Banking operations' illegal tax-evasion and money-laundering activities. Then in 2017, several European nations conducted coordinated raids on Credit Suisse Wealth Management/Private Banking offices in London, Paris, Amsterdam, Germany and Australia as part of "a criminal investigation

into undeclared black accounts" and "aggravated money laundering and financial fraud" — "***a sweeping tax evasion and money laundering investigation spanning five countries*** … ***and thousands of account holders***," which "if proven indicate the bank was effectively a global criminal enterprise." Over time Credit Suisse was fined $540 million by Italy, Germany, and France for "***illegal money laundering***." This was a continuation of that conduct. It never ceased.

47.     Credit Suisse and its Directors and Officers permitted operation of a worldwide business of tax-evasion assistance, participated in and furthered by KPMG. Credit Suisse and its Directors and Officer knew or should have known Credit Suisse and Credit Suisse's clients were engaging in illegal acts. But they violated Credit Suisse's Code of Conduct and allowed the tax-evasion misconduct to continue.

### 2.     The Investment Banking Operations

48.     After the billions of dollars in 2007–2008 subprime losses, the Investment Banking division continued and even expanded its operations — but the Directors and Officers permitted that to occur without the essential supervision of the Investment Bank operation in New York and without properly correcting, updating, fixing or implementing internal legal/regulatory/compliance controls and risk management procedures. Credit Suisse's Directors and Officers and KPMG knew this.

49.     Credit          Suisse's          financial/accounting          controls          and legal/regulatory/compliance controls and risk management and governance procedures were — with proper Board supervision and KPMG oversight and involvement — supposed to deter, detect and prevent intentional illegal or other improper conduct by employees. But the Board's supervisory and compliance monitoring system were "seriously flawed."

50.     The past years have witnessed one scandal after another in Credit Suisse's Investment Banking operation, resulting in over $9 billion in penalties, fines and payments **on top of** operating losses of close to $5 billion and write-downs of long worthless DLJ "goodwill" of almost $6 billion.  In the subprime toxic mortgage-backed securities fiasco, which caused Credit Suisse $2.6 billion in losses in 2007–2008, Credit Suisse officials "defrauded charities and public and private pensions," "misrepresented delinquency data," "systematically failed to adequately evaluate loans," "kept investors in the dark" and "deprived investors of essential information."  This mispricing of subprime mortgage securities by billions of dollars allowed Credit Suisse's Investment Banking officials to create "**fictional profits**," enabling those officials to pocket hundreds of millions of dollars in illicit compensation and bonuses.  According to the SEC, the "**stunning scale**" of the illegal mispricing was "**exceeded only by the greed of senior bankers involved**."

51.     According to regulators, Credit Suisse's Investment Banking operation had material weaknesses in internal financial/accounting controls and legal/regulatory/compliance controls, **lacked** "**adequate systems and controls**," and suffered from a "**lack of monitoring [its] systems and controls**."  The Directors and Officers failed to "**adequately supervise**" this part of the business — "**serious supervisory failures**"; and they "**failed to conduct [the Investment Banking] business with due skill**, **care and diligence** … **failing to organize and control [that] business effectively**," due to the "**serious failures in the** … **controls over the** … **operation**."

52.     The misconduct in the Investment Bank was not limited to dealings in toxic subprime "garbage"/"crap," and assisting with illegal tax evasion in New York/United

States. For its Investment Bank officials' abuse of "dark pools," Credit Suisse was censured, suffering a $100 million penalty, the largest dark pool penalty ever imposed. Credit Suisse paid fines of almost $80 million and had to agree to a criminal non-prosecution agreement in the Eastern District of New York the "Princelings Probe" of New York Investment Bank officials' violations of the United States Foreign Corrupt Practices Act in a "scheme to corruptly win banking business by awarding employment to friends and family of Chinese officials," pursuing a "corrupt scheme" which resulted in a "criminal penalty [that] provides explicit insight into the level of corruption that took place at Credit Suisse."

53.    Credit Suisse was also fined $135 million because, as stated by the Superintendent of the NYDFS, Credit Suisse's Investment Banking officials manipulated and rigged Forex currency trading — they "***consistently engaged in unlawful, unsafe and unsound conduct by failing to implement effective controls***" due to "a corrupt culture," that "violated New York law and repeatedly abuse[d] the trust of their customers over the course of many years." There were "multiple breaches" despite "repeated reminders," as Credit Suisse continued to suffer from a "***supervisory and compliance monitoring system [that] was seriously flawed***" and "***resulted in a systemic supervisory failure***."

54.    When Credit Suisse made a record-breaking $5.28 billion payment in 2017 for mis-selling the toxic subprime mortgage-backed securities, it was because of its Investment Banking officials' "false and irresponsible representations about residential mortgage-backed securities" resulting in the loss of billions of dollars, which took a painful toll on the lives of ordinary Americans — a "huge breach of public trust." Credit

Suisse Investment Bank officials called them "bad loans," "sludge," "complete crap" and "utter complete garbage."

55.    When Credit Suisse's own inventory of these "crappy/garbage" loans backed up — the Investment Banking officials exhorted the salespeople: "we have almost $2.5B of conduit garbage to still distribute." "Credit Suisse knowingly put investors at risk, and the losses caused by its irresponsible behavior deeply affected not only financial institutions ... but also taxpayers and contributed significantly to the financial crisis," said a United States official.

56.    In late 2015 and early 2016, Credit Suisse disclosed the write off of $3.8 billion in long ago used up/worthless "goodwill" that had been carried on the Investment Bank's books from the ***15-year-old DLJ acquisition in 2000*** and huge additional losses — over $1 billion — due to "***shocking***" "***hidden giant risky bets***," by New York Investment Bank officials in more high-risk speculative securities, resulting in Credit Suisse reporting a multi-billion-dollar 2015 loss. Later in 2022 Credit Suisse had to write off $2 billion more of this bogus DLJ goodwill.

**B.    The Unceasing Mismanagement at Credit Suisse and the Continuing Course of Misconduct and Conspiracy Resulting in Constant Scandals and Damaging Credit Suisse Common Shareholders**

57.    The Credit Suisse Defendants have never fixed the lack of controls and lack of adequate supervision of Credit Suisse's Wealth Management and Investment Banking operations. The misconduct continued until the March 2023 collapse.

**1.    Greensill Scandal**

58.    In March 2021, the Greensill Capital scandal engulfed Credit Suisse, which will cost well over $3 billion as Credit Suisse settles claims by investors to whom it sold products dependent on Greensill Capital's solvency and legitimacy — amidst conflicts of

interest and lack of due diligence.  This scandal is a continuation of Credit Suisse's officials' earlier toxic securities scandal — "bags of shit" complete and utter garbage scandal — that cost Credit Suisse billions of dollars and the result of the same continuing lack of oversight and internal controls.

59.    Shortly before Greensill filed for bankruptcy, *The Wall Street Journal* reported:

### Before Greensill Imploded, Credit Suisse Saw Danger

Credit Suisse Group AG **knew since 2019** that supply-chain finance funds it ran with Greensill Capital were too reliant on a small group of insurers to protect investors against default and **failed to remedy the situation**.

That turned out to be **a ticking time bomb**, and when the insurers balked at renewing contracts  ... Greensill began its swift implosion.

60.    In mid-March 2021, *The Wall Street Journal* reported:

### Greensill Collapses, Files for Protection

Greensill Capital filed for insolvency protection ... after regulators took over its banking unit and Credit Suisse Group AG froze investment funds that were critical to the startup's operations.

\*\*\*

The Credit Suisse move was triggered after Greensill lost coverage from credit insurers that provided protection in case the startup's clients defaulted.

**The insurance was crucial because it made Greensill's assets appear safer to Credit Suisse's institutional investors**, **some of whom are restricted from putting cash into riskier investments**.

61.    On March 11, 2021, the *Financial Times* reported: **Credit Suisse Executives 'Overruled' Risk Managers on $160M Loan to Greensill**

Senior Credit Suisse executives **overruled risk managers to approve a $160m loan to Greensill Capital**, which the collapsing finance group now has "no conceivable way" to repay … the loan … was initially rejected by … risk managers in the investment bank.

*** 

The revelations add a further twist to Credit Suisse's entanglement with Greensill, whose former-billionaire founder is **personally a major client of its private bank**, **alongside his company's relationships with its investment bank and asset management arms**.

***

Another person involved added the loan was "**hugely controversial**" and was "**imposed from above**" by the "**top brass**" — **in their view without sufficient internal discussion or due diligence**.

62.    On March 18, 2021, *Bloomberg* warned "**the crisis renews questions about risk management and controls**."  In March 2021, the *Financial Times* reported:

### Credit Suisse's Role in the Greensill Capital Crisis

The Swiss lender has a well-documented history of scandal.

***

… Lex Greensill and Credit Suisse go way back.  The financier was a big private-banking client of the Swiss lender, and his company also held relationships with its investment banking and asset management arms.

Last year, the bank even lent Greensill $160m, of which $140m was outstanding before $50m was repaid this week. **The loan was made even though it was initially rejected by internal risk managers**.

### 2.    Archegos Scandal

63.    In late March 2021, Credit Suisse disclosed that it faced "highly significant and material" losses from yet another New York-based scandal involving its Investment Banking officials and Archegos Capital Management, a New York-based hedge fund

controlled by Bill Hwang, who had a criminal history of securities violations and a prior $44 million penalty. Credit Suisse officials — due to a continuing lack of internal controls and risk management procedures — had improperly extended billions in uncreditworthy loans to Archegos Capital/Hwang. The stock positions financed by improvident loans suddenly collapsed, causing the stock positions to be liquidated and resulting in billions of losses for credit extended by Credit Suisse and supervised by its New York-based operations — ***causing a market loss in its common stock of over $5 billion***, and resulted in Credit Suisse suffering huge losses, damaging its shareholders.

64.    An internal report by a New York-based law firm – based on an investigation in New York — exposed horrible mismanagement and control failures. In its 2022 Annual Report, Credit Suisse admitted:

> Credit Suisse incurred a net charge of ***CHF 4.8 billion in 2021 in respect of the Archegos matter***.
>
> \*\*\*
>
> ***On July 29, 2021, we published the report based on the independent external investigation into Archegos, which found, among other things, a failure to effectively manage risk in the Investment Bank's prime services business by both the first and second lines of defense as well as a lack of risk escalation***.
>
> \* \* \*
>
> ***We have identified material weaknesses in our internal control over financial reporting as of December 31, 2022 and 2021***.
>
> Management has identified certain ***material*** weaknesses in our internal control over financial reporting as a result of which management has concluded that, as of December 31, 2022, the Group's internal control over financial reporting ***was not effective, and for the same reasons, management has reassessed and has reached the same conclusion regarding December 31, 2021, as more fully described in this Annual Report***.

> *Management has also accordingly concluded that*
> *our disclosure controls and procedures were not*
> *effective*.
>
> The material weaknesses that have been identified relate to
> the failure to design and maintain an effective risk assessment
> process to identify and analyze the risk of material
> misstatements in its financial statements and the failure to
> design and maintain effective monitoring activities relating to
> (i) providing sufficient management oversight over the
> internal control evaluation process to support the Group's
> internal control objectives; (ii) involving appropriate and
> sufficient management resources to support the risk
> assessment and monitoring objectives; and (iii) assessing and
> communicating the severity of deficiencies in a timely manner
> to those parties responsible for taking corrective action. These
> material weaknesses contributed to an additional material
> weakness, as management did not design and maintain
> effective controls over the classification and presentation of
> the consolidated statement of cash flows. This material
> weakness resulted in the revisions contained in our previously
> issued consolidated financial statements for the three years
> ended December 31, 2021 as disclosed in the 2021 Annual
> Report.

Credit Suisse SEC Form 20-F, Mar. 14, 2023, at 41, 50–51.

### 3.    Tuna Boat/Bond Scandal

65.    The Tuna Boat/Bond scandal was an "***odious***," "***grotesque***" and a "***brazen***" international "***criminal scheme***" — a series of corrupt and illegal transactions conceived and created by Credit Suisse Investment Bank officials that resulted in a criminal conviction of Credit Suisse and its investment banking officials here in the Eastern District of New York.    ***The Investment Banking officials involved and Credit Suisse did as well have pleaded guilty in criminal cases here in the Eastern District of New York and Credit Suisse incurred penalties of $547 million, and the imposition of yet another expensive monitor***.

66.    Three Credit Suisse officials put together an $850 million dollar loan funded by Credit Suisse.  The proceeds were to be used to purchase tuna boats newly constructed by Privinvest to create a self-sustaining tuna fishing industry for an African country.

67.    This loan was put together and made in violation of Credit Suisse's internal due diligence and other lending protection procedures.  It was done by Credit Suisse officials who were working in cahoots with the principals of Privinvest and corrupt officials to siphon off for themselves hundreds of millions of dollars of the loan proceeds. Today, the project is defunct.  The boats are dry-docked, rusting and useless.

68.    The $850 million loan was turned into Tuna Bonds — sold to investors **here in New York and United States**.  Because hundreds of millions of dollars were siphoned off for bribes and kickbacks, and because much of the loan proceeds were diverted, the Tuna Bonds restructured and defaulted.  An audit established at least $500 million of loan/bond proceeds cannot be accounted for.  ***Prosecutors in the Eastern District of New York charged the trio of Credit Suisse bankers with perpetrating an unlawful scheme***.  ***The Credit Suisse bankers were***, ***according to the prosecutors***, "***acting in the course***" ***of their employment***.  In 2021 Credit Suisse pleaded guilty here in Eastern District of New York to conspiracy and mail fraud and incurred penalties of more than $547 million.

69.    On February 12, 2021, *Bloomberg* reported:

### Credit Suisse Ignored Warning on $2 Billion Deal with Tycoon

Credit Suisse Group AG ignored warnings from its outgoing regional chief executive officer on the risks ... in a scandal that has ... opened up questions about its due diligence.

\*\*\*

> *... **U.S. prosecutors alleged that the contracts were a front for government officials and Credit Suisse's own bankers to enrich themselves by as much as $200 million**.*
>
> \*\*\*
>
> ***The bank had previously designated the billionaire as*** "***an undesirable client** ...."  **An attempt to open an account in which he was the beneficial owner had also been previously rejected** ... **the banks internal records described Safa as a** "**master of kickbacks**."*

### 4.    Princelings "Pay off" Scandal

70.    Credit Suisse paid fines of almost $80 million and had to agree to a criminal non-prosecution agreement in the Eastern District of New York in the "Princelings Probe" of NY Investment Bank officials' ***violations of the United States Foreign Corrupt Practices Act in a*** "***scheme to corruptly win banking business by awarding employment to friends and family of Chinese officials***," pursuing a "***corrupt scheme***" which resulted in a "***criminal penalty* [*that*] *provides explicit insight into the level of corruption that took place at Credit Suisse***."

### 5.    York Capital Hedge Fund Scandal

71.    York Capital Management was a New York City Hedge Fund (located at 1330 Avenue of the Americas) in which Credit Suisse made a $425 million investment in 2010.  The Credit Suisse Defendants acted negligently — without investigation or due diligence and without adequate monitoring going forward.  As a result, in late 2020 Credit Suisse wrote off its ***entire investment*** — $450 million — in the New York-based hedge fund.

### 6.    Money Laundering Scandals

72.    In a continuation of the prior money laundering activities in 2020 Credit Suisse was ***again criminally indicted*** for money laundering "***on a grand scale***." On December 17, 2020, the *Financial Times* reported:

> ... [I]nvestigators said the bank had processed more than $158 million of transactions ***for a clan of mafiosi and former top-level wrestlers***, ***earned from smuggling tonnes of cocaine into Europe and other illegal activities***.

73.    *Finews.com* reported on December 17, 2020 that "***Credit Suisse Was Indicted in ... Drug Scheme***":

> [After] 12-year-long investigation into drug trafficking and money laundering of the proceeds ...  named ex-Credit Suisse executive as well as two alleged members of the criminal organization were also indicted ...
>
> The bank is accused of failing to take ... measures that were ... required to prevent the laundering of assets belonging to and under the control of the criminal organization.

74.    Money laundering deficiencies also continued here in the New York/United States operation as well.  On December 22, 2020, American Banker reported:  ***Credit Suisse Flagged for Anti-Money-Laundering Shortcomings***

> ***The Federal Reserve and the New York State Department of Financial Services have ordered Credit Suisse to repair its anti-money laundering program after shortcomings were found in the Swiss company's United States operation***, ***according to an enforcement action released Tuesday***.
>
> ***Examiners with the Federal Reserve Bank of New York uncovered problems at Credit Suisse's New York branch last year***.

43

**7.    Toxic Securities Scandal — "Bags of Shit" and "Utter and Complete Garbage"**

75.    Credit Suisse's shareholders continued to suffer damages due to the New York centered toxic securities scandal for which Credit Suisse officials in New York were criminally convicted in the Southern District of New York and for which Credit Suisse had been sued here in New York.   On February 13–14, 2020, *The Wall Street Journal* reported:

### Credit Suisse Settles MBIA Case

Credit Suisse Group AG said it would pay $600 million to settle a long running case with credit insurer MBIA Inc. over toxic securities, as its executives seek to clear a roster of legal and regulatory cases that have dragged on the bank's profits for a decade.

\*\*\*

*A New York state judge in January said Credit Suisse should pay $604 million damages in the case*.

\*\*\*

*In all, legal penalties and settlements have cost the bank more than $9 billion since 2009, according to Credit Suisse disclosures*.

**8.    Patrice Lescaudron Scandal**

76.    On February 4, 2021, *The Wall Street Journal* reported:   ***Credit Suisse Was Alerted to Private Banker's Misconduct Years Before Criminal Charges***

Credit Suisse Group AG ***overlooked red flags for years*** while a rogue private banker stole from billionaire clients ....

The private banker, Patrice Lescaudron, was sentenced to five years in prison in 2018 for fraud and forgery.   He admitted cutting and pasting client signatures to divert money and make stock bets without their knowledge, causing more than $150 million in losses ....

The regulator, Finma, ***publicly censured Credit Suisse in 2018*** for inadequately supervising and disciplining Mr. Lescaudron as a top earner, and said he had repeatedly broken internal rules, but it revealed little else about the bank's actions in the matter.

44

***

[A] report commissioned by Finma in 2016 ... found Mr. Lescaudron's activities **triggered hundreds of alerts in the bank that weren't fully probed** in the 2009–15 period studied.  In addition, around a dozen executives or managers in Credit Suisse's private bank knew **Mr. Lescaudron was repeatedly breaking rules but turned a blind eye**, proposed lenient punishment for his misconduct or otherwise glossed over the issues because he brought in an around $25 million in revenue a year, the report found.

It said Mr. Lescaudron's "disregard of internal directives and guidelines, the inadequate safeguarding of client documentation as well as unauthorized settlements of client transactions had been **known to the bank since June 2011**."

77.    In February 2021, the *Financial Times* reported:

### Credit Suisse Turned Blind Eye as Banker Stole from Clients

Credit Suisse **ignored brazen compliance violations** by one of its top bankers for years as he stole from billionaire clients and flouted anti-laundering directives, a leaked regulatory report reveals.

***

**Repeated warning signs, evidence of hundreds of suspicious transactions and four disciplinary proceedings were not acted upon by Credit Suisse** ....

### 9.    Tax Avoidance Scandal

78.    During 2022, Credit Suisse continued to pay the price for its worldwide tax-evasion activities, when it paid $240 million to settle claims that it assisted French citizens in evading taxes.  Then it was reported the tax-evasion misconduct here in New York has never ceased.  While it seems beyond belief — despite the horrible penalties Credit Suisse suffered for its New York officials' massive United States/New York tax-evasion assistance activities, and despite its promise to stop that illegal conduct, they

45

permitted Credit Suisse officials to engage in assisting tax evasion here.  On March 13,

2021, *The New York Times* reported:

### Whistle-Blower Says Credit Suisse Helped Clients Skip Taxes After Promising to Stop

Seven years after Credit Suisse promised federal prosecutors that it would stop helping rich Americans hide their wealth from tax collectors, a whistle-blower is contending that it continued to do just that, raising the possibility that the Swiss bank could face a fresh investigation and steep financial penalties.

*\*\*\**

The whistle-blower ... is also contending that Credit Suisse lied to federal prosecutors, the Internal Revenue Service and members of Congress during their yearlong inquiry into how Swiss banks helped Americans defraud the government. Those investigations ultimately led to a settlement in May 2014 between Credit Suisse and federal prosecutors, in which the Swiss bank pleaded guilty to helping some of its American clients evade taxes by cloaking their wealth through offshore shell companies.

Credit Suisse was fined a total of $2.6 billion, but avoided even higher fines because it vowed to the Justice Department and a Senate panel that it had not only stopped the practice, but that it would close "any and all accounts of recalcitrant account holders."

79.    The whistleblowers were correct.  As reported in a new United States Senate

Report, Credit Suisse's illegal tax evasion continued up to current:

The bank notoriously pleaded guilty in 2014 to criminal charges for "knowingly and willfully" helping U.S. clients hide offshore assets and income from the IRS.

***The now-troubled bank appears to have violated that agreement***, according to a new report by the Senate Finance Committee that details ongoing and rampant abuse since then.

The report, released Wednesday, details the findings of the panel's ***two-year investigation*** and takes on more urgency given the banking crisis.

For years, the bank has provided a safe haven for wealthy American clients to hide assets from the IRS — even after it was caught and prosecuted for doing the same thing more than a decade ago, according two former Credit Suisse bankers who spoke in exclusive interviews with CNBC and are working with the U.S. government as whistleblowers.

The bank notoriously pleaded guilty in 2014 to criminal charges for "knowingly and willfully" helping thousands of U.S. clients conceal their offshore assets and income from the IRS. It admitted at the time that it used sham entities, destroyed account records, and hand delivered cash to American clients to avert IRS detection — agreeing to crack down on U.S. tax dodgers going forward as part of its plea deal. Credit Suisse also agreed at the time to a host of reforms, including disclosing its cross-border activities and cooperating with authorities when they request information, among other things.

***The now troubled bank appears to have violated that agreement, according to a new report by the Senate Finance Committee that details ongoing and rampant abuse since then.***

\*\*\*

The Senate report ... accuses the bank of violating the terms of its 2014 plea agreement, which could trigger a host of repercussions if the Justice Department presses the case.

Senate investigators say they discovered that Credit Suisse enabled as many as 25 American families to hide fortunes totaling more than $700 million in the bank in the years after Credit Suisse's plea agreement.

\*\*\*

***The report and interviews*** ... ***show how compliance systems inside Credit Suisse broke down in the years before its collapse this month and rescue by the Swiss government and rival bank UBS.***

\*\*\*

"The committee's investigation uncovered major violations of Credit Suisse's plea agreement, including ***an ongoing and potentially criminal tax conspiracy involving nearly $100 million dollars and undeclared offshore accounts belonging to a family of dual U.S./Latin American citizens,***" ***a committee aide told CNBC.***

Eamon Javers, *Credit Suisse Whistleblowers Say Swiss Bank Has Been Helping Wealthy Americans Dodge US Taxes for Years*, CNBC, Mar. 29, 2023.



## IV.    THE PARTIES AND OTHER IMPORTANT ACTORS

### A.    Plaintiff

80.    Plaintiff Gregory A. Stevenson is a citizen of the United States domiciled in the State of Indiana.  Plaintiff owed shares of Credit Suisse common stock after October 22, 2013 and has suffered damage due to the conduct complained of.

### B.    Credit Suisse Entity Defendants



81.    Credit Suisse Group AG is a public corporation — a holding company — organized under the laws of Switzerland.  Credit Suisse Group AG operates worldwide via its wholly owned subsidiary, Credit Suisse AG.  Credit Suisse was founded in 1856 and opened its first foreign representative office in New York City in 1870.  Credit Suisse does billions of dollars of business in United States and maintains its "America's" headquarters at 11 Madison Avenue in New York City.

82.    The scope of Credit Suisse's New York presence is demonstrated by the fact that there are over 300 other separate Credit Suisse dominated or controlled entities located here in New York City.  About 100 Credit Suisse entities are incorporated in Delaware and have their principal place of business in New York.  Credit Suisse and its subsidiaries are parties to numerous agreements, contracts and undertakings that consent to United States or New York jurisdiction and the application of New York and United States laws.

83.    The main parts of Credit Suisse's business involved in this lawsuit are described by Credit Suisse as follows:

**Investment Banking & Capital Markets**

The Investment Banking & Capital Markets division offers a broad range of investment banking products and services which include advisory services related to M&A, divestitures, takeover defense strategies, business restructurings and spin offs, as well as debt and equity underwriting of public offerings and private placements.

\*\*\*

***We operate as an integrated bank*** … ***ensuring a strong compliance culture***.

We deliver our investment banking capabilities through regional and local teams based in both major developed and meagering market centers.  ***Our integrated business model*** enables us to deliver high value, customized solutions that leverage the expertise offered across Credit Suisse and that help our clients unlock capital and value in order to achieve their strategic goals.

\*\*\*

**International Wealth Management**

In International Wealth Management, we cater to the needs of our private, corporate and institutional clients by offering expert advice and a broad range of financial solutions.

Our **Private Banking** business provides comprehensive advisory services and tailored investment and financing solutions to wealthy private clients and external asset managers. We serve our clients through 1,100 relationship managers in 43 cities and in 25 countries.

Our **Asset Management** business offers investment solutions and services globally to a broad range of clients, including pension funds, governments, foundations and endowments, corporations and individuals, along with our private banking businesses.  Our asset management capabilities span across a diversified range of asset classes, with a focus on traditional and alternative strategies.

84.    The Credit Suisse Entity Defendants are (a) Credit Suisse Holdings (USA), Inc.; (b) Credit Suisse Securities (USA) LLC; (c) Credit Suisse Capital LLC; and (d) Credit Suisse Management LLC.  Each of these Defendants is a Delaware corporation with its principal place of business in New York.  Each of the Credit Suisse Entity Defendants is a citizen of New York and Delaware.

85.    These Credit Suisse Entity Defendants manage Credit Suisse's operations in the United States.  These Defendants maintain separate, but overlapping, boards of directors.  These Credit Suisse Entity Defendants employed many of the Credit Suisse Individual Defendants.  They and their employees participated in providing Wealth Management and Investment Banking services via Credit Suisse's "United States" and "the America's" headquarters in New York City, where Credit Suisse operated its New York branch with thousands of employees through these wholly-owned subsidiaries. These Credit Suisse subsidiaries all participated in, or were used by, the Credit Suisse Directors and Officers as agents and/or as instrumentalities in their mismanagement of Credit Suisse and violations of their statutory duties of due care.  Credit Suisse Group AG is legally obligated to indemnify each of the Individual Defendants for their negligence liabilities in their action.

## C.    Credit Suisse Director and Officer Defendants

86.    Being a member of the Credit Suisse Group A.G. Board is a prestigious and lucrative position.  The members of the Board receive annual compensation including performance-based compensation, plus reimbursement of their expenses.  Additional compensation is paid to the Chairman and Vice Chairman of the Board, as well as for chairing committees.  Directors are paid $250,000–$300,000 per year, ***plus*** up to $600,000 to sit on Board committees (including Audit, Governance, Compensation, and Risk Committees), ***plus*** extra payments of up to $600,000 to act as an Audit or Risk Committee chair.  In addition, they are paid $150,000–$250,000 to sit on the boards of the New York-based Credit Suisse subsidiaries, named as defendants.  The Directors were also the beneficiaries of the stock-grant/corporate-cash-repurchases (detailed below), whereby Directors were given large stock grants with the ability to secretly convert them to cash from Credit Suisse rather than actually selling the shares on the open market.  With all benefits considered — being a Credit Suisse Director is worth a million dollars a year.

87.    The Chairman and Vice Chairman of the Board receive very large annual compensation and their positions are ***fulltime jobs***.  Between 2008 and 2021 Rohner was paid over $50 million and Tiner over $20 million.  Members of the Executive Board and Board of Directors, named as Defendants, ***have pocketed some billions — over $100 million per year — in compensation***, ***bonuses and stock grants***, ***which were undeserved and unearned and constituted waste and a mis-transfer***, ***misuse and loss of assets made in bad faith for the improper personal benefit of these Defendants***, ***i.e.***, ***to preserve themselves in the position of power***, ***prestige and profit***.  With the help of KPMG, they participated in and

permitted and profited from the plundering of Credit Suisse while mismanaging it, ultimately running it into the ground, damaging the common shareholders, when the stock fell to $2.01 per share on March 17, 2023 (the end of the Class Period).

### 1.    Director Defendants

88.    Defendant Noreen Doyle is a United States citizen domiciled in New York. Doyle was a Member of the Credit Suisse Board of Directors from 2004–2017. She was Vice-Chair and Lead Independent Director, and Member of the Chairman's and Governance Committee from 2014–2017. She was a Member of the Risk Committee from 2004–2007 and 2009–2017. She was a Member of the Audit Committee from 2014–2016 and 2007–2009. She was also a Member of the Board of Credit Suisse International and Credit Suisse Securities (Europe) Limited (UK subsidiaries) from 2011–2017 and Chair of those Boards from 2013–2017.

89.    Defendant Richard E. Thornburgh is a United States citizen, was domiciled in New York for many years while a Credit Suisse executive, and maintains a residence here and in Florida. Thornburgh was a Member of the Credit Suisse Board of Directors from 2006 to 2018, Vice-Chairman of the Board from 2014–2018, Member of the Audit Committee from 2011–2018, Chair of the Risk Committee 2006–2018 and Member of the Governance and Nominations Committee from 2009–2018. He was also a Member of the Board and Chair of Credit Suisse Holdings (USA), Inc./Credit Suisse (USA), Inc./Credit Suisse Securities (USA), LLC (U.S. subsidiaries) from 2015–2018. His prior positions at Credit Suisse included: Member of the Group Executive Board in various executive roles including Group CRO, Group CFO and CFO Investment Banking, from 1997–2005, and Chief Financial and Administrative Officer and Member of the Executive Board of Credit Suisse First Boston from 1995–1996.

90.    Defendant Seraina Macia is a U.S. citizen domiciled in New York, where she owned a property located at 182 East 94th Street for years and sold it in 2020 for $7.5 million.  Macia also owns property in Florida and Connecticut.  She has been a Member of the Credit Suisse Board of Directors since 2015 and a Member of the Risk committee since 2018.  She was a Member of the Audit Committee from 2015–2018.

91.    Defendant Michael Klein is a United States citizen domiciled in New York.  Klein was a Member of the Credit Suisse Board of Directors from 2018 to 2022.  He also served as a Member of the Risk Committee.

92.    Defendant Mirko Bianchi, a United States citizen domiciled in New York, has been a member of the Credit Suisse Board of Directors since 2022, Chair of the Audit Committee and a member of the Risk and Conduct and Financial Crime Control committees.  He attended Northwestern University, Chicago and got his MBA from Fordham University in New York City.

93.    Defendant Joaquin J. Ribeiro, a United States citizen domiciled in Florida, has been a Member of the Credit Suisse Board of Directors and a Member of the Audit Committee from 2016 through 2021.

94.    Defendant Urs Rohner is a citizen of the Swiss Confederation.  From 2011 through 2020–2021, Rohner was the Chairman of the Credit Suisse Board of Directors.  He served as Vice Chairman of the Board from 2009 to 2011.  He was also the Chair of the Conduct and Financial Crime Control Committee.  He was a Member of the Risk Committee from 2009–2011.  He was the Chief Operating Officer of Credit Suisse from 2006–2009, and its General Counsel from 2004–2009, during which he was a Member of the Executive Board.  Rohner is a member of the Bar of the State of New York and was an attorney at the New York office of Sullivan & Cromwell LLP from 1988 to 1989.  He

has traveled to and stayed in New York countless times — hundreds of days in the aggregate. He left Credit Suisse in 2021.

95.    Defendant John Tiner, a citizen of the United Kingdom, was a Member of the Credit Suisse Board of Directors from 2009 through 2021. Tiner was Chair of the Audit Committee and a Member of the Conduct and Financial Crime Control Committee, the Governance and Nominations Committee, and the Risk Committee. He was also a Member of the Board of Credit Suisse Holdings (USA), Inc., Credit Suisse (USA), Inc. and Credit Suisse Securities (USA), LLC (U.S. subsidiaries), and has held these positions since 2015. Prior to his positions at Credit Suisse, he was a partner at Arthur Andersen, UK. He has traveled to and stayed in New York countless times — hundreds of days in the aggregate. He left Credit Suisse in 2021.

96.    Defendant Severin Schwan is a citizen of the Swiss Confederation. Schwan was the Vice Chairman and Lead Independent Director of the Credit Suisse Board of Directors from 2017 to 2021. He has been a member of the Board since 2014 and a Member of the Risk Committee since 2014. He has traveled to and stayed in New York countless times — hundreds of days in the aggregate. He left the Credit Suisse in 2021.

97.    Defendant Iris Bohnet, a/k/a Iris Bohnet Zurcher, is a citizen of the Swiss Confederation residing in Newton Center, Massachusetts. Bohnet has been a Member of the Credit Suisse Board of Directors since 2012. She has lived and maintained a home in Massachusetts for years. She has served as an Academic Dean at the Kennedy School of Government at Harvard University from 2018 to 2021 and from 2010 to 2014. She has traveled to and stayed in New York countless times — hundreds of days in the aggregate.

98.    Defendant Kaikhushru S. Nargolwala is a citizen of Singapore. Nargolwala has lived in the United States. He was a Member of the Credit Suisse Board of Directors

since 2013 through 2022.  He was a Member of the Conduct and Financial Crime Control Committee.  Since 2007, he has also served as the Chairman of the Compensation Committee and as a Member of the Governance and Nominations Committee.  He was a Member of the Risk Committee from 2013 to 2017; a Non-executive Chairman of Credit Suisse's Asia-Pacific region from 2010 to 2011; a Member of the Executive Board from 2008 to 2010; and the CEO of Credit Suisse Asia Pacific region from 2008 to 2010. Nargolwala served as Bank of America's Head of High Technology Industry group in San Francisco and New York from 1984 to 1990.  He has traveled to and stayed in New York countless times — hundreds of days in the aggregate.

### 2.    Officer Defendants

99.    Defendant David R. Mathers, a United States citizen domiciled in New York, was a Member of the Executive Board since 2010.  He was the Chief Financial Officer of Credit Suisse from 2010 to 2022.  He left Credit Suisse in 2022.  He was also the CEO of Credit Suisse International and Credit Suisse Securities (Europe) Limited (UK subsidiaries), and has held these positions since 2016.  He previously served in the following positions at Credit Suisse: Head of Strategic Resolution Unit from 2015 to 2018; Head of IT and Operations from 2012 to 2015; Head of Finance and COO of Investment Banking from 2007 to 2010; and he served in senior positions in Credit Suisse's Equity business, including Director of European Research and Co-Head of European Equities, from 1998 to 2007.

100.    Lydie Hudson, a United States citizen domiciled in New York, was a member of the Executive Board of Credit Suisse for over 13 years, serving as the Group Chief Compliance and Regulatory Affairs Officer until 2020–2021.  In that role, Hudson oversaw Credit Suisse's compliance and regulatory environment and the bank's policies

and controls.  Prior to joining Credit Suisse in 2008, she worked at Lehman Brothers and The Boston Consulting Group in New York.

101.    Defendant James L. Amine is a United States citizen domiciled in New York, where he worked for Credit Suisse for over 25 years.  Amine was a Member of the Boards of Directors of Member of the Board of Credit Suisse Holdings (USA), Inc./Credit Suisse (USA), Inc./Credit Suisse Securities (USA) LLC (U.S. subsidiaries) from 2014 to 2019.  He held the following positions at Credit Suisse:  CEO Investment Banking & Capital Markets from 2015 to 2019; Joint Head of Investment Banking, responsible for the Investment Banking Department from 2014 to 2015; Head of Investment Banking Department from 2012–2015; Member of the Executive Board of Defendant Credit Suisse Holdings (USA), Inc. from 2010 to 2015; Co-Head of Investment Banking Department, responsible for the Americas and Asia Pacific from 2010 to 2012; Co-Head of Investment Banking Department, responsible for EMEA and Asia Pacific and Head of Global Market Solutions Group from 2008 to 2010; Head of European Global Markets Solutions Group and Co-Head of Global Leveraged Finance from 2005 to 2008; Head of European Leveraged Finance from 1999 to 2000 and from 2003 to 2005, Co-Head from 2000 to 2003; and he held various positions within High-Yield Capital Markets of Credit Suisse First Boston from 1997 to 1999.  Prior to his positions at Credit Suisse, he was an attorney at the New York office of Cravath, Swaine & Moore.

102.    Defendant Timothy P. O'Hara is a United States citizen domiciled in New York.  O'Hara was a Member of Credit Suisse's Executive Board from 2014 to 2016.  He served in the following positions at Credit Suisse: CEO Global Markets from 2015 to 2016; Joint Head of Investment Banking, responsible for the Equities business from 2014 to 2015; President and CEO of Credit Suisse Securities (USA) LLC from 2012 to 2016; Head

of Global Equities from 2012 to 2014; Co-Head of Global Securities from 2011 to 2012; Head of Fixed Income, North America from 2009 to 2011; Head of Global Credit Products from 2008 to 2011; Co-Head of Global Leveraged Finance from 2005 to 2008; Head of Global High Yield Capital Markets and Head of United States High Yield Capital Markets from 2000 to 2005; and Managing Director, Head of Global High Yield Capital Markets and Co-Head of Global Debt Capital Markets from 1998 to 2000. He left Credit Suisse in 2021.

103.    Defendant Robert S. Shafir, a United States citizen domiciled in New York, was a Member of Credit Suisse's Executive Board from 2007 to 2015. He was the Joint Head of Private Banking and Wealth Management, and the Regional CEO for the Americas from 2012 to 2015. He was the CEO of Asset Management from 2008 to 2012 and the CEO of the Americas region from 2007 to 2010. Prior to his positions at Credit Suisse, he was Head of Lehmann Brothers' global equity division from 1998 to 2005.

104.    Defendant Lara J. Warner, a United States citizen domiciled in New York, has been a Member of Credit Suisse's Executive Board since 2015. She was the Chief Risk Officer through 2021 and a Member of the Board of Credit Suisse Holdings (USA), Inc., Credit Suisse (USA), Inc. and Credit Suisse Securities (USA) LLC (U.S. subsidiaries), and has held these positions since 2019. In the past, she held the following positions at Credit Suisse: Chief Compliance and Regulatory Affairs Officer from 2015 to 2019; Chief Operating Officer, Investment Banking from 2013 to 2015; Chief Financial Officer, Investment Banking from 2010 to 2015; Head of Global Fixed Income Research from 2009 to 2010; Head of United States Equity Research from 2004 to 2009; and Senior Equity Research Analyst from 2002 to 2004.

105.    Defendant Pamela A. Thomas-Graham is a United States citizen domiciled in New York.  Thomas-Graham was a Member of Credit Suisse's Executive Board from 2015 through 2022.  She was the Chief Marketing Officer and Head of Private Banking and Wealth Management New Markets from 2013 to 2015.  She was the Chief Talent, Branding and Communications Officer from 2010 to 2013.

106.    Defendant Sean T. Brady is a United States citizen domiciled in New York. Brady held various roles at Credit Suisse in New York from 1994 to 2016, including Managing Director and Head of Product Development within the Investment Banking. He was Dougan's right hand man and most trusted confidante.  Prior to his positions at Credit Suisse, he worked for Cleary Gottlieb Steen & Hamilton in New York.

107.    Defendant Robert Jain, a United States citizen domiciled in New York, held various roles at Credit Suisse from 1996 to 2016, including Global Head of Asset Management, Co-Head of Global Securities, and Global Head of Proprietary Trading across equities and fixed income in New York.

108.    Defendant Philip Vasan, a United States citizen domiciled in New York, held the following positioned at Credit Suisse:  CEO of Private Banking for the Americas from 2013 to 2016, Global Head of Prime Services from 2003 to 2013, Global Head of Equity Derivatives and Convertibles from 2002–2003, Head of e-Commerce from 2000 to 2001, and Global Head of Foreign Exchange from 1996 to 2000.  Vasan ran Credit Suisse's global FX derivatives business from 1992 to 1996.  He was also a member of the Management Committee of the Private Bank and before that the Investment Bank.

109.    Defendant Brady W. Dougan is a United States citizen domiciled in New York.  Dougan was a Member of the Credit Suisse's Executive Board from 2003 to 2015 and CEO of Credit Suisse Group AG from 2007 to 2015.  While CEO of Credit Suisse Group

AG, Dougan lived in New York and performed his CEO duties of the New York offices. He was the CEO of the Investment Banking division and the CEO of the Americas region from 2006 to 2007, and a Member of the Group Executive Board from 2004 to 2005. He joined Credit Suisse in 1990. He was the Head of the Equities division from 1996 to 2001, before he was appointed the Global Head of the Securities division. From 2002 to 2004, he was the Co-President of Institutional Securities at Credit Suisse First Boston, and from 2004 until 2005 he was CEO of Credit Suisse First Boston and in May 2005, he became the CEO of Investment Banking.

110.    Defendant Eric Varvel is a United States citizen domiciled in New York. Varvel joined Credit Suisse in 1990 and left in 2021. He was a Managing Director of Credit Suisse in the International Wealth Management division, based in New York. He was also a Global Head of Asset Management and serves as President and CEO of Credit Suisse Holdings (USA), Inc. He was in the middle of the Greensill scandal that exploded in March 2021. He was Chairman of the Emerging Markets and Sovereign Wealth Funds. He served as a member of the Executive Board from 2008 to 2014. From 2012 to 2014, he led the Investment Banking division, with responsibility for the Equities and Investment Banking business. He was also the CEO of the Asia Pacific region. From 2010 until 2012, Varvel was CEO of Investment Banking and served as acting CEO from September 2009 until July 2010. From 2008 until 2010, he was CEO of the EMEA region. Prior to his appointment to the Executive Board in 2008, he was Co-Head of the Global Investment Banking department and Head of the Global Markets Solutions Group in the Investment Banking division of Credit Suisse for over three years, based in New York. Before that, Varvel spent 15 years in the Asia Pacific region in a variety of senior roles,

including Head of Investment Banking and Emerging Markets Coverage for the Asia Pacific region ex-Japan and Head of Fixed Income Sales and Corporate Derivative Sales.

111.    John G. Popp is a United States citizen domiciled in New York.  Popp is a registered broker dealer in the United States.  Popp has been associated with Credit Suisse since 1997.  Popp is a Managing Director of Credit Suisse in the Asset Management division, based in New York.  He is the Global Head and Chief Investment Officer of the Credit Investments Group (CIG), with primary responsibility for investment decisions, portfolio monitoring processes and business development for CIG's global investment strategies.  Popp serves as the President and Chief Executive Officer of the Credit Suisse Funds, the Credit Suisse Asset Management Income Fund, Inc. and the Credit Suisse High Yield Bond Fund.  Previous to Credit Suisse, Popp was a Managing Director of Credit Suisse and Group Head and Chief Investment Officer of CIG, with primary responsibility for making investment decisions and monitoring processes for CIG's global investment strategies. Popp also serves as Trustee, Chief Executive Officer and President of the Credit Suisse Funds, as well as serving as Director, Chief Executive Officer and President for the Credit Suisse Asset Management Income Fund, Inc. and Trustee, Chief Executive Officer and President of the Credit Suisse High Yield Bond Fond.

112.    Defendant Brian Chin is a United States citizen domiciled in New York. From 2003 he was Credit Suisse CEO Global Markets, *i.e.*, Investment banking, Member of the board of Credit Suisse Holdings (USA) Inc., Credit Suisse (USA), Inc. and Credit Suisse Securities (USA) LLC (U.S. subsidiaries) (2016), Co-Head of Credit Pillar within Global Markets (2015–2016), Global Head of Securitized Products and Co-Head of Fixed Income, Americas (2012–2016), and other senior positions within Investment Banking

(2003–2012). He was deeply involved in the Archegos scandal. He left Credit Suisse in 2021–2022.

113.    Defendant Jay Kim is a United States citizen domiciled in New York. Kim was with Credit Suisse for 12 years. He is a registered broker dealer with the United States and New York. He was Managing Director, Global Head of Securitized Products (2016–2023), Managing Director, Global Head of Fixed Income Credit Products (2020–2022), and Managing Director, Global Head of Securitized Products Finance (2011).

114.    Albert Sohn is a United States citizen domiciled in New York. Sohn headed Credit Suisse Securities from 1996 to 2018 and was the Chief Executive Officer and Chief Investment Officer of Securitized Products at Credit Suisse's Investment Bank in New York.

115.    Defendant David Miller, a United States citizen domiciled in Connecticut, has been a Member of Credit Suisse's Executive Board since 2019. Miller is currently the CEO of Investment Banking and Capital Markets, and a Member of the Board of Credit Suisse Holdings (USA), Inc., Credit Suisse (USA), Inc. and Credit Suisse Securities (USA) LLC (U.S. subsidiaries), and has held these positions since 2019. In the past, he held the following positions at Credit Suisse: Head of Credit from 2016 to 2019; Co-Head of Global Markets Americas from 2016 to 2019; Head of Global Credit Products from 2015 to 2019; Co-Head of Global Credit Products and Co-Head of Fixed Income Americas from 2013 to 2015; Head of Global Leveraged Finance Capital Markets from 2008 to 2013; Co-Head of Syndicated Loan Group from 2006 to 2013; Fixed Income CMBS Wind Down from 2009 to 2010; Origination Officer, Syndicated Loan Capital Markets from 2004 to 2006; and various functions in loan origination and banking from 2000 to 2004.

116.    Defendant Romeo Cerutti, a citizen of Italy and the Swiss Confederation, was General Counsel and a Member of the Executive Board at Credit Suisse from 2009 through 2021–2022.  In the past, he was Global Co-Head of Compliance from 2008 to 2009 and General Counsel, Private Banking from 2006 to 2009.  Prior to 1995, he was an attorney at Latham and Watkins in Los Angeles.  Cerutti was admitted to the State Bar of California in 1992.  He has traveled to and stayed in New York countless times — hundreds of days in the aggregate.

117.    As confirmed by their titles and positions each of the officer defendants held over the years, they were each involved in several of the scandals, losses and the mismanagement of Credit Suisse specified herein, all of which caused damage to Credit Suisse's common shareholders.  Each of the individual defendants participated in the mismanagement of Credit Suisse directly and/or as "instigators, perpetrators and accomplices" and they each improperly benefited personally from improper, excessive and illegal bonuses and other illicit compensation schemes.  They were each acting as employees, officers, directors and/or agents of Credit Suisse Group AG and one or more of its New York based subsidiaries.  They utilized the Credit Suisse entities named as Defendants as their agents and/or instrumentalities to carry out their mismanagement of Credit Suisse.

| DEFENDANTS | OFFICES – YEARS – DUTIES/POSITIONS |
| --- | --- |
| Doyle | **Credit Suisse Group AG:**<br>Director 2004-2017<br>Vice Chair 2014-2017<br>Chairman's Committee 2014-2017<br>Risk Committee 2004-2017<br>Audit Committee 2007-2016 |
| Thornburgh | **Credit Suisse Group AG:**<br>Director 2006-2018<br>Vice Chair 2014-2018<br>Audit Committee 2011-2018<br>Risk Committee 2006-2018<br>Governance & Nominations Committee 2009-2018<br>Member Executive Board Chief Financial Officer 1997-2005<br>Investment Bank<br>**Credit Suisse Holdings/Credit Suisse USA, Credit Suisse Securities:** Board Chair 2015-2018 |
| Amine | **Credit Suisse Holdings/Credit Suisse Securities Credit Suisse USA:**<br>Director 2014-2019<br>CEO Investment Banking and Capital Markets 2010-2019<br>CEO 2014-2019<br>CEO European Global Markets 1999-2005/Global Leveraged Finance 1999-2005 |
| Ribeiro | **Credit Suisse Group AG:**<br>Director 2016-2021<br>Audit Committee 2016-2021 |
| Rohner | **Credit Suisse Group AG:**<br>Board Chair 2011-2021<br>Vice Chair 2009-2011<br>Chair-Conduct Finance Crime Control Committee- 2009-2011<br>Member Executive Board 2004-2009<br>Chief Operating Officer 2006-2009<br>General Counsel 2004-2009 |
| Tiner | **Credit Suisse Group AG:**<br>Director 2009-2021<br>Audit Committee Chair 2009-2021<br>Conduct Financial Crime Control Committee 2009-2021<br>Credit Suisse Holdings, Credit Suisse Securities<br>USA- Director 2015-2021 |

| Schwan | **Credit Suisse Group AG:**<br>Vice Chair/Lead Independent Director 2014-2021<br>Risk Committee 2014-2021 |
|---|---|
| Bohnet | **Credit Suisse Group AG**<br>Director 2012-current |
| Nargolwala | **Credit Suisse Group AG:**<br>Director 2013-2022<br>Conduct Financial Crime Control Committee 2013-2022<br>Chair Compensation Committee/Risk Committee 2013-2017<br>Chair/CEO Asian – Pacific Region 2008-2010 |
| Mathers | **Credit Suisse Group AG:**<br>Executive Board<br>Chief Financial Officer -2010-2022<br>CEO Investment Banking 2007-2010<br>CEO Credit Suisse International 2016-2022<br>CEO Strategic Resolution Unit, IT Operations 2012-2015 |
| Hudson | **Credit Suisse Group AG:**<br>Executive Board<br>Chief of Compliance/Regulatory Affairs 2008-2021 |
| Shafir | **Credit Suisse Group AG:**<br>Executive Board 2007-2015<br>CEO Americas 2007-2012<br>CEO Asset Management 2008-2012<br>Joint CEO Wealth Management/Private Banking 2012-2015 |
| Klein | **Credit Suisse Group AG:**<br>Director 2018-2022<br>Risk Committee 2018-2022 |
| Macia | **Credit Suisse Group AG:**<br>Director 2015-current<br>Risk Committee 2018-current<br>Audit Committee 2015-2018 |
| Bianchi | **Credit Suisse Group AG:**<br>Director 2022-current<br>Audit Committee- 2022-current<br>Risk, Conduct and Finance Crime Control Committee-2022-current |

| Warner | **Credit Suisse Group AG:**<br>Executive Board 2015-current<br>Chief Risk Officer 2015-2021<br>Chief Compliance/Regulatory Affairs 2015-2019<br>Chief Operating Officer Investment Banking 2013-2015 |
|---|---|
| Thomas-Graham | **Credit Suisse Group AG:**<br>Executive Board 2015-2022<br>Head of Private Banking Wealth Management 2013-2015 |
| Jain | **Credit Suisse Group AG:**<br>Executive Board 1996-2016<br>Global Head Asset Management<br>Co-head Global Securities/Propriety Trading |
| Vasan | **Credit Suisse Group AG:**<br>Executive Board 2003-2016<br>CEO Private Bank/Wealth Management 2013-2016<br>Global Head – Prime Services 2003-2013<br>Global Head – Foreign Exchange 1997-2000 |
| Dougan | **Credit Suisse Group AG:**<br>CEO 2007-2015<br>Executive Board 2003-2015<br>CEO Investment Banking and Americas 2006-2007<br>CEO Equities 1996-2001<br>CEO Securities 2001-??? |
| Brady | **Credit Suisse Group AG:**<br>Executive Board 1994-2016<br>Dougan's "right hand man" |
| Varvel | **Credit Suisse Group AG:**<br>Executive Board 1990-2021<br>Director Wealth Management/Asset Management<br>CEO Investment Banking 2010-2012<br>Credit Suisse Holdings USA - CEO |
| Popp | **Credit Suisse Group AG:**<br>Executive Board 1997-2022<br>Credit Suisse Wealth Management New York<br>CEO/CIO Credit Investment Group<br>CEO Credit Suisse Funds |

| Chin | **Credit Suisse Group AG:** <br> CEO Global Markets Investment Banking 2003-current <br> Senior Executive Investment Banking 2003-2012 <br> Credit Suisse Holdings/Credit Suisse (USA)/Credit Suisse <br> Securities 2016-present <br> CEO Securitized Products |
|---|---|
| Kim | **Credit Suisse Group AG:** <br> Managing Director Global Head Securitized Products 2011-2023 |
| Sohn | **Credit Suisse Group AG:** <br> 1996-2018 <br> CEO/CIO Securities <br> Products/Investment Banking New York |
| Miller | **Credit Suisse Group AG:** <br> Executive Board Member 2019-current - With Credit Suisse <br> Group AG in New York 2019-forward <br> CEO Investment Banking/Capital Markets – current <br> Head of Credit 2016-2019 <br> Co-Head Global Markets 2015-2019 <br> Head Global Leveraged Finance 2008-2013 <br> ***Credit Suisse Holdings/Credit Suisse USA/Credit*** <br> ***Suisse Securities*** – Board Member 2019-present |
| Cerutti | **Credit Suisse Group AG:** <br> General Counsel 2009-2022 <br> Executive Board 20009-2022 <br> Head Global Compliance 2008-2009 |
| O'Hara | **Credit Suisse Group AG:** <br> Executive Board 2014-2016 <br> CEO Global Markets 2015-2016 <br> Joint CEO Investment Banking 2014-2015 <br> Credit Suisse Securities USA CEO 2012-2016 <br> Head of Global Equities and Securities 2011-2012, <br> Credit Products 2008-2011, <br> Global Leveraged Finance 2005-2008 and <br> High Yield Capital Markets 2000-2005 |

118.    To the extent that any Credit Suisse individual defendant was a director/officer of any Credit Suisse subsidiary or controlled entity, that person was acting on behalf of and within the scope of his/her position at each such subsidiary or controlled entity in taking the actions alleged herein.  Each of the individual Directors and Officers named as defendants violated their individual duties of due care, diligence, prudence and loyalty, and the Credit Suisse Code of Conduct in overseeing those corporate entity or managing those parts of the business which was their responsibility.

119.    The individual Credit Suisse Defendants named above are all insured under very large — over $500 million liability insurance policies.  And, they are indemnified by Credit Suisse for all fees and costs and any judgment.  Thus, they will be defended in this case without any out-of-pocket costs to them and they are entitled to indemnity for any judgment against them based on their negligent conduct.  As a practical matter, none of the foreign defendants should care where the litigation is prosecuted since it will not cost them anything to defend the case.  They will be deposed where they live and will likely never set foot in New York due to the lawsuit.

**D.    KPMG Defendants**

120.    KPMG was formed in New York City in 1890.  Defendants KPMG LLP and KPMG LLC are KPMG's United States operations headquartered in New York City.  The KPMG partners and officers sued are collectively referred to as KPMG.  KPMG has three separate offices in New York, including 350 Sixth Avenue and an "executive" office at 345 Park Avenue.  KPMG LLP is a Delaware limited liability partnership, registered to do business in New York with its principal place of business in New York City.  KPMG LLC is incorporated in New York as a limited liability company headquartered in New York City.  KPMG LLC is a citizen of New York; and KPMG LLP is a citizen of Delaware and

New York.  KPMG LLP/LLC has 5,000 professional employees in New York.  It has 75 United States offices,[8] with 40,000 employees.  KPMG describes itself as a "global network" with 145 offices and 265,000 employees and $35 billion in annual revenues. KPMG was the external auditor for Credit Suisse for over 15 years, consistently certifying its financial statements, the legitimacy of its reported profits, and the adequacy of its internal controls while pocketing millions and millions in fees, enriching the New York partners involved in the Credit Suisse account named as defendants.

121.    KPMG LLP/LLC is a major New York presence.  On August 23, 2022 KPMG issued a press release extolling its New York connections.

> KPMG LLP, the U.S. audit, tax and advisory firm, today announced plans to relocate its headquarters to Two Manhattan West, a new building in Midtown Manhattan's West Side of New York City.
>
> ***
>
> "***KPMG has been based in New York since our inception on August 2, 1897, and we are proud to show our continuing commitment to this great city with our exciting new headquarters in Two Manhattan West in the vibrant Manhattan West neighborhood***," said Paul Knopp, KPMG U.S. Chair and CEO.**
>
> ***

---

[8] KPMG's U.S. offices are Albany, Albuquerque, Anchorage, Atlanta, Austin, Baltimore, Baton Rouge, Bentonville, Birmingham, Boise, Boston, Boulder, Burlington, Charlotte, Chicago, Cincinnati, Cleveland, Columbus, Dallas, Denver, Des Moines, Detroit, Fort Lauderdale, Fort Worth, Grand Rapids, Greensboro, Greenville, Harrisburg, Hartford, Honolulu, Houston, Indianapolis, Jackson, Jacksonville, Kansas City, Knoxville, Las Vegas, Lincoln, Lisle, Los Angeles, Louisville, Memphis, Miami, Milwaukee, Minneapolis, Nashville, New Orleans, New York, Norfolk, Northern Virginia, Oklahoma City, Omaha, Orange County, Orlando, Panama, Philadelphia, Phoenix, Pittsburgh, Portland, Providence, Raleigh, Richmond, Rochester, Sacramento, Salt Lake City, San Antonio, San Diego, San Francisco, San Juan Puerto Rico, Santa Clara, Seal Beach, Seattle, Short Hills, Shreveport, St. Louis, Stamford, Tallahassee, Tampa, Walnut Creek, Washington DC, and Winston-Salem.

KPMG currently occupies space at 345 Park Avenue, its headquarters, as well as 560 Lexington Avenue and 1350 Sixth Avenue. KPMG will lease approximately 450,000 square feet in the new 58-story Two Manhattan West building.

\*\*\*

Yesenia Scheker Izquierdo, KPMG New York Office Managing Partner and Market Hub Leader said, "***This exciting new building is emblematic of our dedication to New York, and it embodies our New York spirit and the forward momentum of our people as we serve clients in the New York metro area well into the future***."

*KPMG to Relocate United States Headquarters to Innovative Space in New York City, New Office Space in Vibrant Manhattan West Neighborhood Will Enhance the Workplace Experience of KPMG's 5,500+ New York-based Professionals*, Press Release, PR NEWSWIRE, Aug. 23, 2022.

122.    KPMG acted as Credit Suisse's auditors, accountants, consultants and advisors for well over 20 years, until replaced by PWC in 2020 after the "steal the list" and "cheat on the tests" scandals.  It was involved in the management of Credit Suisse's business and its internal accounting/financial controls and legal/regulatory/compliance controls worldwide.  The New York office of KPMG was economically dependent on Credit Suisse as a client — as were the top partners in that office — as it was an extremely large and important client to them.

123.    KPMG's New York offices were all but part of Credit Suisse, whose offices were physically close by.  KPMG's personnel were constantly inside Credit Suisse's New York operations working with several different aspects of the management of Credit Suisse's business — including its financial, accounting and compliance controls, its IT systems, as well as the Code of Conduct.  They were not independent of Credit Suisse,

which generated tens of millions of dollars in audit and related fees ***each year*** and was one of the largest audit clients in the New York office of KPMG.

124.    KPMG and its partners sued knew the Credit Suisse's controls were materially defective and inadequate had been for many years and its Code of Conduct was being violated and you could not properly manage Credit Suisse with defective controls or lack of enforcement of the Code of Conduct.  Those deficiencies never ceased.  They were never fixed.  In March 2023, the new external auditor PWC admitted that Credit Suisse's controls were "***materially deficient***," and Credit Suisse's risk management processes were "ineffective."  Credit Suisse promptly collapsed.

125.    The following KPMG partners are named Defendants:

(a)    William Thomas:  Thomas is a United States citizen domiciled in New York.  He is the Chairman and CEO of KPMG International.  Thomas previously served as Chairman of KPMG's Americas region from 2014 to 2017, and as CEO and Senior Partner of KPMG in Canada from 2009 to 2016. He is a licensed CPA in New York.

(b)    Paul Knopp: Knopp is a United States citizen domiciled in Texas.  He is a licensed CPA in New York and is Chair and Chief Executive Officer at KPMG LLP — the United States KPMG operation. He also serves as Chair of the Americas region and is a member of both KPMG's Global Board and Executive Committee.  He served large, multinational clients in a wide variety of complex.  He joined KPMG's San Antonio office in 1983.  In his 36-year career, he has also served in KPMG's New York, Norfolk, Stamford, Chicago, and St. Louis offices.  Prior to becoming Chair and CEO, his career as an audit

partner focused on serving leading global companies. He served as the global lead audit engagement partner and Engagement Quality Control Review Partner for KPMG audits of numerous Fortune 500 companies. He served a five-year term on KPMG's United States Board of Directors from 2012 to 2017, and served as Lead Director of the Board of Directors. He completed a two-year assignment in KPMG's Department of Professional Practice where he was to ensure quality across a range of KPMG audit assignments.

(c)     Laura Newinski: Newinski is a United States citizen domiciled in New York. She is a licensed CPA in New York and Minnesota and is a member of the American Institute of Certified Public Accountants. She has focused largely on serving publicly-held and private companies in the financial services sector. She is Deputy Chair and Chief Operating Officer of KPMG LLP. In this role, she chairs the United States Management Committee and is responsible for the development of the United States firm's strategy and execution of its priorities. She is a member of the United States firm's Board of Directors. She also serves as Deputy Chair for the Americas region and is a member of both the Americas Board of Directors and Management Committee. She is a member of both KPMG's Global Board and Executive Committee. During her 32-year career, she has had extensive experience serving multinational Fortune 500 companies. A member of the KPMG United States Management

Committee since 2015, She most recently served as Vice Chair of KPMG's U.S. Operations.

(d)    Larry Bradley:  Bradley is a United States citizen domiciled in New York.  He is licensed as a CPA in New York.  His area of expertise is Audit.  He is the Global Head of Audit for KPMG, a role he also held from 2013 to 2015. He has been with KPMG for 37 years and has spent nearly 25 years as an SEC reviewing partner, KPMG's designation for its top technical partners, on numerous Global and Fortune 500 companies. He has extensive global experience including a four-year international secondment as well as serving as the Global Lead Partner for a number of the largest companies in the world. He has also served on various national, regional and global boards of directors for KPMG.

(e)    John B. Veihmeyer: Veihmeyer is a United States citizen domiciled in New York. He was Global Chairman of KPMG from 2014 until 2017. He previously served as Chairman and Chief Executive Officer of KPMG's United States operations from 2010 until 2017.  He has also previously held numerous executive roles at KPMG, including Deputy United States Chairman; managing partner of KPMG's Washington, DC operations, and Global Head of Risk Management and Regulatory.

126.   These KPMG partners are all United States citizens, who live in New York or work out of KPMG's United States headquarters in New York.  They each worked on the Credit Suisse account, participating in auditing or supervising the audit of Credit

Suisse, consulting with Credit Suisse and participating in the management of Credit Suisse, producing large revenue and profits for KPMG in which they shared. They each knew Credit Suisse's financial/accounting controls and legal/regulatory/compliance controls and risk management procedures were materially deficient. These KPMG individuals were each aware of the illicit "steal the list" and "cheat on the test" activities and of the altering of the Credit Suisse audit workpapers to cover up deficiencies in the Credit Suisse audits, detailed below.

127. Former KPMG partners/employees identified below are named as defendants based on their stealing secret information from the PCAOB as to KPMG audits to be reviewed, leaving the PCAOB positions for high paid jobs from KPMG in New York. *__The Credit Suisse audits were among the audits to be reviewed__. __Learning this__, __these Defendants then destroyed and altered the Credit Suisse audit workpapers to cover up auditing deficiencies showing inadequate controls to allow the wrongful course of conduct and civil conspiracy to continue__*. In fact, their conduct was criminal, involving mail and wire fraud, for which they were prosecuted and convicted in the Southern District of New York, as detailed in Section XI.B. below.

128. Defendant Scott Marcello was the top audit partner in KPMG's New York office. Marcello is a United States citizen domiciled in New York. He helped arrange the stealing of secret PCAOB information about the identity of upcoming PCAOB inspections of KPMG audit clients — including Credit Suisse. This information was used by KPMG to alter workpapers and audit evidence and "dress up" the Credit Suisse audit records in New York City relating to Credit Suisse.

129.    Defendant Thomas Whittle was the national managing partner for Audit Quality in KPMG's New York office.  Whittle is a United States citizen domiciled in New York.  He helped arrange the stealing of secret PCAOB information about the identity of upcoming PCAOB inspections of KPMG audit clients — including Credit Suisse.  This information was used by KPMG to alter workpapers and audit evidence and "dress up" the Credit Suisse audit records in New York City.

130.    Defendant David Britt was a top partner in KPMG's New York office in charge of Banking and Capital Markets clients.  Britt is a United States citizen domiciled in New York.  He helped arrange the stealing of confidential PCAOB information about the identity of the upcoming PCAOB inspections of KPMG audit clients — including Credit Suisse.  This information was used by KPMG to alter and "dress up" the Credit Suisse audit records in New York City.

131.    Defendant David Middendorf was the National Managing Partner for Audit Quality in KPMG's New York office.  Middendorf is a United States citizen domiciled in New York.  He helped arrange the stealing of secret PCAOB information about the identity of upcoming PCAOB inspections of KPMG audit clients — including Credit Suisse.  This information was used by KPMG to alter workpapers and audit evidence and "dress up" the Credit Suisse audit records in New York City.

132.    Defendant Brian J. Sweet is a United States citizen domiciled in California.  Sweet was a PCAOB supervisor.  While preparing to leave his supervisory position at the PCAOB for a job at KPMG, Sweet downloaded confidential and sensitive inspection-related materials that he believed would help him at KPMG.  KPMG had recruited him to join the firm at a time when it had a high rate of audit deficiencies.

133.    Defendant Cynthia Holder is a United States citizen domiciled in Texas. Holder was a PCAOB inspector.  Holder continued to provide Defendant Sweet with access to confidential PCAOB materials even after he had left the PCAOB.  Holder then got a job with KPMG in New York City as a payoff and reward.

134.    Defendant Jeffrey Wada is a United States citizen domiciled in California. Wada was a PCAOB employee.  After Holder joined Sweet at KPMG, a third PCAOB employee, Jeffrey Wada gave leaked confidential information about planned PCAOB inspections of KPMG to Holder, while Wada was seeking employment at KPMG.

135.    Defendants Middendorf, Whittle, Sweet, Holder, and Britt worked together to review the audit workpapers for at least seven banks — including Credit Suisse — they knew the PCAOB would inspect, in an effort to minimize the risk that the PCAOB would find deficiencies in those audits. Middendorf and Whittle instructed that no one disclose that they had confidential PCAOB information.  They destroyed and altered workpapers on the inspected audits to cover up audit failures and deficiencies Credit Suisse — including a lack of internal financial/accounting controls, legal/regulatory/compliance controls and risk management procedures in the New York operations.   Had this illegal criminal conduct not occurred the PCAOB would have discovered the defects and deficiencies of KPMG's audits of Credit Suisse — especially the internal financial/accounting and legal/regulatory and risk control procedures control deficiencies and then published the result of its review.  When the PCAOB published these deficiencies the ongoing scheme and conspiracy would have been disrupted, and damage to Credit Suisse common shareholders avoided.

E.    **The Non-Party Important Actor — PriceWaterhouseCoopers**

136.    PWC traces its origin to Philadelphia and New York in 1898.  It was the external auditor of Credit Suisse from 2020 when Credit Suisse collapsed in 2023.  PricewaterhouseCoopers LLP and PricewaterhouseCoopers LLC are Delaware entities registered to do business in New York.  PWC LLP/LLC are the PWC-United States operations of PWC for the United States and the Americas headquartered in New York City at 300 Madison Avenue. PWC has 79 United States offices with 55,000 employees.[9] PWC describes itself as a "global network."   PWC's worldwide revenues are $50 billion. PWC LLP and PWC LLC and the individual PWC partners and officers sued are collectively referred to as "PWC."  PWC became Credit Suisse's external auditor for the year ended December 31, 2020.  Its New York partners and its New York based operations will provide important evidence and live witnesses as to the KPMG conduct as the prior auditor, why it was replaced, and as to Credit Suisse's internal controls and risk management procedures.

137.    Each of the PWC individual partners identified below provided services to Credit Suisse in New York as part of the worldwide external audits of Credit Suisse and obtained millions in revenue for the PWC global network.

138.    The following PWC partners were involved.

> (a)    Timothy Ryan is senior partner and Chairman of PWC United States. Previously he served as the Vice Chairman, having responsibility for the firm's strategy function and stakeholder relationships including investor relations, regulatory affairs, public policy, corporate

---

[9] PWC's maintains offices in over 60 cities in the United States, including at least three in New York — Albany, New York City, and Rochester.

responsibility, marketing and sales and human capital.    For over 25 years he worked with clients in the financial services industry in the United States and internationally. Prior to his current role, he led PWC's Assurance (Audit) practice and before that, he led PWC's United States Financial Services practice and PWC's Consumer Finance Group.  He is a certified public accountant in New York.

(b)    Robert E. Moritz is the chairman of PricewaterhouseCoopers International. Prior to his election as global chairman in July 2016, Moritz served as chairman and senior partner of PricewaterhouseCoopers LLP (PWC United States) from 2009 to July 2016. He served as assurance (audit) leader of the United States firm from 2006 to 2009, and was the managing partner of the New York office and Metro region from 2004 to 2006.  Moritz has been with PWC his entire career, joining in 1985. From 1998 to 2001, Moritz served as the Metro Regional Financial Services Leader. He then led the Financial Services Audit and Business Advisory practice, which included the banking, capital markets, insurance, investment management, and real estate sectors from 2001 to 2004. He is a certified public accountant in New York City.  He recently completed two terms as chairman of the governing board for the Center for Audit Quality, a group purportedly dedicated to enhancing investor confidence and public trust in the global capital markets.

(c)    Mark Mendola is a Vice Chair — United States Managing Partner of PWC. In addition to his responsibility for the Assurance (audit),

Advisory and tax businesses, he has overall responsibility for the firm's people and digital transformation strategies. He also serves as the senior relationship partner to several of the firm's largest clients. He is licensed as a certified public accountant by New York.

(d)   Willie R. Pest is a senior managing director in PWC's FSR Group based in New York. FSR focuses on the origination, financing, valuation, risk management, and financial and tax reporting of financial instruments, structured products and real estate. Pest has responsibility for a diverse array of initiatives including valuation review services for a wide spectrum of asset types, including those typically not covered by third party pricing vendors. Pest is deeply involved with the enhancement of valuation related reporting and analytical tools used by audit teams, development of innovative valuation analytics for clients and audit teams, and organizational structure review, development and implementation.

(e)   Henri Leveque, III is a PWC Partner responsible for the development of PWC's Assurance (audit) global digitization strategy and the business plan to drive execution and delivery across the PWC network worldwide. In this role he oversees local and global teams responsible for the technology that enables the delivery of PWC's assurance services. In addition to his global role at PWC. He has a leadership role in the PWC United States firm on the team charged with technology-enabling the audit and driving innovation across the Assurance business. He has over 28 years' experience in providing

79

services to both United States domestic and international clients
with over 20 years as a transaction specialist.  He previously led
PWC's Global and United States Capital Markets and Accounting
Advisory Services Business.  He is licensed as a United States CPA.

139.    The New York office of PWC and each of these individuals were extensively
involved in audits of Credit Suisse especially its New York operations.  They are important
witnesses.  The PWC entities, partners and officials sued acted as Credit Suisse's auditors,
accountants, consultants and advisors after 2019, succeeding KPMG.  They were involved
in evaluating Credit Suisse's internal accounting/financial controls and
legal/regulatory/compliance controls, receiving $70 million in fees each year.

140.    PWC knew, when it succeeded KPMG as auditor, that the Credit Suisse's
controls were materially defective and inadequate, and had been so for years, and that its
Code of Conduct was being violated, and that Credit Suisse could not be properly managed
with defective controls or lack of enforcement of the Code of Conduct.  But PWC kept
silent to get the $70 million per year account.  The deficiencies at Credit Suisse were never
fixed, and the mismanagement never ceased.

141.    In March 2023, when PWC admitted that Credit Suisse's controls were
"materially deficient," defective and ineffective and had been so for the past several years,
Credit Suisse promptly collapsed.

## V.   JURISDICTION AND VENUE

### A.   Subject-Matter Jurisdiction

#### 1.   Federal-Question Jurisdiction

142.    The Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because this action alleges claims under 18 U.S.C. §§ 1964–1965 against persons who engaged in a pattern of racketeering activity via an enterprise from which they directly or indirectly derived income, revenues or profits.  Plaintiff and Class members suffered damage to their business or property by way of a violation of § 1962.  Because no conduct is alleged or relied upon that would have been actionable as fraud in the purchasers or sale of securities, the limitation imposed by the Private Securities Litigation Reform Act of 1995 is inapplicable to plaintiff's claims.

143.    In addition, the Court has jurisdiction under 28 U.S.C. § 1367 over plaintiff's claims under New York law and Swiss law

#### 2.   Diversity Jurisdiction

144.    This Court has subject-matter jurisdiction under 28 U.S.C. § 1332(a)(3) because this action (a) involves a matter in controversy exceeding the value of $75,000, exclusive of interests and costs; and (b) is between citizens of different States and in which citizens or subjects of a foreign state are additional parties.

#### 3.   CAFA Jurisdiction

145.    This Court also has subject-matter jurisdiction under the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d)(2).  The matter in controversy, exclusive of interest and costs, exceeds the sum or value of $5,000,000.  Plaintiff is a citizens of a State different from at least one Defendant; and at least one Defendant is a citizen or subject of a foreign state.  And there are 100 or more Class members.

146.    Because Credit Suisse's ordinary common shares are traded only on exchanges outside the United States, they are not "covered securities" within the meaning of the Securities Act of 1933 (the "Securities Act") and the Securities Exchange Act of 1934 (the "Exchange Act").  Nor are Credit Suisse's ordinary common shares "securities" within the meaning of Section 2(a)(1) of the Securities Act, 15 U.S.C. § 77b(a)(1).  And the claims asserted in this action arise under federal law, New York law, and Swiss law (and not under the laws of any State in which any Credit Suisse-related entities are incorporated or organized).  As such, this action — brought on behalf of holders of Credit Suisse ordinary common shares, including ADSs — does not solely involve a claim (a) concerning a "covered security" as defined in the Securities Act and the Exchange Act; (b) relating to the internal affairs or governance of a corporation or other form of business enterprise, arising under the laws of the State in which such corporation or business enterprise is incorporated or organized; or (c) relating to the rights, duties, and obligations relating to any securities as defined under Section 2(a)(1) of the Securities Act.  Accordingly, the exception to CAFA jurisdiction under 28 U.S.C. § 1332(d)(9) is inapplicable to this action.

147.    Any attempt to block the subject-matter jurisdiction of the United States District Court as pleaded herein, by way of private agreement or foreign legislation, is void and unenforceable in the United States.

**B.    Personal Jurisdiction**

148.    This Court has personal jurisdiction over Defendants because Credit Suisse and other Defendants regularly conducts business in this District because: (a) Credit Suisse maintains its United States headquarters at 11 Madison Avenue in New York City — where it operates through wholly-owned subsidiaries — within the County of New York, over which this District presides; (b) Defendants transact business in the United States,

including in this District; (c) they have substantial aggregate contacts with the United States, including in this District; (d) they engaged and are engaging in conduct that has and had a direct, substantial, reasonably foreseeable, and intended effect of causing injury to persons throughout the United States, including in this District; and (e) Defendants purposely availed themselves of the laws of the United States.

149.    Rohner, Tiner, Cerutti, Schwan, Bohnet, Nargolwala, and Koerner all have "resided" in New York, spending countless nights here, staying in their own, or accommodations provided by, Credit Suisse in New York.

## C.    Venue/Forum in the Southern District of New York —as the Only Forum Where a U.S.-Based Plaintiff Can Litigate These Claims on a Class Basis Against All Defendants

150.    Venue is proper in this Court under 28 U.S.C. § 1391 because (a) Defendants transact business in this District; (b) substantial events and transactions giving rise to this action took place in this District; and (c) many members of the Class reside in this District, and for the reasons set forth throughout the complaint.

151.    The Swiss Code of Obligations/Corporation Law imposes substantive obligations on Credit Suisse and its Directors and Officers and those who assist them or participate in the management of the company, *i.e.*, KPMG as Credit Suisse's external auditor, and provide remedies to shareholders of Credit Suisse whether they live in Switzerland or elsewhere.  Swiss law contains no provision that purport to restrict jurisdiction or venue for Art. 754 and Art. 755 actions to Switzerland.  Nor do Credit Suisse's Charter or Articles.

152.    The substantive claims made are based on (a) New York Business Corporation Law §§ 720 and 1317 and New York common law; (b) Swiss law — the Code of Obligations §§ 41, 42, 50, 716(a), 717, 754, 755, 756, 759, 760; and (c) federal statute —

RICO, 18 U.S.C. §§ 1962–1964. This action is not based on fraud or false or misleading statements by the Credit Suisse Defendants or KPMG Defendants in connection with the purchase or sale of securities, but rather on their conduct including their statutory duties and acts of mismanagement. The claim is for holders, not purchasers, of securities who suffered damages or losses due to the negligence of the Credit Suisse Defendants and KPMG Defendants, by continuing to hold or upon disposing of those securities.

153.    Venue is permitted and proper in the Southern District of New York because most of the acts and transactions in connection with the wrongdoing complained of occurred in New York. Plaintiff, a United States citizen, is presumptively entitled to access the United States courts. Most of the Defendants are United States citizens; and many reside in New York City. Most of the witnesses and the bulk of the evidence needed for the case are here in New York. The headquarters of Credit Suisse's United States operations — where the bulk of relevant evidence is located — are here in New York. So are the headquarters of KPMG. In addition, the files of regulators, prosecutors and the like that conducted the many past criminal and regulatory proceedings involving Credit Suisse are in the Southern and Eastern Districts of New York. So are the files relating to KPMG's "steal the list" criminal scandal, as well as the files of the New York-based lawyers and investment banks that put the UBS-Credit Suisse merger together. Little if any discovery in Switzerland will be necessary.

154.    There are 48 Defendants.

- The two KPMG entities are New York-headquartered.

- The four Credit Suisse Entity Defendants are Delaware companies headquartered in New York.

- Of the 29 individual Credit Suisse Defendants, 23 are United States citizens, most of whom are New York-domiciled.

- Of the six remaining individual defendants, four are Swiss citizens, one is English, and one is from Singapore, each of whom held top Credit Suisse positions for years, were frequently present in New York — working in Credit Suisse's New York headquarters and staying in their own New York accommodations or ones paid for by Credit Suisse.

- Of the 13 KPMG individual defendants, all 13 are United States citizens, most of them New York-based.

- 90% of Defendants are U.S. citizens or New York domiciliaries.

155.    New York is the largest and most important financial, commercial and legal center in the world.  It is the heart of both the United States and global financial markets. The Southern District of New York is sophisticated, efficient and experienced in complex legal disputes involving citizens of different countries, and the application of foreign law. The Credit Suisse corporate enterprise, which its shareholders own, and the Directors and Officers  were oversee and operate on their behalf, has overwhelming contacts with the United States/New York — economically and legally, both with respect to its business operations and the investigations, litigations, penalties, and fines imposed on it, in large part due to the misconduct of Credit Suisse Officers/executives in its corporate/Investment Bank which operated largely out of Credit Suisse's New York headquarters.

156.    All the Credit Suisse Group AG subsidiaries and the KPMG entities sued have their principal place of business in New York City.  New York laws and its public policy strongly favor the maintenance of this class action in New York federal court — ***the***

***only court in the world where these claims can be effectively and efficiently asserted in a class action format by a United States Plaintiff in a forum where all Defendants can be sued and can be compelled to testify**, and where **plaintiff can have the jury trial guaranteed by the United States Constitution**, and can sue without posting a prohibitive $50-plus-million cash bond for court and defense fees and costs*.

157.    Credit Suisse's United States subsidiaries are subject to United States and New York banking laws, and regulated by the Federal Reserve, the United States Treasury, the NYDFS, the NYAG, FINRA, the SEC and the Federal Deposit Insurance Corporation ("FDIC").  These subsidiaries have their United States headquarters here in New York City where the employ thousands and do billions of dollars of business on behalf of Credit Suisse Group AG.  The UBS-Credit Suisse merger cannot close without the approval or consent of United States and New York regulators, including the Federal Reserve, the NYDFS and FINRA.

158.    Over the past decade Credit Suisse has **sued in New York State or Federal courts invoking those courts' jurisdiction – including suing foreign based entities in those suits**.  Credit Suisse has had for decades large New York law firms on retainer to protect their interests in New York and represent them in litigation filed in New York, by and against them.   Credit Suisse and its Directors and Officers have settled at least three securities fraud class action suits and the Holocaust litigations under United States law in the Southern or Eastern Districts of New York in the past ***thus utilizing the jurisdiction and powers of this Court for their own benefit and purposes***.

1.    **Credit Suisse's and KPMG's New York Contacts, Involvement and Misconduct**

159.    Key aspects of alleged violations of Defendants' duties of due care and prudence occurred in New York City, where Credit Suisse giant Investment Bank, which was at the center of much of the illegal conduct that resulted in the damage to Credit Suisse common shareholders, is headquartered.  A substantial part of the billions in fines/penalties and settlements have been paid to United States and New York regulatory authorities, including the NYAG, the NYDFS, and the Manhattan D.A.  Credit Suisse and top executives have been sued in federal court in the United States in several suits under the anti-fraud provisions United States securities laws arising out of the recent events which will be litigated here.  Most of the key witnesses and much of the evidence relevant to plaintiff's claims are located here in New York where these witnesses live and can testify live at a trial.   Most of the huge losses – write downs – that helped bring Credit Suisse down were due to events in Credit Suisse's New York Investment Bank's operations.

160.    Credit Suisse Group AG is an "***Integrated Global Entity***" which operates directly in New York through its New York branch office and subsidiaries located here.  According to Credit Suisse's annual reports:

> ***Our banking operations are subject to extensive federal and state regulation and supervision in the US.  Our direct US offices are composed of our New York Branch*** [***which office***] ***is licensed with***, ***and subject to examination and regulation by***, ***the state banking authority in the state in which it is located***.
>
> ***Our New York Branch is licensed by the New York Superintendent of Financial Services*** (***Superintendent***), ***examined by the DFS***, ***and subject to laws and regulations applicable to a foreign bank operating a New York branch***.

The New York Banking Law authorizes the Superintendent to seize our New York branch and all of Credit Suisse business and property in New York State (which includes property of our New York Branch wherever it may be located, ***and all of Credit Suisse's property situated in New York State***) under circumstances generally including violations of law, unsafe or unsound practices or insolvency.

Our operations are also subject to reporting and examination requirements under US federal banking laws. Our US non-banking operations are subject to examination by the Fed in its capacity as our US umbrella supervisor. The New York Branch is also subject to examination by the Fed and is subject to federal banking law requirements and limitations on the acceptance and maintenance of deposits.

***

The Fed may terminate the activities of a US branch or agency of a foreign bank if it finds that the foreign bank: i) is not subject to comprehensive supervision in its home country; ii) has violated the law or engaged in an unsafe or unsound banking practice in the US or iii) for a foreign bank that presents a risk to the stability of the US financial system, the home country of the foreign bank has not adopted, or made demonstrable progress toward adopting an appropriate system of financial regulation to mitigate such risk.

Credit Suisse Group and the Bank became financial holding companies for purposes of US federal banking law in 2000 and as a result, my engage in broad range of non-banking activities in the US, including insurance, securities, private equity and other financial activities, in each case subject to regulatory requirements and limitations.

***A major focus of US policy and regulation relating to financial institutions has been to combat money laundering and terrorist financing and to enforce compliance with US economic sanctions***. These laws and regulations impose obligations to maintain appropriate policies, procedures and controls to detect, prevent and report money laundering and terrorist financing, verify the identity of customers and comply with economic sanctions. Any failure to maintain and implement adequate programs to combat money laundering and terrorist financing, and violations of such economic sanctions, laws and regulations, could have serious legal and reputational consequences ....
***We have policies***, ***procedures, and training intended***

*to ensure that our employees comply with "**know your customer**" **regulations and understand when a client relationship or business should be evaluated as higher risk for us**.*

***

Broker-dealer and asset management regulation and supervision

Our US broker-dealers are subject to extensive regulation by US regulatory authorities. The SEC is the federal agency primarily responsible for the regulation of broker-dealers, investment advisers and investment companies. In addition, the US Treasury has the authority to promulgate rules relating to US Treasury and government agency securities, the Municipal Securities Rulemaking Board (MSRB) has the authority to promulgate rules relating to municipal securities, and the MSRB also promulgate rules relating to municipal securities credit transactions. In addition, broker-dealers are subject to regulation by securities industry self-regulatory organizations, including the Financial Industry Regulatory Authority (FINRA) and by state securities authorities.

***Our US broker-dealers are registered with the SEC and our primary US broker-dealer is registered in all 50 states, the District of Columbia, Puerto Rico and the US Virgin Islands. Our US registered entities are subject to extensive regulatory requirements that apply to all aspects of their business activity, including, where applicable, capital requirements, the use and safekeeping of customer funds and securities; the suitability of customer investments and best interest obligations for certain retail customers.***

161. Credit Suisse common stock is listed and traded on the NYSE. Thousands of Credit Suisse's common shareholders are United States residents, many of them in New York, own over 400 million shares of Credit Suisse common stock.

162. Pursuant to Credit Suisse's contract with BNY Mellon regarding the Credit Suisse's NYSE-listed ADSs, *i.e.*, common stock in "any suit or proceeding arising out of or relating to the [ADSs]," Credit Suisse Group AG "consents and submits to the jurisdiction"

of "***any state or federal*** ... ***court in the State of New York***" and designated Credit Suisse (USA), Inc., 11 Madison Avenue, New York, New York as its agent for service of process.  This suit arises out of and relates to the ownership of ADSs.  The ADSs suffered the same damage due to the same acts of negligence as the ordinary common shareholders.

163.   Any tortious, *i.e.*, negligent/reckless/intentional, conduct of the Credit Suisse Defendants that took place in Switzerland was ***targeted at United States/New York residents***, ***investors and customers as New York and the United States was one of the most important markets in the world to Credit Suisse***.  New York is the "***center***" "***liaison***" — "***hub***" — "***headquarters***" — "***main office" of Credit Suisse's United States operations***, ***including its Wealth Management/Investment Banking operations that are central to the mismanagement and misconduct alleged in this case***.

164.   By conducting business in New York obtaining billions in revenues each year and raising billions in capital from New York/United States investors, Credit Suisse and its Directors and Officers have purposefully availed themselves of the privilege of accessing New York's commercial and financial markets for their business purposes and their personal economic gain, selling products and services to thousands of New York residents.

165.   Credit Suisse's New York "Branch" and several of the subsidiaries of Credit Suisse Group AG in New York were directly involved in the underlying wrongdoing complained of which damaged Credit Suisse's common shareholders.  Credit Suisse Defendants have "continuous and systematic" contacts and affiliations with New York for

many years and has been repeatedly sued in New York state and federal courts by government regulators, prosecutors and private parties.

166.    Credit Suisse has billions of dollars' worth of its securities listed and traded here in New York.  In order to sell its securities in the United States and/or have them available for ongoing trading here in New York — Credit Suisse has registered Credit Suisse and these securities with the United States SEC and files registration statements and ongoing reports with the SEC as to the business and operations of Credit Suisse, which filings are signed by or authorized by the Board and top financial officers. Because Credit Suisse applied for and received permission to list its securities for trading on the NYSE, it assumed ongoing contractual obligations to the NYSE and New York investors/owners of its NYSE-listed securities. Credit Suisse Group AG owns billions of dollars of assets located in New York, and rents an entire office tower in Manhattan — 11 Madison Avenue, New York, New York — its United States headquarters.

167.    As a consolidated corporate enterprise, Credit Suisse Group AG includes the financial results of the operations of its New York-based business units/divisions/subsidiaries in the publicly owned parent's consolidated financial statements, which are filed with the New York Federal Reserve and the New York Banking authorities, *e.g.*, the NYDFS, and the United States SEC.

168.    Credit Suisse is also a hierarchical "***integrated***" corporate enterprise, subject to the ultimate control, supervision, and management of its Board of Directors and Executive Board of all of the corporate operations.  They set corporate-wide business, accounting, policies and standards of conduct and implement and oversee those uniform policies over all of Credit Suisse's operations, including those in New York.  This control includes directing the activities of — and hiring and firing — the executives of the New

York operations.  It also involves the oversight and enforcement of the parent corporation's Code of Conduct/Ethics which the Directors promulgated and ostensibly oversee with the Executive Board, including over the employees in its New York operations.

169.    The Code of Conduct ostensibly was adopted to ensure compliance with the laws and regulations in the United States and New York applicable to Credit Suisse.  The failure to enforce compliance with that Code of Conduct and the laws and regulations of New York and the United States by Credit Suisse officials participated in and furthered by the New York operations and partners of KPMG caused the damage and losses to thousands of owners/shareholders of Credit Suisse who live in New York/United States.

170.    Key aspects of alleged violations of the Credit Suisse Defendants' duties of due care and prudence took place in the Wealth Management/Investment Banking operations of Credit Suisse, here in New York City.  These operations were at the center of much of the illegal conduct which resulted in the damage to Credit Suisse's common shareholders.  Several billions in fines/penalties and settlements have been paid to United States and New York regulatory authorities and there are ongoing investigations of wrongdoing inside Credit Suisse being conducted by these authorities.  Most of the key witnesses and much of the evidence relevant to plaintiff's claims are located here in New York.  Many of the Defendants cannot be sued in Switzerland as they are not subject to personal jurisdiction and Switzerland has no class action procedure, no jury trials and no RICO remedy.

171.    Credit Suisse is subject to the jurisdiction of New York and federal law enforcement authorities, *i.e.*, the New York State AG, and federal prosecutors who prosecute cases here in New York, where the misconduct occurred.  Credit Suisse has been

subject to regulatory and criminal investigations and prosecutions by federal authorities and state authorities in New York.[10]

172.    A few examples of Credit Suisse being held responsible in federal courts, including the Southern and Eastern Districts of New York, are:

(a)    2014 Federal Reserve Cease & Desist order and $100 million fine for Credit Suisse's New York office's illegal conduct;

(b)    2009 United States DOJ $536 million fine for violating International Emergency Economic Powers Act and New York State law;

(c)    The United States DOJ criminal proceeding in the Southern District of New York and civil actions and payments arising out of the toxic securities scandal;

(d)    United States DOJ $1.8 billion fine imposed in Eastern District of Virginia for tax-evasion assistance and criminal conduct centered in the New York "hub" office and the criminal pleas of eight Credit Suisse officials here in the United States; and

---

[10] Credit Suisse Group AG is the current name of the parent public company and corporate enterprise named as a defendant. Credit Suisse underwent a "technical" corporate reorganization in 2014 to comply with requirements of regulators, including the U.S. Federal Reserve, as part of creating a "resolution plan" in the event that a financial crisis impaired the corporate entity's financial stability. Prior to the reorganization, the parent public company was named Credit Suisse AG. After the 2014/2015 reorganization, the name of the parent public company was changed to Credit Suisse Group AG, a non-operating corporate holding company, the entity sued for derivatively here. Under both names, the public parent company has been repeatedly sued by regulators, prosecutors and private parties here in New York and elsewhere in the United States for conduct that injured US citizens, including those living in New York.

(e)    The United States DOJ criminal proceedings and investigations in the Eastern District of New York involving the Tuna Boats/Bond Scandal where Credit Suisse AG pleaded guilty with a $547 million penalty and the Princeling's scandal where Credit Suisse pleaded guilty with a $80 million penalty.

173.    Credit Suisse Group AG has also been held accountable to several United States federal agencies, *i.e.*, SEC, FHFA, CFTC, Federal Reserve — being censured, fined, paying settlements, agreeing to Consent Decrees and the like for the misconduct of officials/employees of its New York branch and its New York subsidiaries.  This includes the recent $885 million payment to the FHA for the toxic securities abuses of the New York Investment Bank.

174.    Credit Suisse has been sued by private parties in class actions in the Southern District of New York for violations of the United States federal securities laws — at least 6 times between 2008-2018.   Credit Suisse AG settled three securities fraud class action suits in New York for $70 million.  *Cornwell v. Credit Suisse Group*, No. 18-cv-03758; $15.5 million, *City of Birmingham Pension System v. Credit Suisse Group AG et al.*, No. 17 Civ. 10014 (S.D.N.Y.), and $32.5 million, *City of St. Clair Police & Fire Retirement System v. Credit Suisse AG.,* No. 1:21-cv-03385-NRD; in each instance invoking the Southern District of New York's jurisdiction and venue for its own purposes.

175.    Credit Suisse long exploited Swiss banking "secrecy" laws to become a haven for deposits from people all over the world, monies from those seeking secrecy and often to avoid paying taxes in their own countries — hence the negative connotation of the term "***Swiss bank account***."    Many of those secret accountholders were bad actors — corrupt individuals trying to hide the fruits of their illegal behavior or theft, from officials

of the Nazi regime in Germany who sought to hide plundered assets in secret Credit Suisse accounts to post WWII dictators, drug and arms dealers and other miscreants who did the same with the fruits of their illegal conduct.

176.    During the Holocaust, Credit Suisse participated in trading stolen gold, securities, and other assets during that period with Credit Suisse taking for itself thousands of bank accounts of murdered Jews who had put money and assets in the Swiss banks hoping to survive, but perished.

177.    ***In class action lawsuits by Holocaust victims filed here in New York federal courts — the Eastern District of New York — Credit Suisse was accused of keeping thousands of*** "***anonymous***" "***numbered***" ***Swiss Bank accounts and safety deposit boxes of Holocaust victims*** — which went "dormant" after their owners had been murdered.  Credit Suisse ultimately settled the Holocaust lawsuits, ***in the Eastern District of New York*** paying billions — and using the jurisdiction and powers of New York federal courts for its own benefit.

178.    In 2022, a Credit Suisse shareholder derivative action was filed here in New York Supreme Court to recover damages for Credit Suisse arising out of the Archegos scandal.  The motion to dismiss that case has been denied and that case is scheduled for trial here in New York next year.  As a result of Credit Suisse's March 2023 collapse, several securities fraud class actions for purchasers of Credit Suisse securities during 2022–2023 have been filed in federal court in New Jersey.

179.    KPMG has huge New York operations with thousands of professionals serving clients, including Credit Suisse until 2020.  Top KPMG partners/officials located in New York were involved in the worldwide Credit Suisse audits, the Credit Suisse New York operations and the management of the enterprise. They were each negligent and

breached their duties of prudence and due care. KPMG is registered to do business in New York and with the New York regulatory agency with jurisdiction over certified public accountants. The New York offices and partners of KPMG were aware of and intimately involved in the wrongdoing in Credit Suisse's New York operations (and elsewhere) and the management of the enterprise, obtaining millions of dollars in revenues and fees.

180.    As detailed herein, KPMG's "steal the list" scandal involved the theft of confidential PCAOB information as to upcoming reviews of past audits by KPMG — *including audits of Credit Suisse's New York operations and those of other New York based banks was centered in New York*. New York City-based KPMG partners and others involved were sued by the PCAOB and the SEC in the United States. The Credit Suisse audit workpapers they destroyed and altered to cover up their wrongdoing are here in New York. *They were then criminally prosecuted and convicted in the Southern District of New York*. The KPMG cheating on PCAOB competency exams (the "cheat on the test" scandal) was also centered here in their New York offices. These participants are available as live witnesses in the Southern District of New York and the documents and criminal case files, as well as KPMG's own files, are here in New York.

### 2. Credit Suisse's Consents to New York and United States Jurisdiction and Venue and to the Application of New York and Federal Law

181.    New York law contains an intertwined collection of statutes that prohibit trial courts from dismissing, on the basis of *forum non conveniens*, a lawsuit that arises out of or relates to an agreement or undertaking providing for the application of New York law and consent to the jurisdiction of New York courts. The action includes claims based on § 720 of the New York Business Corporation Law. The statutes are CPLR 327(b),

General Obligations Law ("GOL") § 5-1402, and GOL § 5-1401, the relevant texts of which

are quoted below:

> [**CPLR 327(b)**:]  Notwithstanding the provisions of [CPLR 327(a)], the court shall not stay or dismiss any action on the ground of inconvenient forum, where the action arises out of or relates to a contract, agreement or undertaking to which section 5-1402 of the general obligations law applies, and the parties to the contract have agreed that the law of this state shall govern their rights or duties in whole or in part.

> \*       \*       \*

> [**GOL § 5-1402(1)**:]  Notwithstanding any act which limits or affects the right of a person to maintain an action or proceeding, ... any person may maintain an action or proceeding against a foreign corporation, non-resident, or foreign state where the action or proceeding arises out of or relates to any contract, agreement or undertaking for which a choice of New York law has been made in whole or in part pursuant to section 5-1401 and which (a) is a contract, agreement or undertaking, contingent or otherwise, in consideration of, or relating to any obligation arising out of a transaction covering in the aggregate, not less than one million dollars, and (b) which contains a provision or provisions whereby such foreign corporation or non-resident agrees to submit to the jurisdiction of the courts of this state.

> \*       \*       \*

> [**GOL § 5-1401(1)**:]    The parties to any contract, agreement or undertaking, contingent or otherwise, in consideration of, or relating to any obligation arising out of a transaction covering in the aggregate not less than two hundred fifty thousand dollars ... may agree that the law of this state shall govern their rights and duties in whole or in part, whether or not such contract, agreement or undertaking bears a reasonable relation to this state.

182.    These statutes reflect New York's public policy — declared by the Legislature

— that New York located courts are duty-bound to retain jurisdiction over actions that

either arise out of or relate to any agreement or undertaking (involving a transaction

exceeding $1,000,000 in value) where the parties to the transaction (not necessarily the

parties to the action) have consented to the application of New York law and the

jurisdiction of New York courts.  *See Lumbermens Mut. Cas. Co. v. Commonwealth of*

*Pa.*, 52 A.D.3d 212, 212 (1st Dep't 2008) ("In enacting General Obligations Law § 5-1402

and CPLR 327 (b), the Legislature made explicit that public policy favors New York courts

retaining actions against foreign states where a choice of New York law has been made and the foreign state agreed to submit to New York's jurisdiction.").

183.    Consents to New York venue and jurisdiction and New York law applying in many prior business agreements – are important "venue" facts. The following agreements and undertakings fall within the purview of CPLR 327(b) and GOL § 5-1402.

- The 2016 ***Deposit Agreement Between Credit Suisse Group AG and The Bank of New York Mellon*** and Holders of American Depositary Shares states Credit Suisse Group AG "***consents and submits to the jurisdiction of any state or federal court in the State of New York" and*** "[t]his Deposit Agreement and the Receipts shall be interpreted in accordance with and all rights hereunder and thereunder and provisions hereof and thereof shall be governed by the laws of the State of New York."

- **Settlement Agreement**, dated March 21, 2014, between Federal Housing Finance Agency and Credit Suisse Holdings (USA), Inc., Credit Suisse (USA), Inc., Credit Suisse Securities (USA) LLC whereby they agreed to $885,000,000 to settle the claims asserted in the related litigation arising from toxic securities, including *Federal Housing Finance Agency v. Ally Financial Inc.*, No. 652441/2011 (N.Y. Sup. Ct. N.Y. Cnty.), provides Defendants agreed to "submit to the personal jurisdiction of the United States District Court for the Southern District of New York, or to the Supreme Court of New York for New York County in the event that federal jurisdiction is lacking, for purposes of implementing and enforcing the settlement embodied in this

Agreement" and the agreement, the Credit Suisse Defendants agreed that "[t]his Agreement is governed by and shall be construed in accordance with the laws of the State of New York without regard to choice of law or conflicts of law principles."

- **Consent Order Pursuant to Banking Law § 44-a**, dated May 18, 2014, entered into by the NYDFS and Credit Suisse AG, where Credit Suisse agreed to pay a civil penalty of $715,000,000 to settle allegations of misconduct relating to tax evasion states that, in the event of a breach of the order, "the [NYDFS] has all the remedies available to it under New York Banking and Financial Services Law and may use any evidence available to the [NYDFS] in any ensuing hearings, notices, or orders."

- **Consent Order Under New York Banking Law §§ 39, 44, and 44-a**, dated November 13, 2017, entered into by the NYDFS and Credit Suisse AG. Under which Credit Suisse AG agreed to pay $135,000,000 for misconduct relating to its foreign exchange trading business states, Credit Suisse AG agreed that, upon a finding of a breach of the order, "the [NYDFS] shall have all remedies available to it under New York Banking and Financial Services Law and may use any evidence available to the Department in any ensuing hearings, notices, or orders," and that Credit Suisse AG "submits to the jurisdiction of the [NYDFS] for any such future proceedings."

- **Settlement Agreement**, dated January 31, 2016, entered into by the NYAG and Credit Suisse Securities (USA) LLC, under which Credit Suisse Securities (USA) LLC agreed to pay a $30 million penalty to settle

alleged misconduct relating to Dark Pools, states that "[t]his Agreement shall be governed by the laws of the State of New York," and Suisse Securities (USA) LLC also "admits to the jurisdiction of the NYAG over this matter," and that "[t]he NYAG has jurisdiction over this matter under the Martin Act and Executive Law § 63(12)."

- **Settlement Agreement**, dated September 27, 2018, between the NYAG and Credit Suisse Securities (USA) LLC, under which Credit Suisse Securities (USA) LLC agreed to pay $5 million for misconduct relating to dark pools states that any civil action arising out of the agreement "must be adjudicated by the courts of the State of [New York]," and that Credit Suisse "irrevocably and unconditionally waiv[ed] any objection based upon personal jurisdiction, inconvenient forum or venue" and that the agreement "shall be governed by the laws of the State of [New York]."

- **Assurance of Discontinuance**, dated June 25, 2009, entered into by the NYAG and Credit Suisse Securities (USA) LLC, under which Credit Suisse Securities (USA) LLC agreed to pay $15 million to settle allegations of misconduct relating to auction rate securities, which states Credit Suisse Securities (USA) LLC admitted to "the jurisdiction of the [NYAG]" and agreed that the NYAG "retains the right under Executive Law § 63(15) to compel compliance with this Assurance."

- **The Deferred Prosecution Agreement**, dated December 16, 2009, entered into by the United States Department of Justice and Credit Suisse AG in *United States v. Credit Suisse AG*, No. 09-cr-0352 (D.D.C.),

states, "[Credit Suisse AG] has also agreed to pay a separate and additional $268,000,000 pursuant to a Deferred Prosecution Agreement with [the Manhattan D.A.] being entered into contemporaneously[.]"  Upon information and belief, in the Deferred Prosecution Agreement with the Manhattan D.A., Credit Suisse consented, explicitly or implicitly, to the jurisdiction of the New York courts and agreed, explicitly or implicitly, to designate New York law as governing law.

184.    Credit Suisse has also repeatedly entered into agreements with United States regulators and prosecutors in which it consented to United States jurisdiction and venue and application of United States law.  There are several such agreements.  One example relating to — and pleaded in — this complaint is the March 21, 2014, United States Federal Housing Finance Agency settlement for $885 million payments with Credit Suisse to settle two lawsuits *FHFA v. Credit Suisse* and *FHFA v. First Horizon* both here in the Southern District of New York.  That Agreement included:

> All parties hereto submit to the personal jurisdiction of the United States District Court for the Southern District of New York, or to the Supreme Court of New York for New York County in the event that federal jurisdiction is lacking, for purposes of implementing and enforcing the settlement embodied in this Agreement.  The Settling Parties otherwise expressly reserve their jurisdictional rights to any action, suit or proceeding commenced outside the terms of this Agreement.
>
> ***
>
> This Agreement is governed by and shall be construed in accordance with the laws of the State of New York without regard to choice of law or conflicts of law principles.

185.    The above agreements directly relate to this action because they involve and reflect some of the penalties payments and fines resulting from Defendants' misconduct and mismanagement in New York that damaged Class members.

### 3.    The UBS-Credit Suisse Merger Agreed to After the Class Period Was Put Together in New York

186.    Over the weekend of March 19, 2023, an acquisition of Credit Suisse was negotiated and put together ***in New York City by New York-based lawyers and investment bankers***.  Because New York is the center of the international financial and legal world, ***it alone has the necessary*** mix of legal and finance experts — law firms and investment banks — to put together this kind of massive complex merger.  This important evidence is here in New York, involving both documents/files and witnesses who can testify live at trial in the Southern District of New York.  These firms will pocket $100+ million in fees for their work in New York to put the deal together.

187.    New York-based Sullivan & Cromwell's financial services group represented Credit Suisse led by chair Mitchell Eitel and a team that included the Senior Chair of the firm H. Rodgin Cohen and partners Ken Li, Catherina Clarkin, Mario Schollmeyer and associates Ana Gonzalez and Daniel Ruadell ***all*** from the New York office.  Sullivan & Cromwell partners Matthew Friested, Isaac Wheeler, Ruiltui Yu, Juan Rodriguez, Joseph Atelis and counsel to the firm Sarah Remmerlong and associates Ha Jin and William Bekker also advised Credit Suisse the deal, all from the New York office.  All these Sullivan & Cromwell lawyers were New York based.

188.    New York-based Cleary Gottlieb also represented Credit Suisse in the merger.  Cleary partners Craig Brod, Sebastian Sperber, David Lopez, Derek Bush, Lisa Schweitzer, and Deborah North led the firm's work.  Cleary counsels Sarah Lewis and

Brandon Hammer, and associates Lauren Semrad, Mohamed Taha, Julia Knight, Selene Park and James Abaate also advised Credit Suisse.  All these lawyers were based in New York and operations at its New York office.

189.    New York based Davis Polk and Wardwell took the lead representing UBS. Davis Polk partners Marc Williams, Luigi De Ghenghi and Evan Rosen, along with counsel Shanu Bajaj and Daniel Newman, and associate Jung Eun Choi, led the firm's work. Partner John Meade provided capital markets advice. Partners Kara Mungovan, Adam Kaminsky and Ronan Harty also advised on the deal.  These individuals were all based in the firms New York and Washington DC offices and operated out of the New York offices on this deal.

190.    The investment Banks involved were also from and operated in New York on this deal.  Morgan Stanley in New York represented and advised UBS.  Crestview Partners — via Blair Effron — located in New York City, advised Credit Suisse as did New York based JPMorgan.

191.    Each of the firms and individuals identified above is a potential witness in this case in the Southern District of New York, who can be compelled to give live testimony at a trial in New York City. Some of them certainly will be witnesses at any trial. The documents and files of these individuals and their firms contain important evidence for the case.

### 4.    Switzerland Does Not Provide an Adequate Alternative Forum; Any Interest It had in Providing a Neutral, Fair Forum Is Diminished by Its Involvement and Potential Liability That Create Interests Adverse to Plaintiff and the Class

192.    The Southern District of New York is a uniquely situated forum for this case to be litigated.  The Credit Suisse United States/New York offices and the KPMG United

States/New York offices are here, as are the vast bulk of the Credit's Suisse and the KPMG individual defendants who live in New York or the United States. The UBS-Credit Suisse merger was put together in New York City by New York-based lawyers. ***These witnesses can be compelled to testify live at a jury trial in New York*** — as opposed to Switzerland where they cannot be compelled to attend trial, and where there will not be jury trial under any circumstances — even assuming some non-Swiss citizen posts a $50 million bond to permit the suit be filed in Switzerland and somehow inventing a class action procedure like Federal Rule of Civil Procedure 23, which does not exist in the Swiss legal system. In addition, the suit here in the Southern District of New York will have direct easy access to ***troves of evidence***. Beyond the Credit Suisse and KPMG/PWC files in New York — the files of the numerous United States/New York enforcement proceedings before the NYDFS, SEC and Federal Reserve which form a key part of the mismanagement claims are here — as are witnesses to testify live about those proceedings. This case can best and easily, most economically and efficiently, be tried in this federal district court, a sophisticated court — sitting in the center of international business, finance and law. ***This class action case by a United States citizen was meant for the Southern District of New York***. Plaintiff cannot sue in Switzerland because he cannot post the requested multi-million dollar bond. Many of the Defendants are not subject to suit in Switzerland. None of the claims asserted under federal law and New York law in this case can be asserted in Switzerland.

193.    Swiss law does not have a proven efficient class action procedure like Rule 23. It does have two procedures which recognize the legitimacy of a groupwide relief. Swiss Merger Act Art. 105 and Collective Investment Scheme Act (Art. 86). However, these procedures are untested, there are no rules as to how damages are proved or

distributed.  The proceedings are "opt-in" not "opt out."  Art. 105 is very limited to the "fairness" of the merger – not the damage/loss holder claims asserted here.  And any such group claim in Switzerland **by a non-Swiss citizen faces onerous pre-suit, bonding requirements, loser pays attorneys' fees, with no jury trial under any circumstances**.

194.    Upon information and belief, there has never been a successful shareholder class action in Switzerland.  Even if plaintiff wanted to commence action in Switzerland, and there was a procedure to do so, and he could get jurisdiction over all the Defendants which he cannot, **because, and only because, plaintiff is a non-Swiss citizen, to assert these claims would require the posting a huge multi-million dollar cash bond for defense legal fees and costs as well as court costs — to even file the case seeking damages of the amounts sought here.**  The Swiss rules state:

> **Art. 98        Advance payment of costs**
> The court *may demand* that the plaintiff make an advance payment up to the amount of the expected court costs.
>
> **Art. 99        Security for party costs**
> **At the request of the defendant, the plaintiff must provide security for party costs:**
> **If he or she has no residence or registered office in Switzerland.**
>
> **Art. 100        Nature and amount of security**
> Security may be provided in cash or in the form of a guarantee from a bank with a branch in Switzerland or from an insurance company authorized to operate in Switzerland.
>
> **Art. 101        Provision of advance and security**
> *If the advance or security is not provided even within a period of grace, the action or application shall be declared inadmissible.*

195.    Under Swiss law the amount of security depends upon the amount of the damage claims.  Perversely worse the wrongdoing, the more damage inflicted and the larger the claim ***the larger the security required***.  Thus Swiss procedures block assertion of large claims to protect Swiss citizens from legitimate legal claims of non-Swiss, *i.e.*, United States, citizens.  Because there are 4 billion shares of Credit Suisse common stock outstanding, the damages are measured in the billions and the bond would be over $50 million by any measure. This sum is not only ridiculous on its face — ***it is discriminatory against citizens of the United States and should not be enforced directly or indirectly by a United States court***.  ***The Swiss court has no power to waive this statutory requirement***.

196.    Being required to litigate this "dispute" in a "trial" of these claims in Switzerland would be a practical impossibility that would deprive plaintiff of his due process and other rights as a United States citizen, including access to civil justice in the United States legal system with the procedural rules and remedies applicable in proceedings here, and the jury trial guaranteed under our constitution.  This is the only court in the world where plaintiff can practically and realistically assert these class action claims, specifically provided for and authorized by United States legislation and procedural rules.

197.    There are no jury trials in civil cases in Switzerland as in the United States. A citizen of the United States, who is a plaintiff, a constitutional right to a jury trial.  The RICO and New York law claims could not be asserted in Switzerland.  There is no personal jurisdiction over all the Defendants in Switzerland – many defendants are not subject to compulsory process in Switzerland. Switzerland does not permit United States style contingent fees for lawyers.  Individual plaintiffs do not have the means to hire lawyers

on a non-contingent fee basis, or to pay the enormous mandatory advances of court fees and security deposit payments demanded by the provisions of Swiss law.

198.    This case is unique.    The Swiss forum, *i.e.*, government, is not a disinterested sovereign merely providing a legal system to other parties for dispute resolution between private parties only.  The supposed alternative forum in this case is a country where the sovereign is an interested party with direct, legal and economic interests in the outcome of the case that are adverse to plaintiff's interests and litigation, and where its officials and regulators could be sued for damages and/or have to back up UBS's legal obligations as Credit Suisse's corporate successor.

199.    The Swiss government had regulatory oversight jurisdiction of Credit Suisse.  It could have shut Credit Suisse down or forced an acquisition by merger long ago which would have avoided or greatly diminished the losses of the shareholders.  The Swiss government faces liability for its negligent oversight of Credit Suisse and can be sued in Switzerland. Press reports indicate some Credit Suisse obligees are attempting to sue or pursue administrative remedies against the Swiss government.  The Swiss government has an interest in preventing these claims from being successfully prosecuted in Switzerland.

200.    The Swiss Financial Market Supervisory Authority ("FINMA") did not intervene in time and therefore permitted — facilitated — the Bank's ultimate collapse. FINMA could have started enforcement actions for the multiple breaches which occurred in Credit Suisse's business over the last decade.  It should have revoked banking licenses and imposed safety measures after the never-ending series of scandals unfolded.  This would have likely prevented the Bank's demise in the last decade.

201.    The Swiss government is potentially liable for its actions and for its agents' actions according to the Swiss Liability Act (Verantwortilichkeitsgesetz, VG).  The liability is framed as a strict liability, there is no requirement for a plaintiff to prove fault.  Art. 3, Section 1 VG.  Also, FINMA, a government agency, is liable under the liability act of Art. 19, Section 1 VG.   Thus the Swiss government has a direct economic interest in seeing these claims not prosecuted as it could end up paying all or part of the bill.

## VI.    CLASS ACTION ALLEGATIONS

### A.    The October 22, 2013 — March 17, 2023 Class Period

202.    On October 22, 2013 Credit Suisse stock sold for $33.84 per share.  It would never trade that high again.  It ultimately declined to $2.01 per share on March 17, 2023 *inflicting damage on holders of Credit Suisse common stock* between October 22, 2013 and March 17, 2023 due in substantial part to the lack of internal financial/accounting controls, legal/regulatory/compliance controls and risk management procedures that caused the financial collapse of Credit Suisse.

203.    This action is not based on conduct occurring after March 17, 2023.

### B.    The Common Shareholder Class

204.    Plaintiff brings this action as a class action under Rule 23 of the Federal Rules of Civil Procedure on behalf of the following Class:

> All persons who held Credit Suisse common stock, including ordinary shares and ADSs, between October 22, 2013 and March 17, 2023, and suffered loss/damage due to Defendants' actionable conduct, by continuing to hold or disposing of their shares.

205.    Excluded from the Class are Defendants, any entity that requests exclusion from the class, or in which either Defendant has a controlling interest, and Defendants' legal representatives, officers, directors, employees, assigns and successors.  Also

excluded from the Class is any judicial officer and court staff assigned to this matter and the members of their immediate families.

206.    Any purported release of any claim asserted herein for the Credit Suisse common shareholders under Swiss law, New York law or RICO in any settlement of any prior securities class action asserting claims under the federal securities laws is invalid. The claims asserted in this complaint could not have been and were not asserted in those cases brought under the federal securities laws.   The purchasers of ordinary shares shareholders were not given notice of the pendency or settlement of their claims.  They received no payment from any of the settlement funds and, in fact, could not even submit claims.  Any such release violates due process requirements and is an abuse of the class action process by fiduciary representative litigants who, at the expense of and harm to others, released valid legal claims of others for their own personal gain.

207.    **Numerosity**.  Because Credit Suisse had approximately four billion shares of common stock (ordinary shares and ADSs) outstanding at the end of 2022, the members of the Class are so numerous that joinder of all members would be impracticable.

208.    **Commonality and Predominance**. This action involves common questions of law or fact, which predominate over any questions affecting individual Class members, including:

> a) Whether Defendants intentionally or negligently breached their duties to plaintiff and the Class members;
>
> b) Whether plaintiff and the Class members are entitled to actual, statutory, or other forms of damages or any other monetary relief; and

c) Whether plaintiff and other Class members are entitled to equitable relief.

209.  **Typicality**.  Plaintiff's claims are typical of the members of the Class as all members of the Class are similarly affected by Defendants' actionable conduct. Defendants' conduct that gave rise to plaintiff's claims is the same for all members of the Class.  Defendants engaged in a common course of conduct giving rise to the legal rights sought to be enforced by plaintiff and on behalf of the other Class members. Similar or identical statutory violations, business practices, and injuries are involved. Individual questions, if any, pale by comparison, in both quantity and quality, to the numerous questions that dominate this action.  The Credit Suisse Defendants and KPMG Defendants engaged in a common co-operative course of conduct violating the legal rights sought to be enforced by plaintiff and on behalf of the other Class members. Identical statutory violations, business practices, losses/damages are involved. Individual questions, if any, pale by comparison, in both quantity and quality, to the numerous questions that dominate this action.

210.  **Adequacy**. Plaintiff is an adequate representatives of the Class because (a) plaintiff's interests do not conflict with the interests of the other Class members he seeks to represent; (b) plaintiff has retained counsel competent and experienced in complex class action litigation; (c) plaintiff will prosecute this action vigorously; and (d) plaintiff has no interests that are contrary to, or in conflict with the interests of other Class members.  As of the date this action was filed no other claim has been filed on behalf of Credit Suisse share or bond holders under Swiss law.  Few class members would not be able to prosecute separate individual actions given the size and complexity of the case, Swiss bonding requirements and the law.

211.    **Superiority**.  A class action is superior to other available methods for the fair and efficient adjudication of this controversy because joinder of all the members of the Class is impracticable.  Furthermore, the adjudication of this controversy through a class action will avoid the possibility of inconsistent and potentially conflicting adjudication of the asserted claims.  There should be no difficulty in managing this action as a class action.

212.    Class actions like those authorized under Rule 23 are not provided for in a Swiss forum.  Lawsuits of this type and size are impossible in Switzerland — due to fee shifting and pre-suit cash deposit or bonding requirements, under which plaintiffs, *because and only because they are non-Swiss, i.e., United States, citizens, have to make a mandatory cash deposit or bond from a Swiss insurance company of at least $50 million for defense fees/costs and court costs* to even file the action, assuming that all Defendants are subject to jurisdiction there (which is not the case).  The Swiss courthouse door is closed to United States plaintiffs.  To dismiss these claims would violate their due process rights to litigate claims via a jury trial in the United States.  This Rule 23 class action is the only — and thus — superior way to proceed.

## VII.    DUTIES OF THE CREDIT SUISSE DEFENDANTS AND KPMG DEFENDANTS AND THEIR RESPONSIBILITY FOR THE DAMAGE TO AND LOSSES OF CREDIT SUISSE'S COMMON SHAREHOLDERS

213.    Under the Swiss Code of Obligations, the Directors of Credit Suisse have the following "inalienable duties":

(a)    The "*overall management of the company*," *including the* "*accounting and financial control systems as required for management of the company*."

(b)    The "overall supervision of the persons entrusted with managing the company *in particular with regard to compliance with the law*."

(c)    Performing "*their duties with all due diligence*" to "*safeguard the interests of the company in good faith*," including hiring and discharging offices.

(d)    The "*members of the Board of Directors and all persons engaged in the management* … *of the corporation are liable to* … *each shareholder and oblige* … *for the damage caused by an intentional or negligent violation of their duties*."

(e)    "Where several persons have together caused damage, whether as instigator, perpetrator or accomplice [or abettor] they are "*jointly and severally liable*" for damage to the shareholders.

214.    Credit Suisse is regulated by the United States Federal Reserve, the NYDFS, the NYAG, FINRA, the United States Treasury, the SEC, and the FDIC.

215.    As a major international financial institution, Credit Suisse was subject to extensive regulation and worldwide oversight and substantial risks of large penalties, fines and payments upon non-compliance.  Indispensable to effective legal compliance and proper management and operation of a large corporation is an independent outside auditor of the size and with the resources to service the corporation worldwide – including its internal controls.  The Board and the auditor must evaluate on a continuing basis the effectiveness of internal controls.  The auditor relies upon them in determining the scope

of the audit, which includes detecting illegal or improper acts and other compliance tests, *etc.*, and cannot properly certify financial results in the absence of effective controls.

216.    A lack of sufficient internal financial and accounting controls is per se mismanagement because you cannot manage an international publicly owed financial corporation without strong internal controls to assure effective oversight and legal and regulatory compliance and accurate financial reporting.   Compliance with banking, securities and other laws and regulations was indispensable to properly manage Credit Suisse and to protect Credit Suisse's assets and reputation and the value of its stock.  It is the responsibility of the Board of Directors and the finance officers, like the CFO and the external auditor, to use due care, diligence and prudence in assuring the corporation is protected by an adequate and functioning system of internal financial/accounting controls and legal/regulatory/compliance controls under proper supervision and an operating culture of honesty.

217.    No worldwide public company like Credit Suisse can operate successfully and within its legal/regulatory environment and be properly managed without an effective, corporate-wide system of internal financial, accounting, regulatory and compliance controls.  Such systems are necessary to protect the corporations' assets and its shareholders.  The purpose of internal controls is to prevent risk events and to protect a company's ability to maintain operations. These systems prevent losses, payments, penalties, fines and the like to settle the criminal/civil regulatory suits and proceedings.

218.    An internal control system is a collection of safeguards and procedures a corporation implements to protect itself, its assets and its shareholders from damage and losses.  Controls are the component of a risk management plan that allows management to detect possible risks, and how best prevent those risks or mitigate their effects.  In

addition, a solid internal controls program improves operational efficiency and provides accurate financial reporting.  Any organization with an IT environment – also needs internal controls to protect itself from cybersecurity threats and to assure compliance with privacy regulations.

219.    Most importantly, internal controls provide assurance and adherence to applicable laws and regulations.  An effective internal control system plus a proper corporate culture assures an organization's resources are used for their intended purposes, minimizing the risk of fraud or waste.   They also minimize lost profits caused by fines and penalties and help to avoid lawsuits and other forms of compensation that are often necessary after a risk event occurs. Effective controls reduce the chance of ongoing compliance violations that could result in costly enforcement actions/penalties.

220.    Internal controls are unique to every company and designed according to the company's size, risks and structure.   The external auditor plays an indispensable role in testing, auditing and monitoring the effectiveness of the internal controls and internal conduct codes, and certifies them as being adequate and effective.

221.    As a major international public company, Credit Suisse faced conduct, reputation, legal and regulatory risk and it was the obligation of the Board and KPMG to use due care, diligence and prudence to monitor and protect Credit Suisse and its shareholders from the occurrence of these risks and the damage which would result.  The Credit Suisse Board of Directors recognized:

> Our competitive position could be harmed ***if our reputation is damaged*** … ***a reputation for financial strength and integrity is critical to our performance*** …. Our reputation could be harmed if our comprehensive procedures and controls fail, or appear to fail, to address conflicts of interest, prevent employees' misconduct, produce

materially accurate and complete financial and other information or prevent adverse legal or regulatory actions.

## Operational risk

### We are exposed to a wide variety of operational risks ...

Operational risk is the risk of financial loss arising from inadequate or failed internal processes, people or systems or from external events... our businesses face a wide variety of operational risks.... As a global financial services company, we rely heavily on our financial, accounting and other data processing systems, which are varied and complex. Our business depends on our ability to process a large volume of diverse and complex transactions.... We are exposed to operational risk arising from errors made in the execution, confirmation or settlement of transactions or from transactions not being properly recorded or accounted for .... Regulatory requirements in these areas have increased and are expected to increase further.

### We may suffer losses due to employee misconduct

Our businesses are exposed to risk from potential non-compliance with policies or regulations, employee misconduct or negligence and fraud, which could result in civil or criminal investigations and charges, regulatory sanctions and serious reputational or financial harm.

## Legal and regulatory risks

### Our exposure to legal liability is significant

We face significant legal risks in our business, and the volume and amount of damages claimed in litigation, regulatory proceedings and other adversarial proceedings against financial services firms continue to increase in many of the principal markets in which we operate.

*** 

As a participant in the financial services industry, we are subject to extensive regulation by governmental agencies, supervisory authorities and self-regulatory organizations in Switzerland, the EU, the UK, the US and other jurisdictions in which we operate around the world. Such regulation is increasingly more extensive and complex and in recent years, costs related to our compliance with these requirements and

the penalties and fines sought and imposed on the financial services industry by regulatory authorities have all increased significantly and may increase further.

Additionally, authorities in many jurisdictions have the power to bring administrative or judicial proceedings against us, which could result in, among other things, suspension or revocation of our licenses, cease and desist orders, fines, civil penalties, criminal penalties or other disciplinary action which could materially adversely affect our results of operations and seriously harm our reputation.

222.    In order to protect Credit Suisse and its shareholders from these risks occurring and damaging them in 2010 Credit Suisse's Board of Directors and Executive Board adopted the Credit Suisse Code of Conduct, which provides:

At Credit Suisse, we are convinced that a responsible approach to business is a decisive factor in determining our long-term success. We therefore expect all of our employees and members of the Board to observe the professional standards and ethical values set out in our Code of Conduct, including our commitment to complying with all applicable laws, regulations and policies in order to safeguard our reputation for integrity, fair dealing and measured risk-taking… ***No waivers or exceptions are permissible under our Code of Conduct.***

\*\*\*

**Our Ethical Values and Our Professional Standards**

The Code of Conduct provides a clear statement of the ethical values and professional standards that we expect all members of the Board of Directors and employees to uphold as they work to achieve our vision. ***Only by operating within this framework can we maintain and strengthen our reputation for integrity, fair dealing and measured risk-taking.*** The Code of Conduct applies to all members of the Board of Directors and employees of Credit Suisse Group AG and all of its subsidiaries (Credit Suisse). ***There are no exceptions***.

**Integrity**

Integrity is essential for our long-term success.

To achieve this, we must respect the interests of our shareholders, clients, employees ... government authorities, regulators ....

Establishing and maintaining a reputation for integrity also means that we need to identify and manage or avoid potential conflicts of interest.  To do so, we have put in place specific policies and processes such as those relating to reputational risk ....

**Compliance**

***We strive to maintain an exemplary control and compliance culture***.  In particular, we are responsible for:

- Leading by example, particularly in supervisory roles by setting the right tone for compliance with applicable laws, regulations and policies;
- ***Conducting ourselves in accordance with relevant guidelines***, ***policies, manuals***, ***handbooks and best practices relating to our respective areas of responsibility and diligently implementing the prescribed measures and approaches***;
- ***Acting in good faith and with due care at all times***.

**Trust**

***Trust has been central to the success of banking over the centuries***.  ***We are committed to behaving in an ethical and professional manner that will reflect well on ourselves and the industry as a whole and to encouraging others to do likewise***.

***We earn trust by***:

- Having an excellent professional reputation;
- Acting as an honest ambassador and representative of our bank;
***Demonstrating that we act at all times according to the ethical values and professional standards outlined in this Code***.

We expect every member of the Board of Directors and employee to actively build trust in Credit Suisse and to ***refrain from any behavior that might compromise this trust***.

117

**Adherence to Laws and Regulations**

All members of the Board of Directors and employees are expected to comply with applicable laws, regulations and policies.

*In particular, we take our responsibility to ensure the integrity of the international financial system very seriously*. *This means that we are committed to ensuring that we do everything possible to prevent money laundering*, *the financing of terrorist activities and corruption.*

*We maintain the highest standards in our cross-border business activities*.

We are *committed to complying with all relevant tax laws*.

*We do not assist clients in activities intended to breach their tax obligations*.

*** 

**Adherence to this Code**

Our most valuable asset is our reputation. It is our policy that our employees report violations of laws, rules, regulations or this Code internally so that matters can be properly addressed.

We encourage our employees to make reports directly to the relevant supervisors and the members of the Legal and Compliance department, the Credit Suisse Integrity Hotline or, where appropriate, directly to the corresponding higher level within Credit Suisse in accordance with your policies and procedures.   Reports may be made on a confidential anonymous basis.

*We prohibit retaliation against any employee for such reports made in good faith*.

223.   Ascertaining and then helping to assure ongoing compliance with Credit Suisse's Code of Conduct was part of KPMG's auditing obligations, part of taking needed steps to determine if the audited entity is complying with the law.  The Code was never properly enforced by the Credit Suisse Defendants or the KPMG Defendants.

224.    The members and the Directors of a Swiss corporation and its external auditor have much more "hands-on" involvement and liability for the "management" of the business operations of the corporation they supervise than is typical of directors in a United States domestic corporation.   For instance, the Board Chair and Vice Chair positions are full time jobs and Rohner and Schwan have been paid millions of dollars a year — $4–5 million each over the past years while steering Credit Suisse repeatedly into one ditch after another. And as Directors of a highly regulated financial institution, they are required to exercise the oversight necessary to assure compliance with the laws and regulations applicable to regulatory/financial institutions.   The individual Credit Suisse Defendants and KPMG Defendants were each involved in the mismanagement of Credit Suisse at critical points.   Had they properly discharged their duties, they could have prevented or mitigated the damages caused to the shareholders by the events and actions complained of.

225.    In addition to the substantive duties and obligations imposed by Swiss law, Credit Suisse internal documents explained in detail the duties and responsibility of Credit Suisse's Directors and Officers to Credit Suisse and its shareholders:

**Board leadership**

**Chairman of the Board**

The Chairman is a non-executive member of the Board, in accordance with Swiss banking law and performs his role on a full-time basis, in line with practice expected by FINMA, our main regulator.  The Chairman:

- Coordinates the work within the Board;
- Works with the committee chairman to coordinate the tasks of the committee;
- Ensures that the Board members are provided with the information relevant for performing their duties;
- Drives the Board agenda;

- Drives key Board topics, especially regarding the strategic development of the Group succession planning, the structure and organization of the Group, corporate governance as well as compensation and compensation structure, including the performance evaluation and compensation of the CEO and the Executive Board;
- Chairs the Board, the Governance and Nominations Committee, the Conduct and Financial Crime Control Committee and the Shareholder Meetings;
- Takes an active role in representing the Group to key shareholders, investors, regulators and supervisors, industry associations and other external stakeholders.

## Vice Chair and Lead Independent Director

There may be one or more Vice Chairs.  The Vice Chair:

- May convene meetings without the Chairman being present;
- Takes a leading role among the Board members, particularly when issues between a non-independent Chairman and the independent Board members arise (for example, when the non-independent Chairman has a conflict of interest)

Severin Schwan currently serves as the Vice-Chair and the Lead Independent Director.

***

## Board responsibilities

***

With responsibility for the overall direction, supervision and control of the company, the Board:

- Regularly assesses our competitive position and approves our strategic and financial plans and risk appetite statement and overall risk limits;
- Appoints or dismisses the CEO and the members of the Executive Board and appoints or dismisses the head of internal Audit as well as the regulatory auditor;
- Receives a status report at each ordinary meeting on our financial results, capital, funding and liquidity situation;
- Receives, on a monthly basis, management information packages, which provide detailed information on our performance and financial status, as well as quarterly risk reports outlining recent developments and outlook scenarios;

- Is provided by management with regular updates on key issues and significant events, as deemed appropriate or requested;
- Has access to all information concerning the Group in order to appropriately discharge its responsibilities;
- Reviews and approves significant changes in our structure and organization;
- Approves the annual variable compensation for the Group and the divisions and recommends compensation of the Board and Executive Board for shareholder approval at the AGM;
- Provides oversight on significant projects including acquisitions, divestitures, investments and other major projects;
- Approves the recovery and resolution plans of the group and its major subsidiaries;
- Along with its committees, is entitled, without consulting with management and at the Group's expense, to engage external legal, financial or other advisors as it deems appropriate, with respect to any matters within its authority.

**Management information system**

The Group has a comprehensive management information system (MIS) in place as part of our efforts to ensure the Board and senior management are provided with the necessary information and reports to carry out their respective oversight and management responsibilities. The Chairman may request additional reports as deemed appropriate.

**Governance of Group subsidiaries**

***The Board assumes oversight responsibility for establishing appropriate governance for Group subsidiaries****. **The governance of the Group is based on the principles of an integrated oversight and management structure with global scope***, ***which enables management of the Group as one economic unit****. **The Group sets** corporate governance standards to ensure the efficient and harmonized steering of the Group. In accordance with the OGR (Chapter II Board of Directors, Item 51.12) the Board appoints or dismisses the chairperson and the members of the board of directors of the major subsidiaries of the Group and approves their compensation .... The governance of the major subsidiaries subject to compliance with all applicable local laws and regulators

should be consistent with the corporate governance principles of the Group, as reflected in the OGR and other corporate governance documents.  In order to facilitate consistency and alignment of Group and subsidiary governance, it is the Group's policy for the Board to appoint at least one Group director to each of the board of its major subsidiaries. Directors and officers of the Group and its major subsidiaries are committed to ensuring transparency and collaboration throughout the Group.

**Board committees**

The Board has five standing committees:  The Governance and Nominations Committee, the Audit Committee, the Compensation Committee, the Conduct and Financial Crime Control Committee and the Risk Committee.

At each Board meeting, the Chairs of the committees report to the Board about the activities of the respective committees.

**Audit Committee**

***

As part of its main duties and responsibilities, the Audit Committee:

- Monitors and assesses the overall integrity of the financial statements …;

- Monitors the adequacy of the financial accounting and reporting processes and the effectiveness of internal controls over financial reporting;

- Monitors processes designed to ensure compliance by the Group in all significant respects with legal and regulatory requirements, including disclosure controls and procedures;

- Monitors the adequacy of the management of operational risks jointly with the Risk Committee, including the assessment of the effectiveness of internal controls that go beyond the area of financial reporting;

- Monitors the adequacy of the management of reputational risks, jointly with the Risk Committee;

- Reviews jointly with the Conduct and Financial Crime Control Committee any significant matters related to

122

compliance and conduct for which a joint review is determined to be appropriate.

**Conduct and Financial Crime Control Committee**

The Conduct and Financial Crime Control Committee consists of at least three members.

\*\*\*

The Conduct and Financial Crime Control Committee assists the Board in fulfilling its oversight duties with respect to the Group's exposure to financial crime risk. It is tasked with monitoring and assessing the effectiveness of financial crime compliance programs and initiatives focused on improving conduct and vigilance within the context of combatting financial crime.

As part of its main duties and responsibilities, the Conduct and Financial Crime Control Committee:

•      Reviews and assesses the Group's overall compliance framework for addressing financial crime risk, including policies, procedures and organizational set up;

•      Monitors and assesses the effectiveness of financial crime compliance programs, including those with respect to the following areas: anti-money laundering, client identification and know-your-client procedures, client on and off boarding, politically exposed persons, economic and trade sanctions, anti-bribery, anti-corruption and client tax compliance;

•      Reviews the status of the relevant policies and procedures and the implementation of significant initiatives focused on improving conduct and vigilance within the context of combatting financial crime, including employee awareness and training programs;

•      Reviews and monitors investigations into allegations of financial crime or other reports of misconduct pertaining to the areas specified above;

•      Reviews with management, internal Audit and the external auditors audit findings and recommendations with respect to the areas specified above, including annual regulatory audit reports;

- Receives regular updates by management on regulatory, legislative and industry specific developments with respect to the areas specified above;

- Reviews jointly with the Audit Committee and/or Risk Committee any matters for which a joint review is determined to be appropriate, including the annual compliance risk assessment and the Group's framework for addressing conduct risk; and

The responsibilities assumed by the new Conduct and Financial Crime Control committee were previously performed by the Audit Committee in the context of its oversight role over significant compliance matters.

Each Individual Defendant subject to these provisions violated them.

226.   Credit Suisse's executive officers are members of the Executive Board of Credit Suisse:

**Executive Board**

**Members of the Executive Board**

***The Executive Board is responsible for the day-to-day operational management of the group.***   It develops and implements the strategic business plans for the Group overall as well as the principal businesses, subject to approval by the Board.  It further reviews and coordinates significant initiatives, projects and business developments in the division, regions and in the Shared Services functions and establishes Group-wide policies.   The composition of the Executive Board of the Group and the Bank is identical.

227.   As to the Executive Board, *i.e.*, the Officers, Credit Suisse's internal documents state:

Responsibilities:

The Executive Board is responsible for the day-to-day operational management of the Group under the leadership of the CEO.

As part of its main duties and responsibilities, the Executive Board:

- Establishes the strategic business plans for the Group overall as well as for the principal businesses, subject to approval by the Board;

- Regularly reviews and coordinates significant initiatives, projects and business developments in the divisions and the corporate functions, including important risk management matters.

***

### Executive Board committees

The Executive Board has several standing committees, which are chaired by an Executive Board member and meet periodically throughout the year and/or as required.  These committees are:

- The Executive Board Risk Forum:  The Executive Board Risk Forum, chaired by the CRO…. Is responsible for decision making across risk types and functions.  The forum's key responsibilities include the review and challenge of the Group's risk-taking strategy, adjudicating material and cross divisional, cross functional escalated risk issues, oversight of critical approvals (*e.g*., risk appetite, limit allocation, risk capital allocation and mergers & acquisitions activity) and monitoring of key risk trends and relevant metrics.

- Group Conduct and Ethics Board:  The Group CEB (co-chaired by the Global Head of Human Resources and the Chief Compliance Officer (Chief Compliance and Regulatory Affairs Officer since March 5, 2020)) is responsible for overseeing how conduct and ethics matters are handled within the divisions and corporate functions and ensuring consistency and alignment of practices across the Group.  The Group CEB conducts reviews of employee sanctions and may perform subsequent reviews of employee sanctions and may performs subsequent evaluations for specific matters that have been escalated by the CEBs established for each division and the corporation functions.  The Group CEB also oversees the activities of the conduct and ethics ombudsperson.

228.    Every Credit Suisse Individual Defendant knew what was expected of them and the consequences to Credit Suisse and its common shareholders if they fell short — which they did consistently and for many years.

125

## VIII.  THE PERSISTENT MISMANAGEMENT OF CREDIT SUISSE OVER THE YEARS

229.    It took years of mismanagement permitting illegal, improper and wasteful conduct to destroy this institution.  Here is how it happened.

### A.    2008−2011 Events

#### 1.    Wealth Management/Private Banking 2008−2011

230.    During 2008−2011, Credit Suisse's Wealth Management/Private Banking and Investment Banking divisions were both consumed in scandals involving criminal conduct by Credit Suisse officials resulting in criminal pleas in the Southern District of New York and huge operating losses to Credit Suisse, large investment losses to its Investment Bank clients and fines, penalties and settlements ultimately costing Credit Suisse billions of dollars.

231.    During 2007−2008, Credit Suisse's United States operations were already engaged in illegal conduct, *i.e.*, money-laundering/transfers in violation of Treasury Department sanction/prohibitions and assisting thousands of New Yorkers and other United States citizens to illegally evade taxes by way of secret accounts with Credit Suisse's Wealth Management/Private Banking division, using the New York office as the center of its illegal operations in the United States and the Americas.

232.    Due to a lack of, and failure to implement, necessary financial/accounting controls and legal/regulatory/compliance controls and the Directors' and Officers' inadequate supervision, Credit Suisse has repeatedly been implicated in and ***punished*** for illegal money-laundering and monetary-transfer violations by both Credit Suisse Investment Banking and Wealth Management/Private Banking operations.  This was true as long ago as 2009 — and as recently as 2022−2023.

233.   In a December 2009 press release, the Treasury reported:

**US Treasury Department Announces Joint $536 Million Settlement With Credit Suisse AG**

The U.S. Department of the Treasury's … the U.S. Department of Justice and the New York County District Attorney's Office, today **announced a $536 million global settlement with Credit Suisse AG** (**Credit Suisse**) — **the largest penalty settlement in OFAC's history**. The settlement stems from Credit Suisse's structuring of thousands of wire transfers executed through U.S. banks and securities transactions executed through its **U.S. office** to ensure that the involvement of sanctioned parties was not apparent. Today's action is the largest penalty settlement in OFAC's history. **The** … **Federal Reserve System has issued a consent Cease and Desist Order** … **requiring the bank to implement an enhanced global regulatory compliance program**.

\*\*\*

This case arises out of Credit Suisse's processing of **thousands of transactions** over a **20-year period** that concealed the involvement of sanctioned parties and the routing of wire transfers and securities transactions to and through the United States…transactions involved Iran… Sudan, Libya, Burma, Cuba, and the former Liberian regime of Charles Taylor.

This matter represents an **egregious** case under OFAC's enforcement guidelines due to a number of **aggravating factors**, including the substantial economic benefit to sanctioned parties, the **scope and severity of the apparent violations, and the awareness of the conduct within the bank**.

\*\*\*

**Credit Suisse developed and deployed elaborate procedures for altering payments to ensure that the involvement of sanctioned parties was not apparent**.

\*\*\*

**Credit Suisse ignored numerous red flags that were raised over its long course of conduct**.

234.   At the time of this action, it was announced:

**Credit Suisse Agrees to Forfeit $536 Million in Connection with Violations of the international Emergency Economic Powers Act and New York State Law**

Credit Suisse ... has agreed to forfeit $536 million to the United States and to the **New York County District Attorney's Office** in connection with violations of the International Emergency Economic Powers Act (IEEPA) and **New York state law**.   **The forfeiture is the largest ever entered against an entity for IEEPA violations**.

\*\*\*

... [S]aid Attorney General Eric Holder[:] "**Credit Suisse's decades-long scheme to flout the rules that govern our financial institutions robbed our system of the legitimacy that is fundamental to its success**."

235.    In December 2009, FINMA, Credit Suisse's Swiss regulator, "harshly reprimanded" Credit Suisse and demanded "disciplinary measures":

**Settlement Between Credit Suisse and US Authorities Regarding Breach of US Sanctions**

FINMA has followed this case closely from the outset.  **It has harshly reprimanded the Bank for its actions in light of Swiss supervisory law and has requested disciplinary measures**.

236.    By 2009, it became clear that authorities in the United States were pursuing the role of a number of Swiss banks in assisting United States citizens to evade taxes.  The United States exposed that Credit Suisse's main competitor, UBS, had extensive illegal tax-evasion activities here in the United States and imposed a massive $780 million fine on UBS.  The United States DOJ permitted UBS to avoid a criminal plea and accept a non-prosecution agreement because UBS and the Swiss government agreed — for the first time ever — that a Swiss Bank would actually give up the identities of its tax cheat clients in the United States.  This was a watershed event.  For the first time in history, a large Swiss bank had been fined for illegal tax-evasion conduct and was forced to give up the names

of its clients. The impenetrable wall of Swiss bank secrecy had been breached and a massive fine was imposed on UBS for its illegal tax-evader-aider operation.

237.   Despite this highly publicized tax-evasion proceeding against UBS, Credit Suisse's Directors/Officers permitted Credit Suisse's Wealth Management/Private Banking divisions to continue engaging in precisely the same kind of illegal operations, despite the enormous risk that conducting those illegal operations posed to Credit Suisse's business, assets, and reputation and its owners/shareholders.

238.   Credit Suisse's Directors/Officers not only allowed the illegal activities to continue, they expanded their operations in the United States and elsewhere, while obstructing investigators and falsely assuring Credit Suisse's owners/shareholders that Credit Suisse was not involved in assisting in tax evasion anywhere in the world.

239.   Credit Suisse is a highly regulated company subject to scrutiny by regulators in the United States and elsewhere. When a highly regulated enterprise like Credit Suisse is contacted by regulators/prosecutors seeking information about a possible legal violation by the company, as occurred with Credit Suisse Wealth Management/Private Banking's tax-evasion assistance, proper corporate governance and supervisory oversight — due care, prudence and loyalty to the corporate entity — requires that the corporate entity cooperate with the inquiry, and isolate individuals involved in the matter under inquiry to prevent their obstructing or tampering with the inquiry. This must be done to protect the separate interests of the corporation and its shareholders from the officers, executives, directors and other personnel who may have violated the law. By cooperating with the inquiry, the corporation can obtain more lenient treatment, even deferred prosecution, as opposed to being forced to face felony charges, plead guilty and face more punitive penalties, thus mitigating the financial and reputational harm to the corporate

129

entity. Most important, once an inquiry is received or known to be coming, relevant evidence must be safeguarded and destruction — deliberate or intentional — prevented. Credit Suisse's Directors and Officers refused to cooperate with the United States investigations and Credit Suisse was more harshly punished because of it. The Credit Suisse Defendants did not do this.

240. By 2010, the United States was actively investigating Credit Suisse's extensive illegal operations here in the United States, which involved actually sending **_unlicensed bankers illegally to New York and other cities in the United States to recruit tax-evader clients_**, in violation of United States visa, passport and immigration rules.

241. On February 23, 2011, *The New York Times* reported:

### United States Accuses Four Bankers Connected to Credit Suisse of Helping Americans Evade Taxes

Credit Suisse, the big Swiss bank, on Wednesday came under heightened scrutiny of authorities in the United States and Germany over its sale of private banking services that enable tax evasion.

The United States Justice Department accused **_four private bankers on Wednesday of helping Americans evade taxes, widening its investigation of foreign financial institutions_**.

Federal prosecutors ... accused the bankers — Marco Parenti Adami, Emanuel Agustoni, Michele Bergantino and Roger Schaerer — **_of conspiracy and fraud in connection with their banking duties_**.

242. On February 23, 2011, *Bloomberg* reported:

### US Indicts Four Swiss Bankers in Tax Conspiracy Case

The bank's managers in its cross-border business "knew and should have known that they were aiding and abetting US customers in evading their US income taxes," according to the

indictment.    ***In the fall of 2008, the bank had*** "***thousands***" ***of accounts with $3 billion in assets not declared to the US Internal Revenue Service***, ***according to the indictment***.

The scheme included setting up undeclared accounts protected by Swiss bank secrecy, ***providing banking and investment services in New York to holders of those accounts***, ***and having bankers provide unlicensed banking services to customers they visited in the US***, ***according to the indictment***.

"***The conspiracy dates back to 1953*** ...[,]" according to a Justice Department statement.

***

The indictment cites examples of the defendants conspiring with ... residents of ***Beverly Hills, Palm Desert and La Jolla, California; Miami and Palm beach, Florida; Elizabeth and Oakland, New Jersey; Ossining and New York, New York; Charlottesville, Virginia; and Pittsburgh.***

243. By 2010, Credit Suisse's Directors and Officers knew that criminal prosecutors in the United States (and elsewhere) were focusing on the illegal tax-evasion actions of its officials in both the Wealth Management/Private Banking businesses in New York.  Instead of dealing with these highly threatening dangerous criminal investigations in an honest and compliant manner, stopping the illegal conduct and cooperating with prosecutors to protect Credit Suisse (as opposed to themselves) by negotiating a resolution ***avoiding*** a criminal plea and securing a ***lower fine*** by ***cooperating with prosecutors***, ***Credit Suisse's*** Directors and Officers ***destroyed or permitted the destruction of evidence and obstructed and impeded the investigation*** in part by conducting a bogus internal investigation designed to ***coverup the illegal conduct and protect the top Directors and Officers***.  For this misconduct — this willful or, alternatively, negligent lack of due care, due diligence, and prudence, "***in particular***

*with regard to compliance with the law"* by the Directors and Officers — *Credit Suisse — and its shareholders — would pay a terrible price*.

244.   By mid-2011, Credit Suisse was the *target* of a huge United States tax-evasion investigation which prosecutors were pursuing with special zeal — not only because the misconduct was so horrible – but because Credit Suisse Directors and Officers were interfering with and obstructing their investigation.  In July 2011, *The New York Times* reported:

### Credit Suisse Discloses US Inquiry Over Taxes

Credit Suisse disclosed Friday that it was being investigated by the Justice Department to see whether its private banking unit helped Americans evade taxes, raising the possibility that the bank could face legal proceedings similar to those that led its Swiss rival, UBS to pay a costly settlement and open its books to American tax authorities .... *The bank also said it was told it was* "*a target*" *of the investigation*[.]

245.   The United States tax-evasion investigation of Credit Suisse intensified with more indictments of Wealth Management/Private Banking officials.  In July 2011, *The Wall Street Journal* reported:

### Four More Credit Suisse Bankers Charged in Tax Case

US prosecutors on Thursday charged *Credit Suisse Group*'*s former top offshore banking executive in North America and three other senior bankers with defrauding the US government*, *increasing pressure on the Swiss bank over US customers*' *secret accounts that the officials say were used to evade taxes*.

*The charges add senior-level executives to an indictment* filed in February against lower-level bankers who were charged with conspiring to defraud the US by opening and maintaining thousands of offshore accounts for wealthy Americans with as much as $3 billion in hidden assets.

The bankers were Markus Walder, Sussane Meier, Andreas Bachman and Josef Dorig. All eight of these Credit Suisse bankers ultimately pleaded guilty here in federal court in the United States.

### 2. Investment Banking 2008–2011

246. During 2008–2011, Credit Suisse's Investment Banking operation — centered in New York City — was also constantly embroiled in scandal — causing huge operating losses for the Bank and even larger investment losses to clients that would cost Credit Suisse billions of dollars over the next several years. When Credit Suisse reported its year-end 2007 results, it shocked markets and Credit Suisse's owners/shareholders by **disclosing a giant $2.85 billion loss** due to what Bank officials described as "**mismarking**," *i.e.*, "pricing sectors" of mortgage-backed securities, of which Credit Suisse held billions of — and whose Investment Banking division had sold billions more to clients. This innocuous "mismarking" was a giant fraudulent scheme involving reckless risks, deliberate mispricing of toxic securities, and concealed giant losses — so the Investment Bank could pocket huge bonuses.

247. On February 19, 2008, *Reuters* reported:

> ### Credit Suisse Reveals $2.85 Billion Write Downs
>
> Credit Suisse has written $2.85 billion off the value of its asset backed investment and found mismarking and pricing errors on its books … **sending its share plummeting**.
>
> \*\*\*
>
> "**This is a disaster**," said Helvea analyst Peter Thorne. "**This could be the tip of the iceberg**."
>
> \*\*\*
>
> The write-downs were across the range of Credit Suisse's exposures to commercial mortgage-backed securities (CMBS), retail mortgage-backed securities (RMBS) and collateralized debt obligations (CDOs) ….

CDOs are repackaged securities with substantial exposure to subprime mortgages which have suffered a collapse in their value as borrowers have reneged on loans in record numbers.

248.    This was some iceberg.  The out-of-control illegal behavior of the Credit Suisse Investment Banking officials, much of which occurred while Dougan was CEO of the Investment Bank and Rohner was COO and/or Chief Legal Counsel, would ultimately cost Credit Suisse at least $7 billion in fines, penalties and settlements, on top of billions in operating losses.  On March 20, 2008, *The New York Times* reported:

**Credit Suisse Expects to Post a Loss**

Credit Suisse... said ... that it expected to post its first quarterly loss since 2003 because of large write-downs and losses related to "***intentional misconduct***" at its trading desk.

In a statement, the Swiss bank said that it would write off $2.65 billion for the fourth quarter of 2007 and the first three months of 2008.

\*\*\*

Brady Dougan, the chief executive, said Thursday that a review of asset-backed securities positions in the department trading collateralized debt obligations found that the "***intentional misconduct***" had been limited to "***a handful of traders***" ....

***The review also determined that the bank's own security controls*** "***were not effective in this case***," Mr. Dougan added.

249.    On March 1, 2008, *Risk.Net* reported:

**Credit Suisse Reveals $2.85B Subprime Credit Writedown**

Despite the losses, Brady Dougan, chief executive of Credit Suisse, ***ruled out any major changes to the bank's valuation and risk management procedures, describing the writedown as an isolated incident and adding he felt*** "***comfortable with our internal controls***."

\*\*\*

> The losses center on the bank's residential mortgage-backed security and collateralized debt obligation (CDO) portfolios. ***The trading team*** … ***have now been suspended with pay*** ….

250.   Credit Suisse's NY Investment Bank in fact had widespread control and compliance deficiencies — an out-of-control anti-compliance culture, which due to the lack of adequate supervision of the Directors and Officers, had existed for years and would never be fixed.

251.   Regulatory authorities quickly penalized Credit Suisse for the severe weaknesses in, and failure of, the required financial/accounting controls and legal/regulatory/compliance controls and risk management and governance procedures, imposing the ***largest fine ever for such failures but going even further*** — ***finding a failure to adequately supervise the Investment Banking operation and conduct the business with due skill, care and diligence***. Credit Suisse's Directors and Officers were forced to admit that these losses were due to "***material***" weaknesses in Credit Suisse's system of internal financial/accounting controls and legal/regulatory/compliance controls and risk management and governance procedures.

252.   On August 13, 2008, the British Financial Services Authority (the "FSA") issued a release:

> **FSA Fines Credit Suisse 5.6M for Systems and Controls Failings**
>
> The Financial Services Authority (FSA) has today fined the UK operations of Credit Suisse (the subsidiaries) 5.6 million for breaching FSA Principles 2 and 3 by failing to conduct their business with due skill, care and diligence and failing to organize and control their business effectively ….
>
> In breach of Principle 2, the subsidiaries failed adequately to supervise the business of the SCG and did not act in a timely

way on the concerns they had identified about the pricing of certain asset-backed positions.

In breach of Principle 3, adequate systems and controls were not put in place by the subsidiaries which meant that they failed to recognize, for approximately five months, that certain of the SCG's asset backed positions were wrongly valued.

Margaret Cole, director of enforcement, said: "It is imperative ... that firms have in place appropriate systems and controls to manage their risks."

Credit Suisse commissioned a detailed review of the causes of the writedowns.  The identified serious failures in the subsidiaries' controls over the SCG and the operation and management of those controls and concluded that they were not effective.

253.  In August 2008, *The Guardian* reported:

### Credit Suisse Hit by 5.6 Million FSA Fine After Sub Prime Rogue Trading

Credit Suisse has received a record £5.6m fine from the Financial Services Authority following a scandal in ... in its investment banking division ....

It is the largest penalty for a breach of FSA principles by a regulated firm ....  The episode — was highly damaging ....

Today's fine specifically relates to supervision failures by management and to the lack of trader monitoring systems and controls.

254.  The subprime securities misconduct in Credit Suisse's New York Investment Banking operations would result in a myriad of claims, lawsuits and other proceedings by damaged parties over the next several years and Credit Suisse and its shareholders ended up paying the price.

255.  Despite claims by Credit Suisse's Directors and Officers that any control failures were isolated and that they had taken proper "remediation" steps to fix Credit Suisse's financial/accounting controls and legal/regulatory/compliance controls and risk

management and governance procedures, they were not isolated and they had not been

remediated. In July 2010, the FSA issued a release:

### FSA Issues Fines Totaling 4.2M for Transaction Reporting Failures

The three firms are Credit Suisse (£1.75m fine), Getco Europe Limited (£1.4mc) and Instinet Europe Limited (£1.05m). Credit Suisse is a bank, Getco is a market maker trading on electronic markets, and Instinet is an agency broker.

Firms are required to have systems and controls in place to ensure they submit accurate data for reportable transactions …. The FSA uses this data to detect and investigate suspected market abuse: insider trading and market manipulation.

All three firms were found to have committed multiple breaches that resulted in failures to provide transaction reports promptly and correctly to the FSA.

***

Each firm could have prevented the breaches by carrying out regular reviews of its data. Despite repeated reminders from the FSA … none of the firms did this.

256.   The "mismarking" of the subprime toxic securities by officials in Credit

Suisse's Investment Banking division drew a fine from United States regulators — an

ominous sign of huge penalties and settlements to come. In May 2011, FINRA

announced:

### FINRA Fines Credit Suisse Securities $4.5 Million … for Misrepresentations Related to Subprime Securitizations

The Financial Industry Regulatory Authority (FINRA) announced today that it has fined Credit Suisse Securities (USA) LLC $4.5 million, … for misrepresenting delinquency data and inadequate supervision in connection with the issuance of residential subprime mortgage securitizations (RMBS).

***

> FINRA found that in 2006, Credit Suisse misrepresented the historical delinquency rates for 21 subprime RMBS it underwrote and sold. Although Credit Suisse knew of these inaccuracies, it did not sufficiently investigate the delinquency errors, inform clients who invested in these securitizations of the specific reporting discrepancies ... maintenance and updating of relevant disclosure on its website.
>
> ***
>
> Brad Bennett, FINRA Executive Vice President and Chief of Enforcement, said, "Firms must provide accurate information about the products they offer so that their customers can make informed investment decisions. Credit Suisse ... failed to monitor and supervise the reporting of historical delinquency rates, depriving investors of information essential to assessing the profitability of mortgage-backed investments."

257. These "delinquency date" failures were a key part of the subprime mortgage scandal in Credit Suisse's Investment Bank which had already cost Credit Suisse itself over $2.6 billion in losses. However, this misconduct also harmed the buyers of these toxic securities which Credit Suisse officials called "***dog shit***" and "***complete garbage***." In due course criminal prosecutions in the Southern District of New York ensued and government and private lawsuits would end up costing Credit Suisse over $7 billion — and counting.

258. The control, compliance and supervisory failings inside Credit Suisse's Investment Banking operation were widespread and they persisted. In December 2011, FINRA announced:

### FINRA Fines Credit Suisse Securities $1.75 Million for Regulation SHO Violations and Supervisory Failures

The Financial Industry Regulatory Authority (FINRA) announced today that it has fined Credit Suisse Securities (USA) LLC $1.75 million for violating Regulation SHO (Reg SHO) and failing to properly supervise short sales of securities and marking of sale orders. As a result of these violations,

Credit Suisse entered millions of short sale orders without reasonable grounds to believe that the securities could be borrowed and delivered and mismarked thousands of sales orders.

***

Brad Bennett, FINRA Executive Vice President and Chief of Enforcement, said, "***Credit Suisse's Reg SHO supervisory and compliance monitoring system was seriously flawed. Millions of short sale orders were being entered in its systems without locates for over four years because the firm did not have adequate Reg SHO technology and procedures in place***."

## B.    2012–2014 Events

### 1.    Investment Banking 2012–2014

259.    During 2012–2014, Credit Suisse continued to be mired in lawsuits and proceedings because of its Investment Banking officials' misconduct and resulting penalties and fines.  The subprime securities misconduct in Credit Suisse's Investment Bank had inflated Credit Suisse's reported profits, allowing top insiders to pocket huge unjustified bonuses and compensation, amounting to hundreds of millions of dollars.

260.    In February 2012, the SEC announced a suit *in the Southern District of New York*:

### SEC Charges Former Credit Suisse Investment Bankers in Subprime Bond Pricing Scheme During Credit Crisis

The SEC today charged four former veteran investment bankers and traders at Credit Suisse Group for engaging in a complex scheme to ***fraudulently overstate the prices of $3 billion in subprime bonds during the height of the subprime credit crisis***.

The SEC alleges that Credit Suisse's former ***global head*** … of structured credit trading Kareem Serageldin and former ***head of hedge trading*** David Higgs along with two mortgage bond traders … ***priced them in a way that allowed Credit Suisse to achieve fictional profits***. …

> ***The SEC alleges that the mispricing scheme was driven in part by these investment bankers' desire for lavish year-end bonuses*** ….
>
> "***The stunning scale of the illegal mismarking in this case was surpassed only by the greed of the senior bankers behind the scheme***," said Robert Khuzami, Director of the SEC's Division of Enforcement.

261.    In February 2012, the *Financial Times* reported:

### Ex-Credit Suisse Traders Charged Over Security Pricing

> The former head of Credit Suisse's structured products group, Kareem Serageldin, and two others were charged with allegedly inflating the value of mortgage-related securities at the height of the financial crisis to pocket millions of dollars in bonuses.
>
> ***David Higgs and Salmaan Siddiqui***, ***two former Credit Suisse traders who reported to Mr***. ***Serageldin***, ***pleaded guilty to conspiracy*** ….

This criminal case and those pleas were in the Southern District of New York.

262.    In November 2012, the SEC announced it was requiring Credit Suisse to pay a $120 million penalty for this misconduct by its New York Investment Banking officials.

### SEC Charges … Credit Suisse With Misleading Investors in RMBS Offerings

> The SEC charged … Credit Suisse Securities (USA) with misleading investors in offerings of residential mortgage-backed securities (RMBS).
>
> ***
>
> ***Credit Suisse has agreed to pay $120 million to settle the SEC's charges***.

263.    This misconduct by officials in Credit Suisse Investment Banking involving subprime securities inflicted billions of dollars in damages on U.S. investors — many of them New Yorkers.  The damage from the subprime scandal was nationwide.  It resulted in lawsuits from states as well as from federal regulators.

264.    In November 2012, the New York State Attorney General announced:

**AG Schneiderman Sues Credit Suisse For**
**Fraudulent Residential Mortgage-Backed Securities**

....  Credit Suisse deceived investors as to the care with which they evaluated the quality of mortgage loans packaged into residential mortgage-backed securities ....

\*\*\*

... Credit Suisse ... systematically failed to adequately evaluate the loans, ignored defects that its limited review did uncover, and kept its investors in the dark about the inadequacy of its review procedures and defects in the loans.  The loans in Credit Suisse's mortgage-backed securities included many that had been made to borrowers who were unable to repay the loans, were very likely to default, and ultimately did default in large numbers.

265.    Likewise, in December 2013, the *Financial Times* reported:

**New Jersey Sues Credit Suisse**

New Jersey's attorney-general sued Credit Suisse for allegedly misleading investors in $10bn of mortgage-backed securities [the suit] alleges the Swiss bank defrauded investors, including charities and public and private pensions, who bought mortgage-backed securities underwritten by the bank[.]

266.    As 2014 unfolded, Credit Suisse and its shareholders continued to pay the price, *i.e.*, suffer the damage caused by the Directors' and Officers' fiduciary failures that had permitted the subprime securities disaster to occur in Credit Suisse's Investment Banking operation.  The price was escalating.  In March 2014, *The Wall Street Journal* reported:

**Credit Suisse Settles Mortgage Litigation for $885**
**Million**

Credit Suisse Group AG [settled] with the Federal Housing Finance Agency over allegations it misrepresented mortgage-backed securities sold before the financial crisis, paying $885 million ....

> ... [T]he settlement covers claims in two lawsuits filed by the FUFA alleging that it misled Fannie Mae and Freddie Mac about the quality of loans underlying some $16.6 billion in mortgage bonds sold to the government-controlled mortgage finance companies[.]

### 2.    Wealth Management/Private Banking 2012−2014

267.    By early 2014, United States regulators were closing in on the United States tax-evader/aider activities of Credit Suisse officials.  The investigation had uncovered that tax-evasion-assistance activities were going on **in both** the Wealth Management/Private Banking and in the Investment Banking operations.  ***At Credit Suisse, tax-evasion assistance was corporate-wide — a core part of Credit Suisse's business model***, *i.e.*, a massive illegal and secret corporate-wide tax-evader-aider operation.

268.    In February 2014, the SEC issued a release:

> **Credit Suisse Agrees to Pay $196 Million and Admits Wrongdoing in Providing Unregistered Services to US Clients**
>
> The SEC today announced charges against Zurich-based Credit Suisse Group AG for violating the federal securities laws by providing cross-border brokerage and investment advisory services to U.S. clients without first registering with the SEC.
>
> Credit Suisse agreed to pay $196 million and admit wrongdoing to settle the SEC's charges.
> ... Credit Suisse provided cross-border securities services to thousands of U.S. clients ... without adhering to the registration provisions of the federal securities laws.  Credit Suisse relationship managers traveled to the U.S. to solicit clients, provide investment advice, and induce securities transactions.  These relationship managers were not registered to provide brokerage or advisory services ....
>
> "The broker-dealer and investment adviser registration provisions are core protections for investors," said Andrew J. Ceresney, director of the SEC's Division of Enforcement.  "As

Credit Suisse admitted as part of the settlement, its employees for many years failed to comply with these requirements ....”

\*\*\*

“As a multinational firm with a significant U.S. presence, Credit Suisse was well aware of the steps that a firm needs to take to legally conduct advisory or brokerage business with U.S. clients,” said Scott W. Friestad, an associate director in the SEC’s Division of Enforcement.  “Credit Suisse failed to effectively implement internal controls designed to keep its employees from crossing the line and being non-compliant with the federal securities laws.”

269.    Because the adverse impact of the illegal tax-evader/aider activities of Credit Suisse officials on the United States government and our nation’s law-abiding tax paying citizens, this conduct became a matter of substantial public interest.  As such, it was investigated by the United States Senate.  The resulting Senate Committee report was as devastating as it was colorful.  It laid open how **brazen** and vast, *i.e.*, “***systematic***,” the Credit Suisse United States tax-evasion assistance operation was.  On February 25, 2014, *The Wall Street Journal* reported:

### Senate Report Blasts Credit Suisse as Soliciting Tax Evaders

Credit Suisse Group AG went to great lengths to assist US customers trying to open Swiss bank accounts and evade federal taxes, courting clients at a Swiss-themed ball in New York and golf tournaments in Florida and setting up a branch in the Zurich airport to assist Americans on route to ski vacations ....

The 181-page report released by the Senate Permanent Subcommittee on Investigations painted Zurich-based Credit Suisse as a willing accomplice in offshore tax evasion, aggressively seeking business from American customers aiming to hide their money from the US government.

In 2006 Credit Suisse had 22,000 accounts from US customers worth 12 billion Swiss francs ($13.5 billion at current exchange rates) the report said.

143

The firm, which had more than 1,800 bankers working on American business, emphasized discretion and advised wealthy clients to travel to Switzerland to avoid creating a paper trail that would undermine their accounts' secrecy ....

270.   In February 2014, the *Financial Times* reported:

### Credit Suisse 'Helped US Tax Evaders'

Credit Suisse made false claims in US visa applications, conducted business with clients in secret elevators and shredded documents to help more than 22,000 American customers avoid US taxes, according to a scathing report by a US congressional committee.

... "[C]loak and dagger tactics," according to Senator Carl Levin, chairman of the US Senate Permanent Subcommittee on Investigations.

Bankers made 150 trips to the US from 2002 to 2008 to aid in the tax evasion efforts ....  In total, about 1,800 bankers were involved in helping clients avoid taxes, leading Senator John McCain, the subcommittee's top Republican, to call the practices "systematic."

\*\*\*

... Mr Levin said. "The Credit Suisse case study shows how a Swiss bank aided and abetted US tax evasion... but also on US soil by sending Swiss bankers here to open hidden accounts."

271.   The tax-evasion activities of the Credit Suisse officials also came under the

glare of ***New York banking regulators***.  In April 2014, the *Financial Times* reported:

### Credit Suisse Faces New York Probe

New York's banking regulator has opened an investigation into whether Credit Suisse helped clients evade paying state taxes....

\*\*\*

In the report, the subcommittee described how the bank told its investigators that the New York office was intended as an "outpost" to serve as a "liaison" for Swiss clients travelling in the US.

272.    In May 2014, the almost unimaginable occurred: Credit Suisse became the first bank of its size to take a criminal guilty plea in decades and paid the largest tax-evasion fine in history.  On May 19, 2014, *The New York Times* reported:

### Credit Suisse Pleads Guilty in Felony Case

Credit Suisse has done what no other bank of its size and significance has done in over two decades: plead guilty to criminal wrongdoing.

*** 

... Credit Suisse, which has a giant investment bank in New York and whose chief executive is an American, will also pay about $2.6 billion in penalties and hire an independent monitor for up to two years.

273.    The plea agreement disclosed that the extreme tax-evasion criminal activities involved money laundering.  According to a May 19, 2014 announcement by the DOJ:

### Credit Suisse Pleads Guilty to Conspiracy to Aid and Assist US Taxpayers in Filing False Returns

The plea agreement, along with agreements made with state and federal partners, provides that Credit Suisse will pay a total of $2.6 billion ....

... [S]aid Attorney General Holder[:] "Credit Suisse conspired to help U.S. citizens hide assets in offshore accounts in order to evade paying taxes.  When a bank engages in misconduct this brazen, it should expect that the Justice Department will pursue criminal prosecution to the fullest extent possible, as has happened here." As part of the plea agreement, Credit Suisse acknowledged that, ... it operated an illegal cross-border banking business that knowingly and willfully aided and assisted thousands of U.S. clients in opening and maintaining undeclared accounts and concealing their offshore assets and income from the IRS.

*** 

According to the statement of facts filed with the plea agreement, Credit Suisse employed a variety of means to

assist U.S. clients in concealing their undeclared accounts, including by:

- assisting clients in using sham entities to hide undeclared accounts;

- soliciting IRS forms that falsely stated, under penalties of perjury, that the sham entities were the beneficial owners of the assets in the accounts;

- failing to maintain in the United States records related to the accounts;

- destroying account records sent to the United States for client review;

- using Credit Suisse managers and employees as unregistered investment advisors on undeclared accounts;

- facilitating withdrawals of funds from the undeclared accounts by either providing hand-delivered cash in the United States or using Credit Suisse's correspondent bank accounts in the United States; [and]

- structuring transfers of funds to evade currency transaction reporting requirements ....

***

The Board of Governors of the Federal Reserve System is also announcing today that it has reached a resolution with Credit Suisse, by which Credit Suisse has agreed to a cease and desist order, certain remedial steps to ensure its compliance with U.S. law in its ongoing operations, and a civil monetary penalty of $100 million. Additionally, the New York State Department of Financial Services is announcing a similar resolution by which Credit Suisse has agreed to a cease and desist order and a monetary penalty of $715 million.

274. The United States prosecutors made it very clear that they had insisted on the guilty pleas and imposed an enhanced penalty on Credit Suisse because Credit Suisse's Directors and Officers **had obstructed the investigation and permitted the destruction of evidence**. In May 2014, the *Financial Times* reported:

### Credit Suisse Undone by 'Brazen' Misconduct

146

A combination of "brazen" misconduct and a "shamefully inadequate internal inquiry" made Credit Suisse the first major bank in two decades to plead guilty to criminal wrongdoing.

\*\*\*

Yet it was largely the bank's "inadequate" response and resistance to provide client names to US authorities that tipped the scales, Department of Justice officials said.

"It was the nature of the conduct that Credit Suisse was engaged in, how long it engaged in it, how brazenly it engaged in it, and added to that is the fact of what it did when it found out that this was going on," James Cole, deputy attorney-general, said when explaining the reason for the guilty plea. "It allowed documents that could help our investigation to be destroyed."

…Credit Suisse's rival UBS reached a landmark settlement in 2009 in which it paid $780m and agreed to turn over the names of nearly 4,000 American account holders.

Credit Suisse was on notice, but did not launch an internal investigation until January 2011 after the DOJ informed bank officials they found evidence of wrongdoing.

\*\*\*

By failing to investigate and preserve documents and emails, including some located in Switzerland, Credit Suisse "encumbered the scope and progress" of the criminal inquiry, the bank acknowledged in court filings.

Eric Holder, attorney-general, called the bank's internal inquiry "shamefully inadequate."

In early 2013, at least one Credit Suisse executive questioned the bank's internal investigation and left following a dispute over its handling. Anthony DeChellis, the former head of Credit Suisse's private bank for the Americas, told government investigators last year he had clashed with superiors about the bank's disclosures to the DOJ over the tax probe …. He later brought his findings to the DOJ, these people say.

275.  On May 19, 2014, the *Financial Times* reported:

## Credit Suisse Pleads Guilty to Tax Evasion

Credit Suisse pleaded guilty to an "extensive and wide-ranging conspiracy" to help US clients evade taxes and agreed to pay about $2.6bn in fines as it became the first large global bank in two decades to admit to criminal charges.

\*\*\*

Eric Holder, the US attorney-general, said hundreds of bank employees, including managers, were involved in the misconduct over decades.

The DOJ insisted on a guilty plea by Credit Suisse in part because it did not feel the bank had been fully co-operative with the investigation ....

Mr. Holder said that, after learning of the investigation, "Credit Suisse failed to retain key documents, allowed evidence to be lost or destroyed, and conducted a shamefully inadequate internal inquiry."

276.    The New York regulators punished Credit Suisse as well.  On May 19, 2014,

the New York State Department of Financial Services issued a release:

### Statement of New York Superintendent of Financial Services … Regarding Credit Suisse AG

Today's Order requires Credit Suisse AG to pay DFS a $715 million penalty for violations of law in connection with the Bank's global tax evasion scheme.  The Order notes that during the course of the scheme Credit Suisse's New York Representative Office was a hub for the Bank's private banking business and played a significant role in the Bank's facilitation of tax evasion.

The DFS Order also requires the installation of an independent monitor of DFS's choosing inside Credit Suisse.

\*\*\*

Under today's Order, the Bank must also terminate certain individuals who were previously indicted but were still being paid by Credit Suisse.  It is quite obvious that when misconduct occurs at financial firms, some individuals must have committed those bad acts and they should be held accountable.  In this matter, actions have been taken by criminal prosecutors to indict individual Credit Suisse employees.  As a regulator, we are ensuring that those under indictment will not continue to be paid by Credit Suisse.

148

*** 

> ... Going forward ... it is necessary that Credit Suisse and its top management go above and beyond to ensure the Bank is playing by the rules and that management acts to prevent misconduct within the firm.  Facilitating tax evasion was a strategy and business model that the firm engaged in for decades.  It was decidedly not the result of the conduct of just a few bad apples.  It is therefore quite appropriate that the firm itself is today pleading guilty, and for our independent monitor to further review the elements of Credit Suisse's corporate governance that contributed to this wrongdoing.

277. The illegal course of conduct of assisting tax evasion in the United States (and other jurisdictions as well) that the Credit Suisse Defendants permitted to occur not only violated the laws of those nation states, *it violated Swiss law*, *in particular the supervisory and governance obligations of the Directors and Officers of a Swiss bank who in overseeing a publicly owned bank are* "*responsible for the overall management of the company*" "*in particular with regard to compliance with the law*," *and "for organizing the accounting*, *financial control systems as required for management of the company*."

278. In May 2014, FINMA, the Swiss bank regulator, announced:

> **FINMA Published Summary Report on Proceedings Against Credit Suisse**
>
> The Swiss Financial Market Supervisory Authority FINMA has published today a summary report on the enforcement proceedings it conducted against Credit Suisse between 2011 and 2012.  The proceedings focused on the bank's cross-border business with US clients ...  FINMA concluded that Credit Suisse had violated its duty to identify, limit and monitor the risks involved in the US client business.
>
> ***
>
> In January 2011, FINMA initiated a comprehensive investigation into the cross-border US private client business conducted by Credit Suisse since 2000.  The findings of the investigation pointed to regulatory breaches.  Therefore, in

November 2011, FINMA instituted enforcement proceedings against Credit Suisse ....

FINMA based its assessment of the management and control of US cross-border financial services on Swiss supervisory law, which sets out that a bank must at all times assure proper business conduct and have an adequate organization, in particular with regard to risk management.

Credit Suisse violated governance and business conduct requirements.

***

The bank had violated its duty to identify, limit and monitor the risks involved in the US business, exposing itself, the entire financial group and its employees to unduly high legal and reputational risks. Credit Suisse thus violated business conduct requirements under Swiss supervisory law. In the meantime, the risks entered into in the US business have materialized.

279.    The United States Senate, SEC and DOJ investigations and proceedings disclosed that the tax-evasion-aider activities in the United States were long standing, widespread and involved almost 2,000 bankers — hardly a few "rogue" or "isolated" employees. The utterly ridiculous claims of ignorance on the part of the Directors and Officers regarding decades of corporate-wide misconduct involving both the Wealth Management/Private Banking and Investment Banking operations were publicly repudiated by Credit Suisse employees.

280.    On February 27, 2014, *Reuters* reported:

### Credit Suisse Staff Group Demands CEO Apologize for US Testimony

A group representing Swiss bankers demanded an apology from Credit Suisse boss Brady Dougan on Thursday after he said the practice of helping Americans conceal their wealth was the work of a few dishonest employees.

The American-born CEO told a U.S. Senate subcommittee on Wednesday that he and other top managers were not aware a

small group of Credit Suisse private bankers had helped U.S. customers evade taxes with offshore accounts.

***

The body representing staff at Credit Suisse and other Swiss banks reacted with astonishment to Dougan's comments, saying it was "hardly credible" that the bank's bosses knew nothing of the practices.

"It was common knowledge that tax evasion was the strategy, a business model pursued by many banks for a long time," the Schweizerischer Bankpersonalverband said in a statement.

281.    Credit Suisse employees whom the Directors and Officers designated as "*rogue*" and *fired* as having been ***wrongfully terminated for just doing their jobs, have sued***.    One of the Credit Suisse Wealth Management/Private Banking employees who was so designated, fired, and then "cut off" in connection with Credit Suisse's May 2014 guilty plea commenced legal action.    He exposed how Credit Suisse's Directors and Officers have lied and concealed their awareness of this "core business" of Credit Suisse for years.    On May 9, 2019, *Neue Zurcher Zeitung*, a Swiss paper, reported:

### Credit Suisse Loses Spectacularly Before Labor Court

It is a precedent: the big bank is sentenced to pay four million francs to a former employee for improper termination and violation of the duty of care.    The court found serious management errors surrounding the care of American customers.

... [T]hree judges ... agreed with a plaintiff who sued Credit Suisse (CS) for abusive termination and breach of duty of care. ... CS was sentenced to transfer ... CHF 4 million ... to the plaintiff for lost wages, bonuses and pension payments ...

The plaintiff is a former CS customer advisor who has also looked after North American customers across borders.    Their funds were mostly not declared in the United States.    The banker was released on May 19, 2014 by CS.    That day, the big bank in the United States ... said it helped US customers avoid tax obligations.    The banker's dismissal was part of the deal.

In its dismissal, the CS argued that [the employees] had broken internal bank rules several times.

\*\*\*

The banker was one of eight CS individuals who were charged by the US judicial authorities in 2011 with aiding and abetting tax evasion.

\*\*\*

... the judges studied a number of documents, including the bank's business plans and strategy papers on its US offshore business ....  In a process that lasted almost 100 hours, the testimony of 38 witnesses was heard.

\*\*\*

A large number of such business trips took place in the following years, bankers sometimes visited their US customers several times a year.  These trips, which had to be approved high up in the bank's internal hierarchy, were organized and paid for by the CS.  According to the court, the reports prepared by the respective customer advisors before and each trip also reached the members of the "huate direction de la banque."

\*\*\*

The judges came to the conclusion that the CS bankers had been "incited" by their employer to act beyond the bank's own guidelines ....  The court concluded that, despite the strict internal rules, the bank tolerated acts and practices that it knew were contrary to its own guidelines.

The Geneva judges were also "absolutely convinced" that the bank management was "up to date" with the actions of the customer advisors of the North America team and that they accepted these actions.  [They] repeatedly cited the statement made by ... Brady Dougan ... before the US Senate ... [that] a "small group of Swiss private bankers" violated internal bank rule ... the documents and witness statements submitted to the court would ultimately have given a completely different picture.

C.    **2015–2017 Events**

      1.    **Investment Banking 2015–2017**

282.    As 2015 ended, United States regulators were continuing to investigate wrongdoing in Credit Suisse's Investment Banking operation.

283.    In late September 2015, the SEC issued a release:

**Credit Suisse to Pay $4.25 Million and Admits to Providing Deficient "Blue Sheet" Trading Data**

The SEC today charged Credit Suisse ... with submitting deficient information ... about trades done by its customers, commonly referred to as "blue sheet data."

Credit Suisse Securities (USA) LLC, which is headquartered in New York, New York, agreed to settle the charges by paying a $4.25 million penalty and admitting it violated the recordkeeping and reporting provisions of the federal securities laws. It also agreed to be censured and to cease and desist future violations of the books and records provisions of the federal securities laws.

                        \*\*\*

Credit Suisse admitted to the findings in the SEC's order that from January 2012 to January 2014, it made at least 593 deficient blue sheet submissions to the SEC, omitting more than 553,400 reportable trades representing 1.3 billion shares.

284.    On February 1, 2016, the New York Attorney General announced:

**AG Schneiderman Announces Landmark Resolutions With Barclays and Credit Suisse for Fraudulent Operation of Dark Pools; Combined Penalties and Disgorgement to State of New York and SEC of Over $154 Million**

Attorney General Eric T. Schneiderman today announced ... Credit Suisse Securities (USA) LLC will pay a combined $154.3 million to the State of New York and the SEC to settle investigations into false statements and omissions made in connection with the marketing of their respective dark pools and other high-speed electronic equities trading services.

                        \*\*\*

Credit Suisse will pay a penalty of $60 million split equally between the State of New York and the SEC, and will pay a further $24.3 million in disgorgement and prejudgment interest to the SEC relating to other violations. The Attorney General and the SEC have both censured ... Credit Suisse for their misconduct.

285. At the same time, the SEC announced:

**Credit Suisse Charged With Dark Pool Violations**

The SEC today announced that ... Credit Suisse ... agreed to settle [a case] finding that it violated federal securities laws while operating alternative trading systems known as dark pools and Credit Suisse's Light Pool.

***

"... said Andrew Ceresney, Director of the SEC's Enforcement Division. "These largest-ever penalties imposed in SEC cases involving two of the largest ATSs show that firms pay a steep price when they mislead subscribers."

***

The SEC's ... require Credit Suisse to cease and desist from these violations, censure Credit Suisse, and require Credit Suisse to pay $30 million in total penalties, disgorgement of $20,675,510.52, and prejudgment interest of $3,639,643.39.

286. At year-end 2015, with a new CEO had replaced Dougan — the longtime Credit Suisse CEO and head of the Investment Bank operations. Old secrets hidden in the Investment Banking operation's books came out. A major part of Credit Suisse's Investment Banking operation was DLJ, an investment bank Credit Suisse purchased in 2000 for $11.5 billion as part of an expansion of its Wall Street Investment Banking Operation. ***It was this part of Credit Suisse Investment Banking that had caused the massive $2.85 billion loss in 2007–2008, when the out-of-control operation there was exposed***.

287. When Thiam the new CEO came in, he saw "goodwill" value of the very expensive DLJ acquisition was long gone — used up — and would never be recovered

through profitable operations.  Dougan, Rohner and their close allies had hidden the inflated "goodwill" asset for years to cover up their misconduct and to protect each other as part of a continuing course of conduct so they could continue their rule – and plunder – of Credit Suisse.  However, they could not hide it from the new CEO.  At year-end 2015, Thiam insisted the scandal ridden loss Investment Banking operation be scaled back and that this inflated "goodwill" be written off — resulting in a huge embarrassing loss for Credit Suisse.

288.    On February 4, 2016, *The New York Times* reported:

### Credit Suisse Takes Big Loss on Write-Down in 4th Quarter

Credit Suisse reported a multibillion-dollar loss in the fourth quarter on Thursday — far more than analysts had expected and its largest in seven years.

The loss was largely because of a write-down of 3.8 billion francs after Credit Suisse reassessed the value of its investment bank as part of a continuing overhaul.

It was also the first annual loss for Credit Suisse since the bank reported a record loss of 8.2 billion francs in 2008.

289.    On February 4, 2016, the *MarketWatch* reported:

### Credit Suisse Swings to Massive Loss After Write Down

The goodwill impairment charge of 3.8 billion francs is primarily related to its acquisition in 2000 of U.S. investment bank Donaldson, Lufkin & Jenrette for $11.5 billion — a move that was intended to help the Swiss bank vie with Wall Street's biggest firms.

290.    Also on February 4, 2016, *The Wall Street Journal* reported:

### Credit Suisse Shares Plunge on Huge Loss Amid Restructuring

Indeed, part of the net loss of 5.8 billion Swiss francs ($5.8 billion) that Credit Suisse reported in the fourth quarter came

from its move to extricate itself from investment banking. It took a 3.8 billion franc goodwill impairment charge primarily related to its acquisition of US investment bank Donaldson, Lufkin & Jenrette for $11.5 billion in 2000 — a price widely viewed at that time as expensive.

291.    On February 4, 2016, *The Wall Street Journal* further reported:

Storied brokerage Donaldson, Lufkin & Jenrette hasn't received much attention since being folded into Credit Suisse AG 16 years ago. But it resurfaced Thursday as an expensive footnote in a dreary day for its Swiss parent.

Credit Suisse said it would take a write-down of about 3.8 billion Swiss francs ($3.8 billion) largely reflecting impairments from its $11.5 billion acquisition of DLJ — a move that showed the extent to which investment banking has soured as a business since the turn of the century merger.

\*\*\*

The DLJ deal, sealed soon after the peak of the late 1990's Internet bubble .... The Swiss bank paid nearly three times the US firm's book value, a pricey deal even by the standards of the dot com bubble era.

\*\*\*

.... Goodwill-impairment charges can also be an implicit acknowledgment that a company overpaid for an acquisition.

292.    The "goodwill" DLJ write-off was only part of the huge 2015 year-end loss. As Credit Suisse's new CEO undertook to scale back Credit Suisse's Investment Banking scandal-ridden, loss-producing, operations — he not only discovered the billions in inflated "goodwill" on the Investment Bank's books, he also discovered over $1 billion in hidden trading losses in high risk securities in that unit — ***the same kind of misconduct due to the lack of internal and compliance controls and supervision that led to the subprime securities scandal at the Investment Bank operation years earlier***. The control/compliance deficiencies had never been fixed.

293.    As this billion-dollar loss surfaced, on March 23, 2016, *MarketWatch.com*

reported:

### Credit Suisse Pares Back on Investment Banking

Chief Executive Officer Tidjane Thiam, who was appointed in July, is scrambling to unwind big, high-risk bets that he said have been sitting on the investment bank's books without his knowledge, while cutting thousands of jobs from a beleaguered trading unit and running off tens of billions of dollars in unwanted assets.

The moves come as Credit Suisse's investment bank has posted nearly $1 billion in write-downs since the start of the fourth quarter, and as investors have shaved about one-third of the value from the bank's share price in the past three months.

\*\*\*

Mr. Thiam professed to being blindsided by the size and scope of some of the positions accumulated by the investment bank ....

"This was all before my arrival," the CEO said[.]

294.    In late March 2016, the *Financial Times* reported:

### Credit Suisse Spooked by What Lurks Within

Tidjane Thiam, Credit Suisse's ... new chief executive, was really annoyed on Wednesday ... Staff in the bank's markets division, he said, had hidden giant risky bets from senior management and the cost of unwinding those positions was a large part of the problem.

This behaviour was "unacceptable," Mr Thiam said ... "it is shocking that this kind of things can still happen in 2016."

Poor tracking of banks' trading positions was a big part of the problem before the financial crisis ....

Ever since, bankers and regulators have sought to ensure every lender has up-to-date information about its holdings, particularly in its trading book.

So how could senior managers at Credit Suisse be unaware of its outsized, risky and hard to sell positions? Some of them dated back several years.

295.    To say Thiam's blunt honesty was unwelcome to Credit Suisse's ruling clique is to understate their true dislike — even hatred — of him.

296.    The cumulative impact of all these losses, fines, penalties, settlements, and investigations took a horrible toll on Credit Suisse's finances and its reputation — and on the market price and capitalization of its common stock causing damage to Credit Suisse shareholders.  In February 2016, *CNN Business* reported:

### Credit Suisse Shares Crash to 24-Year Low

The bank said Thursday it lost 2.9 billion Swiss francs ($2.8 billion) in 2015, dragged down by losses and charges in investment banking.  Its shares fell 12%, and have lost a third of their value in a month.

Credit Suisse wrote down the value of its investment banking business by 3.8 billion francs ($3.8 billion) in the fourth quarter.

297.    Credit Suisse would continue to pay the price of its Investment Banking officials deceiving clients by unloading "shit," "garbage" toxic securities on them.  In April 2016, it was reported:

### NCUA's Credit Suisse Settlement Bumped to $50.3M

The NCUA announced Thursday that it will receive $50.3 million in damages and interest from Credit Suisse.

\*\*\*

The claims stemmed from the corporate credit unions' purchases of residential mortgage-backed securities from Credit Suisse.

298.    On May 4, 2016, *Deutsche Welle* reported:

### Bank Giants Settle Rate Manipulation Charges

> The banking heavyweights included in the settlement are ... Credit Suisse .... Credit Suisse ... [was] paying $50 million.
>
> The banks were suspected of agreeing among themselves between 2009 and 2012 to set the daily benchmark rate for interest rate exchange contracts, or swaps.

299.    These events in 2016 show how Credit Suisse and its shareholders were continuing to be damaged by the same misconduct and failure of controls in the Investment Bank that caused the huge 2007 loss and damages thereafter — a continuing course of conduct under continuing Board leadership, continuing to damage Credit Suisse and its shareholders.  By July 2016, the Credit Suisse common shares had fallen as low as $15.00 per share.

300.    That misconduct would now result in the ***largest civil payment in history*** and the detailed disclosure of the horrible, out-of-control misconduct that took place under Dougan and Rohner's direct supervision and the oversight of the Credit Suisse Directors and Officers.  In January 2017, the United States DOJ issued a press release:

### Credit Suisse Agrees to Pay $5.28 Billion in Connection with Its Sale of Residential Mortgage-Backed Securities

***

> ... [S]aid Attorney General Loretta E. Lynch[,] "Credit Suisse made false and irresponsible representations about residential mortgage-backed securities, which resulted in the loss of billions of dollars of wealth and took a painful toll on the lives of ordinary Americans ....  These sums reflect the huge breach of public trust committed by financial institutions like Credit Suisse."
>
> "Credit Suisse claimed its mortgage backed securities were sound, but in the settlement announced today the bank concedes that it knew it was peddling investments containing loans that were likely to fail ...."    "That behavior is unacceptable.  Today's $5.3 billion resolution is another step

towards holding financial institutions accountable for misleading investors and the American public."

The settlement includes a statement of facts to which Credit Suisse has agreed. That statement of facts described how Credit Suisse made false and misleading representations to prospective investors about the characteristics of the mortgage loans it securitized.

- Credit Suisse told investors in offering documents that the mortgage loans it securitized into RMBS "were originated generally in accordance with applicable underwriting guidelines …." It also told investors that the loans "had been originated in compliance with all federal, state and local laws and regulations, including all predatory and abusive lending laws."

- Credit Suisse has acknowledged that "Credit Suisse repeatedly received information indicating that many of the loans reviewed did not conform to the … It has acknowledged that in many cases, it purchased and securitized loans into its RMBS that "did not comply with applicable underwriting guidelines and lacked sufficient factors" and/or "w[ere] not originated in compliance with applicable laws and regulations." Credit Suisse employees even referred to some loans they securitized as "bad loans" "complete crap" and "[u]tter complete garbage."

- Credit Suisse acknowledged that its quality control review reported that "more than 25 percent of the loans reviewed for quality control were designed 'ineligible' because of credit, compliance and/or property defects."

- Credit Suisse … acknowledged that its "Co-head of Transaction Management expressed concern that the quality control results could serve as a written record of defects, and sought to avoid documented confirmation of these defects."

- Credit Suisse commented [as]…"loans with potential defects 'pile up in inventory… … rather than adding to sludge in inventory …' … "we have almost $2.5B of conduit garbage to still distribute." … [W]e have major problems." But rather than holding these loans in its own inventory, Credit Suisse securitized certain of these loans into its RMBS.

301. In May 2017, *Reuters* reported:

### Credit Suisse Pays $400 Million Over Toxic Mortgages, Failed US Credit Unions

Credit Suisse Group AG paid $400 million to settle claims that the Swiss bank sold toxic mortgage securities that contributed to the demise of three federal credit unions ....

\*\*\*

The payment is separate from a $50.3 million settlement that the bank reached in April 2016 to resolve claims in a separate NCUA lawsuit, the regulator said.

302.    In mid-November 2017, the NYDFS announced:

### NYDFS Fines Credit Suisse AG $135 Million for Unlawful, Unsafe and Unsound Conduct in its Foreign Exchange Trading Business

New York Financial Services Superintendent Maria T. Vullo today announced that Credit Suisse AG agreed to pay a $135 million fine as part of a consent order with the New York State Department of Financial Services (DFS) for violations of New York banking law, including improper efforts with other global banks, front-running client orders, and additional unlawful conduct that disadvantaged customers. The violations announced today stem from an investigation by DFS determining that from at least 2008 to 2015, Credit Suisse consistently engaged in unlawful, unsafe and unsound conduct by failing to implement effective controls over its foreign exchange business. "Certain Credit Suisse executives in the bank's foreign exchange unit deliberately fostered a corrupt culture that failed to implement effective controls in its foreign exchange trading business, which allowed the bank's foreign exchange traders and others to violate New York State law and repeatedly abuse the trust of their customers over the course of many years," said Superintendent Vullo.

### 2.    Wealth Management/Private Banking 2015–2017

303.    The Credit Suisse guilty plea and giant fine for tax-evasion assistance were not the end of the damage caused to Credit Suisse and its shareholders by the misconduct of officials in the New York Wealth Management/Private Banking business less than two years after that horribly damaging event.  In June 2016, *The Wall Street Journal* reported:

US authorities are investigating Credit Suisse Group AG's operations in Israel ... once again placing the Swiss bank under Justice Department scrutiny related to its handling of American clients.

... the investigation ... is focused on determining whether employees in Israel helped dual Israeli and US citizens conceal their US status to evade American taxes ....

\*\*\*

The new probe comes roughly two years after Credit Suisse pleaded guilty in the US to conspiring to help American clients evade taxes.  Credit Suisse agreed to pay $2.6 billion to various regulators ...

Credit Suisse also agreed to supervision by a monitor, selected by the New York Department of Financial Services, who is tasked with investigating the bank's dealings with US customers.  The monitor, who is still scrutinizing Credit Suisse, has been made aware of the new investigation, a person familiar with the matter said.

US based monitor probing Credit Suisse on behalf of the New York Department of Financial Services, Neil Barofsky, started his oversight of the bank in October 2014, and was meant to remain in place – at the bank's expense – for no more than two years.  However, the bank's struggles in providing Mr. Barofsky with all of the information he has required about its business with US clients may extend his tenure.

Costs stemming from the bank's tax-related US settlements, including those resulting from the monitor, have totaled $297 million since the second quarter of last year, according to public filings.

304.   As United States regulators continued to investigate Credit Suisse's Wealth Management/Private Banking operations, they discovered that, ***as a result of the United States clamp down***, Credit Suisse had not only been illegally assisting tax evasion, it had ***also been falsifying the books to cover up the extent of the outflow of assets under management***.  In October 2016, the SEC announced:

**Credit Suisse Paying $90 Million Penalty for Misrepresenting Performance Metric**

The SEC today announced that Credit Suisse AG has agreed to pay a $90 million penalty and admit wrongdoing to settle charges that it misrepresented how it determined a key performance metric of its wealth management business.

\*\*\*

"Credit Suisse conveyed to the investing community that it followed a structured process for recognizing net new assets when, in fact, the process was reverse-engineered to meet targets," said Andrew J. Ceresney, Director of the SEC's Enforcement Division.

305.    In October 2016, the *Financial Times* reported:

**Credit Suisse Fined By SEC for Misleading Investors**

US regulators have slapped a $90m penalty on Credit Suisse after finding employees at its private bank had misrepresented an important financial metric as they sought to meet performance targets.

\*\*\*

... [T]he bank itself admitted wrongdoing over the episode[.]

306.    In October 2016, *Reuters* reported:

**Credit Suisse Reaches 109.5 Mln Euro Settlement in Italy**

Credit Suisse has agreed to pay 109.5 million euros ($119 million) in taxes and penalties to settle allegations by Italian authorities that it helped clients transfer undeclared funds offshore ....

Milan prosecutors had been investigating since 2014 an alleged fraudulent system which was used to transfer up to 14 billion euros ($15.2 billion) to offshore accounts .... Some 13,000 clients are allegedly involved.

Credit Suisse AG was placed under investigation for alleged money laundering carried out by its executives ....

307.    In December 2016, FINRA announced:

**FINRA Fines Credit Suisse Securities (USA) LLC $16.5 Million for Significant Deficiencies in Its Anti-Money Laundering Program**

163

The Financial Industry Regulatory Authority (FINRA) announced today that it has fined Credit Suisse Securities (USA) LLC $16.5 million for anti-money laundering (AML), supervision and other violations.

\*\*\*

FINRA found that from January 2011 through September 2013, Credit Suisse failed to effectively review trading for AML reporting purposes.

\*\*\*

FINRA also found that from January 2011 through December 2015, Credit Suisse failed to effectively review potentially suspicious money transfers.

308.    In February 2017, *Dealbreaker.com* reported:

### It Took All of Two Months to Catch Credit Suisse Allegedly Doing the Thing it Just Pleaded Guilty to Again

Back in May 2014, Credit Suisse admitted to being a Swiss bank, by which we mean it admitted to having helped Americans and others evade taxes since time immemorial. This came along with the usual professions of high-level ignorance, obsequious prostrations before Congress, a $2.5 billion fine, an annoyingly eager monitor and a promise to never, ever do it again.  Something seems to have been lost in the translation, because Credit Suisse allegedly just shifted its "Swiss banking" business to Israel, where it allegedly gleefully continued as if nothing had changed and allegedly ignored whether any of the Israeli clients it was helping may also have been carrying American passports.

Investigators are determining if other clients with dual Israeli citizenship also got help in concealing American tax obligations by using their Israeli or other personal documents ....

309.    Inevitably, the illegal tax-evasion actions of officials in the Credit Suisse Wealth Management/Private Banking business were targeted by European regulators and governments.  In late March 2017, *The Guardian* reported:

### Credit Suisse Embroiled in Major Global Tax Evasion Investigation

... Credit Suisse[] is at the centre of an international tax evasion case involving **55,000 suspect accounts** and the seizure of millions of euros in cash, gold, jewellery, real estate and paintings.

In a fresh blow to Switzerland's attempts to clean up its reputation for banking secrecy and tax evasion, the Netherlands is leading a coalition of five tax authorities conducting a criminal investigation into undeclared "black" accounts and money laundering.

(£1m), a luxury Mercedes, and a 1 kilogram gold ingot.

***

France announced that 25 customs agents had carried out raids across the country as part of an inquiry into "aggravated money laundering and financial fraud" .... Investigators have found "several thousand" bank accounts opened in Switzerland by French taxpayers who are suspected of having failed to declare them to the authorities.

***

The action is being coordinated by a European Union agency in the Hague which fosters judicial co-operation. In a statement the agency, Eurojust, said: "The independent investigations gathered evidence and analysed a huge amount of data. The undeclared assets hidden within offshore accounts and policies are estimated in the millions of euros ...." "International cooperation will be intensified ..." the agency stated.

Alex Cobham, chief executive of Tax Justice Network, said: "Allegations of laundering and tax evasion on this scale would, if proven, indicate the bank was effectively a global criminal enterprise."

## D.    2018–2021 Events

### 1.    Investment Banking 2018–2020

310.   In mid-2018, Credit Suisse was fined almost $100 million here in the Eastern District of New York due to its Investment Banking officials' violations of the United States Foreign Corrupt Practices Act, including facts of wire and mail fraud. In July 2018, the United States DOJ announced:

***Credit Suisse's Investment Bank in Hong Kong Agrees to Pay $47 Million Criminal Penalty for Corrupt Hiring Scheme that Violated the FCPA***

Credit Suisse… agreed to pay a $47 million criminal penalty for its role in a scheme to corruptly win banking business by awarding employment to friends and family of Chinese officials.

\*\*\*

"Credit Suisse … engaged in a corrupt scheme to win business with Chinese state-owned entities by hiring friends and family of Chinese government officials,  ..," said Acting Assistant Attorney General Cronan … the company will pay the price for that corruption," said U.S. Attorney Donoghue.

\*\*\*

The criminal penalty imposed today provides explicit insight into the level of corruption that took place at the hands of Credit Suisse …."

\*\*\*

The Department and CSHK entered into a non-prosecution agreement, and CSHK agreed to pay a criminal penalty of $47 million to resolve the matter.

311.    In July 2018, the SEC announced:

### SEC Charges Credit Suisse With FCPA Violations

The SEC today announced that Credit Suisse… AG will pay approximately $30 million to resolve SEC charges that it obtained investment banking business in the Asia-Pacific region by corruptly influencing foreign officials in violation of Foreign Corrupt Practices Act (FCPA).

Credit Suisse also agreed to pay a $47 million criminal penalty to the U.S. Department of Justice.

\*\*\*

The SEC's order found that in a six-year period, Credit Suisse offered to hire more than 100 individuals referred by or connected to foreign government officials ….  "Bribery can take many forms, including granting employment to friends and relatives of government officials.  Credit Suisse's practice of engaging in these hiring practices violated the law, and it is

now being held to account for having done so," said Charles Cain, Chief of the SEC Enforcement Division's FCPA Unit.

The SEC's order finds that Credit Suisse violated the anti-bribery and internal accounting controls provisions of the Securities Exchange Act of 1934.

312. In September 2018, the New York Attorney General announced:

### AG Underwood Announces $10 Million Settlement With Credit Suisse Over Fraudulent Electronic Trading Practices

Attorney General Barbara D. Underwood today announced that Credit Suisse Securities (USA) LLC ("Credit Suisse") has agreed to pay $10 million to settle an investigation into fraudulent practices in connection with Credit Suisse's Retail Execution Services ("RES") business.

\*\*\*

"Credit Suisse gamed its publicly-reported statistics and misled customers — and now they're being held to account," Attorney General Underwood said.

### 2.    Wealth Management/Private Banking 2018–2020

313. In September 2018, the *Financial Times* reported:

### Credit Suisse Censured by Watchdog Over Anti-Money Laundering Failings

Credit Suisse has been censured by the Swiss financial watchdog for failings in anti-money laundering, in the latest slapdown of a European bank over the handling of suspected illicit finance.

Finma, the financial supervisor, identified weaknesses in a number of corruption scandals, including those involving the world football body Fifa, the Brazilian oil company Petrobras and the Venezuelan oil company PDVSA.

\*\*\*

On Monday, Finma demanded remedial steps at Credit Suisse to improve procedures, which would be monitored by an independent third party. Under Swiss law, Finma does not have the power to impose fines.

167

\*\*\*

The scandal at Fifa erupted in May 2015 with the dramatic arrest of top football officials ... US and Swiss law authorities subsequently launched probes into allegations of criminal misconduct, bribery and corruption, which called into question Fifa's future.

Its investigation at Credit Suisse examined the period from 2006 to 2016 and found shortcomings, including in identifying clients, determining beneficial owners, categorising riskier business relationships and in documentation.

"The identified shortcomings occurred repeatedly over a number of years ...." Finma said.

FIFA and Petrobas were both KPMG clients as well. The bank and the auditor cooperated to facilitate and cover up these two financial scandals.

314. In September 2018, FINMA, the Swiss regulator, issued a release:

### FINMA Finds Deficiencies in Anti-Money Laundering Processes at Credit Suisse

The Swiss Financial Market Supervisory Authority FINMA has concluded two enforcement procedures against Credit Suisse AG. In the first procedure, FINMA identified deficiencies in the bank's adherence to anti-money laundering due diligence obligations in relation to suspected corruption involving the International Federation of Association Football FIFA, the Brazilian oil corporation Petrobras and the Venezuelan oil corporation Petróleos de Venezuela, S.A. (PDVSA). The second procedure relates to a significant business relationship for the bank with a politically exposed person (PEP). In this instance too, FINMA identified deficiencies in the anti-money laundering process, as well as shortcomings in the bank's control mechanisms and risk management. FINMA has decreed measures to further improve anti-money laundering processes and to accelerate the implementation of steps already initiated by the bank.

\*\*\*

FINMA finds deficiencies in anti-money laundering processes at Credit Suisse ....

\*\*\*

168

Deficiencies in compliance with due diligence obligations relating to FIFA, Petrobras and PDVSA

FINMA determined through its enforcement procedure that Credit Suisse AG had infringed its anti-money laundering supervisory obligations in all three instances.

315.    In late December 2019, FINRA announced:

### FINRA, Cboe, Nasdaq, NYSE and Affiliated Exchanges Fine Credit Suisse Securities $6.5 Million for Supervision and Market Access Rule Violations

FINRA, Cboe Global Markets, The Nasdaq Stock Market LLC, the New York Stock Exchange, and their affiliated Exchanges (collectively, "Exchanges") today announced that they censured Credit Suisse Securities (USA) LLC, and fined the firm a total of $6.5 million for supervisory violations and violations of various provisions of Rule 15c3-5 of the Securities Exchange Act of 1934 (known as the Market Access Rule).

\*\*\*

FINRA and the Exchanges found that during most of the relevant time period, Credit Suisse did not establish a supervisory system, including written supervisory procedures, reasonably designed to monitor for potential spoofing, layering, wash sales and pre-arranged trading by its direct market access clients. As a result, orders for billions of shares entered the U.S. markets without being subjected to post-trade supervisory reviews for such potential manipulative activity. Moreover, Credit Suisse was put on notice of gaps in its surveillance system by correspondence with one of its direct market access clients and by an internal audit report.

… Credit Suisse violated numerous provisions of the …Market Access Rule's provisions related to the prevention of erroneous orders, the setting of credit limits and the firm's annual review of the effectiveness of its market access controls and supervisory procedures.

### 3.    The Tuna Boat/Bond Scandal

316.    Credit Suisse became embroiled in the Tuna Boat/Bond scandal, which

arises out of a series of financing transactions. Credit Suisse made an $850 million loan

supposedly to establish a tuna fishing fleet.  Much of the loan money was diverted or

hundreds of millions more was siphoned off for bribes and kickbacks.  The Credit Suisse

Investment Banking officials involved in this "***odious***" and "***grotesque***" scandal that

"***took advantage of the US financial system and defrauded US investors***."

***They pleaded guilty in a criminal case here in New York City***.  So has Credit

Suisse, incurring a $450 million penalty. Of the few tuna boats that were built did not

conform to specifications.  The few tuna boats which were manufactured and delivered

caught almost no fish.  Today, the tuna boats are dry-docked, rusting and useless.

317.    In January 2019, prosecutors in the United States indicted the three Credit

Suisse bankers.  The *Financial Times* reported:

> Three former Credit Suisse bankers have been charged by US
> prosecutors with alleged fraud and receiving kickbacks in
> connection with [a] "tuna bonds" hidden loans scandal.
>
> ***
>
> The three former employees of the Swiss investment bank —
> Andrew Pearse, Detelina Subeva and Surjan Singh — were
> arrested … alleged money laundering and defrauding of US
> investors in the loans.
>
> … the bankers "created the maritime projects as fronts to
> enrich themselves and intentionally diverted portions of the
> loan proceeds" to fund $200m of bribes and kickbacks,
> according to the indictment.
>
> The indictment charged four counts of conspiracy to commit
> money laundering, conspiracy to violate the US Foreign
> Corrupt Practices Act, conspiracy to commit securities fraud
> and conspiracy to commit wire fraud.  Mr. Chang was not
> charged on the FCPA conspiracy count.
>
> ***
>
> The US attorney's office additionally alleged that the three
> former bankers acted "within the scope of their employment"
> and that they intended, in part at least, to benefit the bank,
> two key tests prosecutors have to meet to find a company
> liable for the actions of its employees.

318.    Information about how this bizarre loan by Credit Suisse was initiated came

out.  In January 2019, *Finews.com* reported:

> Against bank rules, Pearse and Singh themselves conducted
> due diligence for the proposed credit lines, or hired a third
> party to do so.
>
> ***
>
> Red flags ... were raised within Credit Suisse ...  One senior
> investment bank boss vetoed extending credit to the African
> nation ....
>
> According to the US indictment Credit Suisse sent the funds
> from New York to Abu Dhabi as bribes.
>
> Charges against three former Credit Suisse bankers in the
> Mozambique tuna bond case distract from the role of the
> Swiss bank itself in the loan scandal.  Credit Suisse's controls
> failed.
>
> ***
>
> ... [t]he US indictment also exposes alarming loopholes, acts
> of carelessness and mistakes within Credit Suisse and the
> compliance department.

319.    According to this and another *Financial Times* report:

> "The seriousness of these offences, particularly in the US,
> cannot be underestimated," said one lawyer involved in the
> case.
>
> ***
>
> The allegations indicated that Credit Suisse identified red
> flags ....
>
> In one incident, a senior executive in the investment bank
> objected to the involvement of an executive at Privinvest ... of
> boats and gear to the projects, according to the indictment.
>
> A due diligence report maintained by the bank described the
> unidentified executive as a 'master of kickbacks' ....

320.    On March 7, 2019, the DOJ announced an expanded indictment in the

Eastern District of New York:

> "As charged in the indictment, the defendants orchestrated an immense fraud and bribery scheme that took advantage of the United States financial system, defrauded its investors … in order to line their own pockets with hundreds of millions of dollars," said United States Attorney Donoghue.

***

> "The indictment unsealed today alleges a brazen international criminal scheme in which corrupt… corporate executives, and investment bankers stole approximately $200 million in loan proceeds …," said Assistant Attorney General Benczkowski.

321.    The Credit Suisse bankers involved pleaded guilty.  On May 21, 2019, the

*Financial Times* reported:

> Detelina Subeva, a former vice-president at the Swiss bank's global financing unit, entered the guilty plea on a charge of conspiracy to help launder money before a New York court on Monday.

322.    In July 2019, *Reuters* reported:

> A former Credit Suisse Group AG banker … pleaded guilty to U.S. charges that he took part in a fraud scheme that involved $2 billion in loans to state-owned companies in Mozambique and helped lead to the country's debt default.

> Andrew Pearse, who headed Credit Suisse's Global Financing Group at the time, entered his plea [in] Brooklyn, New York federal court, admitting that he took millions of dollars in kickbacks in connection with the loans.

323.    On October 19, 2021 the United States Attorney for the Eastern District of

New York announced:

### Credit Suisse Resolves Fraudulent Mozambique Loan Case in $547 Million Coordinated Global Resolution

> Credit Suisse Group AG, a global financial … admitted to conspiring to commit wire fraud by defrauding U.S. and international investors in an $850 million loan to finance a tuna fishing project in Mozambique.  Credit Suisse has been assessed with more than $547 million in penalties, fines and disgorgement as part of coordinated resolutions with criminal

172

and civil authorities in the United States and the United Kingdom. As part of these coordinated resolutions with the department, the U.S. Securities & Exchange Commission (SEC) and the U.K. Financial Conduct Authority (FCA), as well as an enforcement action by Switzerland's Financial Market Supervisory Authority (FINMA), Credit Suisse will be subject to enhanced compliance and self-reporting, including that FINMA will impose an independent third party to monitor the bank's transactions, risk management and internal control systems, as well as its existing credit transactions with financially weak and corruption-prone states and companies, to prevent and detect similar conduct in the future.

Credit Suisse entered into a deferred prosecution agreement with the department in connection with a criminal information filed today in the U.S. District Court for the Eastern District of New York charging the bank with conspiracy to commit wire fraud. CSSEL pleaded guilty in the U.S. District Court for the Eastern District of New York to a one-count criminal information charging it with conspiracy to commit wire fraud.

*\*\**

***Credit Suisse also admitted that***, ***prior to and during the EMATUM financing***, ***it identified significant red flags concerning the transaction***.

324. This was an ***extremely unusual*** high-risk loan, which was put together and made ***without complying with Credit Suisse's internal due diligence and other lending*** protection procedures by Pearse, Subeva and Singh. Working in cahoots with others they siphoned off millions of dollars of the loan proceeds to benefit themselves. Contrary to Bank procedures those officials conducted the "due diligence" on the scheme they conceived and were the key bankers on.

325. This is yet again another instance of the Directors' and Officers' failure to exercise proper supervision of and lack of control in the Investment Bank, which the Board and top executives have permitted to exist now for many years, inflicting billions of dollars of damage on the corporate entity. Credit Suisse has been damaged here in

terms of the loan losses to be suffered and the expenses involved in dealing with a catastrophe that never should have occurred, and in turn its stock price has declined causing damage to Credit Suisse shareholders.

### 4.    The 2019–2020 CEO Spying Circus

326.    By year-end 2015, in light of the subprime toxic securities scandal in the Investment Banking operation and the tax-evasion scandal in the Wealth Management/Private Banking operation — ***major wrongdoing in the two most important parts of Credit Suisse's business*** — the Credit Suisse Board had to let CEO Dougan go.  To replace Dougan, the Credit Suisse Directors selected a new CEO — Tidjane Thiam — the first African CEO of any Swiss Bank.

327.    On March 10, 2015, Credit Suisse issued a release:

> **The Board of Directors of Credit Suisse Group AG Has appointed Tidjane Thiam as the new CEO**
>
> Urs Rohner [said]: "With Tidjane Thiam, ***a strong and distinguished leader with an impressive track record*** in the global financial services industry will take the helm of our bank.  His extensive international experience, including in wealth and asset management and in the successful development of new markets, provides a firm foundation for leading Credit Suisse.  As CEO, he led Prudential to great success in challenging times."

328.    Thiam was very different from any prior Credit Suisse CEO, all of whom were "home grown" talent with long experience inside the secretive, insular Credit Suisse culture.  Thiam was not only different looking, he made clear he was going to change things at Credit Suisse.  On March 12, 2015, the *Financial Times* reported:

> **Tidjane Thiam Set To Overhaul Credit Suisse Leadership**
>
> Tidjane Thiam is expected to waste little time in building a top team around him when he starts as chief executive of Credit Suisse ...

329.    Upon becoming CEO, Thiam quickly discovered that Credit Suisse had been carrying $3.8 billion in "goodwill" on its books from the $11 billion acquisition of Donaldson Lufkin 15 years earlier as part of Credit Suisse's New York Investment Banking operation.  Not wanting this grossly inflated "asset" to be later written off, penalizing Credit Suisse results from operations ***on his watch and on which his bonus compensation would depend***, Thiam insisted this huge timebomb be written off ***now***.  In late 2015, Thiam also discovered that Credit Suisse had concealed huge losses from giant, risky bets in the Investment Bank and hidden losses arising from the continuing lack of internal accounting and compliance controls in, and lack of adequate supervision of, that operation.

330.    The DLJ "goodwill" write-off and these trading losses produced a very large 2015 loss for Credit Suisse, its first annual loss in years.  Thiam insisted this was "***all before my arrival***" and it was "***shocking this can still happen in 2016***."

331.    Over the next few years, Thiam imposed substantial cost reductions, pressed his call for a "***cultural change***" at Credit Suisse, and made clear his ***absolute prohibition*** of any "winking" at tax-evasion assistance by the Wealth Management/Private Banking operation.  ***These strong steps created considerable tension with the ruling structure inside Credit Suisse***.

332.    However, during 2019 a personal dispute arose between CEO Thiam and Iqbal Khan, Credit Suisse's very successful head of Wealth Management/Private Banking, where profits had grown by 80%, adding nearly $50 billion in assets under management during his leadership.

333.    On July 2, 2019, the *Financial Times* reported:

**Credit Suisse Wealth Management Head Leaves
After Power Struggle**

> The Swiss bank made a surprise announcement late on
> Monday night that Iqbal Khan was leaving after almost four
> years leading the wealth management division, which has
> been the centerpiece and profit-driver of Mr. Thiam's
> overhaul of the organization.

To the extreme embarrassment of Credit Suisse's top Directors: Khan went to work for

Credit Suisse's biggest competitor and cross-town rival — UBS — a major humiliation for

Credit Suisse.

334.    Shortly thereafter, Credit Suisse had hired private eyes to spy on Khan,

suspecting he was poaching Credit Suisse's Investment Banking/Private Banking

personnel and clients to follow him to UBS.   When Khan spotted one of the detectives

who had been following him he confronted him, started taking pictures of the detective's

license plate and shouted for police to help.  Arrests were made.  On September 23, 2019,

the *Financial Times* reported:

**Credit Suisse to Review Surveillance Ordered on
Star Who Defected**

> Credit Suisse's board has launched an inquiry into the bank's
> decision to hire private investigators to follow a high-flying
> executive who defected to arch-rival UBS.
>
> ... The surveillance was ordered as Credit Suisse suspected he
> was tapping up colleagues and clients to join him at UBS ....

335.    Rohner condemned this illegal spying.  On October 1, 2019, the *Financial*

*Times* reported:

> > In a hastily arranged press conference on Tuesday, Urs
> > Rohner, Credit Suisse's chairman, said: "It was wrong to order
> > the surveillance.  The measures taken did not represent our
> > standards.  Those responsible for the observation should not
> > be employed by the group."

... "[T]he reputation of our bank has suffered .... I would like to apologize on behalf of Credit Suisse to... our shareholders, and to Iqbal Khan and his family for the consequences."

336.   The Bank's investigation by an outside law firm showed neither Khan nor Thiam had done anything wrong.  Khan did not poach clients or colleagues and Thiam did not order or know of the spying.  The Board fired Pierre-Olivier Bouée, Credit Suisse's Chief Operating Officer, for ordering the spying.  On October 1, 2019, *The New York Times* reported:

> **Spying Scandal at Credit Suisse Leads to Top Executive's Resignation**
>
> \*\*\*
>
> *The board was told that the surveillance had found no evidence that Mr. Khan tried to poach employees or clients from Credit Suisse.*
>
> *The investigation also found that Mr. Thiam and other executives had not been aware of the spying.*

337.   The *Financial Times* reported on October 5, 2019:

> *Since he was hired in 2015, Mr. Thiam's bold strategy to shake up Credit Suisse has impressed many bankers elsewhere in the world but it has been seen in Switzerland, and in Zurich, as an outsider trying to dismantle much of what gave the bank its distinctive character.*
>
> *Racism was also a factor*, said Mr Pieth.

338.   On February 5, 2020, the *Financial Times* reported:

> ***Credit Suisse's top shareholders have thrown their support behind chief executive Tidjane Thiam and called on chairman Urs Rohner to quit***, ***in a high-stakes power struggle at the Swiss bank following a spy scandal last year***.
>
> \*\*\*
>
> On Wednesday evening, David Herro, vice-chairman of Credit Suisse's largest shareholder Harris Associates, wrote to directors saying it would be a "terrible mistake" to oust Mr

Thiam and pointing out deficiencies in Mr Rohner's own performance during his 16 years at the bank.

*\*\*\**

In an interview, Mr. Herro pointed to a list of prior legal problems at Credit Suisse, including a $5.3bn settlement with the United States Department of Justice over the pre-crisis sale of toxic mortgage bonds and the bank's involvement in the "tuna bond" scandal ...

"All of these things the chairman presided over; he was legal counsel when all the pain occurred," he told the FT.

... Eminence Capital has written to the bank's non-executive directors to warn them against pursuing "a personal agenda with respect to the CEO rather than act[ing] in a responsible fiduciary way" ....

On Wednesday, Silchester International Investors, which said it owned 3.3 per cent of the Swiss bank, also called on Mr. Rohner to resign if he could no longer support Mr. Thiam.

*\*\*\**

US-based Harris owns an 8.4 per cent stake in Credit Suisse ... suggested that Mr. Thiam — who is the first black chief executive of Credit Suisse — may be encountering racism .... "To be very frank, it seems [like] envy from competitors or perhaps something else given that Mr. Thiam looks a little bit different than the typical Swiss banker. Either one of these two rationales behind these attacks against him, to me are extremely distasteful."

According to the *Financial Times*, Rohner and his longtime allies on the Board prevailed and Thiam was pushed out as CEO, replaced by a long time Credit Suisse functionary — and Swiss native.

"The board and media watched the bank being destroyed for 15 years, then they attacked the guy trying to clear it up," said a person close to Mr. Thiam.

339. Thiam is justifiably stung by this discriminatory behavior by the Board. On February 12, 2020, the *Financial Times* reported:

### Tidjane Thiam Hints He Faced Prejudice As Credit Suisse CEO

Credit Suisse's ousted chief executive Tidjane Thiam has suggested he faced prejudice during his time at the top of the Swiss bank...

"I am who I am and I cannot change who I am," Mr. Thiam said at a presentation of the bank's annual results in Zurich. "I have always thought that it is the essence of injustice to hold against somebody who they are."

\*\*\*

At an emotional swansong, Mr. Thiam said "The same way I was born with a right hand, I cannot change being right-handed ... if people don't like right-handed people, then I'm in trouble. I can't become left-handed."

340.     Rohner's selfish motives — to hold on to his power as Board Chair when his term expired in 2021 seemed evident — something he could not have done if Thiam had remained as CEO. In early 2020, the *Financial Times* reported:

### Credit Suisse Chairman Has Sought To Extend Tenure

Credit Suisse chairman Urs Rohner has privately sounded out investors about extending his term beyond 2021 multiple times in the past four months, despite repeatedly pledging to step down next year after ousting chief executive Tidjane Thiam.

341.     Thus, Rohner and the Credit Suisse Board have allowed Credit Suisse to become embroiled in two major, embarrassing scandals — which have further badly damaged the Bank's reputation, costing it millions of dollars causing its stock price to decline inflicting damage on its shareholders. The Bank is in the center of the Tuna Boat/Bond scandal and under threat of indictment and for certain facing losses and penalties that will likely be in the hundreds of millions. They also caused Credit Suisse to lose its star Wealth Management/Private Banking CEO (Khan), who boosted profits by

80% and assets under management by almost $50 billion, to its arch-rival UBS, and its acclaimed CEO (Thiam), who worked to clean up the Investment Bank's books; to curtail its out of control operations; to really force the Wealth Management/Private Banking operation to stop assisting tax cheaters and who restored Credit Suisse's profitability — when **neither of these men did anything wrong**.

### 5.     Greensill, Archegos, Money Laundering, York Capital Hedge Fund, Toxic "Bags of Shit," Lescaudron and Tax-Avoidance Activities

369.    These scandals are detailed in Section III.B. above and ¶¶ 455–470 below.

### 6.     Defendants' Specific Failures and Acts of Mismanagement

342.    Over the past years with each new scandal that has erupted, Credit Suisse's Directors and Officers have followed a predictable course of action — describe what happened as an "**isolated incident**" due to "**intentional misconduct**" on the part of a "**few**," or "**a small number of**" "**rogue**" employees; but nevertheless, Credit Suisse "**accepts responsibility**."  If the incident — scandal — is particularly heinous or embarrassing, they will express "**regret**" and even "**deep regret**" and "**apologize**," even "**sincerely**."  Whether it was the massive trading loss in the Investment Bank during 2007/2008, the massive tax-evasion scheme here in the United States which resulted in the huge $2.8 million fine and unprecedented corporate criminal guilty plea, the 2015–2016 billion dollar hidden losses due to unauthorized high-risk trading, the $6 billion in payments to settle federal and state claims for cheating United States investors in the subprime toxic securities scandal, the Mozambique Tuna Boat/Bond scandal — **each of which involved criminal conduct by multiple Credit Suisse officials** — or even the more recent operatic Zurich **spy scandal** — it is always the same story

line — whatever was done, whatever happened, was without the Board's authorization or knowledge.

343.    Years of scandals, billions in fines, penalties and settlements and repeated criminal convictions of high-level Credit Suisse Investment Banking and Wealth Management/Private Banking officials were all said to have occurred without the knowledge or notice of the Directors — the people with a legal duty for "***overall management of the company***," who are required to perform their duties with "***all due diligence***" "***in particular with regard to compliance with the law***."

344.    This claim of ignorance — we saw nothing, we heard nothing, and therefore we said and did nothing — has been rejected by New York and federal officials and those in Switzerland and elsewhere, who have made it clear that the vast scope of the wrongdoing involved large numbers of officials and employees — ***several thousand*** Credit Suisse officials acting together for many years of which more than 1,800 solicited and assisted clients in the United States — operating within Credit Suisse's "***integrated***" worldwide "***business model***." It defies belief that years and years of continuing criminal conduct by a large number of officials in both the Investment Banking and Wealth Management/Private Banking operations was the doing of "rogue" actors.

345.    In February 2014, then-CEO Dougan lied to the United States Senate by claiming that he and other Credit Suisse "big wigs" did not know of the Bank's massive, decades long, tax-evader-aider activities involving over some 2,000 Credit Suisse bankers over a 50-year period.  To show how absurd the claims of ignorance are, *Reuters* reported on February 27, 2014:

**Credit Suisse Staff Group Demands CEO Apologise
for US Testimony**

A group representing Swiss bankers demanded an apology from Credit Suisse boss Brady Dougan on Thursday after he said the practice of helping Americans conceal their wealth was the work of a few dishonest employees.

\*\*\*

The body representing staff at Credit Suisse and other Swiss banks reacted with astonishment to Dougan's comments, saying it was "hardly credible" that the bank's bosses knew nothing of the practices.

"It was common knowledge that tax evasion was the strategy, a business model pursued by many banks for a long time," the [Swiss Bank Employees' Union] said in a statement.

346.    Credit Suisse Directors have been quick to condemn those employees whose supposed "intentional" misconduct damaged Credit Suisse as "rogue" actors, and **yet they have done nothing about it**.    If there were any truth to the "rogue" condemnation, **those employees should have been fired for cause and penalized for violating both the law and Credit Suisse's Code of Conduct and valid legal claims against those actions**.    Of course, the Directors and Officers did not fire or penalize those criminal actors.    Instead, they have wasted corporate assets by continuing to pay these individuals, keeping them on the Credit Suisse payroll, as well as paying their legal fees of millions and millions of dollars over the years.

347.    The reason the expenditures were made was not to protect or advance Credit Suisse's interests but to protect Chairman Rohner and CEO Dougan and other high officials who authorized or made these payments with the intent to secure the cooperation and/or silence of these actors, and result in them not turning on those higher ups. Because the expenditures were made for the **personal benefit** of the Directors and Officers who made them, as they were disloyal to the corporation in making these payments which constitute a loss, misuse and waste of corporate assets.

182

348.    Ultimately, government officials in the United States and New York became so furious over this continuing practice of Credit Suisse's Directors and Officers that they began to force Credit Suisse *to fire these criminal actors*, as the regulators believed allowing the Directors and Officers to retain such people on the Credit Suisse payroll impeded the regulators' oversight and investigations of Credit Suisse.

349.    The Credit Suisse Defendants and KPMG had a duty to act with due care, diligence, prudence and loyalty to Credit Suisse shareholders, in an honest manner, actions complained of, the then serving Directors acted collectively, as did the Group Executive Board, thus the Directors and Group Executive Board members are individuals and collectively responsible, factually and legally.  They:

- Failed to take required steps to assure that Credit Suisse had adequate, effective risk management and governance systems and internal financial/accounting controls and legal/regulatory/compliance controls in place so as to provide reasonable assurance that Credit Suisse officials would operate the business in compliance with the laws and regulations of the jurisdictions where Credit Suisse operated — especially laws and regulations relating to financial institutions, as well as Credit Suisse's own Code of Conduct.

- Failed to properly oversee and assure compliance with applicable regulatory and legal requirements, including Credit Suisse's own Code of Conduct, Charter and Statement of Duties, which *prohibited all of the types of misconduct complained of* and which resulted in billions of dollars in fines, penalties and settlements — including criminal convictions, DPAs, censures, consent decrees and cease and desist orders.

- Failed to take required steps to require the Wealth Management division to operate in accordance with the laws of various jurisdictions and Credit Suisse's own Code of Conduct regarding tax evasion and money laundering.

- Failed to supervise and/or control Credit Suisse's executives and employees in the Investment Banking operations to prevent reckless, improper and unlawful conduct, permitting overly risky, reckless conduct and illegal actions, misrepresentations to and cheating of clients, money laundering, terrorist-transfer violations, price fixing, bid rigging and market manipulation.

- Failed to take required steps — including creating, implementing and overseeing proper risk, management, financial/accounting controls and legal/regulatory/compliance controls — to protect Credit Suisse and its shareholders against loss and damage, including harm due to the excessively risky, dubious and illegal misconduct of its executives, management and top employees.

- Failed to properly and promptly assure cooperation with regulatory requests, demands and inquiries (as is the corporate norm) so as to protect the corporation and its assets and its shareholders, and permitted implicated insiders to influence the Bank's response to investigations to impede, thwart or block them, and conceal evidence.

- Failed to pursue valid legal claims against Credit Suisse officials for violation of duties by those involved in the Investment Banking operation subprime losses or the Wealth Management operation tax-evasion activities, or against persons who were Directors at the times that misconduct and illegal activities were

taking place, which would have put an end to or curtailed the ongoing misconduct.

- Failed to prevent and/or take proper action to recover the payment of hundreds of millions of dollars of grossly inflated bonuses to executives — especially to executives in the Investment Banking and Wealth Management operations — based on profits generated by illegal activities.

- Failed to devise or implement a system of regulatory/legal compliance controls and procedures to detect and/or prevent improper, illegal or unethical behavior by Credit Suisse officials — to protect Credit Suisse against "conduct risk," "reputational risk" and "legal/regulatory risk."

- Failed to take required steps to assure that Credit Suisse had adequate, effective and internal financial/accounting controls and legal/regulatory/compliance controls so as to provide assurance that Credit Suisse's financial statements were accurate and that Credit Suisse's officers and employees would operate the business in compliance with the laws and regulations of the jurisdictions where Credit Suisse operated — especially laws and regulations relating to the financial institutions.

- Failed to obtain and then act on the basis of adequate information after due inquiry so as to discharge their duties and responsibilities of due care and prudence, including failing to properly oversee and enforce applicable regulatory and legal requirements, including Credit Suisse's own internal Code of Conduct, which prohibited all the types of conduct complained of and which resulted in billions of dollars in fines, penalties and settlements, including several criminal convictions.

185

- Failed to properly, thoroughly and independently investigate apparent wrongdoing inside Credit Suisse, including allegations of wrongdoing by powerful executives.

- Failed to supervise and/or control Credit Suisse's top executives and to require them to work in a cooperative and collegial manner, resulting in losing a top executive to a main competitor.

- Failed to assure Credit Suisse financial statements were accurate and permitted them to be falsely inflated by recording as revenue and reporting as profit billions of dollars from the sale of the illegal products or without establishing adequate sources.

- Failed to take required steps — including proper risk, accounting and compliance controls — to protect against loss and damage, including reputational harm due to the excessively risky, dubious and illegal misconduct of its executives, management and top employees.

- Failed to properly and promptly assure cooperation with investigatory officials, as is the corporate norm, to protect the corporation and its assets, and not permit implicated insiders to influence the Bank's response to investigations, block them, and conceal or destroy evidence.

- Failed to assure that Credit Suisse's employees and inside and outside counsel properly and promptly cooperated with regulatory inquiries or internal investigations into possible misconduct by Credit Suisse executives and employees, to assure that the interests of Credit Suisse were protected and not jeopardized by persons implicated in the alleged wrongdoing seeking to protect themselves at the expense of Credit Suisse.

186

- Failed to take necessary steps to assure Credit Suisse's compliance with prior DPAs, Consent Decrees and Cease and Desist orders, resulting in enhanced penalties.

- Failed to properly, thoroughly and independently investigate apparent wrongdoing inside Credit Suisse, including allegations of illegal activity and allowed whistleblowers and others who expressed ethical/legal concerns inside the Bank to be intimidated or retaliated against and failed to sue corporate malefactors, hold them to account and stop the ongoing course of misconduct where the Officers and Directors know they will not be sued for their misconduct, and that they will be paid off to go away and be silent.

350.   The Credit Suisse Defendants failed to use due care, diligence and prudence, allowing the waste or mis-transfer or loss of corporate assets to themselves or others in violation of both New York and Swiss law caused damage to Credit Suisse's shareholders in so doing.

351.   The Credit Suisse Defendants failed to use due care in selecting and/or retaining KPMG as the statutory outside auditor given the track records of both firms in prior audit failures and involvement with repeated financial and corruption scandals.

352.   The decisions made by Credit Suisse's Directors concerning its internal financial/accounting and legal/regulatory, responses to criminal investigations and regulatory inquiries and the like were not entrepreneurial decisions.  They were and are fiduciary and legal compliance decisions mandated by law as to which the Director and Officers had no discretion other than to ensure compliance by Credit Suisse.

353.   The fiduciary decisions like legal and regulatory compliance are not decisions entitled to the protection of any "business judgment rule" even if it existed

187

under Swiss law and which it does not and which does not require proof of reckless misconduct or even gross negligence for liability.  Taking actions to lie, cheat, in effect steal and market your services in an illegal manner all over the world in violation of countless laws and regulations and the corporation's own Code of Conduct is not conduct protected by any sort of business judgment rule.  Although the conduct of the Credit Suisse Defendants and KPMG Defendants far exceeds a lack of due care, ***mere negligence is sufficient to impose liability on the Credit Suisse Defendants and KPMG Defendants***, **who violated their duties under the Swiss Code of Obligations**, **the New York Business Corporation Law and New York common law**.

354.    With due care, due diligence and effective internal accounting and legal compliance controls and honest stewardship the collapse of Credit Suisse would not have occurred and the shareholders would not have been damaged.  The damage and loss complained of was caused by failure of Board of Directors' and Officers' oversight, stewardship and management obligations, participated in and advanced by KPMG.  The members of the Board were well aware of the unlawful tax-evasion conduct of the Wealth Management/Private Banking operation and that it was aggressively being pursued.  They knew yet disregarded the widespread nature of the wrongdoing, the involvement of top officers and numerous employees, and the fact that Credit Suisse was already operating under a United States Consent Decree involving earlier violations.  They failed to exercise the due care, due diligence and prudence required by the Swiss Code of Obligation in fulfilling their obligations, including implementing and enforcing effective systems of internal financial/accounting controls and legal/regulatory/compliance controls, and risk management and governance procedures, including those specified in Credit Suisse's

Code of Conduct and in retaining KPMG as statutory auditors to prevent, identify and/or stop the improper and illegal activities.

### 7.    Repeated Complaints of Inadequate Controls and Unreasonable Risks Were Turned Aside by Defendants

355.    A lengthy investigative report based on discussions with Credit Suisse insiders evidence the long course of conduct of top executives turning aside warnings about inadequate controls — and excessive risks.

> Five months before Greensill Capital's collapse, Credit Suisse invited a special guest to present to its top ranks in Asia. The visitor was hailed as the sort of bold entrepreneur the bank wanted to do business with: Lex Greensill.
>
> ***
>
> Yet just two months earlier Greensill Capital had been put on a "watchlist" by the Swiss bank's risk managers in Asia, according to people familiar with the matter.
>
> ***
>
> However, ***warnings were repeatedly dismissed by the bank's leadership*** …. They continued to market the Greensill funds and even approved a $160m loan to the company …. In March Greensill collapsed into administration. Its fall from grace could cost Credit Suisse's clients as much as $3bn.
>
> ***
>
> The Greensill blow-up is only one link in a long chain of risk management failures at Credit Suisse. Just weeks later, Archegos Capital, the family office of disgraced former hedge fund manager Bill Hwang, defaulted on a margin call, sparking chaos at banks that had lent him billions to magnify his positions. Credit Suisse is nursing the biggest losses of at least $4.7bn.
>
> The succession of crises have left investors and staff furious and demanding answers. How did executives become so enthusiastic about a small group of dubious clients? ***And why were those raising red flags ignored or marginalized***?

"Accumulating giant exposures to single entities, especially low-grade ones, goes completely contrary to every principle of how to manage risk," said Benedict Roth, a former risk supervisor at the Bank of England. 'Swimming with the sharks'

In interviews with the *Financial Times*, six current and former Credit Suisse managers said the bank hollowed out risk expertise and trading acumen in favor of promoting salesmen and technocrats. Dissenting voices were suppressed, they said.

"There was a dulling of the senses," said a former executive. "Credit Suisse was in the deep end swimming with the sharks, but doing it with a private banking mindset. They were always going to get destroyed."

At the center of the controversies was Lara Warner, the chief risk and compliance officer until she was ousted on April 6. A former Lehman Brothers equity analyst, she joined Credit Suisse in 2002 to cover the cable television and telecoms industries.

The Australian-US dual citizen rose to finance director of the investment bank, before ex-CEO Tidjane Thiam named her chief compliance and regulatory affairs officer in 2015.

Credit Suisse chair Urs Rohner and Thiam "came in with a mindset that you can appoint anyone clever into a job and they will be a success, even if they had no experience . . . [but] that was inappropriate for risk and compliance," another executive said.

In the summer after Thiam stepped down over a spying scandal, his successor Thomas Gottstein added to Warner's responsibilities, giving her oversight of the newly combined global risk and compliance division*.

***

During her five-year tenure, Warner and other executives pushed for risk and compliance to be "more commercial" and "aligned" with the front office traders and dealmakers, multiple current and former staff told the FT.

She led by example. In October, Warner personally overruled risk managers who cautioned against giving Greensill a $160m bridge loan ahead of a private fundraising. The loan is now in default.

Warner also removed more than 20 senior managers from Credit Suisse's risk department.

*\*\*\**

"When you bring in a sense of fear into an organization by removing so many people, the culture of the risk is not to say 'no' to the business anymore," said a person involved at the time.

Last year Warner ruffled more feathers by changing reporting lines. Some markets' risk functions, which previously sat within an independent central risk team, were shifted to report to the head of front office technology.

While some other banks use this model, "from a control point of view this was a disaster" at Credit Suisse, according to one person who lobbied against the changes. "Risk lost its independence."

*\*\*\**

Problems were bubbling beneath the surface before Credit Suisse's costly missteps at Greensill and Archegos emerged.

"There were numerous tremors that signaled to any risk-literate person that the potential for a big one to hit is growing," said a former senior executive.

In 2018, Credit Suisse lost about $60m after it was left holding a block of shares in clothing company Canada Goose when its stock price plummeted. About a year later, the bank lost about $200m when Malachite Capital, a New York hedge fund and one of its prime brokerage clients, imploded.

"Those losses arose from lack of discipline," the former executive said.

"There was systematic insensitivity at all levels," said a second person. "If you're the head of risk and you let a $60m loss go by, then a $200m loss, and you don't ask what the hell is happening here, what are you doing?"

One former managing director recalls a 2019 conference call about the reform of the Libor interest rate benchmark. When a senior trader dialed in, an automatic message was played reminding everyone that the meeting was now being recorded, a regulatory requirement.

> When Warner heard this, she asked the trader to call back from a non-recorded line. Some of those present found it a jarring intervention from a risk officer. A person close to Warner, noting that the call had nothing to do with trading, said it was just a normal way of doing business.

Stephen Morris, *et al.*, *How Credit Suisse Rolled the Dice on Risk Management — and Lost*, FINANCIAL TIMES, Apr. 19, 2021.

356.    Many times over the years, Credit Suisse employees complained about the improper goings on, the lack of adequate controls. For instance:

> A former high-level Credit Suisse executive said she was terminated after refusing to mislead auditors scrutinizing a joint venture between the bank and the big-data firm Palantir Technologies, according to filings in a federal administrative action obtained via FOIA by NBC News.

> Colleen Graham, a 20-year employee of the Swiss-based bank who rose to head its compliance unit in the U.S., alleged in her complaint, which was filed with the Department of Labor, that the bank wanted her to bend the rules to avoid multimillion-dollar losses for itself and Palantir. The companies had launched a joint venture called Signac LLC, co-headed by Graham, which was developing software to police Credit Suisse's traders and wealth managers worldwide.

> In an interview with NBC News, Graham said she began to experience bullying and harassment — including encounters outside work — immediately after she objected to the effort to mislead KPMG, the firm auditing the joint venture. "I was scared for my safety and the safety of my family."

> Graham said she was shut out of meetings, including those concerning Signac, on whose board she sat. The joint venture refused to pay her 2016 bonus, she said, adding, "I was subject to a 'walk around the block' where I was told that a colleague of mine might be terminated if he did not go along" with the plan to bend the rules.

> ***

> In spring 2017, Signac was working to perfect the software, Graham contended in her complaint, when executives at Credit Suisse and Palantir became upset. They had learned that the bank would have to take a significant loss in 2016 and

Palantir would have to reduce its internal valuation, under software accounting rules. Those rules require companies to recognize revenues once their products have been delivered to customers and are in use.

Emails produced in the case show that Palantir's net income would have been reduced by $10 million under the accounting rules and the value of its investment would decline by $5.5 million. The impact on Credit Suisse was estimated at a penny or two per share, which is significant for such a large company.

Credit Suisse and Palantir asked Graham to convince the auditor, KPMG, to avoid the problematic consequences, the filings said, by booking the revenues improperly in 2016. Shortly after she refused, she was fired and blackballed in the industry, she said in her claim, which was filed in 2017.

She also alleges in her filings that she was followed when she went to an interview with another financial services firm, which she believes was done to intimidate her.

***

Credit Suisse and Palantir wound down Signac shortly after the accounting dispute, saying it was a "complete bust."

*Ex-Credit Suisse Exec Says She Was fired and Harassed When She Wouldn't Bend Accounting Rules*, Edwards, NBC News, Dec. 11, 2019.

357.    Becoming involved with the "master of kickbacks" after having been warned not to do so — and ending up with a criminal plea and a $547 million penalty, when that specific warning inside the Bank were turned aside, is another example.

358.    These were far from the only warnings. As pleaded throughout, the compliance personnel frequently questioned or objected to actions taken or proposed by the commercial types.  Objections were cast aside.  Imprudent and unduly risky deals were done.  In due course, disaster ensued.

### IX.    THE CREDIT SUISSE DIRECTORS COVERED UP WRONGDOING, DESTROYED EVIDENCE, CONDUCTED SHAM INVESTIGATIONS, FAILED TO FIRE OR SUE MISCREANT SUBORDINATES PLUNDERED CORPORATE ASSETS FOR THEIR PERSONAL GAIN AND ALLOWED THE ONGOING WRONGDOING TO PERSIST, CAUSING DAMAGE TO COMMON SHAREHOLDERS

359.    In the face of obvious and enormous damage to Credit Suisse and losses to shareholders and widespread complaints and harsh criticism from New York and federal regulators, and those of other jurisdictions, and in the face of *repeated criminal convictions*, *censures*, *sanctions*, *consent decrees*, *cease and desist orders*, and non-prosecution agreements, the then Directors of Credit Suisse destroyed or permitted the destruction of evidence and conducted what the Attorney General of the United States found was a "*shamefully inadequate internal inquiry*."  They have not only neglected to pursue these facially meritorious negligence and other claims against miscreant subordinates despite adequate opportunity to do so, in fact they have taken steps to try to prevent or hinder the assertions of such claims, which had they been properly asserted in a timely manner would have put a stop to this ongoing misconduct and prevented or ameliorated the damages suffered by the Class members.  Upon information and belief KPMG personnel participated in the "shamefully inadequate internal investigation."

360.    Despite — or perhaps because of — the disastrous results of their failed oversight and severe criticism of their stewardship, the Directors have refused to objectively and honestly evaluate what happened or whether Credit Suisse had valid legal claims to recover the damages caused by the conduct of Credit Suisse Directors and Officers and others. Instead they protected wrongdoers and thus themselves.  Had they pursued them they could stopped the ongoing wrongdoing which reflected the corporate

culture of tolerance for bad, even criminal conduct, that destroyed the bank and damaged the shareholders.

361. A corporate legal claim for damages, especially if the defendant(s) has assets or insurance to cover the claim, is an asset of the corporation and properly protected and developed, can be a very large asset. According to Credit Suisse: We maintain directors' and officers' insurance for our directors and officers. "Like any other significant asset of a corporation, the Directors and Officers have a duty to use due care and prudence to protect that asset and to *maximize its value*. *Many of the potential defendants had pocketed millions and millions in bonuses, raises, increased pensions, due to their conduct that damaged Credit Suisse and are very wealthy*. *The Directors and Officers are covered by a multi-hundred-million-dollar D&O insurance policies purchased and paid for with Credit Suisse's corporate funds the shareholders' money — not their funds*. Any such policy is a corporate asset that can and ought to be realized upon (to help compensate Class members for the damage they suffered due to Defendants' wrongdoing and lack of due care and prudence). It was negligent not to pursue these claims and the Credit Suisse Defendants did so in bad faith to prevent exposing their own conflicts or risk being implicated by those sued. Better to pay them off.

362. Credit Suisse projected the image of a rock-solid bank with a conservative culture and financial expertise that earned large profits, largely due to the apparent success of its Investment Bank and its Wealth Management businesses. Credit Suisse's apparent success and growth — yielded hundreds of millions in fees to KPMG and multi-million-dollar salaries and bonuses and benefits for Credit Suisse's top officials, *who all personally profited from the wrongdoing they participated in or permitted*

***to occur.*** The Board Chair is paid a base salary of $3 million per year for his full-time job while the other directors get between $400,000-$1.1 million per year other officers were paid well over $1 million per year. ***Collectively***, ***the top Credit Suisse Individual Defendants pocketed over $2 billion between 2010–2023***. For KPMG the annual fees were $40+ million with more for consulting and other services. But, the Credit Suisse success — the image — the profits were based on misconduct. And the compensation, bonuses, pensions, *etc.*, were undeserved and much of this unearned as well and the fees to KPMG were unjustified and unearned as well as they in return for furthering illegal conduct. Much or all of these expenditures were a ***waste***, ***loss or mis-transfer*** of corporate assets under their management – done to benefit those insiders or their allies/assistors.

363.    The Individual Defendants, with the knowing help and assistance of KPMG wasted and misused Credit Suisse's assets – its money (the shareholders money) — to satisfy regulators and prosecutors with headline grabbing settlements, fines and payments while avoiding any individual accountability.  The corporate insiders were using, ***losing and wasting, and mis-transferring*** corporate assets in violation of their duties of due care and loyalty as part of their mismanagement of Credit Suisse.  This was done to entrench the Credit Suisse Directors and Officers in their positions of power, prestige or profit and avoid individual accountability, using corporate assets to protect and benefit themselves.

364.  Given the scandals in both the Investment Bank and Wealth Management/Private Bank operations, CEO Dougan had to go.  On October 3, 2015, Rohner announced that Dougan, who had been at Credit Suisse for years, headed the Investment Bank operations during the 2000s and been overall CEO of Credit Suisse

Group AG while living in New York City and operating out of Credit Suisse's New York headquarters since 2007 and thus presided over this horrific management and governance disaster was out. Board Chair Rohner, who had himself been a top member of management (COO) and Chief Legal Counsel before becoming Board Chair, and thus had ***participated in and/or presided over that disaster, heaped praise on Dougan:***

> "We are extremely grateful to Brady Dougan for his exceptional commitment, unparalleled personal contribution and leadership to Credit Suisse over many years. Brady has significantly and successfully shaped our company; he has kept our bank on track in recent years despite a complex environment and considerable headwinds in the global financial services industry. Brady and his management team have mastered even the most difficult challenges together."
>
> Urs Rohner said: "I wish to thank Brady for his remarkable commitment to the bank and exceptional record of achievements over the past 25 years."

365. Dougan was permitted to keep over $200 million in bonus compensation and bonuses he had pocketed while participating in and/or permitting the Investment Bank and Wealth Management/Private Banking misconduct that had cost Credit Suisse billions.

366. In late October 2013, *Reuters* reported:

### Ex-Credit Suisse Chairman Calls Dougan's 90 Million Swiss Francs Payout a 'Mistake'

> Credit Suisse made a "mistake" by paying Chief Executive Brady Dougan nearly 90 million Swiss francs ($100.51 million) in 2010 under two different payout plans, the board member who oversaw the payment said in a television interview on Monday.
>
> As anger at multi-million-dollar payouts for executives spread following the financial crisis, Dougan sparked a public outcry when he took home 19.2 million francs in cash and stock in

2009, and was also paid 70 million francs worth of stock under a bonus plan for 2004.

"That was certainly a mistake …."

367.    By year end 2015, it became apparent that it was necessary to part ways with Credit Suisse CEO Dougan and his New York management team because of the horrible scandals, losses, fines, penalties and payments that had been imposed on New York operation.

368.    However, Dougan had not acted as a lone wolf and others bore collective responsibility.    Indeed, both Board Chair Rohner and longtime Board Member Nargolwala, each of whom had in earlier years been top members of Credit Suisse's executive management, were personally implicated in prior wrongdoing.    Rohner served as Credit Suisse's General Counsel and as Chief Operating Officer at the times the wrongdoing in the Investment Bank/Wealth Management and Private Banking operations had taken place and Nargolwala was a top Investment Bank official who pocketed $21 million personally in 2008.

369.    Dougan and other members of the New York management team were in a position to expose the involvement of Rohner and Nargolwala (and other long time Credit Suisse Directors like Tiner, Schwan, Bohnet) in the criminal wrongdoing, which went on — with Dougan's knowledge — in both the Investment Bank and Wealth Management/Private Bank operations.    Thus, to secure Dougan's silence (and that of his team members), and their cooperation and support of the Board members going forward, they permitted Dougan to keep over $200 million in compensation and bonuses he had received as a result of the inflated and fictitious profits of the Investment Banking operation and the illicit profits produced by the Wealth Management/Private Banking

operation, much of which had been or was being consumed by billions in fines, penalties, payments and costs due to that misconduct.

370.    When Dougan was let go, the Board publicly showered him with praise, lauding his integrity, accomplishments and hard work, thus assuring him that Credit Suisse would not pursue him legally, even though it was under his "leadership" that Credit Suisse had been so badly damaged economically and reputationally and its shareholders badly damaged.  Similarly, and with the same motivation, the Board pushed out several of Dougan's top Investment Bank aides and fellow officers, including Sean Brady, and top officials in the Wealth Management/Private Banking operations, including O'Hara, Shafir, Brady, Jain and Vasan, yet allowed them to keep the hundreds of millions of dollars of salaries and bonuses they had pocketed due to the illegal conduct inside the Investment Bank and the Wealth Management/Private Banking operations.  This payoff practice became a payoff routine as the misconduct continued – with the Board frequently improperly disposing misusing, mis-transferring, wasting and losing corporate assets under their management to make large payments to exiting executives despite their wrongdoing to procure their silence and cooperation.  All those wasteful expenditures must be accounted for and disgorged under New York Business Corporation Law § 720 and New York common law, as well as this Court's equitable powers under RICO.

371.    Even though the Directors had the authority under Credit Suisse's internal rules to "clawback" compensation obtained in violation of internal rules, codes and risk management procedures they never did.  They let wrongdoers keep hundreds of millions of corporate assets and money — contributing to the financial harm to Credit Suisse which damaged the common shareholders, inflicting harm directly on them, separate from and disproportionate to any harm suffered by  Credit Suisse.

372.    The Directors have never retained or even consulted independent outside counsel with special expertise in evaluating or prosecuting claims against the wrongdoers to evaluate the factual and legal bases to pursue such claims and then, if valid grounds exist to do so, to pursue them.  This is because they did not want to pursue the claims or see them pursued by others, despite the huge size of the Directors and Officers liability insurance policies.

373.    The disgrace and damage to Credit Suisse and its shareholders has occurred as Rohner — and Tiner — have presided over and controlled the Board.  This unprecedented litany of wrongdoing by Credit Suisse Directors and Officers has been overseen — and participated in by Rohner, Tiner and other top Directors.  While they have dominated the Credit Suisse board,  the Board has been unable to halt the chaos inside the Bank and install and/or maintain necessary IT systems and internal financial/accounting controls and legal/regulatory/compliance systems and controls, and effective risk management and governance procedures, stop the ongoing improper and illegal conduct by Bank executives, and halt the Bank's continuing descent as billions in fines, penalties and settlements are paid because of the misconduct of Investment Banking and Wealth Management/Private Banking officials and the lack of due diligence, care and oversight on the part of the Board of Directors.

374.    The Credit Suisse Board has failed to pursue wrongdoers in part because they were dependent for information and advice to come from long time Credit Suisse officers — members of the Executive Board who held key corporate positions during the period of the alleged wrongdoing and actively participated in it — or let it go on under their supervision.  Romeo Cerutti, Credit Suisse's general counsel and the Board's chief legal advisor held that key insider job ***2009–2022*** and is deeply personally implicated

in what went on.  Lara Warner, the top risk officer for years had been a Credit Suisse insider *since 2002*.  David Mathers was Credit Suisse's Chief Financial *Officer from 2010 through 2022* — and with the Investment Bank's division as COO and head of finance from *2007–2010*.  Lydie Hudson, the Chief Compliance Officer for years has been a Credit Suisse executive since *2008*.

375.    Not only have the Directors failed to pursue past wrongdoers.  Rohner sought to absolve himself and he and the Board have already purported to absolve Dougan.  In 2014, after the giant United States fine and unprecedented tongue lashing by the United States Attorney General, CEO Dougan refused to resign.  In May 2014, the *Financial Times* reported:

### Dougan Says No Plan to Quit Credit Suisse After Fine

Credit Suisse's chief executive and chairman sought to put a three-year battle with US authorities behind them on Tuesday, by insisting they had no plans to resign after the Swiss bank pleaded guilty to helping American citizens evade taxes.

\*\*\*

After details of Credit Suisse's settlement were announced, some Swiss politicians continued to call for the ousting of Mr Dougan as chief executive and of Urs Rohner as chairman.

\*\*\*

"*Personally, our hands are clean*," [*Rohner*] *said*. "Whether the bank's hands have been clean over the years is another question.  It is the case that Swiss banks, including Credit Suisse, took on untaxed money .... We are disappointed, and regret this greatly."

376.    The Credit Suisse Defendants have consistently praised wrongful conduct while they refuse to sue to stop it or hold bad actors accountable:

Urs Rohner, Chairman of the Board of Directors, said:  "We are extremely grateful to Brady Dougan for his exceptional

commitment, unparalleled personal contribution and leadership to Credit Suisse over many years. Brady has significantly and successfully shaped our company; he has kept our bank on track in recent years despite a complex environment and considerable headwinds in the global financial services industry. Brady and his management team have mastered even the most difficult challenges together."

377. Later in 2015, Credit Suisse in a corporate report the Board stated:

Thank you, Brady W. Dougan

As communicated in early March, Brady W. Dougan will step down from his role as CEO for Credit Suisse at the end of June 2015. After an exceptional career of 25 years with Credit Suisse, including eight years as its CEO, Brady W. Dougan, in close consultation with the Board of Directors, has decided to step down. Brady significantly and successfully shaped Credit Suisse. Despite a complex environment and considerable headwinds in the global financial services industry, he has kept our bank on track and mastered even the most difficult challenges. The Board of Directors, the Executive Board and our employees are extremely grateful to Brady for his tremendous commitment and unparalleled contribution over the years!

378. Schwan — until 2022 Board's Vice Chair and supposedly "Lead Independent Director" *absolved Rohner of any blame or fault*. According to *Bloomberg* (February 7, 2020): A former lawyer who has been chairman of Credit Suisse for a decade, Rohner's leadership "during this turbulent time" *was praised by lead independent director Severin Schwan*, CEO of Swiss pharmaceuticals company Roche Holding AG."

379. While these individuals were engaging in mutual assurances of their innocence, the Credit Suisse insiders plundered Credit Suisse while mismanaging it. It has been repeated in SonntagsZeitgung in May 2023, that the top Credit Suisse officials has a secret "skinning" operation whereby that took for themselves attractive "sure thing" economic opportunities coming to them in the course of their employment – a secret

bonus pool for top insiders to line their own pockets, including but not limited to Varvel, Popp, Jain, Chin, Shafir, Kim and Sohn. This was a fraud on the bank and a misuse and waste and loss of corporate assets harmed and damaged shareholders.  According to reports:

### Credit Suisse Senior Staff Were Paid Unreported Bonuses: Paper

The SonntagsZeitung report says the alleged profit-sharing scheme dates back to 2008. It lists two payments of 50 million Swiss francs ($56.12 million) for 2019 alone, citing information from an internal staff meeting.  It says the payments went to members of the bank's Asset Management division and that most of them do not feature in the company's annual reports.

Senior staff at Credit Suisse received additional bonuses worth hundreds of millions of dollars over many years, most of which were not officially recorded, a Swiss newspaper reported on Sunday.

The SonntagsZeitung report says the alleged profit-sharing scheme dates back to 2008, it lists two payments of 50 million Swiss francs ($56.12 million) for 2019 alone, citing information from an internal staff meeting. It says the payments went to members of the bank's Asset Management divisions and that most of them do not feature in the company's annual reports.

380.    According to Credit Suisse:

*Risk and control considerations are an integral part of the performance assessment and compensation processes. This ensures that the Group's approach to compensation includes a focus on risk and internal control matters and discourages excessive risk taking. In order to align profitability and risk when determining annual performance objectives and results, all employees are assessed on a set of business conduct behaviors that include adherence to the Code of Conduct, challenge and escalation, incident reporting, quality assurance and work prioritization.* In addition to the annual performance assessment conducted by their line managers, employees who have breached Group

policies or procedures are subject to a review process by the Group's control functions, which impacts decisions regarding individual variable incentive compensation awards. The control functions are independent from the businesses and include General Counsel, Compliance and Regulatory Affairs, Risk Management, Finance, Internal Audit, and Human Resources, Communications & Branding. Disciplinary review committees include the input of the Group's control functions and make recommendations on disciplinary measures, as necessary. Such measures can include dismissal, as well as the reduction or elimination of the employee's variable incentive compensation award for the current year and deferred compensation awards from prior years, in line with the applicable malus provisions. The Board's Audit and Risk Committees are periodically provided with information on the disciplinary cases and may give directional input regarding the appropriateness of disciplinary outcomes. The results of the disciplinary review committees' assessment and any disciplinary measures are communicated to the Compensation Committee, together with details of any impact on variable incentive compensation.

381.     According to Credit Suisse:

The clawback provision applies to all variable incentive compensation (including deferred and non-deferred items such as the cash component of variable incentive compensation) granted to PRA Code Staff. The clawback may be enforced by the Group at any time up to seven years from the grant date of the variable incentive compensation in the event that:

● the individual participated in or was responsible for conduct which resulted in significant losses to the Group;

● the individual failed to meet appropriate standards of fitness and propriety, assessed by reference to factors including i) honesty, integrity and reputation; ii) competence and capability and iii) financial soundness;

● there is reasonable evidence of misbehavior by the individual or material error made by the individual; or

● the Group or the relevant business unit suffers a material failure of risk management.

382.   Not one penny of hundreds of millions of dollars paid to miscreant underlings, including each of the Officer Defendants was ever recaptured.  Had such action been taken, it would have disrupted the ongoing course of misconduct and conspiracy and ameliorated or prevented damage to Credit Suisse shareholders.

383.   Knowing that the conduct they were allowing, permitting and/or participating in would result in harm and damage to Credit Suisse and its shareholders they sold their stock, pocketing the proceeds as they knew the stock would likely decline in value.  In so doing they defrauded the bank and obtained the assets and securities and other property for their own benefit by means of false/fraudulent pretenses, representations and promises — *i.e.*, their conduct was proper and conformed to the bank's internal rules and Code of Conduct as did the transaction they caused the bank to undertake.

384.   Under Credit Suisse's internal rules the bank had the right to seize bonuses where there had been "a material failure of risk management, reputational harm or other similar events" ***at the discretion of the Board***.  This was never done.

385.   As is routine in Swiss public companies in past years, Credit Suisse Directors proposed that the Credit Suisse shareholders vote to "discharge" the Directors and Officers for the prior "financial year."  No shareholder vote discharging the Credit Suisse Directors and Officers or KPMG in any of the prior "financial years" relevant to this case was effective or valid.

386.   In each of the years relevant to this complaint, the "Invitation to the Annual General Meeting of Shareholders contained an Agenda item" Discharge of the Members of the Board of Directors and Executive Board a "Motion Proposed by the Board of

Directors" which said "The Board of Directors proposes that the Members of the Board of Directors and the Executive Board during the [year] financial year be discharged."

387.    Nothing more was said, unlike every other motion proposed by the Board which was accompanied by a narrative "Explanation by the Board of Directors," detailing the reasons for the motion and its impact if adopted.    At each annual meeting the Chairman — almost always Rohner — called the Discharge Motion for the Board.    But in 2022 when the discharge petition was actually debated in the context of the Greensil and Archegos disasters the shareholders voted against the discharge.    Before Credit Suisse collapsed in March 2023 the Credit Suisse directors were intending to try to get the shareholders vote to discharge the directors and officers for conduct during the 2022 year. Due to shareholder protest and outrage and the "unprecedented circumstances concerning the bank" this proposal was withdrawn from a shareholder vote.

## X.    THE STATUTE OF LIMITATIONS HAS NOT RUN ON ANY CLAIMS

388.    Because the misconduct and conspiracy never ceased prior to March 2023, all of the claims asserted sought fall within any applicable statute of limitations under either Swiss law, New York law or RICO.    All claims are timely because the wrongful course of continuing course of conduct and civil conspiracy never ceased and continued until March 2023, with the last acts of the civil conspiracy occurring within any limitations period.

389.    The Swiss Code of Obligations contains provisions regarding corporations, shareholders, and their respective rights and obligations.    This is an integrated code of substantive duties and obligations and rights, striking a balance between shareholder and corporate interests, which includes a long 10 year statute where – as here – there was a course of conduct that did not **"cease"** and up to 15 years where the underlying conduct

was criminal as it was here as well. Swiss Art. 760 "Prescription" for claims under Art. 754 is a key part of these statutes. It is substantive and it controls those claims. Under the RICO statute the limitations period is four years tolled by continuing tortious conduct. It was not until March 2023 that Credit Suisse admitted there were material deficiencies in the internal financial/legal regulatory controls and risk management procedures. Credit Suisse stock plummeted to $2.01 on March 17, 2023 — and Credit Suisse imploded in days.

390.    The damage/losses caused upon Credit Suisse's shareholders over past years by the Credit Suisse Defendants' violations of their duties of due care, diligence, prudence and/or loyalty to Credit Suisse and the shareholders, originate with the 2007–2008 subprime toxic loan scandal in Credit Suisse's Investment Banking operations, accelerated with the $2.6 billion United States fine and criminal plea for tax-evasion assistance in 2014, continued with over $1 billion in trading losses and reached astronomical levels with the $6-plus billion subprime toxic securities settlements in 2016–2019, further tax-evasion/money-laundering investigations and fines and penalties committed in 2018–2021 — capped off by the Tuna Bonds scandal, spying fiasco, Greensill, Archegos, and continuous tax-evasion assistance, and damage from those failures (and the hundreds of millions required to be spent on external monitors' insistent and upon by United States/New York regulators continued to be incurred.

391.    Due to the Credit Suisse Defendants and KPMG Defendants' lack of due care, prudence and loyalty to Credit Suisse, the compliance controls and supervision were defective and the Code of Conduct and Board Charter — corporate wide directives — were ignored, which in combination permitted the wrongdoing to occur on a corporate-wide scale for several years continuing to cause loss and damage to Credit Suisse shareholders

who held common stock on and after October 22, 2013, including those who disposed of shares along the way, or who held until March 17, 2023 and suffered damage due to Defendants' actionable misconduct.

392.   The control, compliance, supervision, oversight and risk management deficiencies in the Investment Bank that led to the horrific 2007–2008 losses to Credit Suisse and to its clients/customers were never fixed and never ceased.  Over the next several years, the damages and losses from these continuing failures alone played out at the cost of billions of dollars as regulators/prosecutors and private parties brought actions against the bank, obtained recoveries and fines and penalties which over time drove the stock price down.

393.   During this 2007–2022 period there were numerous other violations of money-laundering prohibitions and other laws of the United States and other nations by the Investment Banking officials' misconduct which continued to inflict economic damage on Credit Suisse shareholders.  These continuing damages were caused by the continuing failure of the Credit Suisse Defendants and KPMG Defendants to exercise proper supervision and control over its financial/accounting controls and legal/regulatory/compliance controls and risk management procedures of the Investment Bank.

394.   The same is true with respect to the negligence and lack of due care and prudence of the Directors and Officers in allowing officials in Credit Suisse's Wealth Management/Private Banking operation to continue to engage in tax-evader-aider activities in New York.  The tax-evasion activities continued in many other nations even after Credit Suisse's 2014 United States guilty plea and $2.8 billion fine, which included monitoring and oversight expenditures totaling hundreds of millions of dollars in 2016–

2017.  Even as of March 2023, Credit Suisse continued to be under investigation and embroiled in a massive multi-national coordinated tax-evasion investigation in Europe which has cost it millions of dollars in fees and expenses and will undoubtedly cost billions more to resolve.  Thus, the ***aggregate damage*** caused by the Individual Defendants' breaches of their duties of due care, prudence and loyalty ***especially with regard to "compliance with laws" and accounting and financial systems as required to merger the company as required under the Swiss code of obligations*** has been caused by, and is the result of, a continuing course of conduct by Defendants, which has inflicted damage on Credit Suisse's shareholders over the entire holding period.

395.    One specific example: In 2014, when Credit Suisse Group AG entered a ***criminal plea*** and consented to pay the large criminal fines and penalties to the United States and New York in connection with its Wealth Management/Private Banking operations tax-evasion activities, it was forced to also agree to the installation of independent monitors within Credit Suisse and to report to the New York Banking Authorities ***over the next two or more years***, *i.e.*, well into 2016–2017.  The same is true of the Tuna Boat/Bond scandal pleas in 2021. The monitor was part of the ***penalty***, *i.e.*, ***damage***, imposed on Credit Suisse due to the Directors' and Officers' breaches of duties.  The monitor fees and associated costs ran into the hundreds of millions of dollars and ***continued to be paid by Credit Suisse well into 2022–2023***, thus inflicting continuing damage on Credit Suisse and its shareholders.  In addition, the illegal tax-evasion assistance activity in the United States has continued until current times.

396.    Another example of the continuing economic damage to Credit Suisse and its shareholders from the long-standing continuing control, compliance and risk management failures in the Investment Banking operations is the $1 billion hidden loss

there resulting from high-risk unauthorized securities trading discovered at year-end 2015 in the Investment Bank and the "***grotesque***" and "***odious***" Tuna Boat/Bond scandal which resulted in a Credit Suisse guilty plea in the Eastern District of New York in 2021–2022.

397.    Another example is the damages from penalties and payments stretching out many years.  A $2.8 billion loss in 2008, a $55 million United States FHA payment in 2014, a $5.28 billion United States DOJ fine in 2017, a $450 million payment to United States credit unions in 2017 and a $600 million payment to MBIA in 2020.  Additional examples are the DLJ goodwill write-offs — $5.8 billion in 2015-2016 and another $1.2 billion in 2022 and assistance of tax evasion in New York/United States and billion dollar fine in 2014 and has continued and is detailed in a United States Senate report released in late March 2023.

398.    The recent collapse of Credit Suisse is a result of the ***continuing failure*** of the Credit Suisse Defendants and KPMG Defendants to correct the ineffective internal financial/accounting controls, legal/regulatory/compliance controls and risk management procedures in Credit Suisse's Investment Bank operations and instill a culture of legal compliance and properly supervise the Investment Bank operations.

399.    The Directors and Officers have denied their own, their predecessors' and their allies' wrongdoing for years, including publishing reports and making assurances to Credit Suisse's owners/shareholders of their commitment to robust and effective legal/regulatory/compliance controls, which they have not fulfilled.  They have denied and continued to resist and deny legal accountability for key wrongdoers who continued to control or influence the Credit Suisse Board until very recently.  During that time they

refused to honestly evaluate, consider or bring legal actions against defaulting parties which would have disrupted if not stopped the course of this conduct.

## XI.    KPMG'S COMPLICITY IN THE MISCONDUCT AND MISMANAGEMENT AS CREDIT SUISSE'S EXTERNAL AUDITOR AND VIOLATION OF ITS OWN DUTIES OF DUE CARE

> Auditors are caught in a fundamental conflict of interest.  They are supposed to serve the public.  They're expected to act as watchdogs. "By certifying the public reports that collectively depict a corporation's financial status, the independent auditor assumes a public responsibility transcending any employment relationship with the client," the U.S. Supreme Court has stated.  "This 'public watchdog' function demands that the accountant maintain total independence from the client at all times, and requires complete fidelity to the public trust." *United States v. Arthur Young & Co.*, 465 U.S. 805 (1984).

### A.    The Regulation, Oversight and Liability of Accounting Firms like KPMG

400.    International accounting firms like KPMG are reviewed and regulated by specialized bodies in the countries where they operate.  Here in the United States the SEC and the PCAOB have oversight.  In the UK it's the Financial Reporting Council ("FRC") and predecessor bodies.  Other nations have their own regulatory bodies. These oversight organizations were created because independent accounting firms providing ***honest***, ***competent audit and accounting functions*** to public companies are ***indispensable to*** protect shareholders and creditors; but because auditors (including KPMG) historically have failed to perform their duties properly, contributing to causing repeated financial scandals costing shareholders and others billions in losses, these oversight entities and the right of shareholders to sue for damages exist.

401.    KPMG is one of the most dishonest and/or incompetent of the "Big Four" worldwide accounting firms, ***with the worst record of audit failures.***  KPMG has

been repeatedly criticized, sanctioned and fined, paying hundreds of millions of dollars for audit and accounting failures.  They have been caught *lying* to regulators, *stealing* secret information from regulators, cheating on compliance exams and *destroying or manufacturing audit evidence* to cover up their own wrongdoing or that of their clients.  They have been ousted from many audit engagements, sued and paid out billions in settlements to shareholders, bankruptcy administrators and creditors. Their audit conduct have been condemned as "*unacceptable*."  They remain in business despite their sordid record because of the oligarchy of the "Big Four" accounting firms have over public company accounting and the huge fees they pocket for helping companies "cook the books."  The Big Four audit 99% of S&P 500 companies.

402.  While they project an image of care, competence and compliance with auditing standards, independence requirements, and generally accepted accounting principles — and dedication to high quality work consistent with their duties to the investing public and government agencies — that is all a sham — a front for what is actually going on.

403.  In fact, KPMG participated in an international oligopoly benefiting four firms that audit 95% of the Fortune 500 and large S&P companies.  Thus, the firms were able to charge "premium" fees due to the lack of competition — fees so large that generate huge profits for the accounting firms and their partners and enable the firms to do their clients' bidding — to throw in with them, to abandon their independence, to create and destroy audit materials after the fact, even though this misconduct results in frequent suits and proceedings that have cost the firms *billions of dollars in recent years*. Despite these fines, penalties and payments, the senior partners made upwards of $3 million per year while the "average" partner makes north of $800,000.  When they can

pocket this kind of cash, they view these huge penalties as "costs of doing business" spending hundreds of million in legal fees to obstruct claims against them for years.  *In the case of KPMG*, *this is a deliberate business strategy to benefit themselves economically while the executives and top directors cash in big salaries*, *bonuses*, *and stock options* enhanced by the manipulated finances the accountants help them produce.  Private suits like this are indispensable to the victims, shareholders and creditors of this avaricious misconduct which violates the rules and laws of the United States and New York and other nations, provisions enacted to provide investors and creditors remedies to both compensate them and call such misconduct to account.

404.    KPMG has been associated with an eye watering list of financial and accounting scandals – going back years. Several of those are infamous examples of financial and accounting fraud, misconduct and culpability.  *Even today's most current bank financial scandals involve KPMG*, *the auditor for both the now notorious Silicon Valley Bank failures and Signature Bank which flamed out in March 2023 and are now buried in a tsunami of lawsuits and investigations*.  *No other big accounting firm has a track record of wrongdoing like this*.

405.    The PCAOB on April 17, 2023 announced:

> Public Company Accounting Oversight Board (PCAOB) inspectors outlined their priorities for 2023 inspections in a new PCAOB staff report... The report outlines plans to increase the focus on fraud-related audit procedures...and continue selecting audits in the financial services sector for inspection...
>
> "Increased deficiencies in 2021 inspections and increased comment forms in 2022 inspections revealed a troubling

trend in audit quality, which we are tackling head-on in 2023," said PCAOB Chair Erica Y. Williams.

Last year, the PCAOB found a year-over-year increase in the number of audits with deficiencies at audit firms that the PCAOB inspected in 2021. Chair Williams said higher deficiency rates in 2021, coupled with increased comment forms for 2022, were a warning signal. She challenged the audit profession to sharpen its focus on improving audit quality and protecting investors.

The complete list of 2023 inspection priorities outlined in today's report includes:
**Risk of fraud**
**Auditing and accounting risks**
**Risk assessment and internal controls**
**Financial services specific considerations**

406.    Due to the Credit Suisse's Boards' neglect and misconduct and self-dealing — with the acquiescence and assistance of KPMG.  Credit Suisse devolved into an international criminal enterprise. "***Banksters***" ***must have compliant accountants who forsake their independence and betray the trust of shareholders and the public to work illegally with them for their mutual economic gain***.  The decades long misconduct at Credit Suisse simply could not have happened without a "prestigious" accounting firm providing the "clean opinions" and based on compliance with required auditing standards necessary to create and sustain the veneer of respectability and regularity to support the public "trust" a multiple billion dollar international financial institution must have to operate.

The so-called Big Four accounting firms – Deloitte & Touche, Ernst & Young (EY), KPMG and PricewaterhouseCoopers (PwC) – essentially have a lock on auditing the biggest corporations traded on United States stock markets.  It takes a big accounting firm to audit a big company.
But when inspectors from the Public Company Accounting Oversight Board (PCAOB) have audited a sample of audits performed by the US arms of the Big Four, they have found

> many were inadequate – so bad that the accounting firms had no business issuing opinions on those audits.
>
> In the most recent annual inspections of the US arms of the Big Four for which the oversight board has reported results, inspectors found ... PricewaterhouseCoopers botched 23.6% ... and KPMG botched 50%.

David S. Hilzenrath, *Botched Audits: Big Four Accounting Firms Fail Many Inspections*, PROJECT ON GOVERNANCE OVERSIGHT (POGO), Sept. 5, 2019.  If a doctor or lawyer — or virtually any other licensed professional — botched some 25-50% of his or her cases, he or she would be put out of business and likely be put in jail.  But KPMG is too big — too powerful for that to happen.  In the end, corporate shareholders and creditors pay the price for KPMG's unremitting wrongdoing here in New York City and elsewhere.

407.  Government oversight — while critical — alone it is not enough.  The regulators are filled with and dominated by alumni of the big accounting firms including partners of KPMG.  Even if they do a good job — and many think they do not — ***the regulators cannot recover damages for victims***.  Thus, private suits for damages remain indispensable to compensate the victimized and damaged shareholders and to try to deter such conduct going forward.

> A new investigative report by the Project On Government Oversight (POGO) found that a little known government agency charged with oversight of the audit industry is failing to do its job.
>
> POGO studied 16 years' worth of the Public Company Accounting Oversight Board's inspection reports on the U.S. arms of the Big Four audit firms—Deloitte & Touche, Ernst & Young, KPMG, and PricewaterhouseCoopers— and found the board has cited 808 instances where the firms issued defective audits that shouldn't have vouched for a company's financial statements, internal controls, or both.
>
> ***
>
> Compared to the 808 instances of defective audits, the audit watchdog has brought only 18 enforcement cases, involving a

total of 21 audits, against the U.S. Big Four or employees of the firms.

*Audit Watchdog's Failure to do its Job Leaves Economy at Risk*, PROJECT ON GOVERNMENT OVERSIGHT (POGO), Sept. 5, 2019.

408.    The Public Company Accounting Oversight Board, the watchdog for United States accounting firms, has taken issue with audits performed by KPMG:

> In reports posted on the PCAOB website on Monday... Problems were found at 12 of 54 KPMG audits reviewed, up from eight.

409.    Three years later, in 2014, Reuters reported:

### Audits Around the World are Riddled With Problems — Survey

> Public company and bank audits conducted around the globe by units affiliated with the world's six largest accounting firms are persistently riddled with flaws, a group of international regulators have found.
>
> The finding, released on Thursday in a survey by the International Forum of Independent Audit Regulators (IFIAR), raises major policy questions about whether enough has been done by global regulators to improve audit quality since the 2007-2009 financial crisis.
>
> Leading up to the crisis, many publicly traded banks portrayed a rosy financial picture of their corporate books, only to later suffer massive losses on subprime mortgage securities in their portfolios.
>
> Critics have questioned why independent auditors tasked with reviewing the accuracy and quality of public company financial reporting failed to spot the problems sooner.
>
> "The high rate and severity of inspection deficiencies in critical aspects of the audit, and at some of the world's largest and systemically important financial institutions, is a wake-up call to firms and regulators alike," said Lewis Ferguson of the Public Company Accounting Oversight Board, the body that polices auditors in the United States.

410.    In May 2014, *Reuters* reported:

**UK Accounting Watchdog Warns over Bank Audits**

Accountants who check the books of Britain's banks must sharpen their act or could be ordered to take corrective measures, the sector's watchdog said in a report showing how a core lesson from the financial crisis has yet to be applied.

The Financial Reporting Council (FRC) said in its annual audit quality inspections report ... the banking sector continues to be, generally below those of other types of entity," the FRC said.

The inspections during 2013 and 2014 covered audits for the year that ended December 2012. They included the books of five banks and five building societies, all unnamed and none were "good" - the top grading - while 56 percent needed improvements.

411.    The current banking scandals — foretold in repeated in the past several

years are due to persistent audit failures – specifically by KPMG.  *The American Prospect*

on March 21, 2023 reported:  ***The Systemic Risk of Big Accounting***

Practically all corporate blow-ups begin with some creative accounting. Unfortunately, the industry best positioned to monitor malfeasance in corporate accounting hasn't fulfilled its responsibility.

... a clean bill of health on the audits of SVB, Signature, and First Republic Banks, just two weeks before their collective implosions. Until 2019, KPMG also audited Credit Suisse, which nearly went bankrupt this past week due to long-standing underlying issues, before it secured a stage-managed buyout.

KPMG's botched audits are just the most recent failures by the auditing industry that has repeatedly missed nearly every major corporate meltdown in recent decades, from Enron to Lehman Brothers to FTX. KPMG, in particular, has been a repeat offender. The firm got hit with a $17 million lawsuit following the collapse of its client, the British multinational Carillion, in 2020, and lost both Deutsche Bank and GE's accounts after fines were imposed on the firms for a series of violations. And there's the infamous "steal the exam" scandal, where top KPMG auditors went to prison for acquiring advance information on what audits would be scrutinized by a federal regulator.

412.    No other large accounting firm has a track record of wrongdoing that match that of KPMG.  Listed below are some of the corporate accounting/financial scandals and controversies — many involving banks/financial institutions and internal control failures that KPMG have been involved in the past.  Not every accusation is true. Not every lawsuit is meritorious. But the accumulation of suits, controversies, accusations, admissions, penalties, payments, fines and regulatory findings and actions is so extensive and consistent as to give any reasonable person pause as to the competence, honesty and suitability of KPMG to serve as an external auditor for Credit Suisse.  Despite access to this information until the "steal the list" scandal and convictions the Credit Suisse Directors never did any search to review or evaluate PWC or KPMG to be retained or to continue be retained annually as external auditor for Credit Suisse.  They never did a review, study or evaluation that considered the prior — and ongoing — track record of either firm.  Had such a review occurred and honest, competent external auditors been selected, the ongoing common course of conduct/conspiracy could have been disrupted, and the damage suffered to Credit Suisse shareholders could have been avoided or ameliorated.

**B.    KPMG's Involvement and Complicity with Credit Suisse**

413.    The KPMG Defendants have been closely associated with Credit Suisse for decades.  KPMG was the statutory auditor and accountant for years up until 2020.  While external auditor KPMG both participated in, obtained revenue from, and profited from the "Credit Suisse Enterprise" as defined herein.  It was paid hundreds of millions of dollars by Credit Suisse as its accountants, auditors, consultants and advisors on many matters relating to the operation and management of the corporation, including its internal controls and risk management procedures and adherence to the Code of

Conduct-obtaining hundreds of million in dollars in fees. KPMG was also actively involved in the management of the company. A substantial factor in causing the damage/loss to the Credit Suisse shareholders was the lack of adequate internal financial accounting, and legal compliance and regulatory controls in Credit Suisse's operations, especially in New York.  Without adequate internal controls and risk management procedures Credit Suisse could not be properly managed.  Credit Suisse did not have them, was mismanaged and eventually collapsed.  Credit Suisse's internal controls have been defective and deficient for over 20 years.  KPMG knew this when certifying the controls and risk management processes as adequate and effective in 15 plus years of Annual Reports to shareholders.  They did this because they wanted the huge fees – and upon which they had become dependent, and which were very important to their New York partners/officers there. KPMG has a decade long history of being the external auditors of large and often international financial corporations like Credit Suisse that have blown apart due to a lack of internal controls, as detailed below.

414.    KPMG was actively involved in the management of Credit Suisse's business participating in the wrongdoing complained of as instigators, accomplices and perpetrators in a civil conspiracy that went on until the release of Credit Suisse's 2022 financial statements in March 2023 when PWC admitted and made Credit Suisse admit the internal controls were "materially deficient."  In addition to serving as statutory external auditor, KPMG deeply involved with Credit Suisse as advisor and consultants in several areas and were involved in the management of Credit Suisse.  Without KPMG's "clean" opinions including the adequacy of internal controls, Credit Suisse could not operate.

415.    In December 2022, the PCAOB announced:  ***Imposing $7.7 Million in Fines, PCAOB Sanctions Three Firms and Four Individuals from KPMG Global Network***

> The Public Company Accounting Oversight Board (PCAOB) today announced seven settled disciplinary orders sanctioning firms and individuals from ***KPMG's global network for violations of professional auditing standards***, ***quality control standards***, ***and PCAOB rules, totaling $7.7 million in penalties***.

> In addition to fines, today's sanctions include ***barring or suspending four auditors from participating in public company audits*** and requiring three KPMG member firms to review and improve as necessary their quality control policies and procedures.

> "These actions should send the message to KPMG ... that the PCAOB is committed to rooting out misconduct wherever it occurs and will employ all sanctions at its disposal to protect investors and improve audit quality," said PCAOB Chair Erica Y. Williams.

> "***The breadth of the misconduct uncovered in these matters and the aggregate size of the sanctions imposed demonstrate the global reach of the PCAOB's oversight and the Board's heightened vigilance in enforcement***," said Mark A. Adler, PCAOB Acting Director of Enforcement and Investigations. "I commend my Division of Enforcement and Investigations colleagues for their dedication in pursuing these significant cases and their commitment to protecting investors."

> ****

> The PCAOB found that, in 2016, KPMG and various individuals improperly altered audit documentation for two audits in anticipation of a PCAOB inspection, and provided that altered documentation to PCAOB inspectors. Meléndez, the engagement partner for one of those audits, directed the improper alterations for that audit.

> The PCAOB also sanctioned KPMG Assurance and Consulting Services LLP ("KPMG India") and KPMG India engagement partner Sagar Pravin Lakhani (PDF) ("Lakhani"). The sanctions are based on KPMG India's quality control failures

and Lakhani's supervisory and documentation failures in connection with a practice of signing off on blank placeholder work papers during the 2017 audit of a public company.

The PCAOB found that, in the course of that audit ... members of the KPMG ... engagement team signed off on dozens of blank work papers. The blank work papers were replaced with completed work papers, in many cases after the issuance of the audit report, but the sign off dates were not updated.

The PCAOB censured the firm and suspend [a KPMG partner] from associating with a registered public accounting firm for one year.

416.    ***KPMG is dishonest***.  ***The firm cheats and steals and then destroys incriminating evidence and creates exculpatory evidence and lies to cover up***.  KPMG — here in New York City — was caught up in one of the biggest accounting scandals in history — stealing confidential data about upcoming PCAOB tests or reviews of KPMG clients including Credit Suisse here in the United States. KPMG was severely sanctioned by the PCAOB and the SEC — fined over $50 million while its top audit partners in New York City — each of whom worked on the Credit Suisse audits – were aware of this dishonest conduct involving altering KPMG's Credit Suisse audit workpapers — and several other KPMG officials were criminally convicted.

417.    As a result of this illegal commercial espionage, KPMG learned the PCAOB was going to review KPMG's Credit Suisse audits illegally armed with this information KPMG "dressed up" the audit work on Credit Suisse.  This avoided the PCAOB inspectors for discovering and publishing the audit and internal control failures, which would have disrupted the ongoing course of conduct aiding and abetting civil conspiracy, and forced true ***remedial*** steps to be taken.

On a spring day in 2015, his last day on the job at the board that oversees corporate auditors, Brian Sweet stuffed an external hard drive containing confidential board records into

221

his computer bag along with hard copies of other confidential board documents.

Then Sweet said goodbye to his life as a regulator inspecting the big accounting firm KPMG and walked through the revolving door to a new job at KPMG's Park Avenue offices in New York. The partnership at KPMG came with pay of $525,000, more than double the approximately $240,000 he had been getting at the oversight board.

\*\*\*

KPMG had been performing disastrously on inspections conducted by the Public Company Accounting Oversight Board (PCAOB), and it was under pressure to improve. In the annual inspections, the oversight board scrutinizes a sample of the audits that major accounting firms perform on companies listed on U.S. stock markets. Advance word of which audits the PCAOB planned to inspect would give KPMG an edge.

On Sweet's first day at the firm, over lunch at a posh Mediterranean restaurant, KPMG brass pumped him for information on the PCAOB's inspection plans. His second day on the job, in a tête-à-tête in an executive conference room, as Sweet recalled, his boss's boss referred to the uneasiness Sweet had shown divulging such information and told him he needed to remember where his paycheck came from. His fourth day on the job, while Sweet and his new boss, Thomas Whittle, walked back to the office from lunch at a Chinese restaurant, Sweet told Whittle that he knew which audits the oversight board planned to inspect that year—and that he had taken PCAOB documents with him.

That evening, "Thomas Whittle came by my office where I was sitting and he leaned against the door and asked me to give him the list," Sweet testified.

Ties That Bind Brian Sweet was part of a pipeline that funneled confidential information from KPMG's prime regulator to KPMG.

The conspiracy took Washington's notorious revolving door to a criminal extreme. According to the Justice Department, KPMG partners hired PCAOB employees, pumped them for inside information on the oversight board's plans, and then exploited it to cheat on inspections. Meanwhile, PCAOB

> employees angled for jobs at KPMG and divulged regulatory secrets to the audit firm.
>
> The case has led to a series of convictions and guilty pleas— and a $50 million administrative fine against KPMG. It also laid bare inner workings of the revolving door in detail seldom seen.
>
> Beyond the conduct labeled as criminal, in little-noticed testimony the case revealed a series of side contacts between senior KPMG partners and top officials of the PCAOB—one, or in some cases two, members of its five-member governing board. The low-profile meetings at locations such as the Capital Hilton, which is steps from the PCAOB's Washington headquarters, gave KPMG leaders a preview of questioning they would later face at periodic meetings with the full board.

David S. Hilzenrath, *How Accountants Took Washington's Revolving Door to a Criminal Extreme*, PROJECT ON GOVERNMENT OVERSIGHT (POGO), Jan. 14, 2020.   In fact their conduct was criminal involving mail and wire fraud.

418.    On January 22, 2018 the SEC announced:

> ### Six Accountants Charged with Using Leaked Confidential PCAOB Data in Quest to Improve Inspection Results for KPMG
>
> The Securities and Exchange Commission today announced charges against six certified public accountants – including former staffers at the Public Company Accounting Oversight Board (PCAOB) and former senior officials at KPMG LLP – arising from their participation *in a scheme to misappropriate and use confidential information relating to the PCAOB's planned inspections of KPMG*.
>
> ... the former PCAOB officials made unauthorized disclosures of PCAOB plans for inspections of KPMG audits, *enabling the former KPMG partners to analyze and revise audit workpapers in an effort to avoid negative findings by the PCAOB. Two of the former PCAOB officials had left the PCAOB to work at KPMG.* ... *[T]he third official leaked PCAOB data at the time he was seeking employment with KPMG. The three*

*former KPMG partners were all in the firm's national office*.

\*\*\*

"As alleged, these accountants engaged in ***shocking misconduct — literally stealing the exam — in an effort to interfere with the PCAOB's ability to detect audit deficiencies at KPMG***," said Steven Peikin, Co-Director of the SEC's Enforcement Division. "The PCAOB inspections program is meant to assess whether firms are cutting corners, compromising their independence, or otherwise falling short in their responsibilities. The SEC cannot tolerate any scheme to subvert that important process."

\*\*\*

... [W]hile preparing to leave his supervisory position at the PCAOB for a job at KPMG, Brian Sweet downloaded confidential and sensitive inspection-related materials that he believed might help him at KPMG. KPMG had recruited him to join the firm at a time when it had a high rate of audit deficiencies. ***Indeed, nearly half of the KPMG audits that the PCAOB inspected in 2013 were found deficient***.

After leaving the PCAOB, Sweet ... continued to gain access to confidential PCAOB materials through Cynthia Holder, a PCAOB inspector. After Holder joined Sweet at KPMG, a third PCAOB employee, Jeffrey Wada, allegedly leaked confidential information about planned PCAOB inspections of KPMG to Holder. According to the SEC's order, Wada leaked this information while he was seeking employment at KPMG.

... [U]pon his arrival at KPMG, Sweet told his supervisors in KPMG's national office that he had taken confidential materials from the PCAOB and revealed ... the KPMG audit clients that the PCAOB intended to inspect that year. [Those] encouraging Sweet to divulge the stolen information to them and others at the firm were his supervisors – David Middendorf, KPMG's then-national managing partner for audit quality and professional practice and Thomas Whittle, KPMG's then-national partner-in-charge for inspections and another high-level partner at the firm, David Britt, KPMG's banking and capital markets group co-leader. The SEC's Enforcement Division and Office of the Chief Accountant allege that Middendorf, Whittle, Sweet, Holder, and Britt worked ***together to review the audit workpapers for***

*at least seven banks they were told the PCAOB would inspect in an effort to minimize the risk that the PCAOB would find deficiencies in those audits. Middendorf and Whittle allegedly instructed that no one disclose that they had confidential PCAOB information.*

419.    On January 23, 2018, the United States Attorney for the Southern District of New York announced: "*5 Former KPMG Executives and PCAOB Employees Charged in Manhattan Federal Court for Fraudulent Scheme to Steal Valuable and Confidential PCAOB Information and use that Information to Fraudulently Improve KPMG Inspection Results*":

> Geoffrey S. Berman, the United States Attorney for the Southern District of New York... announced the unsealing yesterday of an Indictment in Manhattan federal court charging David Middendorf, Thomas Whittle, and David Britt, former executives of accounting firm KPMG LLP ("KPMG"), Cynthia Holder, a former employee of KPMG and the Public Company Accounting Oversight Board (the "PCAOB"), and Jeffrey Wada, a former employee of the PCAOB, with conspiracy and wire fraud charges in connection with their scheme to defraud the Securities and Exchange Commission (the "SEC") and the PCAOB by obtaining, disseminating, and using confidential lists of which KPMG audits the PCAOB would be reviewing so that KPMG could improve its performance in PCAOB inspections.
>
> *Brian Sweet* [*a KPMG partner*] *pled guilty to conspiracy and wire fraud charges in connection with this scheme* ....
>
> Manhattan U.S. Attorney Geoffrey S. Berman said: "These defendants were each meant to be the watchmen of our financial system.  The defendants who formerly worked for KPMG were vested with the responsibility to audit publicly filed financial statements and issue audit opinions relied upon by the investing public.  The defendants who formerly worked for the PCAOB were supposed to help ensure the quality of the work behind those audits.  But, as alleged, *these defendants chose to cheat the system and to undermine the safeguards put in place to protect investors*."

225

*** 

Inspector-in-Charge Philip R. Bartlett said: "As alleged, the defendants took advantage of confidential information **stolen from the PCAOB and used it to tip off KPMG partners of impending audit inspections**. This undermined the overall integrity of the program. The PCAOB … former employees and KPMG insiders **created their own corruption scandal**.

*** 

In recent years, KPMG fared poorly in PCAOB. At the time, Middendorf was head of KPMG's Department of Professional Practice (the "DPP"), which was broadly responsible for the quality of KPMG's audits and KPMG's performance in PCAOB inspections. Britt was a partner in the audit group within the DPP and Whittle was head of the inspections group within the DPP.

… between 2015 and 2017, Middendorf, Whittle, Britt, Holder, Wada, and Sweet worked to illicitly acquire valuable confidential PCAOB information concerning which KPMG audits would be inspected…

In 2017, a KPMG partner who received early notice that his/her engagement was on the confidential 2017 inspection list reported the matter, as a result of which KPMG's Office of General Counsel launched an internal investigation. **Thereafter**, **Holder and Sweet took a number of steps to destroy or fabricate evidence relevant to the investigation**. **For example, Holder deleted a number of relevant text messages**, **emails**, **and documents**, and said she was going to purchase a "burner phone" so her conversations could not be monitored. Similarly, Sweet **burned evidence of the 2017 inspection list and provided a falsified version of the list to KPMG counsel**.

420.    On March 11, 2019 the United States Attorney's Office for the Southern

District of New York announced:

### Former KPMG Executive and Former PCAOB Employee Convicted of Wire Fraud for Scheme to Steal and Use Confidential PCAOB Information

Geoffrey S. Berman, the United States Attorney for the Southern District of New York, announced that David

Middendorf, who was the National Managing Partner for audit quality at the accounting firm KPMG LLP ("KPMG"), and Jeffrey Wada a former employee of the Public Company Accounting Oversight Board (the "PCAOB"), were convicted of wire fraud charges in connection with their scheme to defraud the PCAOB by obtaining, disseminating, and using confidential lists of which KPMG audits the PCAOB would be reviewing so that KPMG could improve its performance in PCAOB inspections.

\*\*\*

Wada was an Inspections Leader at the PCAOB, who was obligated to keep confidential the PCAOB's nonpublic information. WADA joined the conspiracy in the fall of 2015 and began passing confidential information to KPMG. In March 2016, Wada provided Cynthia Holder, a KPMG employee, with confidential information on certain of the PCAOB's 2016 inspection selections. Holder, in turn, provided the 2016 inspection selections to Sweet, who passed them to Middendorf, Whittle, and others. Middendorf, Whittle, Sweet, and others then **agreed to launch a stealth program to** "**re-review**" **the audits that had been selected, and agreed to keep their stealth re-reviews within their** "**circle of trust**." In order to cover up their illicit conduct, other KPMG engagement partners were given a false explanation for the re-reviews. **The stealth re-review program allowed KPMG to strengthen its work papers**.

In January 2017, Wada, who had been passed over for promotion at the PCAOB, again **stole valuable confidential PCAOB information**, **misappropriating a preliminary list of confidential 2017 inspection selections for KPMG audits and passing it on to Holder**, **referring to it in a voicemail as the** "**grocery list**." At the same time, Wada provided Holder with his resume and sought her assistance in helping him to acquire employment at KPMG. Sweet internally shared the preliminary inspection selections provided by Wada with Whittle, another co-conspirator, who in turn shared it with Middendorf, who approved its use to improve the audits on the list.

421. On April 5, 2022, the PCAOB announced: "**PCAOB Sanctions Former KPMG Vice Chair of Audit for Failure Reasonably to Supervise**, **Imposing**

227

*Largest Individual Penalty Ever in a Settled Proceeding*, **First Time This Type of Disciplinary Action Has Been Taken by the PCAOB**"

> The Public Company Accounting Oversight Board (PCAOB) today announced that it has sanctioned Scott Marcello, CPA, KPMG LLP's former Vice Chair of Audit(PDF), fining him $100,000 and **censuring** him for supervisory failures in connection with KPMG's receipt and use of confidential PCAOB inspection information. ***This is the largest money penalty ever imposed on an individual in a settled case.***

> The PCAOB's order found that Marcello failed reasonably to supervise KPMG personnel who engaged in ***a scheme to illegally obtain and use confidential PCAOB information in an attempt to improve KPMG's PCAOB inspection results***.

> \*\*\*

> The Board found that, among other supervisory failures, Mr. Marcello failed to take appropriate action when he was informed by a subordinate, in early 2016, that personnel under his supervision had obtained highly confidential PCAOB information, which Marcello understood had come from within the PCAOB.

422.    According to a June 17, 2019 *CBS News* report:

> The U.S. Securities and Exchange Commission ... charged accounting firm KPMG with illegally getting sneak peaks at regulators' plans to review its work before making changes to remove potential issues.

> The SEC also alleges KPMG auditors cheated on the auditing firm's training exams, calling its ethical failures "***simply unacceptable***."

> KPMG admitted wrongdoing and will pay a $50 million penalty to settle the charges as the SEC continues to investigate the auditing firm.

423.    Also on June 17, 2019, the SEC announced that

> The SEC ... charged KPMG with altering past audit work after getting stolen information about inspections of the firm to be conducted by [the PCAOB].  The SEC's order also finds that

numerous KPMG audit professionals **cheated on internal training exams** by improperly sharing answers and manipulating test results.

\*\*\*

"***The breadth and seriousness of the misconduct at issue here is, frankly, astonishing***," ***Steven Peikin, co-director of the SEC's Enforcement Division, added. KPMG acknowledged wrongdoing*** ....

424.    According to a June 18, 2018 BBC News report:

KPMG audits had shown an "**unacceptable** Financial Reporting Council said.

Every year the watchdog reviews the audits of Britain's biggest companies to ensure they meet certain standards. The FRC noted problems at all the firms, but KPMG was singled out for the poor quality of its work.

"There has been an unacceptable deterioration in quality at one firm, KPMG," the FRC said in a statement. "50% of KPMG's FTSE 350 audits required more than just limited improvements, compared to 35% in the previous year."

425.    ***This dishonesty is directly related to this case. KPMG's illegal cheating involved audits of Credit Suisse!***

Marketwatch now has court documents that, for the first time, names the audit clients caught up in the scandal. They're mostly financial companies ... [including] Credit Suisse.

\*\*\*

Additionally, "numerous KPMG audit professionals **cheated on internal training exams** by improperly sharing answers and manipulating test results," the SEC said in a statement.

"***The breadth and seriousness of the misconduct at issue here is, frankly, astonishing***," ***Steven Peikin, co-director of the SEC's Enforcement Division added. KPMG acknowledged wrongdoing*** ....

Francine McKenna, *The Auditor of Citi, Credit Suisse, and Deutsche Bank was Tipped Off before Inspection*, MARKETWATCH, June 20,2018.

### C.    KPMG's Long History of Participating in Corporate Accounting Scandals Involving Failed Audits and Destruction of Stock Value

426.    KPMG has a long history of involvement in financial blow ups and accounting scandals that were caused or permitted by their failure to properly perform audits and abandoning its independence by colluding with corporate insiders resulting in shareholders, creditors and others suffering large losses.    KPMG has been repeatedly sued and accused of improper conduct and repeatedly sanctioned, censured and penalized.  It has paid out billions for damage caused by bad audits and has had its partners criminally prosecuted.    Many of the proceedings and events, set out below involve financial institutions/banks and a failure of internal financial and accounting and regulatory and legal compliance controls.

#### 1.    US Criminal Tax Avoidance Scheme

KPMG admitted to *criminal wrongdoing* and agreed to pay $456 million in fines as part of an agreement to defer prosecution of the firm for a massive US tax avoidance fraud scheme in a widespread program managed out of its New York operations to design, market, and implement fraudulent tax shelters for several years.  Six KPMG partners and the former deputy chairman of the firm were criminally prosecuted.

#### 2.    Highest Rate of Audit Deficiencies

According to the PCAOB, KPMG had the highest number of deficiencies, among the Big Four. *Over 50% of the KPMG audits reviewed by the US Regulator were found to be deficient*. *The UK accounting regulator Financial Reporting Council (FRC) criticized KPMG for its "unacceptable" failure to meet required standards in its audits of banks for a third year running. Only 61% of KPMG's audits sampled by the regulator met industry standards*.

#### 3.    Cheating on PCAOB Inspections-Audit Reviews and Training Exams

KPMG was fined a total of $57.7 million by the U.S. SEC for stealing and illicitly using PCAOB data to learn which of their

bank audits would be reviewed by the PCAOB and also separately for cheating on training competency exams. KPMG was forced to terminate five partners in its New York/U.S. audit practice, including the head of its audit practice in the US who had been involved in the Credit Suisse audit, after an investigation of advanced confidential knowledge of planned audit inspections by the PCAOB was confirmed.

The PCAOB fined KPMG $50 million for failing to have proper procedures in place to prevent its auditors from doctoring work papers. It also fined two of its partners and banned them from working for three years, as they were found to have improperly altered documents and violated auditing standards during the firm's audit of the business of an unnamed US-listed company. In addition, inspectors also discovered document alterations to deceive inspectors and blank audit papers. The PCAOB fined the former head of KPMG's US audit practice, Scott Marcello, for having failed to reasonably supervise senior auditors who engaged in the scheme to improve KPMG's inspection results. The PCAOB discovered that over 1,000 KPMG employees cheated on their compliance exams. KPMG agreed to pay US$7.7 million. Criminal prosecutions in the Southern District of New York against top New York-based KPMG and partners resulted.

### 4.    Fines for Lying During UK FRC Investigations

The UK FRC said KPMG and David Costley-Wood, a partner at KPMG, used an "untruthful defence" in an investigation into the sale of Silentnight, Costley-Wood, was barred from practicing for 13 years. KPMG Partner, Stuart Smith, who led the firm's audit of IT company, Regenersis was fined after he admitted misleading its inspectors.

### 5.    FIFA World Soccer Corruption Scandal

KPMG missed vast corrupt throughout the Federation Internationale de Football Association, audited by KPMG's Swiss offices. As a result of this scandal KPMG left the account after issuing 16 years of clean opinions. Over 40 FIFA officials were charged with corruption. FIFA admitted the allegations required FIFA "be externally reviewed" and a new auditor was "***an essential step.***"   "There were sufficient red flags of improper and highly suspicious payments, as well as money transfers to and from officials and others....***that should have caused the auditors to highlight and report on them internally, and recommend further investigation," a former prosecutor said***. "***This is***

*especially the case in light of the recent history of this organization, where recent investigations already had found bribery and corruption activity,"* *he added.*

### 6.    Wells Fargo Customer Products Abuse Scandal

KPMG has admitted it knew of the illicit sales and business practices Wells Fargo – opening over 2 million accounts without customer consent, and forcing auto insurance on customers while not making required refunds to them. The Wall Street Journal asked "Wells Fargo: Where was the Auditor?" This was one of the worst modern banking scandals with ***widespread illegal acts*** by the Bank and scores of its employees. Wells Fargo and KPMG paid $627 million to compensate shareholders for losses. KPMG's share was $37 million.

### 7.    Abraaj Group Scandal – Abu Dhabi Ban on KPMG

KPMG came under criticism for its role in the bankruptcy of Dubai-based private equity firm, Abraaj Group, after it was determined that KPMG Lower Gulf Chairman and CEO Vijay Malhotra's son had worked at Abraaj and an executive named Ashish Dave alternated between stints at KPMG ***and*** as Abraaj's chief financial officer, destroy KPMG's independence.

Two units of Abraaj went into bankruptcy. KPMG was sued because KPMG accountants "failed to maintain independence and an appropriate attitude of professional skepticism," and breached their duty of care when auditing the private-equity firm. Dubai Emirate's financial regulator, Dubai Financial Services Authority fined KPMG and one of its audit employees, for failing to follow audit standards. Then a Dubai court fined KPMG $231 million. The Abu Dhabi Accountability Authority (ADAA) then ***removed KPMG from its list of authorized auditors that can sign off on financial statements.***

### 8.    Suspension from Practice in Oman

Oman's Capital Market Authority suspended KPMG from auditing entities regulated by the OCMA for a year after discovering "major financial and accounting irregularities" in the entities' records, "professional negligence" warranting discipline.

### 9.     General Electric Accounting Scandal

The US SEC determined that General Electric misled investors as to the true nature of its reported operating profits and other misdeeds.  This was one of several GE accounting scandals in recent years.   GE paid almost $2 billion in fines and its stock price declined by 75%. GE's settlement with the SEC includes a $200 million penalty for violation of securities laws related to anti-fraud, reporting, disclosure controls and accounting controls.  The company's longtime CFO, Jeffrey Bornstein, exited the company.     KPMG had been GE's auditor for over 100 years. ***Shareholders voted to oust KPMG, an extraordinary event***. Finance experts called GE a "***bigger fraud than Enron***" – a $38 billion accounting fraud.

### 10.     Xerox Accounting Scandal

KPMG paid $102 million to Xerox shareholders and the US SEC over ***manipulated earnings for aiding and abetting violations of the anti-fraud, recordkeeping and internal controls provisions*** of the federal securities laws and well as failing to disclose known illegal acts. KPMG partners were censured and suspended from SEC practice.

### 11.     Carillion Accounting Scandal

Carillon, a new construction firm, went bankrupt.  The FRC sued KPMG.  KPMG paid over $17 million ***admitting its provided false information to regulators – FRC –*** "***forged***" and "***manufactured***" and missing audit documents requested by the FRC.    FRC said "***the seriousness of the misconduct that we have found proved scarcely needs explanation***.  KPMG's CEO said "***I accept the findings and sanctions in full.***"

### 12.     Siemens and Olympus Bribery Scandals

KPMG ignored questionable payments in the Siemens bribery scandal. Siemens, a NYSE-listed company, paid out over $1.5 billion in bribes over an 11 year period while KPMG was external auditor.  An investigation found KPMG at fault. Siemens paid over $400 million in fines. The Siemens Supervisory Board got rid of KPMG as auditor.  According to an independent panel formed to investigate irregular payments made by Olympus, KPMG's failed identify fraud at that company.

### 13.    VBS Bank Scandal

VBS Mutual Bank went bankrupt as a result of fraud. KPMG – which gave "clean" opinions was sued over its audit on the defunct bank and involvement in the "fraudulent" ransacking of the bank which involved a payoff to a KPMG auditor. The KPMG partners were fired because they were "***complicit" in the fraud***.  A report "The Credit Bank heist" laid out the fraud. According to an investigation "***fraud permeated the regulatory audit.***"

### 14.    Cooperative Bank Scandal

KPMG was ***fined*** $6.5 million by the FRC and ***reprimanded*** for defective audits and misconduct relating to the valuation of Britannia's commercial loans and liabilities. The takeover led to the near collapse of Co-operative Bank.  The KPMG partners involved were ***reprimanded and fined as well***. KPMG ***admitted*** it failed to properly audit the bank.

### 15.    Rite Aid Accounting Scandal

Rite Aid revealed a major accounting fraud – overstating profits by $1.6 billion.  KPMG paid $125 million to settle lawsuits stemming from its failed audits of Rite Aid here in the US.

### 16.    Lear Out & Hauspie Accounting Scandal

KPMG paid $115 million to settle lawsuits here in New York stemming from its failed audits of collapsed software company Lernout & Hauspie, which had overstated profits using improper accounting for years.

### 17.    Oxford Health Accounting Scandal

KPMG paid $75 million to settle lawsuits stemming from the firm's failed audit of Oxford Health Plans, here in the US.

### 18.    BNY Mellon Audit Failure

BNY Mellon was fined over $125 million for failing to keep customer funds safe.  KPMG was fined $4.24 million by the FRC for failing to properly audit customer fund accounts of BNY Mellon.  KPMG ***admitted*** fault.

### 19.    Conviviality Accounting Scandal

234

The FRC investigated KPMG's audit work for Conviviality after the drinks supplier collapsed into bankruptcy. KPMG was fined $6 million for audit deficiencies and given a "***severe reprimand***" as were the partners involved.  The FRC said the ***audit failures were serious and spanned several significant areas***.  KPMG ***admitted*** "our work wasn't good enough.

### 20.    China Medical Accounting Scandal

KPMG was accused of "***appalling***" audit work that allowed China Medical Technologies, to commit a "***brazen***" $400 million accounting fraud, which resulted in the collapse of the company.  ***US prosecutors charged the CEO and CFO with fraud***.  91 partners of KPMG faced contempt proceedings due to a refusal to honor a court order to produce working papers, correspondence, and records.

### 21.    China Forestry Accounting Scandal

KPMG paid $84 million after failing to identify fraud at a Chinese timber company, China Forestry. The liquidators of China Forestry said KPMG was negligent when it ***failed to detect serious false accounting by the company's top management***.

### 22.    Revolution Bars Group Accounting Scandal

The FRC fined KPMG and a top partner $1.4 million for "***serious failings***" in their audits of Revolution Bars Group, issuing a "severe reprimand."

KPMG "accepted" its failures and regretted its work fell short its work fell short of required standards.

### 23.    New Century Accounting Scandal

New Century went bankrupt amid widespread accounting fraud. KPMG ***was*** accused of enabling "improper and imprudent practices" at New Century Financial, a failed mortgage company. A Report by the US DOJ concluded KPMG either "initiated accounting fraud at New Century or stood idly by" as the multi-billion-dollar fraud was committed.  According to the author of the Report in the post Enron era lessons should have been the accountant needed to be skeptical, strong and independent … you didn't have any of those attributes here."  Fraud claims were settled for $120 million with KPMG paying $45 million.

### 24.    South African Corruption Scandals

KPMG paid out $84 million and published an open apology for its participation in various scandals in South Africa, including publishing a misleading report that led to the resignation of the South African Finance Minister, involvement with the Gupta family who have been implicated in corruption scandal with former President, Jacob Zuma. Two KPMG partners resigned after disciplinary charges. Several companies said they were going to drop KPMG as auditor as a result of this scandal.

### 25.    Rolls Royce Accounting Scandal

Rolls Royce was fined over $500 million by the UK's Serious Fraud Office and agreed to a deferred prosecution agreement. The UKFRC, investigated KPMG's audit of Rolls-Royce. KPMG was fined $4 million over "***serious failings*** in its audit of Rolls Royce."    KPMG ***admitted it*** failed to do proper audits.

### 26.    Ted Baker Accounting Scandal

KPMG resigned from the auditor role at fashion firm, Ted Baker after the company admitted overstatement of its inventory by over $60 million.  KPMG was then fined $4 million by the UK FRC for "***breach of ethical standards that lead to the loss of KPMG's independence with respect to the audits***."  KPMG ***admitted*** their "conduct fell significantly short of the standards expected – fundamental requirements of professional competence and due care."

### 27.    Silent Night Misconduct

The UK FRC fined KPMG $15 million because of its "***serious misconduct"*** in the sale of bed company Silentnight. KPMG conspired with a private equity group HIG Capital drive Silentnight into bankruptcy, so that HIG could acquire the company without assuming its large pension liabilities and AIG was fined $30 million. KPMG was "***severely reprimanded"*** for "***deeply troubling***" conduct.  A senior KPMG partner lied to the FRC during the investigation.  He was banned from the profession for 13 years.  He used personal emails for firm work to cover up wrongdoing.

### 28.    Lloyds Syndicate 2018 Scandal

KPMG was fined $8 million by the UKFRC following an investigation into misconduct in the firm's auditing of Lloyds Syndicate 218 after $350 million went missing. KPMG and its partner Mark Taylor were both "***severely reprimanded***" for its audit failures – "***wholly improper***" conduct.

## 29.    Quindell Accounting Scandal

KPMG was fined $5 million for the botched audit of Insurance software firm Quindell.  KPMG admitted the ***deficient*** audit work for Quindell.  Quindell's reported profits of over $90 million – were actually a $75 million loss.

## 30.    Skechers – Herbalife – Insider Trading

The partner in charge of KPMG's Los Angeles audit practice, ***admitted*** passing on stock tips about clients, including Herbalife, Skechers, and other companies, to his friend Bryan Shaw, a California jewelry-store owner. In return Shaw gave London $70,000 as well as gifts that included a $12,000 Rolex watch and concert tickets. Shaw agreed to pleaded guilty. This scandal led KPMG to ***resign as auditor for Herbalife and Skechers.***

## 31.    Miller Energy Audit Failure

KPMG paid $6.2 million to the US SEC for inadequacies in its audit of the financial statements of oil and gas company, Miller Energy Resources.  KPMG and its audit partner did not consider "known acts" that raised serious doubts as to the valuation of corporate assets – allowing assets purchased for $5 million to be presented as worth over $500 hundred million.  The audit partners suspended from SEC practice.

## 32.    1 MDB Malaysia Scandal

The Government of Malaysia and the state sovereign fund, 1MDB sued KPMG and its partners for alleged breaches and negligence linked to a corruption scandal at the fund.  KPMG agreed to pay a fine of $11 million to settle the case.

## XII.   CAUSES OF ACTION

427.   In order to protect Credit Suisse's shareholders wherever they reside or operate, from damage or loss due to the lack of due care, prudence or diligence of Credit Suisse, others involved in the management of the company and the company's external auditors, Swiss law imposes duties on them and provides liability for their negligence, breach of duty, lack of due care or prudence that damages or causes loss to Credit Suisse's shareholders.   New York law provides for subject-matter jurisdiction enforcement of those Swiss law claims "***the same as if a domestic corporation was involved***," ***where***, ***as here***, ***the claims involved the waste***, ***misuse***, ***loss of corporate assets under their management***.   The federal RICO statute is intended to protect United States citizen/residents like plaintiff and other Class members from the kind of criminal misconduct, *i.e.*, RICO predicate acts, by the Credit Suisse entities and KPMG that occurred here in New York, damaging their property or business.   Swiss law contains no provision restricting where a suit such as this can be filed.   Nor does Credit Suisse's corporate charter or articles.

428.   While this complaint pleads conduct by certain individuals or entities employed by or associated with Credit Suisse that amounted to intentional, knowing and even criminal misconduct, the liability standard under Swiss law for the Directors, Officers and others who participated in the management of Credit Suisse is negligence, as is the liability standard for the external auditors.   Both Art. 754 and Art. 755 specify negligence, New York Business Corporation Law § 720 and common law incorporate that same standard.   The claims asserted in this action are not based on fraud or any false and misleading statements by Defendants — but rather negligent actions, inaction or misconduct, often involving bad faith occurring before March 17, 2023.

**CAUSE OF ACTION I**
**AGAINST THE CREDIT SUISSE DEFENDANTS AND KPMG DEFENDANTS**
**FOR BREACHES OF STATUTORY DUTIES TO CREDIT SUISSE'S**
**SHAREHOLDERS UNDER SWISS LAW**

429.    Plaintiff incorporates by reference the allegations set forth above.

430.    The Swiss Code of Obligations/Company Law provides:

> *Art. 716a*
> The board of directors has the following non-transferable and inalienable duties:
>
> The overall management of the company and the issuing of all necessary directives;
> ***
> The organization of the accounting, financial control and financial planning systems as required for management of the company;
>
> The appointment and dismissal of persons entrusted with managing and representing the company;
>
> Overall supervision of the persons entrusted with managing the company, in particular with regard to compliance with the law, articles of association, operational regulations and directives;
> ***
> **Art. 717 Duty of Care and Loyalty**
> The members of the board of directors and third parties engaged in managing the company's business must perform their duties with all due diligence and safeguard the interests of the company in good faith.
>
> **Art. 754 Liability of the Directors and Officers**
> Section 1.  The members of the board of directors and all persons engaged in the management or liquidation of the corporation are liable not only to the corporation, but also to each shareholder and to the corporation's obliges for the damage caused by an intentional or negligent violation of their duties.
>
> **Art. 755 External Auditors' Liability**
> All persons engaged in auditing the annual and consolidated accounts, the company's foundation, a capital increase or a capital reduction are liable both to the company and to the individual shareholders and creditors for the losses arising from any intentional or negligent breach of their duties.

**Art. 759 Joint and Several Liability**
If several persons are liable for a damage, any one of them is jointly and severally liable with the others to the extent the damage is attributable to such person based on his own fault and the circumstances.

431.    The Swiss Code of Obligations also provides:

**Art. 41** - Any person who unlawfully causes damage to another, whether willfully or negligently, is obliged to provide compensation.

*** 

**Art. 42** - Where the exact value of the damage cannot be quantified, the court shall estimate the value at its discretion in the light of the normal course of events and the steps taken by the person suffering damage.

**Art. 50** - Where two or more persons have together caused damage, whether as instigator, perpetrator or accomplice, they are jointly and severally liable to the person suffering damage.

**Art. 55 -** An employer is liable for the damage caused by his employees or ancillary staff in the performance of their work unless he proves that he took all due care to avoid a damage of this type or that the damage would have occurred even if all due care had been taken.

432.    The Credit Suisse Defendants and KPMG acting individually and jointly, and as instigators, perpetrators, accomplices, assistors and abettors, in a civil conspiracy, breached their duties to Credit Suisse's shareholders and under Swiss law, including their duties of due care, diligence, prudence and loyalty, as well as their duty to secure compliance with the Credit Suisse Code of Conduct, Corporate Charter and other requirements.    Defendants participated in the mismanagement of Credit Suisse damaging Credit Suisse's shareholders.

433.    These Defendants violated, and are liable under Swiss Code of Obligations Arts. 716(a), 754, 755 and 759, as well as Arts. 41, 42, 50 and 55.

434.    Credit Suisse shareholders have both been damaged and suffered losses due to the Credit Suisse Defendants and KPMG Defendants' negligence and failures to comply, or enforce compliance, with Credit Suisse's Code of Conduct, and breaches of their duties of due care, diligence, prudence, loyalty, their actions and failures to act were a substantial factor in causing the damages and losses alleged.

435.    Defendants individually and collectively have sufficient assets in the United States that can be reached to satisfy all judgments.  Any insurance coverage of these Defendants or its officers or directors can be reached in the United States.

436.    These Defendants are jointly and severally liable to each Class member for damages in an amount to be proven at trial.

### CAUSE OF ACTION II
### AGAINST THE CREDIT SUISSE DEFENDANTS AND KPMG DEFENDANTS UNDER NEW YORK STATUTORY AND COMMON LAW FOR BREACHES OF DUTIES TO CREDIT SUISSE'S SHAREHOLDERS

437.    Plaintiff incorporates by reference the allegations set forth above.

438.    New York Business Corporation Law § 1317 — Liabilities of Directors and Officers of Foreign Corporations — provides:

> ... [T]he directors and officers of a foreign corporation doing business in this state are subject, to the same extent as directors and officers of a domestic corporation, to the provisions of ... Section 720 (Action against directors and officers for misconduct.)

> ... [A]ny liability [under Section 720] may be enforced in, and such relief granted by, the courts in this state, in the same manner as in the case of a domestic corporation.

439.    New York Business Corporation Law § 720 – *Action Against Directors and Officers for Misconduct — provides*:

(a) An action may be brought against one or more directors or officers of a corporation to procure a judgment for the following relief:

(1) … to compel the defendant to account for his official conduct in the following cases:

(A) The neglect of, or failure to perform, or other violation of his duties in the ***management*** and ***disposition of corporate assets committed to his charge***.

(B) ***The acquisition by himself, transfer to others, loss or waste of corporate assets due to any neglect of, or failure to perform, or other violation of his duties***.

440.    The mismanagement, misuse and loss of corporate assets entrusted the control of to the Credit Suisse Directors and Officers, mis-transferred by them and wasted by them are detailed at Section IX.

441.    Under New York common law, Directors and Officers own fiduciary duties of honesty, prudence and due care directly to shareholders.  Under New York common law, the Credit Suisse Directors and Officers have the same duties as under New York Business Corporation Law § 720.  In violation of these duties, however, the Credit Suisse Directors and Officers aided and abetted and knowingly participated in and furthered their misconduct.

442.    Each Defendant played an important and indispensable part in a concerted, common course of conduct, for their own, and their joint, economic gain.  Defendants worked together, knowing the roles of the others and each taking the specific overt acts alleged within their special areas of expertise, involvement, and knowledge to further the misconduct.  They acted as instigators, perpetrators, accomplice, assistors or abettors, in a civil conspiracy, including mismanagement of Credit Suisse including in the disposition

or transfer of corporate assets for their own personal benefit. Each Defendant profited from participation in the scheme. Their conduct was in bad faith.

443.    Defendants are jointly and severally liable to Class members for damages in an amount to be proven at trial.

## CAUSE OF ACTION III
## AGAINST THE CREDIT SUISSE ENTITY DEFENDANTS AND KPMG UNDER RACKETEERING INFLUENCE AND CORRUPT ORGANIZATIONS ACT — 18 U.S.C. §§ 1962(b), 1964(c)

444.    Plaintiff incorporates by reference the previous allegations set forth above.

445.    To the extent the viability of any part of the RICO causes of action requires pleading a level of intent or knowledgeable misconduct for liability, plaintiff requests that the prior factual allegations be so construed or the purpose of the RICO causes of action. Under such construction, the Credit Suisse Defendants and KPMG Defendants acted willfully, knowingly and intentionally based on the facts pleaded.

446.    The RICO claims are based on the misconduct identified in this cause of action. That misconduct includes repeated violations of the mail, wire and financial institution fraud, visa/immigration and money laundering provisions of United States law. Specifically:

> (a)    Illegal assistance of tax avoidance scandals in the United States/New York including illegally getting Credit Suisse officials into the United States/New York violating visa/passport and immigration laws as well as acts of mail and wire fraud resulting in criminal prosecution in the United States;

(b)    Illegal money laundering, including monetary transfers in avoidance of terrorist sanctions in the United States/New York and to aid in illegal tax avoidance;

(c)    Violations of the Foreign Corrupt Practices Act in the Princelings "pay off" scandal involving acts of mail and wire fraud resulting in criminal prosecution in the Eastern District of New York;

(d)    The Tuna Boat/Bonds scandal resulting criminal prosecutions in New York federal court involving acts of mail and wire fraud;

(e)    Illegal conduct involving mortgage backed "toxic" securities resulting in criminal pleas by Credit Suisse employees, in the Southern District of New York to conduct involving acts of mail and wire fraud;

(f)    Bank and financial institution fraud whereby the Individual Defendants obtained the monies, securities, cash and other payments or property of the financial institution — here, Credit Suisse — by means of a scheme and plan involving false pretenses and fraud involving the use of mail and wire communications;

(g)    Illegal conduct in Forex trading in New York resulting in a $135 million penalty imposed by New York banking regulators involving acts of mail and wire fraud, as well as financial institution fraud; and

(h)    The KPMG criminal proceedings in New York arising from stealing PCAOB's audit lists and destroying and altering KPMG's Credit Suisse audit workpapers involving acts of mail and wire fraud.

447.   The RICO predicate acts include:   Mail Fraud (18 U.S.C. § 1343); Wire Fraud. (18 U.S.C. § 1343); Financial Institution Bank Fraud (18 U.S.C. § 1344); Fraud and Misuse of Visas, Permits and Other Documents (18 U.S.C. § 1546); Money Laundering (18 U.S.C. §§ 1956–1957).  The RICO predicate acts occurred in the United States, impacted foreign and interstate commerce and damaged plaintiff in the United States.

448.   The RICO predicate acts were related and part of a continuing course of conduct permitted by Defendants' mismanagement of Credit Suisse and efforts to cover up, conceal and continue that misconduct for their own personal profit by plundering Credit Suisse assets.   The same conduct was involved — inadequate internal financial/accounting controls and legal/regulatory/compliance controls, which facilitated criminal conduct — acts of mail and bank fraud that damaged Credit Suisse shareholders.  The actors were the same or similar and were all related — Credit Suisse and KPMG and their top Directors and Officers acting in the course of the scope of their employment and an ongoing civil conspiracy.

449.   This misconduct occurred mostly under the direction and domination of Rohner, Tiner and Schwann and their ruling clique and Dougan as the CEO in New York and his team.  It was a continuous wrong and civil conspiracy by many of the same people, for the same purposes, and by the same means going forward. Key participants entered and left, but no one ever blew a whistle or made "noisy" withdrawal. The constant victims of this pattern of misconduct permitted by Defendants' negligent oversight and lack of controls who were damaged as a Credit Suisse's stock declined in price ending up at less than $2.01 per share.  The repeated misconduct, supervisory failures, lack of controls and inadequate oversight in violation of Swiss, United States, and New York law and Credit Suisse's own Code of Conduct continued.  This is the very outcome that honest corporate

directors and officers and who obey the law and corporate codes of conduct and the corporation's independent statutory auditors and consultants and advisors are supposed to identify and prevent.

450.    This RICO cause of action does not rely on or plead any conduct that would have been actionable as the fraud in the purchases or sale of securities because no purchase or sale of securities by plaintiff or Class members is pleaded nor is each purchase or sale necessary for recovery under the first three causes of action.  For the avoidance of doubt, to the extent that any allegation concerns the purchases or sale of securities, plaintiff disavows any such allegations for the purposes of this cause of action.

451.    The RICO enterprise is the Credit Suisse New York-based subsidiaries and the New York-based KPMG sued as defendants — forming the "***Credit Suisse Enterprise***," as the course of misconduct and conspiracy unfolded and continued.  The joint action of Credit Suisse and its external auditor, KPMG, was necessary for the enterprise to exist and act.  They were associated in fact.  Neither could operate without the other.  Credit Suisse could not operate without audited, certified financial statements, assuring adequacy of internal controls and risk management procedures. They were mutually interdependent.  Working together they violated laws and committed RICO predicate acts and obtained billions in revenues for the Credit Suisse Defendants and the KPMG Defendants, personally benefit each of the Defendants.  When KPMG was replaced in 2020, it did not make a "noisy" withdrawal.

452.    The several criminal and other regulatory enforcement proceedings involving Credit Suisse and many of its officers and agents as pleaded below have involved numerous RICO predicate acts that are detailed in the indictments, pleas, pleadings, statements, non-prosecution agreements and press releases issued in connection with

those proceedings. This misconduct as specified in the documents detailed below is incorporated by reference. They detailed numerous RICO predicate acts, including:

- communications mailed or sent by commercial carriers or in wire communications in interstate and foreign commerce to further and execute the ongoing illegal conduct and scheme as pleaded, *i.e.*, mail and wire fraud in violation of 18 U.S.C. §§ 1341, 1343;

- defrauding a financial institution, *i.e.*, Credit Suisse, and misusing its assets to benefit and enrich the involved actors personally by obtaining moneys, funds, assets, or securities of Credit Suisse or under the control of Credit Suisse by way of false or fraudulent pretenses, statements or promises, *i.e.*, their conduct and transactions were lawful, legitimate and complied with Credit Suisse's Code of Conduct — Bank fraud in violation of 18 U.S.C. § 1344;

- financial transactions representing and involving the proceeds of unlawful activity disguised, manipulated or falsified to conceal the nature, location and source or ownership of the proceeds of the unlawful activity and/or to avoid proper reporting of the transaction to federal or state authorities — money laundering in violation of 18 U.S.C. §§ 1956–1957; and

- illegal entry into and illegal presence in the United States and New York in connection with Credit Suisse's illegal conduct here — visa/permits fraud in violation of 18 U.S.C. § 1546.

453. Each of the Credit Suisse Defendants and KPMG Defendants received income directly or indirectly, revenue, income and profits derived from a pattern of racketeering activity involving the Credit Suisse Enterprise, the activities of which affected, interstate and foreign commerce.

454.    Each of the Credit Suisse Individuals and KPMG Defendants were associated with the Credit Suisse Enterprise which was engaged in interstate or foreign commerce, and conducted or participated, directly or indirectly in the conduct of such enterprise's affairs through a pattern of racketeering activity with the corporate officers and directors and accounting firm partners sued all directly benefiting by the waste, loss and mis-transfers of the assets of the financial institution.

## A.    Monetary Transfers Violating Terrorist Sanction Prohibition Scandal

455.    In December 2009, due to misconduct in its New York operations, Credit Suisse entered into criminal pleas and agreements with the U.S. DOJ and the Manhattan D.A. for evading terrorist sanctions via illegal money transfers to Iran, Sudan and others, paying a $536 million penalty, the largest ever imposed for such criminal conduct.  The plea agreements and press releases dated December 16, 2009 detail how Credit Suisse operatives falsified the records of a financial institution" for at least 15 years, while illegally transferring funds.  According to the Manhattan D.A.'s release:

### District Attorney Morgenthau Announces Deferred Prosecution Agreement with Credit Suisse

Manhattan District Attorney Robert M. Morgenthau today announced the resolution of a joint investigation with the U.S. Department of Justice (DOJ) into the criminal conduct of Credit Suisse AG (Credit Suisse), a Swiss bank. Mr. Morgenthau made public a Deferred Prosecution Agreement in which Credit Suisse admitted violating New York State law by ***falsifying the records of a New York financial institutions***.  The scheme enabled Credit Suisse's Iranian, Libyan, Sudanese and other sanctioned clients to access the US financial system in violation of US sanctions ....  ***Credit Suisse admitted violating federal law***.

\*\*\*

From the mid-1990s through 2006, Credit Suisse ***systematically violated*** both New York State and US law by moving hundreds of millions of dollars illegally through

banks in Manhattan on behalf of clients subject to US sanctions. ... Credit Suisse processed over $700 million in payments that violated US sanctions. In addition, Credit Suisse processed over $1.1 billion in payments that were **formatted or manipulated to hide their Iranian origin** .... Further, from 2000 to 2006 ... Credit Suisse Asset Management Group (CSAM), illegally invested over $150 million of funds belonging to a banned Libyan bank and a banned Sudanese bank. CSAM executed trades ... through its accounts at Credit Suisse Securities (USA) in New York **using code names to hide the identities** of the banks.

456.    According to the DOJ December 16, 2009 release:

Credit Suisse AG ... has agreed to forfeit $536 million ... in connection with violations of the International Emergency Economic Powers Act (IEEPA) and New York state law. The forfeiture is the largest ever entered against an entity for IEEPA violations.

The violations relate to transactions Credit Suisse **illegally conducted** on behalf of customers from Iran, Sudan and other countries sanctioned in programs administered by the Department of the Treasury's Office of Foreign Assets Control (OFAC).

A criminal information was filed today in the U.S. District Court for the District of Columbia charging Credit Suisse with one count of violating the IEEPA. **Credit Suisse** ... **accepted and acknowledged responsibility for its criminal conduct**.

*** 

Specifically, according to court documents, Credit Suisse deliberately **removed material information**, **such as customer names**, **bank names and addresses**, **from payment messages so that the wire transfers would pass undetected through filters at U.S. financial institutions**.

"Through its egregious conduct, Credit Suisse illegally moved hundreds of millions of dollars through the American financial system and actively assisted sanctioned countries in evading U.S. laws," said Assistant Attorney General Lanny A. Breuer of the Criminal Division. "In essence, Credit Suisse said to sanctioned entities, 'We've got a service, and that service is helping you evade U.S. banking regulations.'"

249

457.    The specific acts of wire and mail fraud and acts of money laundering involved in these proceedings are further detailed in the United States DOT Settlement Agreement, dated December 16, 2009, the United States Federal Reserve's Order to Cease and Desist dated December 16, 2009; the DOJ Deferred Prosecution Agreement dated December 16, 2009; and the Criminal Information dated December 16, 2009.

**B.    Toxic Securities — "Bags of Shit" and "Complete and Utter Garbage" — Scandal**

458.    In connection with the toxic securities scandal in Credit Suisse's New York investment bank that led billions in losses, penalties and fines there were several criminal proceedings in the Southern District of New York.  For instance, New York-based Credit Suisse bankers Higgs, Seragoldin and Siddiqui pleaded guilty to "***conspiracy to falsify the books and records of the bank***" ***including*** "***wire fraud***."  The plea agreement stated the participants in this conspiracy enriched themselves by creating false documents used to falsify the asset values — mailing them and sending them over the internet, to distort and falsify an important ABX index used by market participants which these actors manipulated and distorted.  *See* June 24, 2014 Release by U.S. Attorney's Office for the Southern District of New York.  The criminal information and indictments of Higgs/Siddiqui in the Southern District of New York, specifies they were accused of and later pleaded guilty to ***wire fraud — specifying several specific acts***.

459.    On November 23, 2013 the U.S. Attorney for the Southern District of New York announced:

**Former Credit Suisse Managing Director Sentenced In Manhattan Federal Court to 30 Months in Prison in Connection with Scheme to Hide Losses in Mortgage-Backed Securities Trading Book**

Preet Bharara, the United States Attorney for the Southern District of New York, announced that KAREEM SERAGELDIN, the former Managing Director/Global Head of Structured Credit in the Investment Banking Division of Credit Suisse Group ("Credit Suisse"), was sentenced today to 30 months in prison in connection with a scheme to hide more than $100 million in losses in a mortgage-backed securities trading book at Credit Suisse. The bonds at issue in Credit Suisse's trading book comprised subprime residential mortgage-backed securities ("RMBS") and commercial mortgage backed securities ("CMBS"). Once discovered, SERAGELDIN's manipulation of these bond prices contributed to Credit Suisse taking a $2.65 billion write-down of its 2007 year-end financial results.

460. Higgs and Siddiqui all pleaded guilty in the Southern District of New York to conduct constituting ***mail and wire fraud***.

461. On January 18,2017, Credit Suisse paid a multi-billion dollar penalty to the U.S. DOJ for violations of federal law arising out of the toxic securities scandal in its New York investment bank.

462. The misconduct and the RICO predicate acts involved are detailed in the DOJ press release dated January 18, 2017, and in the January 18, 2017 Settlement Agreement with the DOJ and Credit Suisse including Annex 1 "Statement of Facts" detailing how these actors defrauded the bank in the scheme and conspiracy – to enrich themselves. This misconduct damaged Credit Suisse shareholders when Credit Suisse was forced to pay additional huge civil penalties, payments and settlements of billions more, as the price of Credit Suisse common stock declined.  This settlement included a statement of facts — acts of mail, wire and bank fraud to which Credit Suisse agreed and which stated:

- Credit Suisse has now acknowledged involved are that in many cases, it purchased and securitized loans into its RMBS that "did not comply with applicable underwriting guidelines and lacked sufficient factors" and/or "w[ere] not originated in

compliance with applicable laws and regulations." Credit Suisse employees even referred to some loans they securitized as "bad loans," "'complete crap' and '[u]tter complete garbage.'"

- A Credit Suisse manager wrote to another manager who was reviewing these loans, "Thanks for working thru this mess. If it helps, it looks like we will make a killing on this trade."

                              ***

- Between 2005 and 2007, Credit Suisse managers made comments in emails about the quality of Conduit loans and its process for reviewing those loans. For example, a top Credit Suisse manager wrote to senior traders, "'Of course we would like higher quality loans. That's never been the identity of our [mortgage] conduit, and we're becoming less and less competitive in that space.'" A senior Credit Suisse trader, discussing the "fulfillment centers" Credit Suisse used to review Conduit loans, stated in an email: 'we make these underwriting exceptions and then we have liability down the road when the loans go bad and people point out that we violated our own guidelines ... The fulfillment process is a joke.'"

                              ***

- Credit Suisse has acknowledged that it also "received reports from vendors that it might have been acquiring and securitizing loans with inflated appraisals" and that its approach for reviewing the property values associated with the mortgage loans "could lead to the acceptance of inflated appraisals." In August 2006, a Credit Suisse manager wrote to two senior traders, "How would investors react if we say that 20 percent of the pool have values off by 15 percent? If we are comfortable buying these loans, we should be comfortable telling investors."

- Credit Suisse has now acknowledged that its "Co-Head of Transaction Management expressed concern that the quality control results could serve as a written record of defects, and sought to avoid documented confirmation of these defects." In May 2007, a top Credit Suisse manager met with others "to discuss implementing this reduction of quality control review." Credit Suisse's Co-Head of Transaction Management wrote that "this change was to 'avoid the previous approach by which a lot of loans were QC'd ... creating a record of possible rep/warrant breaches in deals ....'"

- In another example, in May 2007, a Credit Suisse employee identified two wholesale loans Credit Suisse itself had originated and wrote, "'I would think that we would want to see loans like these that seem to represent confirmed problems, especially on our own originations. Why do we have an appraisal watch list and broker oversight group if we aren't going to review the bad ones and take action appropriately? … I just see so many of these cross my desk, fraud, value, *etc.*, it's hard to just let them go by and not do something.'" Credit Suisse's Co-Head of Transaction Management responded, "'I think the idea is that we don't want to spend a lot of $ to generate a lot of QC results that give us no recourse anyway but generate a lot of negative data, so no need to order QC on each of these loans.'" The employee then stated, "'I think the lack of interest in bad loans is scary.'"

- As another example, in June 2007, a Credit Suisse employee identified 44 Wholesale loans Credit Suisse had itself originated that had gone 60 days delinquent. Credit Suisse's Co-Head of Transaction Management wrote in response, "'if we already know: that the loans aren't performing … the only thing QC will tell us is that there were compliance errors, occupancy misreps *etc.* I think we already know we have systemic problems in FC/UW [fulfillment centers/underwriting] re both compliance and credit. The downside of QC'ing these 44 loans is, after we get the QC results, we will be obligated to repurchase a fair chunk of the loans from deals, assuming the loans are securitized and the QC results look like the QC we've done in the past. So based on a wholesale QC historical fail rate of over 35 percent (major rep defects), the avg bal of wholesale loans and the loss severities, it is reasonable to expect this QC may cost us a few million dollars.'"

- Credit Suisse commented about the mortgage loans that accumulated in its inventory. For example, Credit Suisse's Co-Head of Transaction Management wrote to another Credit Suisse manager that "loans with potential defects 'pile up in inventory … So my theory is: we own the risk 1 way or another …. I am inclined to securitize loans that are close calls or marginally non-compliant, and take the risk that we'll have to repurchase, if we can't put them back, rather than adding to sludge in inventory …' One of the senior traders responded, 'Agree.'" In another instance, a Credit Suisse senior trader commented in 2007 that "'we have almost $2.5B of conduit garbage to still distribute.'" In another instance, a Credit Suisse trader wrote to a top manager, discussing another bank

> to which Credit Suisse was seeking to sell loans from its inventory, and stated, "'[The other bank] again came back with an embarrassing number of diligence kicks this month .... If their results are in any way representative of our compliance with our reps and warrants, we have major problems.'"

463.    This misconduct involved repeated acts of mail and wire communications to participants in the scheme as part of circumventing the bank's own internal procedures and Code of Conduct — in effect defrauding the bank, for their own profit while furthering – executing – the ongoing scheme and civil conspiracy complained of – the mismanagement of Credit Suisse, while plundering it for their own economic benefit and damaging its common shareholders.

## C.    Forex Trading Scandal

464.    On November 13, 2017 the NYDFS fined Credit Suisse $135 million for "unlawful, unsafe and unsound" practices in its FOREX exchange business in New York. According to the NYDFS:

> The violations announced today stem from an investigation by DFS determining that from at least 2008 to 2015, Credit Suisse consistently engaged in *unlawful, unsafe and unsound conduct by failing to implement effective controls over its foreign exchange business.*
>
> \*\*\*
>
> "Certain Credit Suisse executives in the bank's foreign exchange unit deliberately fostered a corrupt culture that failed to implement effective controls in its foreign exchange trading business, which allowed the bank's foreign exchange traders and others to violate New York State law and repeatedly abuse the trust of their customers over the course of many years," said Superintendent Vullo.
>
> \*\*\*
>
> The DFS investigation found that for many years, Credit Suisse foreign exchange traders participated in *multi—party electronic chat rooms*, *where traders*, *sometimes using code names to discreetly share confidential customer information*, *discussed*

*coordinating trading activity and attempted to manipulate currency prices or benchmark rates*. *By improperly working together*, *these traders sought to diminish competition among banks*, *allowing these banks and traders to reap higher profits from the execution of foreign exchange trades at customers*' *expense*. Credit Suisse traders also engaged in improper activity by sharing of confidential customer information, again *enhancing their own profits* ....

*\*\*\**

The DFS investigation also found that front-running – trading ahead of known client orders – was encouraged by executives of eFX, Credit Suisse's electronic trading platform. From at least April 2010 to June 2013, Credit Suisse employed an algorithm designed to front-run clients' limit and stop-loss orders. Credit Suisse programmers designed the algorithm to predict the probability that a client's limit or stop-loss order would be triggered. Credit Suisse traders would apparently enter the market with that information, knowing that the market might move in a specific direction if the stop-loss or limit order was triggered. From April 2010 through June 2013, Credit Suisse executed approximately 31,000 limit orders and 41,000 stop-loss orders that may have been a source of profit through front running. Additionally, because front-running can occur on orders that ultimately remain unfilled, Credit Suisse may have profited as well from front running many tens of thousands of additional client orders.

465.    Again, there were several emails and wire communications involved in furthering and executing this Forex trading misconduct as part of the scheme and conspiracy involving of the mismanagement of Credit Suisse while plundering the bank, enriching themselves and damaging its shareholders.

## D.    United States Tax-Evasion Scandal

466.    Credit Suisse's illegal assistance of tax evasion misconduct in the U.S., which started in 1953 and continued well past 2014, has involved repeated criminal indictments and guilty pleas which involve RICO predicate acts of wire and mail and visa fraud. Between 2011 and 2014 at least eight Credit Suisse bankers were indicted for aiding

255

and abetting U.S. taxpayers in illegal tax evasion.  They pleaded guilty.  The June 22, 2016

DOJ press release for the guilty plea of one of the Credit Suisse bankers lays out the

misconduct those bankers engaged in:

### Former Swiss Banker Pleads Guilty to Conspiring with U.S. Taxpayers and Other Swiss Bankers to Defraud the United States

A former Credit Suisse AG banker... pleaded guilty today in U.S. District Court in the Eastern District of Virginia to charges related to aiding and assisting U.S. taxpayers in evading their income taxes ....

Michele Bergantino, 48 ... pleaded guilty ... to conspiring to defraud the United States by assisting U.S. taxpayers to conceal foreign accounts and evade U.S. tax during his employment as a banker working for Credit Suisse AG on its North American desk.

Bergantino admitted that from 2002 to 2009, while working as a relationship manager for Credit Suisse in Switzerland, he participated in a wide-ranging conspiracy to aid and assist U.S. taxpayers in evading their income taxes by concealing assets and income in secret Swiss bank accounts.  Bergantino oversaw a portfolio of accounts, largely *owned by U.S. taxpayers residing on the West Coast*, which grew to approximately $700 million of assets under management. During his time as a relationship manager, Bergantino assisted many U.S. clients in utilizing their Credit Suisse accounts to evade their U.S. income taxes and to facilitate concealment of the U.S clients' undeclared financial accounts from the U.S. Treasury Department and the Internal Revenue Service (IRS).  Among the steps taken by Bergantino to assist clients in hiding their Swiss accounts were the following: ...withdrawals from their undeclared accounts by sending multiple checks, each in amounts below $10,000, to clients in the United States; facilitating the withdrawal of large sums of cash by U.S. customers from their Credit Suisse ... holding clients' mail from delivery to the United States; issuing withdrawal checks from Credit Suisse's correspondent bank in the United States; and taking actions to remove evidence of a U.S. client's control over an account because the U.S. client intended to file a false and fraudulent income tax return.  Moreover, Bergantino understood that a number of his U.S. clients concealed their ownership and control of

foreign financial accounts by holding those accounts in the names of nominee tax haven entities, or structures, which were frequently created in the form of foreign partnerships, trusts, corporations or foundations.

\*\*\*

Bergantino also admitted traveling to the United States ... to meet with clients, taking careful steps to conceal the purpose of his visits from U.S. law enforcement. ***He used private couriers to send clients' account statements to the U.S. hotels where he stayed, so that he would not be caught traveling with clients' statements in his possession. In addition, Bergantino obtained "travel" account statements for each client he intended to visit which were devoid of Credit Suisse's logo and account or customer identification information and used business cards that Credit Suisse provided that contained only his name and office number and did not carry the Credit Suisse name or logo. On entering the United States, Bergantino provided misleading information regarding the nature and purpose of his visit to U.S. Customs and Border Protection authorities.***

\*\*\*

Two of Bergantino's co-defendants, Andreas Bachmann and Josef Dörig, pleaded guilty to the superseding indictment in 2014 and were sentenced on March 27, 2015. Credit Suisse pleaded guilty in May 2014 for conspiring to aid and assist taxpayers in filing false returns and was sentenced in November 2014 to pay $2.6 billion in fines and restitution.

467. On May 19, 2014 Credit Suisse ***itself*** pleaded guilty to illegal tax evasion assistance and paid a $2.6 billion fine. The DOJ press release and surrounding documents detailed the misconduct of Credit Suisse operations and how they involved acts of mail and wire fraud, visa violations and acts of bank fraud that ended up in huge fines, penalties that caused harm to Credit Suisse that damaged its shareholders due to the horrible reputational harm and big fines which damaged Credit Suisse shareholders by driving the common stock price lower.

468.    According to the DOJ May 19, 2014 release:  Credit Suisse Pleads Guilty to

Aid and Assist U.S. Taxpayers in Filing False Returns

> Credit Suisse AG pleaded guilty today to conspiracy to aid and assist U.S. taxpayers in filing *false income tax returns and other documents with the Internal Revenue Service* (*IRS*).
>
> The plea agreement, along with agreements made with state and federal partners, provides that Credit Suisse will pay a total of $2.6 billion — $1.8 billion to the Department of Justice for the U.S. Treasury, $100 million to the Federal Reserve, and $715 million to the New York State Department of Financial Services .... Earlier this year, Credit Suisse paid approximately $196 million in disgorgement, interest and penalties to the Securities and Exchange Commission (SEC) for violating the federal securities laws by providing cross-border brokerage and investment advisory services to U.S. clients without first registering with the SEC.
>
> \*\*\*
>
> As part of the plea agreement, Credit Suisse acknowledged that, for decades prior to and through 2009, it operated an illegal cross-border banking business that knowingly and willfully aided and assisted thousands of U.S. clients in opening and maintaining undeclared accounts and concealing their offshore assets and income from the IRS.
>
> According to the statement of facts filed with the plea agreement, Credit Suisse employed a variety of means to assist U.S. clients in concealing their undeclared accounts, including by:
>
> - assisting clients in using *sham entities* to hide undeclared accounts;
> - soliciting *IRS forms* that falsely stated, under penalties of perjury, that the sham entities were the beneficial owners of the assets in the accounts;
> - failing to maintain in the United States records related to the accounts;
> - destroying account records sent to the United States for client review;
> - using Credit Suisse managers and employees as unregistered investment advisors on undeclared accounts;

- facilitating withdrawals of funds from the undeclared accounts by either providing hand-delivered cash in the United States or using Credit Suisse's correspondent bank accounts in the United States;
- structuring transfers of funds to evade currency transaction reporting requirements; and
- providing offshore credit and debit cards to repatriate funds in the undeclared accounts.

469. On May 19, 2014 the U.S. Federal Reserve announced: Federal Reserve Board announces Civil Money Penalty and Issues Cease and Desist Order Against Credit Suisse

> The Federal Reserve Board on Monday announced that **Credit Suisse** will pay a $100 million penalty for unsafe and unsound practices and failure to comply with the federal banking laws governing its activities in the United States.
>
> ***
>
> The Board's cease and desist order and assessment of civil money penalty against Credit Suisse, a foreign bank that is subject to the International Banking Act and other U.S. federal banking laws, are based on the institution's inadequate risk-management and compliance program, and its failure to conduct and accurately report to the Federal Reserve the operations of its New York representative office in compliance with U.S. banking laws. These failures contributed to the violation of the International Banking Act, the U.S. income tax laws, and the U.S. securities laws.

470. The Credit Suisse Plea Agreement in Criminal No. 1:14-cr-188 further detailed conduct constituting mail and wire and bank and visa fraud and money laundering, including its attached Statement of Facts.

## E.    Princelings "Pay off" Scandal

471. The Princelings criminal plea/penalty in the Eastern District of New York detailed the mail and wire fraud and bank fraud that are RICO predicate acts. The DOJ July 5, 2018 press release stated that:

- [Credit Suisse] reached a resolution with the Department of Justice and agreed to pay a $47 million criminal penalty for its role in a scheme to corruptly win banking business by awarding employment to friends and family of Chinese officials.

- These 'relationship hires' often lacked necessary technical skills, and offered fewer qualifications and significantly less relevant banking experience than other candidates for the jobs. The Department of Justice remains steadfast in our commitment to combatting bribery and corruption in all its many forms, including where companies engage in corrupt hiring practices to gain the favor of foreign officials to generate improper business advantages and *increase profits*.

- Credit Suisse Hong Kong's practice of employing friends and family members of Chinese government officials as a *quid pro quo* for lucrative business opportunities was both profitable and corrupt[.]

- In related proceedings, Credit Suisse Group AG also settled with the U.S. Securities and Exchange Commission (SEC).  Under the terms of its resolution with the SEC, Credit Suisse Group AG agreed to pay a total of [over $30 million].

## F.    Tuna Boats/Bonds Scandal

472.    Three Credit Suisse bankers and Credit Suisse pleaded guilty to criminal conspiracy in the Eastern District of New York in the Tuna Boats/Bonds scandal, including acts of wire fraud, money laundering and financial institution fraud.

473.    According to the DOJ's October 19, 2021 press release:

### Credit Suisse Resolves Fraudulent Mozambique Loan Case in $547 Million Coordinated Global Resolution

Credit Suisse Group AG, a global financial institution … admitted to defrauding U.S. and international investors in the financing of an $850 million loan for a tuna fishing project in Mozambique, and have been assessed more than $547 million in penalties, fines, and disgorgement as part of coordinated resolutions with criminal and civil authorities in the United States …

"Credit Suisse Group AG, ... defrauded U.S. and international investors ... "Among other things, Credit Suisse Group AG, ... and their co-conspirators deceived investors by hiding information about the risk that loan proceeds were used for illegal purposes in connection with the restructuring of the loan. Today's coordinated resolution with the U.S. Securities and Exchange Commission and the Financial Conduct Authority in the United Kingdom shows that the department will not tolerate fraud by international financial institutions ...."

According to court documents filed today in the U.S. District Court for the Eastern District of New York and statements made during the proceeding, Credit Suisse Group AG entered into a three-year deferred prosecution agreement with the department in connection with a criminal information charging Credit Suisse Group AG **with conspiracy to commit wire fraud** ....

This resolution follows the prior entry of guilty pleas ... Andrew Pearse, ... **pleaded guilty to conspiracy to commit wire fraud**. In September 2019, Surjan Singh, a former managing director of CSSEL, pleaded guilty to conspiracy to commit money laundering, and in May 2019, Detelina Subeva ... **also pleaded guilty to conspiracy to commit money laundering**.

... co-conspirators diverted loan proceeds obtained from investors [they] paid kickbacks of approximately $50 million to [the Credit Suisse bankers] and bribes totaling approximately $150 million ....

Credit Suisse also admitted that it identified significant red flags prior to and during the EMATUM financing. For example, Credit Suisse had learned of significant corruption and bribery concerns associated with the contractor.

474.    In addition, the October 18, 2021 criminal information in *United States v. Credit Suisse Securities (Europe) Ltd.*, Cr. No. 21-520 (WFK) (E.D.N.Y.) (18 U.S.C. § 981(a)(1)(c), 1349 and 355 *et seq.*; 21 U.S.C. § 853, 8 U.S.C. § 2461(c)), the October 19, 2021 Plea Agreement and the October 19, 2021 Deferred Prosecution Agreement detail the repeated acts of wire fraud and money laundering committed by Credit Suisse and its officials who all pleaded guilty.

261

475.    Even though in some of those cases the actual crime admitted to was not wire, mail or bank fraud or money laundering the actual underlying conduct/acts committed and admitted to constitutional were wire, mail or bank fraud and money laundering, *i.e.*, RICO predicate acts.

476.    The letter agreement between Credit Suisse's New York-based counsel and the DOJ and the attached Statement of Facts in the Princelings scandal admit many of the RICO predicate acts involved in the Princelings criminal conduct and pleas.

477.    During most, if not all, of the U.S./New York federal and state criminal, *quasi*-criminal and regulatory proceedings Credit Suisse was represented by its New York-based counsel (which negotiated on behalf of Credit Suisse and made binding admissions of illegal conduct and legal violations).  The firm and its lawyers are important witnesses to provide live testimony, as well as documents in their custody, in these matters.

## G.    Financial Institution Bank Fraud

478.    The Credit Suisse Individual Defendants received millions of shares of Credit Suisse stock as part of their unjustified, indeed illegal, lavish compensation, as well as part of looting and plundering the bank, abuse their control of its assets, monies and securities.  For example, the following two charts (reported in Credit Suisse's 2015 Annual Report) reflect the compensation received by the Directors and Officers in year 2015:

## Board compensation for 2015 (audited)

| in | Base board fee | Committee fee | Chair fees | Subsidiary board fees | Total compensation [1] | Awarded in cash | % of total compensation | Awarded in Group shares [2] | % of total compensation |
|---|---|---|---|---|---|---|---|---|---|
| **2015 (CHF)** | | | | | | | | | |
| Urs Rohner, Chairman [3] | 3,000,000 | – | – | – | 3,225,956 | 3,225,956 | 100% | – | 0% |
| Jassim Bin Hamad J.J. Al Thani [4] | 250,000 | – | – | – | 250,000 | 125,000 | 50% | 125,000 | 50% |
| Iris Bohnet [4, 5] | 250,000 | 100,000 | – | – | 369,783 | 194,783 | 53% | 175,000 | 47% |
| Noreen Doyle [4, 6] | 250,000 | 250,000 | – | 280,000 | 780,000 | 530,000 | 68% | 250,000 | 32% |
| Andreas N. Koopmann [4] | 250,000 | 200,000 | – | – | 450,000 | 225,000 | 50% | 225,000 | 50% |
| Jean Lanier, Chairman of the Compensation Committee [4, 7] | 250,000 | 200,000 | 200,000 | – | 650,000 | 325,000 | 50% | 325,000 | 50% |
| Sereina Maag [4] | 250,000 | 150,000 | – | – | 400,000 | 200,000 | 50% | 200,000 | 50% |
| Kai S. Nargolwala [4] | 250,000 | 200,000 | – | – | 450,000 | 225,000 | 50% | 225,000 | 50% |
| Severin Schwan [4] | 250,000 | 100,000 | – | – | 350,000 | 175,000 | 50% | 175,000 | 50% |
| Richard E. Thornburgh, Chairman of the Risk Committee [4, 8] | 250,000 | 350,000 | 583,333 | 116,667 | 1,300,000 | 708,333 | 54% | 591,667 | 46% |
| Sebastian Thrun [4] | 250,000 | 100,000 | – | – | 350,000 | 175,000 | 50% | 175,000 | 50% |
| John Tiner, Chairman of the Audit Committee [4, 8] | 250,000 | 350,000 | 641,667 | 58,333 | 1,300,000 | 679,167 | 52% | 620,833 | 48% |
| **Total** | 5,750,000 | 2,000,000 | 1,425,000 | 455,000 | 9,875,739 | 6,788,239 | 69% | 3,087,500 | 31% |

[The remainder of this page is deliberately left blank.]

## Executive Board holdings and values of deferred share-based awards by individual

| end of | Number of owned shares [1] | Number of unvested share awards | Number of owned shares and unvested share awards | Value of unvested awards at grant (CHF) | Value of unvested awards as of December 31 (CHF) |
|---|---|---|---|---|---|
| **2015** | | | | | |
| Tidjane Thiam | – | 677,368 | 677,368 | 14,322,470 | 14,692,112 |
| James L. Amine | 118,982 | 601,098 | 720,080 | 13,448,466 | 13,037,816 |
| Pierre-Olivier Bouée | – | 73,307 | 73,307 | 1,885,249 | 1,590,029 |
| Romeo Cerutti | 219,539 | 122,417 | 341,956 | 2,727,390 | 2,655,225 |
| Peter Goerke | – | 79,034 | 79,034 | 1,843,536 | 1,714,247 |
| Thomas Gottstein | – | 98,344 | 98,344 | 2,174,771 | 2,133,081 |
| Iqbal Khan | 13,358 | 99,516 | 112,874 | 2,098,706 | 2,158,502 |
| David R. Mathers | 35,063 | 215,170 | 250,233 | 4,793,822 | 4,667,037 |
| Joachim Oechslin | 17,099 | 97,982 | 115,081 | 2,124,889 | 2,125,230 |
| Timothy P. O'Hara | 29,079 | 579,567 | 608,646 | 13,521,795 | 12,570,808 |
| Helman Sitohang | 5,992 | 406,124 | 412,116 | 9,145,242 | 8,808,830 |
| Lara Warner | 29,313 | 158,244 | 187,557 | 3,658,283 | 3,432,312 |
| **Total** | 468,425 | 3,208,171 | 3,676,596 | 71,744,619 | 69,585,229 |
| **2014** | | | | | |
| Brady W. Dougan | 641,334 | 326,139 | 967,473 | 8,074,202 | 8,179,566 |
| James L. Amine | 79,131 | 522,755 | 601,886 | 13,505,094 | 13,110,695 |
| Gaël de Boissard | 249,617 | 506,289 | 755,906 | 13,485,853 | 12,697,728 |
| Romeo Cerutti | 96,887 | 169,842 | 266,729 | 4,158,932 | 4,259,637 |
| David R. Mathers | 32,146 | 287,055 | 319,201 | 7,031,063 | 7,198,339 |
| Hans-Ulrich Meister | 318,484 | 321,385 | 639,869 | 7,948,267 | 8,060,336 |
| Joachim Oechslin | – | 64,060 | 64,060 | 1,595,094 | 1,606,625 |
| Timothy P. O'Hara | – | 664,016 | 664,016 | 17,154,283 | 16,653,521 |
| Robert S. Shafir | 617,053 | 386,794 | 1,003,847 | 9,439,287 | 9,700,794 |
| Pamela A. Thomas-Graham | – | 158,139 | 158,139 | 3,857,930 | 3,966,126 |
| **Total** | 2,034,652 | 3,406,474 | 5,441,126 | 86,250,005 | 85,434,367 |

[1] Includes shares that were initially granted as deferred compensation and have vested.

263

479.    According to Credit Suisse, the Directors and Offers were given the option of receiving cash for their "share-based awards":

> The terms of all past and future share-based awards granted to the Executive Board were amended in 2014 to enable election of settlement in cash or shares. The Executive Board members are permitted to elect, at a predefined date in advance of settlement, to receive their vested share-based awards in the form of shares, cash or 50% in the form of shares and 50% in cash, in each case based on the Group share price at the time of settlement. An election to receive cash is subject to reversal if at the time of settlement the Group share price is less than 75% of the share price at the time of election. The timing and pricing of settlement will be the same as under the previous award plan and as under the plans of the non-Executive Board population. This change does not affect deferred share-based awards granted to non-Executive Board members as of December 31, 2015, which will continue to be settled in the form of Group shares.

480.    The Credit Suisse Directors and Officers including those named as defendants here received a substantial amount of their compensation in the form of Credit Suisse securities, *i.e.*, common stock awards. They obtained ownership and control of these securities through fraudulent pretenses and associated acts of mail and wire fraud. They obtained the securities under the false pretense that their conduct and the transactions they approved were both legitimate and legal and conformed with the Credit Suisse Code of Conduct which applied to each of them. As part of their scheme to profit personally via the wrongdoing they were engaged in, virtually all of these shares were sold into the marketplace or back to Credit Suisse by the individuals involved. There were millions of shares awarded, of which 100% of those that vested were sold off for cash — in large part because these insiders knew Credit Suisse was being mismanaged and was operating illegally and, as a consequence, its common stock was going to be worth less in the future.

481.    According to Credit Suisse, between January 1, 2008 and March 17, 2023, members of Credit Suisse's Board of Directors and Executive Board sold a total of 8,632,827 shares of Credit Suisse shares at an average price of $30.91 per share ($28.90 higher than the price of $2.01 on March 17, 2023), receiving over $266,817,032.19 in proceeds, via financial institution fraud.

482.    There were hundreds of individual sales, necessitating wire communications, wire transfers of proceeds and the like, by which these Defendants illegally obtained the securities and cash of the bank — financial institution — bank fraud.

483.    Each of the Credit Suisse cases in the United States and New York listed above involved a financial institution and illegal receipt of the moneys, funds, assets, securities owned by or under the control or contract of the financial institution by means of false pretenses, representations, and promises to enrich themselves.  In doing so, Defendants also committed acts of wire and mail fraud.

## H.    KPMG/Credit Suisse "Steal the List"

484.    Key to the ongoing illegal course of conduct and conspiracy alleged was KPMG "stealing the list" of KPMG audits to be reviewed by the PCAOB so KPMG could destroy and alter the audit workpapers of those audits to "dress up" the involved audits to pass inspection.  Having stolen the list of KPMG audits to be reviewed, KPMG and its partners learned Credit Suisse was on the list, secretly illegally altered the Credit Suisse audit workpapers to cover up the deficiencies as to internal accounting/financial and regulatory/legal compliance controls and risk management procedures.  This avoided having the PCAOB discover the deficiencies, disclose KPMG's deficient Credit Suisse audits and publicize its findings, which would have exposed the deficient audit ***and***

deficient controls, which would have disrupted the ongoing misconduct/conspiracy, avoiding or ameliorating the damage to the common shareholders.

485.    The guilty pleas and DOJ releases regarding these criminal cases all detail, **_repeated acts of wire and mail fraud_**.  In addition to what is pleaded in Section XI.B., two opinions of United States District Judge J. Paul Oetken dated July 17, 2008 and September 9, 2019 upholding the criminal convictions of Middendorf and Wada go into great detail as to the acts of wire/mail fraud involved and found sufficient to support their convictions of the same.

486.    As a direct and proximate result of Defendants' racketeering activities and violations of 18 U.S.C. § 1962(c), plaintiff and the Class have been injured in their business and property.

**CAUSE OF ACTION IV**
**AGAINST THE CREDIT SUISSE ENTITY DEFENDANTS AND KPMG UNDER RACKETEERING INFLUENCE AND CORRUPT ORGANIZATIONS ACT —**
**18 U.S.C. §§ 1962(d), 1964(c)**

487.    Plaintiff incorporates by reference the previous allegations set forth above.

488.    The heart of a RICO case is the existence of a pattern of racketeering activity. Under the statute, "racketeering activity" includes a host of offenses.

489.    Among other things, "racketeering activities" include "any act which is indictable under" a list of federal criminal statutes. The list covers an expansive range of violations, for example, 18 U.S.C. §§ 1341 (mail fraud) and 1343 (wire fraud); 18 U.S.C. §§ 1956, 1957 (money laundering); 18 U.S.C. § 1546 (visa fraud), and 18 U.S.C. §§ 2318–2320 (copyright infringement), all were "indictable" and each of which had a nexus to interstate or foreign commerce.

490.    Each Defendant is a RICO person as each is "an individual or entity capable of holding a legal or beneficial interest in property," natural persons, corporations or partnerships.

491.    Plaintiff alleges that Defendants conducted the affairs of an enterprise though a pattern of racketeering activity.  The persons and the enterprise are distinct.

492.    A RICO enterprise includes "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." The definition captures both legitimate and illegitimate enterprises.  The RICO enterprise is defined above.

493.    A "pattern" exists where any combination of two or more predicate offenses occurred, and there is "continuity plus relationship" the conduct be "ordered" or arranged, as is alleged above.

494.    As alleged here, the "indictable acts" and conduct pleaded here forms a pattern as it embraces criminal acts that had the same or similar purposes, results, participants, victims or methods of commission, or were otherwise interrelated and not isolated events."

495.    The racketeering acts are related to the affairs of the Credit Suisse enterprise in that: (1) the racketeering acts furthered the goals of or benefitted the enterprise,  (2) the enterprise or each defendant's role in the enterprise enabled Defendants to commit, or facilitated the commission of, the racketeering acts,  (3) the racketeering acts were committed at the behest of, or on behalf of, the enterprise,  or (4) the racketeering acts had the same or similar purposes, results, participants, victims or methods of commission.

496.    Continuity is pleaded here. The predicate acts were a regular way of conducting the defendant's ongoing legitimate business — in the sense that it is not a business that exists for criminal purposes.

497.    The Supreme Court has held:

> A conspiracy may exist even if a conspirator does not agree to commit or facilitate each and every part of the substantive offense. The partners in the criminal plan must agree to pursue the same criminal objective and may divide up the work, yet each is responsible for the acts of each other. If conspirators have a plan which calls for some conspirators to perpetrate the crime and others to provide support, the supporters are as guilty as the perpetrators.
>
> ***
>
> A conspirator must intend to further an endeavor which, if completed, would satisfy all of the elements of a substantive criminal offense, but it suffices that he adopt the goal of furthering or facilitating the criminal endeavor. He may do so in any number of ways short of agreeing to undertake all of the acts necessary for the crime's completion. One can be a conspirator by agreeing to facilitate only some of the acts leading to the substantive offense. It is elementary that a conspiracy may exist and be punished whether or not the substantive crime ensues, for the conspiracy is a distinct evil, dangerous to the public, and so punishable in itself.

*Salinas v. United States*, 522 U.S. 52, 63–65 (1997).

498.    Plaintiff pleads below the following elements:

- Existence of an enterprise;

- The enterprise engaged in, or its activities affected, interstate or foreign commerce;

- Each defendant was employed by or was associated with the enterprise;

- Each defendant conducted or participated, either directly or indirectly, in the conduct of the affairs of the enterprise;

- Each defendant participated in the affairs of the enterprise through a pattern of racketeering activity; and

- Each Defendant conspired to commit the substantive RICO offenses alleged.

499.    As a direct and proximate result of Defendants' racketeering activities and violations of 18 U.S.C. § 1962(d), plaintiff and the Class have been injured in their business and property.

## XIII.    PRAYER FOR RELIEF

WHEREFORE, plaintiff, on behalf the Class members, demands judgment as follows:

A.    Declaring that plaintiff may maintain this action on behalf of the Class;

B.    Declaring that the Credit Suisse Defendants and KPMG Defendants have breached their respective duties to Credit Suisse's shareholders;

C.    Determining and awarding to Class members the damages/losses sustained by each of them, including treble damages as a result of the violations set forth above from the Credit Suisse Defendants and the KPMG Defendants, individually, jointly and severally, together with interest thereon, as appropriate under the law;

D.    Ordering a full accounting of all (1) compensation, bonuses, stock awards, options, and sales proceeds, fees, pensions or other payments to the Credit Suisse Individual Defendants and all fees paid to the KPMG Defendants in connection with, and while they participated in, the Credit Suisse audits; (2) all fines, payments, settlements, legal and accounting fees and the like paid by Credit Suisse as a result of public or private lawsuits or proceedings, or legal or regulatory violations; and (3) imposing a constructive trust upon and ordering the recapture and disgorgement of all such monies and benefits, and directing that they be used to pay the Class members' damages;

E.    Exercising the Court's equity power to (1) set aside and recapture such waste of assets and excessive/improper payments; (2) fashion such relief as is justified and necessary to benefit Credit Suisse's shareholders for the damages/losses suffered; and (3) ensure that the Credit Suisse Individual Defendants and KPMG are stripped of all improper or illegal economic gains and benefits obtained by them during their course of misconduct and violations of their duties;

F.    Awarding plaintiff's counsel reasonable attorneys' fees and expenses in addition to and on top of damages;

G.    Awarding plaintiff an appropriate incentive award for having the courage and initiative to bring this action to benefit Credit Suisse's shareholders, to be paid out of the recovery; and

H.    Granting such other relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all issues so triable.

Dated: May 28, 2023

Respectfully submitted,

BOTTINI & BOTTINI, INC.
Francis A. Bottini, Jr.
(*pro hac vice* to be submitted)
Michelle C. Lerach
(*pro hac vice* to be submitted)
Albert Y. Chang

s/ Albert Y. Chang
Albert Y. Chang

7817 Ivanhoe Avenue, Suite 102
La Jolla, California 92037
Telephone:  (858) 914-2001
Facsimile:   (858) 914-2002
fbottini@bottinilaw.com
mlerach@bottinilaw.com
achang@bottinilaw.com

*Attorneys for Plaintiff*
*Gregory A. Stevenson*